**RJN 2** – Research Article: Timothy H. Fine, Misuse and Antitrust Defenses to Copyright Infringement Actions, 17 Hastings L.J. 315 (1965).

## Hastings Law Journal

Volume 17 | Issue 2                                                                    Article 8

1-1965

# Misuse and Antitrust Defenses to Copyright Infringement Actions

Timothy H. Fine

Follow this and additional works at: https://repository.uchastings.edu/hastings_law_journal

Part of the Law Commons

### Recommended Citation

Timothy H. Fine, *Misuse and Antitrust Defenses to Copyright Infringement Actions*, 17 Hastings L.J. 315 (1965).
Available at: https://repository.uchastings.edu/hastings_law_journal/vol17/iss2/8

This Article is brought to you for free and open access by the Law Journals at UC Hastings Scholarship Repository. It has been accepted for inclusion in Hastings Law Journal by an authorized editor of UC Hastings Scholarship Repository.

# Misuse and Antitrust Defenses to Copyright Infringement Actions

### By Timothy H. Fine[*]

SHOULD a court of equity lend its aid to protect the copyright owner's monopoly when he is using it to suppress competition in violation of the federal antitrust laws[1] or is otherwise misusing it?

This question has not been answered by the United States Supreme Court, even though it has been twenty-four years since the Court enunciated the patent misuse doctrine in *Morton Salt Co. v. G. S. Suppiger Co.*,[2] wherein the Court held that a patentee who utilized his patent to gain economic control over unpatented products would be denied all relief against infringement of his patent. In light of later Supreme Court decisions,[3] holding that a refusal by the copyright owner to license one or more of his copyrighted products unless the licensee accepted another copyrighted product is a violation of the Sherman Anti-Trust Act, it appears that the doctrine of *Morton Salt* is fully applicable to copyright infringement actions. However, two other Court decisions,[4] subsequent to *Morton Salt*, have upheld the denial of the defense of antitrust violations in actions not involving patent, trademark, or copyright infringements, and those decisions have been relied upon by lower courts to deny the defense of antitrust violations to a copyright infringement action.[5]

Whether the patent misuse doctrine should be extended to cover

---

[*] B.E.E., 1959, University of Virginia; M.S.E.E., 1962, University of Southern California; LL.B., 1965, University of California, Berkeley; Law Clerk to U.S. District Judge William T. Sweigert; Member, San Francisco Bar.

[1] The Clayton Act § 1, 38 Stat. 730 (1914), 15 U.S.C. § 12 (1964) defines antitrust laws as: The Sherman Anti-Trust Act, 26 Stat. 209 (1890), 15 U.S.C. §§ 1-7 (1964); Wilson Tariff Act §§ 73-77, 28 Stat. 570 (1894), as amended, 15 U.S.C. §§ 8-11 (1964); and the Clayton Act, 38 Stat. 730 (1914), as amended, 15 U.S.C. §§ 12, 13, 14-27 (1964).

[2] 314 U.S. 488 (1942).

[3] United States v. Loew's Inc., 371 U.S. 38 (1962); United States v. Paramount Pictures, Inc., 334 U.S. 131 (1948).

[4] Kelly v. Kosuga, 358 U.S. 516 (1959); Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743 (1947).

[5] Alfred Bell & Co. Ltd. v. Catalda Fine Arts, Inc., 74 F Supp. 973 (S.D.N.Y. 1947), aff'd, 191 F.2d 99 (2d Cir. 1951). See also Peter Pan Fabrics, Inc. v. Candy Frocks, Inc., 187 F. Supp. 334 (S.D.N.Y. 1960).

[315]

a copyright infringement action or whether the less restricted bar of "unclean hands"[6] should continue to be the test, requires an understanding of both the patent misuse doctrine and the defense of antitrust violations in civil actions where infringement is not involved. Then, upon examination of the public policy underlying the grant of a copyright monopoly, it will be possible to make some determination as to whether the patent misuse doctrine should apply to a copyright infringement action.

## The Patent Misuse Doctrine

Prior to the *Morton Salt Co.* case, it was generally believed that a violation of the antitrust laws by the patent owner in the use of his patent was not a proper defense to an infringement action upon that patent.[7] The underlying rationale was aptly expressed: "There is no law that one who restrains trade forfeits one's property to any person who chooses to take it."[8]

However, if the defendant charged with infringement could show that the plaintiff had come into court with unclean hands, the court might deny plaintiff the relief he sought.[9] In application, the doctrine of unclean hands was very limited, particularly in cases where the plaintiff was violating the antitrust laws in the use of his patent.[10] The doctrine was applicable only in cases where the plaintiff's unconscionable conduct was directly connected with the subject matter of the suit.[11] As stated by the Court in *Keystone Driller Co. v. General Excavator Co.*:[12]

> But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some un-

---

[6] "It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court." STORY, EQUITY JURISPRUDENCE § 98 (14th ed. 1918).

[7] 2 WALKER, PATENTS § 409 (Deller ed. 1937).

[8] Radio Corp. of America v. Hygrade Sylvania Corp., 10 F Supp. 879, 883 (D.N.J. 1934).

[9] Keystone Driller Co. v. General Excavator Co., 290 U.S. 240 (1933).

[10] See F.A.D. Andrea, Inc. v. Radio Corp. of America, 14 F Supp. 226 (D. Del. 1936); Radio Corp. of America v. Hygrade Sylvania Corp., 10 F. Supp. 879 (D.N.J. 1934); General Electric Co. v. Minneapolis Lamp Co., 10 F.2d 851 (D. Minn. 1924).

[11] See cases cited note 10 *supra.*

[12] 290 U.S. 240, 245 (1933). As to the status of the doctrine today, see Gaudiosi v. Mellon, 269 F.2d 873, 881-82 (3d Cir. 1959), *cert. denied*, 361 U.S. 902 (1959).

conscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.

In *Morton Salt* the Court sounded the death knell for the patentee's double standard. No longer could the patent owner enter into various unlawful agreements to restrain trade by the use of his patent and at the same time expect the courts to enforce his patent rights against infringers. In effect, the Court adopted a prophylactic rule to prevent the patent owner from engaging in unlawful conduct with his patent.

In *Morton Salt* the petitioner was manufacturing and leasing salt depositing machines which respondent claimed directly infringed its patent. Respondent, on the other hand, leased its patented salt depositing machines under licenses which required the licensees to use the respondent's unpatented salt tablets with its machines. Previously, the Court had held that the patent owner could not bring an infringment suit against a licensee who had violated a condition of the license by using with the patented machine an unpatented article.[13] In 1931, the Court had held that it was an illegitimate extension of the patent monopoly for a patent owner to exclude others from supplying unpatented materials for use in its patented invention.[14]

In *Morton Salt*, however, petitioner was not being sued for supplying the unpatented salt tablets, nor was petitioner one of respondent's licensees. Petitioner was being sued for direct infringement of respondent's patented salt depositing machine. In reversing, the Court took notice of the unclean hands doctrine and respondent's argument that the doctrine should not apply here because the wrongful conduct was not a part of the subject matter between the parties.[15] While the decision mentioned the unclean hands doctrine, its real basis was the nature of the right sought to be enforced. The Court stated in answer to respondent's unclean hands argument: "[A]dditional considerations must be taken into account where maintenance of the suit concerns the public interest as well as the private interests of suitors."[16]

---

[13] Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502 (1917).
[14] Carbice Corp. of America v. American Patents Dev. Corp., 283 U.S. 27 (1931).
[15] 314 U.S. at 492-93.
[16] *Id.* at 493.

These additional considerations were: (1) "[T]he public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention."[17] (2) Public policy "forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office."[18] (3) "[T]he adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct          "[19]

The particular misuse which the Court found to justify the denial of relief in *Morton Salt* was tying the patent monopoly to unpatented products. While the Clayton Act prohibits tying clauses,[20] the Court has preferred to rest its decisions holding that the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying the invention on the ground that this constitutes an illegitimate extension of the patent monopoly granted to the inventor by the Constitution[21] and laws[22] of the United States.[23] Thus, the concept of patent misuse relates to the unlawful expansion of the patent monopoly, and while this may constitute antitrust violations, it is peculiarly a question of patent law

The relevance of the patent misuse doctrine to the copyright field is quite apparent. Both the grant to the inventor of a patent monopoly and the grant to the author of a copyright monopoly are special privileges designed to carry out the public policy adopted by the Constitution and statutes of the United States.[24]

Throughout the *Morton Salt* opinion, reference is made to two

---

[17] *Id.* at 492.

[18] *Ibid.*

[19] *Id.* at 494.

[20] Clayton Act § 3, 38 Stat. 731 (1914), 15 U.S.C. § 14 (1964) condemns tying clauses for the lease or sale of goods, wares, merchandise, machinery, supplies or other commodities "whether *patented* or unpatented          " (Emphasis added.)

[21] U.S. CONST. art. I, § 8.

[22] Patent Act of 1952, ch. 950, 66 Stat. 792-814 (codified in scattered sections of 35 U.S.C.).

[23] Motion Picture Patents Co. v. Universal Film Mfg., Co., 243 U.S. 502 (1917). In the Court of Appeals, the ground for denying relief was that the license restriction came within the prohibition of the Clayton Act. Motion Picture Patents Co. v. Universal Film Mfg. Co., 235 Fed. 398 (2d Cir. 1916). *Accord*, Carbice Corp. of America v. American Patents Dev. Corp., 283 U.S. 27 (1931). Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661 (1944) held that it was an unlawful expansion of the patent monopoly to protect the unpatented part of a combination patent from competition.

[24] Constitution and statutes cited notes 21 and 22 *supra. But cf.* Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 346 (1908)· "There are such wide differences between the right of multiplying and vending copies of a production protected by the copyright statute and the rights secured to an inventor under the patent statutes, that the cases which relate to the one subject are not altogether controlling as to the other." (dictum).

types of copyright cases: (1) cases where relief for copyright infringe-
ment was denied because of inequitable conduct on the part of plain-
tiff copyright owner[25] and (2) cases involving a use of the copyright
which was held to be in restraint of trade and not within the protec-
tion of the copyright monopoly, but which did not involve an action
for copyright infringement.[26] With regard to the former, the Court
stated:

> Similarly equity will deny relief for infringement of a trademark
> where the plaintiff is misrepresenting to the public the nature of his
> product either by the trademark itself or by his label   see also,
> for application of the like doctrine in the case of copyright, *Edward
> Thompson Co. v. American Law Book Co.*, 122 F  922, 926; *Stone
> & M'Carrick [Inc.] v. Dugan Piano Co.*, 220 F  837, 841-43.[27]

In the *Edward Thompson* case,[28] the plaintiff charged defendant
with infringement of its copyright on an encyclopedia. Defendant
denied that it had infringed and as an affirmative defense asserted
that plaintiff's editors in preparing the encyclopedia had pirated para-
graphs and syllabi from the copyrighted works of others. The court
held that defendant had not infringed plaintiff's copyright and, in
addition, stated: "But if it were piracy in one it was piracy in the
other and a literary pirate is not entitled to consideration in a court
of equity     An author who has pirated a large part of his work
from others is not entitled to have his copyright protected."[29]

In *Stone & M'Carrick*[30] the plaintiff sought to prevent infringe-
ment of the copyright on its book containing forms of advertising. The
defendant moved to dismiss on the ground that the advertisements
were not copyrightable under the law  The court affirmed the dis-
missal of the action on the grounds that the book of advertising forms
was not copyrightable and that it was not entitled to the protection of a
court of equity  On the latter point the court stated:

> But advertisements by dealers of their wares, in order to insure the
> protection of the law, should reflect the truth and avoid representa-
> tions which mislead and deceive the people. If their tendency be
> misleading and deceptive, they will find the doors of a court of equity
> barred against their admission.[31]

---

[25] 314 U.S. at 494.
[26] *Id.* at 491, 494.
[27] *Id.* at 494.
[28] 122 Fed. 922 (2d Cir. 1903).
[29] *Id.* at 926 (dictum).
[30] 220 Fed. 837 (5th Cir. 1915).
[31] *Id.* at 843.

Both of these cases involved the traditional unclean hands argument. The courts indicated that their doors were barred in light of plaintiff's inequitable conduct. The idea that the condemned activity was an unlawful extension of the copyright grant was neither mentioned nor intimated.

As previously stated, the Court in *Morton Salt* cited a number of copyright cases which involved various types of restraint of trade, but which were not for infringement[32] of the copyright. In one category of cases of trade restraint, commonly known as resale price maintenance, the Court stated that the reason for barring the prosecution of respondent's suit for patent infringement is fundamentally the same as that which precludes a suit

> against a vendee of a patented or copyrighted article for violation of a condition for the maintenance of resale prices, *Adams v. Burke*, 17 Wall. 453; *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339; *Bauer & Cie v. O'Donnell*, 229 U.S. 1, *Straus v. Victor Talking Machine Co.*, 243 U.S. 490; *Boston Store v. American Graphophone Co.*, 246 U.S. 8; cf. *United States v. General Electric Co.*, 272 U.S. 476, 485.[33]

Since the decision of *Dr Miles Medical Co. v. John D Park & Sons Co.*,[34] contracts fixing resale prices of unpatented articles have been held invalid under the Sherman Anti-Trust Act.[35]

In *Bobbs-Merrill Co. v. Straus*,[36] the Court held that the rights granted a copyright owner do not include the right, after a sale of the copyrighted book, to restrict the future price of the book by the mere insertion in the book that a sale of the book different from that specified would constitute an infringement of the copyright.[37] In *Straus*

---

[32] The Copyright Act, 61 Stat. 652-68 (1947), as amended (codified in scattered sections of 17 U.S.C.) does not contain a definition of the term "infringement," and in some cases the word is used to denote an action upon a violation of conditions under a copyright license. However, as used herein, copyright infringement is intended to mean only the unauthorized copying of a copyrighted work. NIMMER, COPYRIGHT §§ 100, 141 (1965).

[33] Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 494 (1942).

[34] 220 U.S. 373 (1911).

[35] The Miller-Tydings Act, 50 Stat. 693 (1937), 15 U.S.C. § 1 (1964) amended the Sherman Act to validate minimum resale price maintenance contracts for goods sold in interstate commerce if the state where the goods were sold had legalized such contracts under so-called Fair-Trade laws.

[36] 210 U.S. 339 (1908).

[37] Cf. Straus v. Victor Talking Mach. Co., 243 U.S. 490 (1917) and Bauer & Cie v. O'Donnell, 229 U.S. 1 (1913), holding that the patent owner does not have the right under statute to dictate the price at which a patented article will subsequently be sold merely by fixing a notice on the patented article that it is not to be sold below a specified price.

*v. American Publishers' Ass'n,*[38] the Court held that an agreement between an association of publishers and an association of booksellers that their members would sell copyrighted books only to those who maintained the stipulated retail price was in violation of the Sherman Anti-Trust Act and was not sanctioned by any authority conferred in the copyright act.[39]

The only exception, other than state fair-trade laws,[40] which allows for the fixing of resale prices is the very limited doctrine of *United States v. General Electric Co.*,[41] which holds that an owner of a patent may grant a license to manufacture and vend, and as part of the license agreement, fix the price at which the patented article may be sold by the licensee.[42] This does not include the right to restrain the licensees from selling to retailers, jobbers or others who do not maintain resale prices.[43]

In another category of cases involving trade restraint through so-called tie-in contracts or tying clauses, the Court in *Morton Salt* stated:

> But a patent affords no immunity for a monopoly not within the grant, *Interstate Circuit v. United States*, 306 U.S. 208, 228, 230; *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456, and the use of it to suppress competition in the sale of an unpatented article may deprive the patentee of the aid of a court of equity to restrain an alleged infringement by one who is a competitor.[44]

In *Interstate Circuit, Inc. v. United States*,[45] the Court held that

---

[38] 231 U.S. 222 (1913).

[39] *Cf.* Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20 (1912), holding that similar agreements, unlawful under the Sherman Act, are not protected under the patent monopoly conferred by statute, and with regard thereto, stating: "Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights a universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained." *Id.* at 49.

[40] See note 33, *supra.*

[41] 272 U.S. 476 (1926). In United States v. Huck Mfg. Co., 86 Sup. Ct. 385 (1965), *affirming per curiam by an equally divided Court* 227 F Supp. 791 (E.D. Mich. 1964), the question presented to the Court was whether the *General Electric* doctrine should now be overruled. The Court, by its affirmance, refused to answer that question in the affirmative.

[42] *But cf.* United States v. Line Material Co., 333 U.S. 287 (1948), holding that once patent owners combine their patents, through cross-licensing agreements or otherwise, they may not issue licenses with price restrictions. The *General Electric* doctrine and its limitations are thoroughly discussed, *id.* at 299-305.

[43] Ethyl Gasoline Corp. v. United States, 309 U.S. 436 (1940).

[44] 314 U.S. at 491.

[45] 306 U.S. 208 (1939).

the copyright owner of motion pictures cannot, in order to oblige a particular exhibitor, dictate to other licensee-exhibitors the admission price which shall be paid for an entertainment which includes features other than the particular picture licensed, or dictate that other pictures may not be shown with the licensed film.[46] The citation of this case in *Morton Salt,* in support of the fact that a "patent affords no immunity for a monopoly not within the grant"[47] indicates that the same is true with respect to a copyright affording no immunity for a monopoly not within the copyright grant, and that a court of equity will not restrain an alleged infringer when the copyright owner is using his copyright beyond the scope of his grant to suppress competition.

Since the decision in *Morton Salt,* the Supreme Court has handed down two important opinions dealing with the illegitimate extension of the copyright owner's monopoly in violation of the antitrust laws.[48] Both of these cases give added weight to the use of the misuse doctrine to defeat a copyright infringement action, although both were civil actions by the government under the Sherman Anti-Trust Act.

In *United States v. Paramount Pictures, Inc.,*[49] the Court held a number of practices by motion picture producers, distributors and exhibitors to be unlawful under the federal antitrust laws. In particular, the Court condemned the practice of block-booking,[50] stating:

> That enlargement of the monopoly of the copyright was condemned below in reliance on the principle which forbids the owner of a patent to condition its use on the purchase or use of patented or unpatented materials. See *Ethyl Gasoline Corporation v. United States,* 309 U.S. 436, 459; *Morton Salt Co. v. Suppiger Co.,* 314 U.S. 488, 491, *Mercoid Corp. v. Mid-Continent Investment Co.,* 320 U.S. 661, 665. The court enjoined defendants from performing or entering into any license in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features.
>
> We approve that restriction.[51]

---

[46] In addition, the Court in *Interstate* found an unlawful conspiracy among the distributors of motion pictures to restrain competition even though there was no simultaneous action or agreement on the part of the conspirators, stating: "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *Id.* at 227.

[47] 314 U.S. at 491.

[48] United States v. Loew's Inc., 371 U.S. 38 (1962); United States v. Paramount Pictures, Inc., 334 U.S. 131 (1948).

[49] 334 U.S. 131 (1948).

[50] "Block-booking is the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period." *Id.* at 156.

[51] *Id.* at 157.

In *United States v. Loew's Inc.*,[52] the Court held the practice of block-booking of copyrighted motion pictures for television exhibition illegal and in violation of the Sherman Anti-Trust Act. The defendants contended that the *Paramount Pictures* holding, that a refusal to license one or more copyrights unless another copyright is accepted, should not be applied to cases where motion pictures are being licensed or sold to television stations, because the licensor or seller in the case of television stations did not have sufficient economic power to force the stations to accept unwanted motion pictures in order to obtain certain wanted pictures.[53] The defendants pointed out that feature films constitute less than eight per cent of television programming. Thus, defendants argued that their behavior should be judged by the general principles which govern the validity of tying arrangements of nonpatented products, rather than by the principle of the patent cases that a tying agreement where the tying product is patented is *per se* illegal.[54]

The Court, however, held that the requisite economic power to appreciably restrain free competition in the market for the tied product is presumed when the tying product is copyrighted, the same as when the tying product is patented. The Court stated in arriving at this conclusion:

> This principle grew out of a long line of patent cases which had eventuated in the doctrine that a patentee who utilized tying arrangements would be denied all relief against infringement of his patent
> *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488; *Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 661.[55]

---

[52] 371 U.S. 38 (1962).

[53] Not all tie-in contracts are illegal. The standard of illegality which governs tying arrangements of nonpatented and noncopyrighted products is that the seller must have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 6 (1958).

[54] Certain practices have been deemed by the courts to be unlawful under the Sherman Antitrust Act in and of themselves, although the Act § 1, 26 Stat. 209 (1890), 15 U.S.C. § 1 (1964) prohibits: "every contract, combination    or conspiracy, in restraint of trade or commerce among the several States    " While the Court has construed this provision as precluding only those contracts or combinations which "unreasonably" restrain competition, Chicago Board of Trade v. United States, 246 U.S. 231 (1918); Standard Oil Co. of New Jersey v. United States, 221 U.S. 1 (1911), it has conclusively presumed certain types of agreements to unreasonably restrain competition and has held these agreements to be per se illegal. United States v. Socony-Vacuum Oil Co. Inc., 310 U.S. 150 (1940) (holding a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce illegal per se).

[55] United States v. Loew's, Inc., 371 U.S. 38, 46 (1962).

From this, the Court reasoned:

> Since one of the objectives of the patent laws is to reward uniqueness, the principle of these cases was carried over into antitrust law on the theory that the existence of a valid patent on the tying product, without more, establishes a distinctiveness sufficient to conclude that any tying agreement involving the patented product would have anti-competitive consequences. *E.g., International Salt Co. v. United States,* 332 U.S. 392.[56]

Finally, in arriving at the conclusion that any tying arrangement involving a copyrighted product as the tying means would be a violation of the Sherman Anti-Trust Act, the Court quoted from *Paramount Pictures:*

> It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius. But the reward does not serve its public purpose if it is not related to the quality of the copyright. Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other. The practice tends to equalize rather than differentiate the reward for the individual copyrights. Even where all the films included in the package are of equal quality, the requirement that all be taken if one is desired increases the market for some. Each stands not on its own footing but in whole or in part on the appeal which another film may have. As the District Court said, the result is to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses. 334 U.S., at 158.[57]

It seems reasonable to conclude from the *Loew's* case that if a copyright owner who uses his copyright to control other products is in violation of the federal antitrust laws, as an outgrowth of the patent misuse doctrine, then this doctrine—that a patentee who utilized his patent to control unpatented products would be denied all relief against infringement of his patent—includes within it the denial of all relief against infringers when the copyright owner utilizes his copyright to gain economic control over other products.

The interesting feature of the *Loew's* case is that the patent misuse doctrine is the pillar upon which the Court found tie-in contracts with copyrighted products to be per se illegal under the federal antitrust laws. This would indicate that patent and copyright misuse are types of conduct separate and apart from violations of the antitrust laws and that the former does not necessarily include the latter.

In early cases[58] following the *Morton Salt* decision, the Court

---

[56] *Ibid.*
[57] *Id.* at 47.
[58] Hartford-Empire Co. v. United States, 323 U.S. 386 (1944); Mercoid Corp. v.

tended to indicate that patent misuse encompasses the whole of anti-trust violations. In *Hartford-Empire Co. v. United States*, the Court stated:

> The Government urges that such forfeiture is justified by our recent decisions in *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, and *B. B. Chemical Co. v. Ellis*, 314 U.S. 495. But those cases merely apply the doctrine that, so long as the patent owner is using his patent in violation of the antitrust laws, he cannot restrain infringement of it by others.[59]

Recent cases of the Court have indicated that the doctrine of *Morton Salt* is limited to tying arrangements.[60] In *United States v. Loew's Inc.*,[61] the Court seemed to pinpoint what the patent misuse doctrine encompassed when it said, "This principle grew out of a long line of patent cases which had eventuated in the [patent misuse] doctrine that a patentee who utilized tying arrangements would be denied all relief against infringement of his patent."[62]

However, other cases prior to *Loew's* but within the last dozen years, have held that certain types of conduct other than tie-in contracts constituted an unlawful expansion of the patent monopoly so as to bar an infringement action.[63] The question of what types of behavior, other than tie-in contracts, fall within the scope of the misuse doctrine is very much in doubt at the present time.

### Antitrust Defenses to Civil Actions Not Involving Infringement[64]

At common law, contracts in unreasonable restraint of trade were deemed illegal and unenforceable.[65] The resulting restraints did not give rise to a civil action for damages, nor were they unlawful under

---

Minneapolis-Honeywell Regulator Co., 320 U.S. 680 (1944); Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661 (1944).

[59] *Supra* note 58, at 415.

[60] United States v. Loew's Inc., 371 U.S. 38 (1962); United States v. Paramount Pictures, Inc., 334 U.S. 131 (1948).

[61] 371 U.S. 38 (1962).

[62] *Id.* at 46.

[63] United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457 (1957) (holding that infringement relief would be barred if plaintiff is found to have engaged in price-fixing pursuant to certain patent licenses). Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806 (1945) (holding that the failure to inform the U.S. Patent Office of perjury committed by the opponent to an interference proceeding barred infringement relief on the subsequently issued patent). *Cf.* Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 230 (1964).

[64] See generally Lockhart, *Violation of the Anti-Trust Laws as a Defense in Civil Actions*, 31 MINN. L. REV. 507 (1947).

[65] HANDLER, CASES ON TRADE REGULATION ch. 2 (3d ed. 1960).

Case 2:17-cv-01731-TSZ Document 39-2 Filed 06/18/18 Page 14 of 24

criminal law [66] The contracts were merely not enforced by the courts.[67]

The answer to the question of whether a purchaser could refuse to pay for delivered goods on the ground that the supplier was a party to a contract in restraint of trade depended upon whether the particular contract, in addition to restraining competition, was part of an attempt to monopolize.[68] If it was not part of an attempt to monopolize, then the contract was considered ancillary to the restraint of trade, and such contracts "for the sale of property or of business and good will, or for the making of a partnership or a corporation"[69] were enforceable.

*Connolly v. Union Sewer Pipe Co.*[70] was the first Supreme Court decision on the question of whether the purchaser could refuse to pay for delivered goods because the seller was a party to various agreements with his competitors which were in restraint of trade under common law doctrine and in violation of the Sherman Anti-Trust Act. The plaintiff corporation had sold the defendant a quantity of Akron pipe and had brought an action on two promissory notes given by the defendant for the pipe. Defendant pleaded as a special defense that plaintiff was part of a trust or combination of divers persons and corporations, who, contrary to the common law, and among other things, "have agreed to keep the prices of said articles of commerce at certain fixed or graduated figures."[71] The Court rejected the defense and cited the common law "ancillary" argument as the reason therefor:

> But we are aware of no decision to the effect that a sale similar to that made by the present plaintiff to the defendants respectively would in itself be illegal or void under the principles of the common law The contracts between the plaintiff and the respective defendants were, in every sense, collateral to the alleged agreement between the plaintiff and other corporations, firms or associations whereby an illegal combination was formed for the sale of sewer pipe.[72]

The Court did not mention the common law exception that, if the contract between plaintiff and defendant was part of an attempt to monopolize, it would not be enforced, and it appears from a recital of defendant's contentions that such an exception was not urged.

With regard to the defendant's contention that the contract was

---

[66] *Ibid.*
[67] *Ibid.*
[68] United States v. Addyston Pipe & Steel Co., 85 Fed. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).
[69] United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 291 (6th Cir. 1898).
[70] 184 U.S. 540 (1902).
[71] *Id.* at 542.
[72] *Id.* at 549.

void because the plaintiff was in a combination illegal under the Sherman Anti-Trust Act, the Court adopted the same rationale expressed in denying the defense based on the common law, stating, "There is no necessary legal connection here between the sale of pipe to the defendants by the plaintiff corporation and the alleged arrangement made by it with other corporations, companies and firms."[73] The Court apparently did not recognize that the price of the goods in the contract between plaintiff and defendant was fixed by the members of the "combination."

Seven years later, in *Continental Wall Paper Co. v. Voight & Sons Co.,*[74] the Court was again called upon to decide whether the defense of antitrust violations should be allowed in an action to recover money on a contract. The defendant jobber had previously signed a contract which bound him to buy all of his wallpaper from plaintiff and not to sell at prices lower than those stipulated. If the defendant had not signed the contract he would not have been able to continue in the wallpaper business. In a five to four decision the Court upheld the antitrust defense against plaintiff's action to recover $56,762.10 on an account for merchandise sold and delivered to the defendant. The Court said that *Connolly* was plainly distinguishable, stating that the contract in *Connolly*.

> was to take certain goods at an agreed price, nothing more, and was not in itself illegal, *nor part of nor in execution of any general plan or scheme that the law condemned.* The contract of purchase was wholly collateral to and independent of the agreement under which the combination had been previously formed by others in Ohio.[75]

But, as to the contract before the Court in *Continental Wall Paper* the Court stated:

> The case now before us is an entirely different one. The Continental Wall Paper Company seeks, in legal effect, the aid of the court to enforce a contract for the sale and purchase of goods which, *it is admitted by the demurrer was in fact and was intended by the parties to be based upon agreements that were and are essential parts of an illegal scheme*      It is admitted by the demurrer to that defense that the account sued on has been made up *in execution of the agreements* that constituted or out of which came the illegal combination formed for the purpose and with effect of both restraining and monopolizing trade and commerce among the several States.[76]

[73] *Id.* at 551.
[74] 212 U.S. 227 (1909).
[75] *Id.* at 260.
[76] *Id.* at 261.

It thus appears that the added element of the contract being a part of a scheme to create an illegal monopoly may have brought the wallpaper contract across the gray river from being ancillary to being part of the illegal scheme. The Court, however, did not make any mention of the common law exception that if the contract was an attempt to monopolize then it could not be enforced, although the respondent had urged that contracts which are a material step in creating a monopoly not be enforced.[77]

To Justice Holmes, this distinction of contracts being ancillary to an illegal combination or part of the illegal scheme was one without a difference. In his dissent, he stated that "the policy of not furthering the purposes of the trust is less important than the policy of preventing people from getting other people's property for nothing when they purport to be buying it."[78]

Justice Brewer also dissented, but felt that the defense should not be allowed on the ground that the case came "within the proposition that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.'"[79]

Six years later, in *D R. Wilder Mfg Co. v. Corn Prod. Ref Co.*,[80] the Court was again called upon to determine whether a contract for the purchase of goods was inherently illegal, as in *Continental Wall Paper*, or was ancillary to the illegality, as in *Connolly*. The defendant alleged that under his contract of purchase he was coerced into buying all his glucose from plaintiff and that this coercion of him and other users of glucose resulted in driving out of business many glucose suppliers. While it is difficult to understand how this type of contract with its natural tendency toward causing monopolization was any different from the contract in *Continental Wall Paper*, the Court held that it was not inherently illegal and therefore did not come within the holding of *Continental Wall Paper* But the real basis of the decision was the reason advanced by Justice Brewer in his dissent in *Continental Wall Paper*, that the remedies afforded by the Sherman Anti-Trust Act are exclusive and nullification of a purchase of goods is not one of them.

For all intents and purposes, *Wilder Mfg. Co.* signaled the end of the distinction between contracts that are inherently a part of a scheme to restrain trade and those which are only ancillary to the scheme,

---

[77] *Id.* at 232.
[78] *Id.* at 270-71.
[79] *Id.* at 273.
[80] 236 U.S. 165 (1915).

although the final burial did not occur until 1959.[81] Several decisions subsequent to *Wilder Mfg. Co.* relied mainly on the exclusion of remedies rationale for the denial of the antitrust defense.[82]

In *Bruce's Juices, Inc. v. American Can Co.,*[83] the first case after the decision in *Morton Salt* to consider the antitrust defense to a civil action not involving an infringement of a patent, trademark, or copyright, the Court in a five to four decision rejected the antitrust defense to an action on renewal notes representing the balance on a continuing account for goods sold. The petitioner claimed that the notes were illegal because the respondent Can Company had sold to others at prices which discriminated against Bruce and was thereby violating the Robinson-Patman Act.[84]

The basis of the Court's decision was that the Act made no provision for the defense (exclusion of remedies theory) and, unless the contract is intrinsically illegal, the purchaser has the duty to pay for goods he has purchased. The dissent felt that while petitioner should not be allowed to get his goods for nothing, he should be allowed to prove as a set-off, notwithstanding that the suit was a state action,[85] that the notes aggregating 114,000 dollars represented the illegal differential of the more than two million dollars it had paid respondent during the period of 1937 to 1942. The opinion of the Court made no mention of *Morton Salt*, while the dissent cited *Morton Salt* in answer to the Court's reliance on the exclusion of remedies theory, stating, "Similarly, without specific statutory permission, private litigants have been allowed to invoke the policy of the antitrust laws so as to limit the scope of patent rights."[86]

The latest case presenting this question to the Court is *Kelly v. Kosuga.*[87] Here petitioner and other growers of onions entered into an agreement to purchase 287 carloads of onions from respondent if respondent refrained from delivering any onions on the futures market for the remainder of the trading season, the purpose being to create a false market condition and thereby raise the trading price of onions.

As a defense to respondent's action for the unpaid purchase price

---

[81] Kelly v. Kosuga, 358 U.S. 516 (1959).

[82] A. B. Small Co. v. Lamborn & Co., 267 U.S. 248 (1925); Geddes v. Anaconda Mining Co., 254 U.S. 590 (1921).

[83] 330 U.S. 743 (1947).

[84] 49 Stat. 1526, 1528 (1936), 15 U.S.C. 13, 13a (1964).

[85] If the case had been brought in federal court, then the defendant could have, pursuant to FED. R. CIV. P. 13, pleaded as a counterclaim the damages resulting from the antitrust violation.

[86] 330 U.S. at 761 (citing, *inter alia, Morton Salt* and *Mercoid*).

[87] 358 U.S. 516 (1959).

of the onions, petitioner asserted that the contract was intrinsically illegal and came within the holding of *Continental Wall Paper* The Court, deciding that it was finally time to put an end to this battered and dying horse, stated:

> The distinction asserted [between contracts inherently illegal and those ancillary to the illegality] is, to say the least, on its face paradoxical     If the defense of illegality is to be allowed as a collateral method of enforcement of the antitrust laws, as the breadth of the petitioner's argument suggests, it must be said that his theory creates a very strange class of private attorneys general.[88]

The Court rested its denial of the defense on two grounds: (1) "the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.' "[89] and (2) the reluctance of the federal courts to create a policy of nonenforcement of contracts where state law governs the rights and duties of sellers and purchasers of goods. The latter ground was no doubt intended to distinguish such a case from *Morton Salt* where the rights under a patent are governed by federal law

The *Kelly* case was decided by a seven-to-two majority and, in spite of the fact that it did not explicitly overrule *Continental Wall Paper*, indicates that except in the most aggravated of circumstances, the defense of antitrust violations to a civil action not involving a paramount federal right should not be allowed. Thus, it seems clear that the antitrust defense to actions which do not involve paramount federal rights is not to be confused with actions which do involve such rights, *i.e.*, actions for patent, copyright or trademark infringement.

## Misuse and Antitrust Defenses to Copyright Infringement Actions

While the United States Supreme Court has not explicitly held that the misuse doctrine enunciated in *Morton Salt* is applicable to a copyright infringement action, the lower federal courts have on the whole held that it is not applicable.[90] No federal courts have, however,

---

[88] *Id.* at 519-20.

[89] *Id.* at 520-21.

[90] The following cases subsequent to *Morton Salt* have held that the defense of antitrust violations or "misuse" is not applicable to a copyright infringement action: Peter Pan Fabrics, Inc. v. Candy Frocks, Inc., 187 F Supp. 334 (S.D.N.Y. 1960) (dictum); Harms, Inc. v. Sansom House Enterprises, Inc., 162 F Supp. 129 (E.D. Pa. 1958), *aff'd sub nom.* Leo Feist, Inc. v. Lew Tandler Tavern, Inc., 267 F.2d 494 (3d Cir. 1959); Alfred Bell & Co. v. Catalda Fine Arts, 74 F Supp. 973 (S.D.N.Y. 1947),

held that a violation of the federal antitrust laws will, in and of itself, bar a copyright infringement action.[91]

The leading case which allowed the defense of "misuse" to a copyright infringement action is *M. Witmark & Sons v. Jensen*.[92] In this case the District Court was requested by the plaintiffs, members of the American Society of Composers, Authors and Publishers (better known as ASCAP) to enjoin defendants, who operated motion picture theatres, from showing certain films in their theatres without first obtaining from plaintiffs a license to perform publicly the musical compositions which accompanied the showing of the films. Defendants contended that the plaintiffs should be barred from obtaining the relief they sought because they had illegally extended the scope of their copyrights and their method of doing business was in violation of the Sherman Anti-Trust Act.

The American Society of Composers, Authors and Publishers (hereinafter referred to as ASCAP) is a nonprofit performing rights society made up entirely of composers, authors and publishers.[93] The members of ASCAP grant to the Society their nondramatic performing rights on a non-exclusive basis, and the Society in turn licenses various users of music the right to perform all the copyrighted music in its repertory These users of music, which include radio and television stations, restaurants, taverns, dance halls, hotels, factories and department stores, have the option of dealing directly with the individual copyright owner or with the Society Prior to the *Jensen* suit, the Society had been the subject of a civil antitrust action filed by the Justice Department on February 25, 1941, and terminating in a consent decree on March 4, 1941. At the time of the *Jensen* suit, eighty per cent of the music integrated in sound films was copyrighted and owned by members of ASCAP, and the licensing was exclusively controlled by ASCAP

---

*aff'd*, 191 F.2d 99 (2d Cir. 1951). In the following cases the courts did not explicitly hold that the defense of misuse of copyright was not applicable as a matter of law but held that the defendants had failed to establish it: United Artists Associated, Inc. v. NWL Corp., 198 F Supp. 953 (S.D.N.Y. 1961); Greenbie v. Noble, 151 F Supp. 45 (S.D.N.Y. 1957); Columbia Pictures Corp. v. Coomer, 99 F Supp. 481 (E.D. Ky. 1951). The only case in which the misuse defense has been successful in defeating a copyright infringement action is M. Witmark & Sons v. Jensen, 80 F Supp. 843 (D. Minn. 1948).

[91] *But see* NIMMER, COPYRIGHT § 149.1, at 663 n.265 (1965) (citing M. Witmark & Sons v. Jensen, 80 F Supp. 843 (D. Minn. 1948) as indicating that a copyright owner will be denied relief in an infringement action if he is in violation of the antitrust laws). See text accompanying note 98 *infra*.

[92] 80 F Supp. 843 (D. Minn. 1948).

[93] See generally Finkelstein, *Public Performance Rights in Music and Performance Rights' Societies*, in SEVEN COPYRIGHT PROBLEMS ANALYZED 69 (1952).

Prior to the *Jensen* decision, ASCAP had been sued by 164 motion picture theatre owners for treble damages and injunctive relief under the federal antitrust laws.[94] In this case, Judge Leibell found:

> Almost every part of the Ascap structure, almost all of Ascap's activities in licensing motion picture theatres, involve a violation of the anti-trust laws. Although each member of Ascap is granted by the copyright law a monopoly in the copyrighted work, it is unlawful for the owners of a number of copyrighted works to combine their copyrights by any agreement or arrangement, even if it is for the purpose of thereby better preserving their property rights     The result of such a combination "is to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses."[95]

In a follow-on decision by Judge Leibell,[96] the court prohibited ASCAP from excepting the performing rights (*i.e.*, the playing in the theatre of the musical composition which is recorded on the film's sound track) from the license it grants to the motion picture producer to record the music on the sound track (known as the synchronization rights)  Thus, in effect, Judge Leibell's decree forced ASCAP to license both the synchronization and performing rights to the motion picture producer. As justification for the elimination of a right granted to the copyright owner by the Copyright Act—the right to perform a composition publicly for profit and the right to record it are separate and independent rights under the Copyright Act[97]—Judge Leibell relied on the patent misuse cases, stating:

> An illegal combination of copyrights and a pooling of the proceeds derived from the licensing of the copyrights through the illegal combination, renders unenforceable the rights granted under the Copyright Act, at least while the illegal combination continues.[98]

In the *Jensen* case, the court cited Judge Leibell's findings and held that a number of practices by ASCAP amounted to an extension of the copyright grant and, therefore, denied the relief sought by ASCAP for infringement of its copyright. With regard to whether antitrust violations alone would defeat the action, the court stated: "In view of the Court's finding that the copyright monopoly has been extended, it is

[94] Alden-Rochelle, Inc. v. American Soc. of Composers, Authors and Publishers, 80 F Supp. 888 (S.D.N.Y. 1948).
[95] *Id.* at 893 (citing United States v. Paramount Pictures, Inc., 334 U.S. 131 (1948)).
[96] Alden-Rochelle, Inc. v. American Soc. of Composers, Authors and Publishers, 80 F Supp. 900 (S.D.N.Y. 1948).
[97] Interstate Hotel Co. v. Remick Music Corp., 157 F.2d 744 (8th Cir. 1946).
[98] Alden-Rochelle, Inc. v. American Soc. of Composers, Authors and Publishers, 80 F Supp. 900, 904 (S.D.N.Y. 1948) [citing *Morton Salt, Line Material, Interstate Circuit,* and *Paramount Pictures*].

not necessary to determine whether anti-trust violations alone would deprive plaintiffs of the right of recovery."[99]

The particular misuse which the court found to be an illegitimate extension of the copyright monopoly was the placing with the Society of performance rights for motion pictures, which gave each copyright owner a potential economic advantage far exceeding that enjoyed by an individual copyright owner. The court stated:

> However free plaintiffs and their associates in Ascap may have been from any design or intent to extend their copyright monopoly, or however beneficial it may be for them to carry on their business in this manner, or however inconvenient it may be for them to function otherwise, such facts and circumstances will not permit them to enlarge their lawful monopoly [100]

Since the *Jensen* case there have been a number of amendments to the 1941 consent decree between the Society and the Department of Justice which have gone a long way toward making the copyrights of ASCAP's members as competitive as possible without ordering the Society dissolved.[101]

In *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*,[102] an action for infringement of copyrights covering mezzotint engravings, the defendant alleged that plaintiff and other members of the Fine Arts Guild had entered into certain agreements to restrict the number of mezzotint engravings produced and to maintain minimum sale prices. The defendant contended that, inasmuch as these agreements constituted violations of the Sherman Anti-Trust Act and a misuse of the copyright, the court should as a matter of equity deny plaintiff the relief sought. The court held as a matter of law that the defense was insufficient. In reaching this conclusion, the court found that the *Bruce's Juices* case limited *Morton Salt*'s application solely to cases of patent infringement.

On appeal,[103] the court upheld the lower court's denial of the misuse defense, although it did not reach this conclusion as a matter of law. Instead, the court balanced the policy of preventing piracy of copyrighted matter against the policy of enforcing the antitrust laws, and stated, "As the defendants' piracy is unmistakably clear, while the plaintiffs' infraction of the antitrust laws is doubtful and at most

---

99 M. Witmark & Sons v. Jensen, 80 F Supp. 843, 850 (D. Minn. 1948).
100 *Id.* at 848.
101 See Shull, *Collecting Collectively: ASCAP's Perennial Dilemma,* in ASCAP COPYRIGHT LAW SYMPOSIUM SEVEN 35 (1956).
102 74 F Supp. 973 (S.D.N.Y. 1947), *aff'd,* 191 F.2d 99 (2d Cir. 1951).
103 Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99 (2d Cir. 1951).

marginal, we think the enforcement of the first policy should outweigh enforcement of the second."[104] However, the Court of Appeals did feel that the unclean hands doctrine (of *Morton Salt*) had been somewhat narrowed by later Court decisions, citing *Bruce's Juices* among others.

Subsequent to the Court of Appeals' decision in *Alfred Bell*, the District Court in *Peter Pan Fabrics, Inc. v. Candy Frocks, Inc.*[105] held that violation of the antitrust laws would not be a defense to a copyright infringement action, citing *Alfred Bell, Bruce's Juices*, and other cases.

In *United Artists Associated, Inc. v. NWL Corp.*,[106] an action for copyright infringement, the plaintiff moved to strike the defendant's defense of copyright misuse. The court denied the motion on the ground that a definitive adjudication on this question should only be made after a plenary hearing. The court, however, did state: "As a general rule, it is not a defense to a copyright infringement action to allege that plaintiff is violating the antitrust statutes by a combination or conspiracy in restraint of trade."[107] With regard to the misuse of copyright defense, the court, citing *Alfred Bell*, stated that issue would have to await a determination of the effect of plaintiff's alleged misuse of copyright on its action for infringement.

From the foregoing, it is evident that the lower federal courts are very much in doubt as to the applicability of the misuse doctrine enunciated in *Morton Salt* to copyright infringement actions. Almost all the lower courts are in agreement that antitrust violations, by themselves, are no defense to a copyright infringement action, and the defense, if any, rests on a concept of copyright misuse. However, the defense of copyright misuse has been given narrow scope by a few courts which regard it as only a factor to be considered in relation to the degree of culpability of defendant's infringement. Other courts have disallowed it altogether, relying on the cases which deny the antitrust defense to actions not involving paramount federal rights, such as actions on a contract or notes.

## Conclusion

The *Morton Salt* case established a new standard of conduct for the individual who has been given the special privilege of a patent monopoly. He must use his patent in a manner consistent with the privi-

---

[104] *Id.* at 106.
[105] 187 F Supp. 334 (S.D.N.Y. 1960) (dictum).
[106] 198 F Supp. 953 (S.D.N.Y. 1961).
[107] *Id.* at 957

lege, and, if he does not, he will find that the privilege will be withheld until he has purged himself of the misuse. The conduct attendant on this privilege should not be confused with the conduct required of those who are parties to contracts, notes and other forms which are given legal effect, but which do not rise to the height of the special privilege of a monopoly granted by the United States.

All the considerations which the Court in *Morton Salt* felt justified the denial of relief against patent infringement are applicable in the case of the copyright grant. The public policy which includes writings within the granted monopoly excludes from it all that is not embraced in the writing. It equally forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Patent Office and the granting of which is contrary to public policy Finally, in copyright infringement suits there is an adverse effect upon the public interest of a successful infringement suit in connection with an expansion of the copyright beyond its legitimate scope.

As stated by Chief Justice Hughes in *Fox Film Corp. v. Doyal*,[108] "The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors." Surely the public does not receive its benefits when the copyright owner extends the monopoly granted to him by the United States and thereby violates the public policy of this country as set forth in our antitrust laws. In such an instance, it is only fitting that courts of equity not lend themselves to protecting the copyright owner's monopoly until the misuse has been purged.

Finally, the types of copyright misuse which would defeat an infringement action should not rest on any fixed formula. The misuse doctrine is peculiarly a question of patent and copyright law involving an unlawful extension of the monopoly grant, and it would not be in consonance with the theory of this doctrine to hold that any and all violations of the federal antitrust laws constitute a misuse of the patent or copyright grant. Rather, each type of conduct should be separately examined to determine whether the public policy underlying the patent or copyright grant is being subverted.

Naturally, tying clauses using the patent or copyright as the economic lever to control other products is a subversion of that policy which gives the patent or copyright owner a special monopoly privilege. It would also seem to be a subversion of this policy where the patent or copyright is used, outside the *General Electric* doctrine, to maintain resale prices or to fix prices among competitors.

---

[108] 286 U.S. 123, 127 (1932).

At the present time, except for tie-in contracts, the misuse doctrine is in an amorphous state. The doctrine, however, should not be restricted merely to tie-in arrangements, but should encompass all potential types of conduct which would not be within the privilege of the patent or copyright grant and which would be in violation of the public policy supporting that special grant.