THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>               Plaintiff,<br><br>vs.<br><br>JOHN DOE, subscriber assigned IP address 73.225.38.130,<br><br>               Defendant. | NO. 2:17-cv-01731-TSZ<br><br>**DECLARATION OF J. CURTIS EDMONDSON IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL PRODUCTION OF SOFTWARE OR EXCLUDE EXPERT AND LAY TESTIMONY WHICH DEPENDS ON ITS RELABILITY** |
| JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>               Counterclaimant,<br><br>vs.<br><br>STRIKE 3 HOLDINGS, LLC,<br><br>               Counterdefendant. | |

I, J. Curtis Edmondson, hereby declare under the penalty of perjury under the laws of the United States of America, the following:

1.      I am counsel of record in this case. I am a member of the bar of this Court and a member of the Patent Bar. I respectfully submit this declaration in support of Defendant's

DECLARATION OF J. CURTIS EDMONDSON IN
SUPPORT OF DEFENDANT'S MOTION TO COMPEL
PRODUCTION OF SOFTWARE OR EXCLUDE EXPERT
AND LAY TESTIMONY WHICH DEPENDS ON ITS
RELABILITY - 1
CASE NO. 2:17-CV-01731-TSZ

1   Motion to Compel Production of Software or Exclude Expert and Lay Testimony Which

2   Depends on its Reliability in the above-captioned matter. I have personal knowledge of the facts

3   set forth in this declaration and could testify competently to them if called upon to do so.

4       2.      Along with co-counsel, Adrienne McEntee, on March 7, 2019, I conferred with

5   Mr. Bandlow and Mr. Case about Strike 3's responses in Exhibit 1 below.

6       3.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of Plaintiff's Objections

7   and Responses to Defendant's Requests for Production of Documents.

8       4.      Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the Expert Report of

9   Stephen Bunting dated December 21, 2018. This was produced by the Plaintiffs as BATES

10  00155-165.

11      5.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of the Declaration of

12  Patrick Paige dated November 11, 2013, this was produced by the Plaintiffs as BATES 00166-

13  00169.

14      6.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of the Expert Report of

15  Patrick Paige dated August 19, 2016, this was produced by the Plaintiffs as BATES 00171-

16  00180.

17      7.      Attached hereto as <u>Exhibit 5</u> is a true and correct copy of the Expert Disclosures

18  served on March 15, 2019, by Counsel for Strike 3 Holdings, LLC.

19      8.      Attached hereto as <u>Exhibit 6</u> is a true and correct copy of the Expert Report served

20  on March 15, 2019, by Patrick Paige served by counsel for Strike 3 Holdings, LLC.

21      9.      Attached hereto as <u>Exhibit 7</u> is a true and correct copy of the Expert Report served

22  on March 15, 2019, by Stephen Bunting served by counsel for Strike 3 Holdings, LLC.

23      I declare under penalty of perjury under the laws of the United States that the foregoing

24  is true and correct.

25

26

27  DECLARATION OF J. CURTIS EDMONDSON IN
    SUPPORT OF DEFENDANT'S MOTION TO COMPEL
    PRODUCTION OF SOFTWARE OR EXCLUDE EXPERT
    AND LAY TESTIMONY WHICH DEPENDS ON ITS
    RELABILITY - 2
    CASE NO. 2:17-CV-01731-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    EXECUTED this 4th day of April, 2019, at Hillsboro, Oregon.

2

3                                           /s/ J. Curtis Edmondson, WSBA #43795
                                          J. Curtis Edmondson, WSBA #43795

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    DECLARATION OF J. CURTIS EDMONDSON IN
      SUPPORT OF DEFENDANT'S MOTION TO COMPEL
      PRODUCTION OF SOFTWARE OR EXCLUDE EXPERT
      AND LAY TESTIMONY WHICH DEPENDS ON ITS
      RELABILITY - 3
      CASE NO. 2:17-CV-01731-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

<u>CERTIFICATE OF SERVICE</u>

I, Adrienne D. McEntee, hereby certify that on April 4, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Bryan J. Case, WSBA #41781
Email: bcase@foxrothschild.com
FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154
Telephone: (206) 624-3600
Facsimile: (206) 389-1708

Lincoln D. Bandlow, *Admitted Pro Hac Vice*
Email: lbandlow@foxrothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Blvd., Suite 900
Los Angeles California 90067
Telephone: (310) 598-4150
Facsimile: (310) 556-9828

*Attorneys for Plaintiff*

Joshua L. Turnham, WSBA #49926
E-mail: joshua@turnhamlaw.com
THE LAW OFFICE OF JOSHUA L. TURNHAM PLLC
1001 4th Avenue, Suite 3200
Seattle, Washington 98154
Telephone: (206) 395-9267
Facsimile: (206) 905-2996

*Attorneys for Non-Party Donald Isaksen, Jr.*

DECLARATION OF J. CURTIS EDMONDSON IN
SUPPORT OF DEFENDANT'S MOTION TO COMPEL
PRODUCTION OF SOFTWARE OR EXCLUDE EXPERT
AND LAY TESTIMONY WHICH DEPENDS ON ITS
RELABILITY - 4
CASE NO. 2:17-CV-01731-TSZ

1          DATED this 4th day of April, 2019.

2                                    TERRELL MARSHALL LAW GROUP PLLC

3

4                                    By:   /s/ Adrienne D. McEntee, WSBA #34061
                                        Adrienne D. McEntee, WSBA 34061
5                                       Email:  amcentee@terrellmarshall.com
                                        936 North 34th Street, Suite 300
6                                       Seattle, Washington 98103-8869
                                        Telephone: (206) 816-6603
7                                       Facsimile: (206) 319-5450

8                                    *Attorneys for Defendant*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    DECLARATION OF J. CURTIS EDMONDSON IN
      SUPPORT OF DEFENDANT'S MOTION TO COMPEL
      PRODUCTION OF SOFTWARE OR EXCLUDE EXPERT
      AND LAY TESTIMONY WHICH DEPENDS ON ITS
      RELABILITY - 5
      CASE NO. 2:17-cv-01731-TSZ

# — EXHIBIT 1 —

1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>                    Defendant. | Case No.: 2:17-cv-01731-TSZ<br><br>**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S REQUESTS FOR PRODUCTION OF DOCUMENTS** |

Pursuant to Fed. R. Civ. P. 34, Plaintiff Strike Three Holdings, LLC ("Plaintiff") hereby responds and objects to the First Request for Production of Documents propounded by Defendant John Doe, subscriber assigned IP address 73.225.38.130 ("Defendant") as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiff's responses to these Requests are based on its current knowledge, information, and belief.  As Plaintiff is still in the initial stages of discovery, additional knowledge of facts and information may result from further discovery or investigation.  It is possible that there are additional facts which Plaintiff has been unable to determine and additional documents which Plaintiff has been unable to locate despite diligent efforts, and Plaintiff anticipates that additional facts may be determined and that additional documents may be located through further discovery, investigation and research.  Such discovery efforts are

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

ACTIVE\83353197.v1-1/4/19

ongoing.  Accordingly, Plaintiff reserves the right to identify additional facts and documents, as well as the right to amend or supplement its responses to these Requests as this case progresses.

2.     By responding to these Requests, Plaintiff neither waives nor intends to waive, and in fact expressly reserves all objections, including: (1) all objections as to competency, relevancy, materiality and admissibility; (2) all objections as to vagueness, ambiguity and undue burden; (3) all rights to object on any ground to the use of any of these answers, or the subject matter thereof in any subsequent proceeding or at trial of this case; and (4) all rights to object on any ground to any request for further answers to these or any other discovery requests.

3.     This response is made by Plaintiff subject to and without waiving, but on the contrary reserving, Plaintiff's right to object to other discovery procedures relating to the subject matter of the Requests.  Further, information and documents agreed to be produced is being produced subject to Plaintiff's right to object to the introduction of such information or document at any hearing or at the trial of this matter.  The fact that Plaintiff may agree to produce responsive documents that can be located after a reasonable search should not be taken as an admission that any such documents exist.  The fact that Plaintiff has responded to part or all of any Request is not intended to be, and shall not be construed to be, a waiver by Plaintiff of any objection to any Request.

## GENERAL OBJECTIONS

1.     The following General Objections and the above Preliminary Statement are deemed incorporated into Plaintiff's responses to each Request for Production below.  They are set forth here to avoid the unnecessary repetition of restating them for each individual answer.  Failure to specifically incorporate a General Objection shall not be construed as a waiver of it with respect to any specific Request.

2.     Plaintiff objects to each Request to the extent that it calls for the production of information or documents by Plaintiff which are not in Plaintiff's custody, possession or control.  Specifically, Plaintiff objects to Defendant's definitions of "Strike 3 Holdings, LLC,"

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

2

1   "You," and "Your" insofar as they purport to require Plaintiff to produce information in the

2   hands of third parties.  Plaintiff answers these Requests only on its own behalf and not on behalf

3   of any other party.

4       3.      Plaintiff objects to Plaintiff's Definitions and Instructions to the extent they are

5   inconsistent with the appropriate Federal Rules of Civil Procedure, such as Rules 26 and 34, and

6   the Local Rules of the Court and the Court's orders.  Plaintiff will rely upon the Federal Rules

7   of Civil Procedure, the Local Civil Rules, the Court's orders and governing case law with

8   respect to the appropriate scope of the Requests.

9       4.      Plaintiff objects to each Request to the extent they purport to require disclosure

10  of Plaintiff's confidential and/or proprietary business information and trade secrets.  Likewise,

11  Plaintiff will not produce the confidential, proprietary or trade secret information of third parties

12  with whom Plaintiff transacts business.  Similarly, Plaintiff will not produce confidential

13  personal information in violation of the privacy rights of its officers, employees or any third

14  parties.

15      5.      These responses represent Plaintiff's good faith effort to respond based on

16  information and documents available at this time.  Plaintiff specifically reserves the right to

17  supplement its responses in the future, as appropriate.

18      6.      Plaintiff objects to each Request to the extent that it seeks information that is

19  protected by the attorney-client privilege, the work product privilege or other privileges, or

20  which constitute material prepared in anticipation of litigation and/or which are exempt from

21  disclosure pursuant to Fed. R. Civ. P. 26, upon the grounds that privileged matter is exempt

22  from discovery and trial preparation material may only be discoverable upon satisfaction of the

23  prerequisites delineated in Fed. R. Civ. P. 26(b)(3) and (b)(4), which prerequisites have not

24  been satisfied.

25

26

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

3

7.      The statement that Plaintiff will produce responsive documents that can be located after a reasonable search should not be taken as an admission that any such documents exist under Plaintiff's possession or control or at all.

8.      The inadvertent or mistaken provision of information subject to the protections of the attorney-client privilege, work product doctrine, or other privilege shall not constitute a general, inadvertent, implicit, subject matter, separate, independent or other waiver of such privilege or protection, and does not put in issue or constitute the affirmative use of the advice of counsel or of any privileged communications.  All such inadvertently provided information shall be returned to Plaintiff's counsel, along with any copies made thereof.

To the extent Plaintiff has agreed to produce documents in response to these Requests, Plaintiff will do so pursuant to the parties' agreement (if one exists) regarding the timing and manner of such production.

## SPECIFIC OBJECTIONS AND RESPONSES

**REQUEST FOR PRODUCTION NO. 1:**

A copy of the object code of the Infringement Detection Software used on the Dates Of Alleged Infringements.

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully herein.  Plaintiff specifically objects to this request as vague and ambiguous with respect to the term "object code," which impermissibly requires Plaintiff and/or its attorneys to speculate as to the meaning intended.  Plaintiff further objects to this request as seeking the production of documents which are not in Plaintiff's possession, custody, or control.  The documents and materials sought by this request—documents related to the technical specifications, hardware, software, code operation, creation, tests, or maintenance of the Infringement Detection System—are in the exclusive possession, custody, and control of IPP International, UG's ("IPP"), a third party over whom Plaintiff has no control.  To be clear, IPP and Plaintiff are

PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S REQUESTS FOR PRODUCTION OF DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

4

ACTIVE\83353197.v1-1/4/19

separate entities.  IPP is not owned by, partnered with, or affiliated with Plaintiff.  Plaintiff pays

for IPP's anti-piracy data collection services and therefore IPP is a vendor to Plaintiff.

Accordingly, IPP does not and will not provide any of its trade secrets to Plaintiff.  Plaintiff

objects to this request for production as vastly overbroad, beyond the scope of permissible

discovery and not relevant to the claims and defenses in this case nor proportional to the needs

of this case.  Plaintiff further objects to this request for production as seeking confidential,

proprietary, and trade secret information.

Subject to and without waiver of its foregoing objections, Plaintiff has no documents or

materials responsive to this request for production within its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 2:**

A copy of the source code of the Infringement Detection Software that was used on the

Dates Of Alleged Infringements.

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully

herein.  Plaintiff specifically objects to this request as seeking the production of documents

which are not in Plaintiff's possession, custody, or control.  The documents and materials

sought by this request—documents related to the technical specifications, hardware, software,

code operation, creation, tests, or maintenance of the Infringement Detection System—are in the

exclusive possession, custody, and control of IPP International, UG's ("IPP"), a third party over

whom Plaintiff has no control.  To be clear, IPP and Plaintiff are separate entities.  IPP is not

owned by, partnered with, or affiliated with Plaintiff.  Plaintiff pays for IPP's anti-piracy data

collection services and therefore IPP is a vendor to Plaintiff.  Accordingly, IPP does not and

will not provide any of its trade secrets to Plaintiff.  Plaintiff objects to this request for

production as vastly overbroad, beyond the scope of permissible discovery and not relevant to

the claims and defenses in this case nor proportional to the needs of this case.  Plaintiff further

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

ACTIVE\83353197.v1-1/4/19

objects to this request for production as seeking confidential, proprietary, and trade secret information.

Subject to and without waiver of its foregoing objections, Plaintiff has no documents or materials responsive to this request for production within its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 3:**

A copy of all third-party software licenses that were used for Infringement Detection Software on the Dates Of Alleged Infringements.

**RESPONSE**:

*See* Plaintiff's objections and response to Request for Production No. 2, which Plaintiff incorporates herein by reference.

**REQUEST FOR PRODUCTION NO. 4:**

A copy of all build files of the Infringement Detection Software that was used on the Dates Of Alleged Infringements.

**RESPONSE**:

*See* Plaintiff's objections and response to Request for Production No. 2, which Plaintiff incorporates herein by reference. Plaintiff further objects to this request as vague and ambiguous with respect to the term "build files," which impermissibly requires Plaintiff and/or its attorneys to speculate as to the meaning intended.

**REQUEST FOR PRODUCTION NO. 5:**

A copy of all validation test files for the Infringement Detection Software that was used on the Dates Of Alleged Infringements.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

6

1  **RESPONSE**:

2  *See* Plaintiff's objections and response to Request for Production No. 2, which Plaintiff

3  incorporates herein by reference.

4

5  **REQUEST FOR PRODUCTION NO. 6:**

6  A copy of all documentation for Infringement Detection on the Dates Of Alleged

7  Infringements.

8  **RESPONSE**:

9  Plaintiff incorporates the foregoing General Objections by reference as if set forth fully

10  herein.  To the extent that this request seeks the production of documents related to the technical

11  specifications or operation of the Infringement Detection System itself, Plaintiff incorporates

12  herein by reference its objections and response to Request for Production No. 2.  Plaintiff

13  further objects to this request as vague and ambiguous with respect to the term

14  "documentation," which impermissibly requires Plaintiff and/or its attorneys to speculate as to

15  the meaning intended.

16  Subject to and without waiver of the foregoing objections, Plaintiff will produce all the

17  PCAPs, .tar files, and .torrent files in its possession, custody, or control, related to Defendant's

18  infringing transactions alleged in the operative complaint as well as a Technical Report

19  associated with one infringing transaction committed by IP address 73.225.38.130.

20

21  **REQUEST FOR PRODUCTION NO. 7:**

22  A copy of all expert reports regarding the testing, validation, and/or inspection of the

23  Infringement Detection Software on the Dates Of Alleged Infringements.

24  **RESPONSE**:

25  Plaintiff incorporates the foregoing General Objections by reference as if set forth fully

26  herein.  Plaintiff specifically objects to this request as vague and ambiguous with respect to the

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

7

term "expert reports," which impermissibly requires Plaintiff and/or its attorneys to speculate as to the meaning intended.  Plaintiff further objects to this request as seeking publicly available documents.  To the best of Plaintiff's knowledge, IPP's Infringement Detection System has been tested twice by an expert based in the U.S, and reports regarding such tests are publicly available.

Subject to and without wavier of the foregoing objections, Plaintiff will, as a courtesy, search for and, if located, produce copies of those expert reports.  However, to the extent this request for production seeks any other reports (such as any created for IPP's internal purposes), Plaintiff incorporates herein by reference its objections and response to Request for Production No. 2.

**REQUEST FOR PRODUCTION NO. 8:**

A copy of all expert reports regarding the testing, validation, and/or monitoring of Infringement Detection.

**RESPONSE**:

*See* Plaintiff's objections and response to Request for Production No. 7, which Plaintiff incorporates herein by reference.

**REQUEST FOR PRODUCTION NO. 9:**

A copy of any and all Documents that reference IP Addresses used to monitor the BitTorrent Swarm for Infringement Detection on the Dates Of Alleged Infringements.

**RESPONSE**:

Plaintiff incorporates herein by reference its objections to Request for Production No. 2. Subject to and without wavier of the foregoing objections, Plaintiff will produce all the PCAPs, in its possession, custody, or control, related to Defendant's infringing transactions alleged in the operative complaint as well as the Infringement Transaction Log File, which lists each

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

8

ACTIVE\83353197.v1-1/4/19

1  infringing transaction involving IP address 73.225.38.130, and a Technical Report associated

2  with one infringing transaction committed by IP address 73.225.38.130.

3

4  **REQUEST FOR PRODUCTION NO. 10:**

5      A copy of all PCAPs from the BitTorrent Swarms that were collected for Infringement

6  Detection on the Dates of the Alleged Infringements.

7  **RESPONSE**:

8      Plaintiff incorporates the foregoing General Objections by reference as if set forth fully

9  herein.  Plaintiff specifically objects to this request for production as vastly overbroad, beyond

10  the scope of permissible discovery and not relevant to the claims and defenses in this case nor

11  proportional to the needs of this case.

12      Subject to and without wavier of the foregoing objections, Plaintiff will produce a copy

13  of all PCAPs from the BitTorrent Swarms that were collected for Defendant's IP address on the

14  Dates of the Alleged Infringements.

15

16  **REQUEST FOR PRODUCTION NO. 11:**

17      A copy of all Torrent Files accessed by the Infringement Detection Software

18  corresponding to the Works.

19  **RESPONSE**:

20      Plaintiff incorporates the foregoing General Objections by reference as if set forth fully

21  herein.  Plaintiff specifically objects to this request for production as vastly overbroad, beyond

22  the scope of permissible discovery and not relevant to the claims and defenses in this case nor

23  proportional to the needs of this case.  As written, the request seeks the production of .torrent

24  files that are not at issue in this case.  To explain, a single .torrent file can only correspond to a

25  single particular hash.  Although IPP monitors the infringement of each Work listed in the

26  operative complaint, each work is potentially infringed through hundreds of different .torrent

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

9

1    files and hashes.  Accordingly, a request for every .torrent file is overly broad and unduly

2    burdensome, and seeks data not relevant or proportional to the needs of this case.  The only

3    relevant .torrent files are those which Plaintiff alleged that Defendant infringed in this case.

4         Accordingly, subject to and without waiver of the foregoing objections, Plaintiff will

5    produce the .torrent files for all the hashes at issue in this case.  If the Defendant infringed a

6    single work using multiple .torrent files, Plaintiff will produce the .torrent files for each of those

7    hashes as well.

8

9    **REQUEST FOR PRODUCTION NO. 12:**

10        A copy of all DMCA notices sent to IP address 73.225.38.130.

11   **RESPONSE**:

12        Having conducted a reasonable and diligent search, Plaintiff is not in possession,

13   custody, or control of any documents responsive to this request for production.

14

15   **REQUEST FOR PRODUCTION NO. 13:**

16        A copy of all DMCA notices sent to any internet service provider, in relation to IP

17   address 73.225.38.130.

18   **RESPONSE**:

19        Having conducted a reasonable and diligent search, Plaintiff is not in possession,

20   custody, or control of any documents responsive to this request for production.

21

22   **REQUEST FOR PRODUCTION NO. 14:**

23        A copy of all copyright certificates related to the Works.

24   **RESPONSE**:

25        Plaintiff will produce all non-privileged documents within its possession, custody, or

26   control responsive to this request for production.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

10

ACTIVE\83353197.v1-1/4/19

**REQUEST FOR PRODUCTION NO. 15:**

A copy of all copyright depository copies related to the Works.

**RESPONSE**:

Plaintiff will produce all non-privileged documents within its possession, custody, or control responsive to this request for production.


**REQUEST FOR PRODUCTION NO. 16:**

All Documents, for the last three years, supporting your allegation in paragraph 3 of the Complaint that SH3 has "...more than 20 million unique visitors to its websites each month..."

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully herein.  Plaintiff specifically objects to this request for production as vastly overbroad, unduly burdensome, beyond the scope of permissible discovery, not relevant to the claims and defenses in this case nor proportional to the needs of this case, and in direct violation Fed. R. Civ. P. 26 (b)(1), which states that the "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Here, the requested production of _voluminous_ server logs establishing that 20 million unique IP addresses visit Plaintiff's websites each month is neither relevant nor proportional to the needs of this case.  Indeed, this documentation has no bearing on Defendant's liability for copyright infringement and does nothing to support any claim or defense in this matter, including Defendant's abuse of process and declaration of non-infringement counterclaims.  Plaintiff further objects to this request for production as designed to annoy, harass, oppress, and interposed for an improper purpose.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

11

ACTIVE\83353197.v1-1/4/19

Subject to and without waiver of the foregoing objections, Plaintiff is not presently producing documents in response to this request for production.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents supporting your allegations in paragraph 4 of the Complaint that Defendant "...has been recorded infringing 80 movies over an extended period of time".

**RESPONSE**:

Plaintiff will produce all non-privileged documents within its possession, custody, or control responsive to this request for production.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents supporting your allegations in paragraph 9 of the Complaint that "...Plaintiff used IP address geolocation technology by Maxmind Inc. ("Maxmind")".

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully herein.  Plaintiff specifically objects to this request for production as not relevant to the claims and defenses in this case nor proportional to the needs of this case.  Plaintiff merely used Maxmind Inc. to determine the location of Defendant and, therefore, determine if venue for this lawsuit was proper in this district, which it is and Defendant never objected to venue in this district.  Here, Maxmind determined that the Defendant assigned IP address 73.225.38.130 resides in the Western District of Washington—a fact which defense counsel subsequently confirmed.  Since Defendant's residence is not in dispute, any document relating to this geolocation technology is irrelevant.

Subject to and without waiver of the foregoing objections, Plaintiff is not presently producing documents in response to this request for production.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

12

**REQUEST FOR PRODUCTION NO. 19:**

All Documents supporting your allegations in paragraph 13 of the Complaint that "Strike 3's subscription based websites proudly boast a paid subscriber base that is one of the highest of any adult-content sites in the world."

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully herein. Plaintiff specifically objects to this request for production as vastly overbroad, unduly burdensome, beyond the scope of permissible discovery, not relevant to the claims and defenses in this case nor proportional to the needs of this case, and in direct violation Fed. R. Civ. P. 26 (b)(1), which states that the "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Here, the requested production of *voluminous* subscriber data that is neither relevant nor proportional to the needs of this case. Indeed, Plaintiff's subscriber base has no bearing on Defendant's liability for copyright infringement and does nothing to support any claim or defense in this matter, including Defendant's abuse of process and declaration of non-infringement counterclaims. Plaintiff further objects to this request for production as designed to annoy, harass, oppress, and interposed for an improper purpose. Plaintiff also objects to this request for production as seeking highly sensitive private subscriber information which infringes these subscribers' privacy rights and confidential business information pursuant to Fed. R. Civ. P. 26(c).

Subject to and without waving the foregoing objection, Plaintiff avers that ample data on numerous publicly accessible websites support this allegation and Plaintiff is therefore not presently producing documents in response to this request for production.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

13

**REQUEST FOR PRODUCTION NO. 20:**

All Documents supporting your allegations in paragraph 13 of the Complaint that "Strike 3 also licenses its motion pictures to popular broadcasters".

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully herein.  Plaintiff specifically incorporates herein by reference its objections and response to Request for Production No. 19.  Plaintiff further objects to this request for production as seeking documents containing confidential business information pursuant to Fed. R. Civ. P. 26(c).  Indeed, the terms of each agreement are highly confidential, not publicly known, and provide each party with a competitive advantage.

Subject to and without waiver of the foregoing objections, Plaintiff is not presently producing documents in response to this request for production.


**REQUEST FOR PRODUCTION NO. 21:**

All Documents supporting your allegations in paragraph 13 of the Complaint that "Strike 3's motion pictures are the number one selling adult DVDs in the United States".

**RESPONSE**:

Plaintiff incorporates the foregoing General Objections by reference as if set forth fully herein.  Plaintiff specifically objects to this request for production as vastly overbroad, unduly burdensome, beyond the scope of permissible discovery, not relevant to the claims and defenses in this case nor proportional to the needs of this case, and in direct violation Fed. R. Civ. P. 26 (b)(1), which states that the "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

14

ACTIVE\83353197.v1-1/4/19

outweighs its likely benefit."  Here, the requested production of *voluminous* sales data that is neither relevant nor proportional to the needs of this case.  Indeed, Plaintiff's sales data has no bearing on Defendant's liability for copyright infringement and does nothing to support any claim or defense in this matter, including Defendant's abuse of process and declaration of non-infringement counterclaims.  Plaintiff further objects to this request for production as designed to annoy, harass, oppress, and interposed for an improper purpose.  Plaintiff also objects to this request for production as seeking highly sensitive sales data which infringes these subscribers' privacy rights and confidential business information pursuant to Fed. R. Civ. P. 26(c).

Subject to and without waving the foregoing objection, Plaintiff avers that ample data on numerous publicly accessible websites support this allegation and Plaintiff is therefore not presently producing documents in response to this request for production.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents supporting your allegations in paragraph 16 of the Complaint that "Often appearing among the most infringed popular entertainment content on torrent websites, Strike 3's motion pictures are among the most pirated content in the world."

**RESPONSE**:

Plaintiff incorporates herein by reference its objections and response to Request for Production No. 21.

Subject to and without waving the foregoing objection, Plaintiff avers that ample data on numerous publicly accessible websites support this allegation and Plaintiff is therefore not presently producing documents in response to this request for production.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

15

ACTIVE\83353197.v1-1/4/19

**REQUEST FOR PRODUCTION NO. 23:**

All Documents supporting your allegations that Defendant distributed S3H's Works, as alleged in paragraph 23 of the Complaint.

**RESPONSE**:

Plaintiff will produce such documents responsive to this request for the production to the extent they are non-privileged within its possession, custody, or control, and can be located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents supporting your allegations in paragraph 26 of the Complaint that "A full copy of each digital media file was downloaded from the BitTorrent file distribution network, and it was confirmed through independent calculation that the file hash correlating to each file matched the file hash downloaded by Defendant."

**RESPONSE**:

Plaintiff will produce such documents responsive to this request for the production to the extent they are non-privileged within its possession, custody, or control, and can be located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents supporting your allegations in paragraph 27 of the Complaint that "Defendant downloaded, copied, and distributed a complete copy of Plaintiff's Works".

**RESPONSE**:

Plaintiff will produce such documents responsive to this request for the production to the extent they are non-privileged within its possession, custody, or control, and can be located after a reasonable search.

PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S REQUESTS FOR PRODUCTION OF DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

16

ACTIVE\83353197.v1-1/4/19

**REQUEST FOR PRODUCTION NO. 26:**

All Documents supporting your allegations in paragraph 29 of the Complaint that "The digital media files have been verified to contain a digital copy of a motion picture that is identical (or alternatively, strikingly similar or substantially similar) to Plaintiff's corresponding original copyrighted Works."

**RESPONSE**:

Plaintiff will produce the .tar file and the control copy corresponding to each Work.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents supporting your allegations in paragraph 30 of the Complaint that "Absent this lawsuit, Plaintiff knows of no way to effectively prevent Defendant from infringing Plaintiff's motion pictures."

**RESPONSE**:

Plaintiff will produce such documents responsive to this request for the production to the extent they are non-privileged within its possession, custody, or control, and can be located after a reasonable search.

DATED this 4th day of January, 2019

**FOX ROTHSCHILD LLP**


  s/ *Bryan J. Case*
Bryan J. Case, WSBA #41781
Lincoln D. Bandlow, *admitted Pro Hac Vice*
(CSBA #170449)

Attorneys for Plaintiff Strike 3 Holdings, LLC

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

17

ACTIVE\83353197.v1-1/4/19

1

## **CERTIFICATE OF SERVICE**

2

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle,

3

Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within

4

cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing

5

on counsel of record for all other parties to this action as indicated below:

6

7

8

9

J. Curtis Edmondson, WSBA #43795          ☒ Via CM/ECF / Email
399 NE John Olsen Avenue                          ☒ Via U.S. Mail
Hillsboro, Oregon 97124                              ☐ Via Messenger Delivery
Telephone: (503) 336-3749                           ☐ Via Overnight Courier
Email: jcedmondson@edmolaw.com              ☐ Via Facsimile

10

DATED this 4th day of January, 2018.

11

12

13

_Courtney R. Tracy_
Courtney R. Tracy
Legal Administrative Assistant

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S REQUESTS FOR PRODUCTION OF
DOCUMENTS (Case No.: 2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

18

ACTIVE\83353197.v1-1/4/19

— **EXHIBIT  2** —

## DECLARATION OF STEPHEN M. BUNTING

I, STEPHEN M. BUNTING, DO HEREBY DECLARE:

1.     My name is Stephen Michael Bunting.  I am over the age of twenty-one (21), and I am competent to make this Declaration.  I make this Declaration voluntarily and the facts stated herein are based on my personal knowledge and information.

2.     Attached hereto as Exhibit "A" is a true and accurate copy of my Curriculum Vitae which truly and accurately represents my relevant employment history, training, experience, certifications, and expert-witness experience.

3.     I currently work as Director of Services for SUMURI, LLC and as independent forensic consultant as owner of Bunting Digital Forensics, LLC.  Prior to that, I was a police officer from 1980 until 2009 with the University of Delaware Police from which I retired as a Captain.  During the last ten years with the University of Delaware Police, I was in charge of the digital forensics and cyber investigations unit, that I founded.  From 2009 until early 2013, I was a Senior Forensic Consultant with Forward Discovery, LLC, which in late 2012 was acquired by Alvarez and Marsal (NY) where I was a manager in the digital forensics division.  I founded Bunting Digital Forensics, LLC in early 2013.

4.     I have taken hundreds of hours of training in digital forensics, network forensics, and cyber investigations.  I have provided training in the same topic areas, from beginner to expert levels, to members of various local, state, and federal law enforcement agencies and private sector examiners.  I have trained like personnel internationally in over twenty-one (21) different countries.  I have provided training, as either a part-time employee or contractor, for Guidance Software, Magnet Forensics, MicroSystemation, A.B., Organization of American States, and the

1

U.S. Department of State Anti-Terrorism Assistance Program (Cyber Division). I have developed digital forensic or cyber training programs for several government and private entities.

5.    I hold several industry-related certifications. I was the recipient of the 2002 Guidance Software Certified Examiner Award of Excellence for receiving the test score on my certification examinations. Among my varied certifications I am an EnCase Certified Examiner EnCE (Guidance Software), an AccessData Certified Examiner (ACE), Certified Computer Forensics Technician (HTCN), and a Certified XRY Instructor.

6.    I am the principle author of *EnCase Computer Forensics - The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition,* the co-author of *Mastering Windows Network Forensics and Investigation, the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 2nd Edition,* and the co-author of *Mastering Windows Network Forensics and Investigation 2nd Edition, the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition* (all published by Wiley).

7.    I have written numerous articles in the field of digital forensics over my career. Most recently, I published two articles regarding spoliation examinations in which several peer-to- peer cases on which I have consulted were referenced in a hypothetical context: *Forensic Analysis of Spoliation and Other Discovery Violations - Part 2 of a 2-Part Series - Windows Examinations* - eForensics Magazine - December 2016 *Forensic Analysis of Spoliation and Other Discovery Violations - Part 1 of 2-Part Series - Macintosh Examinations* - eForensics Magazine - October 2016

8.    I have testified as a fact and expert witness numerous times in the field of computer forensics before state and federal courts in Delaware and New Jersey. I have submitted affidavits,

2

S3H (217-cv-01731)-000156

as an expert in digital forensics, on many matters in several states, including Delaware, Georgia, and South Carolina.

9.    No court has ever refused nor has any attorney ever challenged to accept my testimony on the basis that I was not an expert or not qualified in the field of computer forensics.

10.    As a digital forensics examiner I have acquired and examined hundreds of computer systems and mobile devices for various local, state, and federal agencies, in addition to scores of private clients. The types of cases or examinations include: homicide, child-exploitation, fraud, Medicaid fraud, unlawful intrusion into computer systems (hacking), intellectual property theft, research fraud, email forgery, criminal impersonation, forgery, sexual harassment, peer-to-peer, and spoliation. I have acquired computer systems of many types, including servers, virtual servers, desktops, and laptops. I have acquired hundreds of mobile devices (feature phones and smart phones), both logically and physically. I also have acquired smart phones using JTAG and chip-off techniques, both of which require disassembly and working with the printed circuit boards inside a smart phone.

11.    I have considerable experience with network-related cases, such as unlawful intrusions and peer-to-peer cases. I have investigated or provided digital forensics support to several unlawful intrusion incidents in both a law enforcement and a private sector capacity.

12.    In the past, I have consulted with Computer Forensics, LLC, in copyright infringement cases utilizing IPP's technology. I'm familiar with the technology that was used in those cases to detect the copyright infringement offenders.

13.    As a police officer I received specialized training in conducting peer-to-peer investigations by S.A. Flint Waters with the Wyoming Internet Crimes Against Children (ICAC) Task Force. S.A. Waters developed the Wyoming Toolkit, a customized version of Phex, a peer-

3

to-peer client on the Gnutella network.  I participated with members of the State of Delaware ICAC in this training program and afterwards in a task force conducting peer-to-peer investigations. Using the Wyoming Toolkit, we searched for child sexual exploitation images and movies on the peer-to-peer networks. When images were found, the software identified offending computers by their IP addresses.[1]  The IP addresses hosting the illegal images are parsed by the toolkit using an IP geolocation database by which offending IP's are isolated or filtered to only those within our police jurisdiction.   Once offending IP's were found in Delaware, we would request that the Attorney General's office submit subpoenas to the ISP (Internet Service Provider) for specific customer information and address of the offending IP address.  As IP addresses are often time-specific, we submitted the exact date / time (along with time zone offset) for the offending IP address.   The ISP would return to us the customer or subscriber information (name, address, account information, etc.) for the ISP in question.  We would investigate further and obtain a search warrant for the premises at which the IP was hosted.  The search warrant would permit us to seize all media and electronic devices capable of holding digital media, as we did not know specifically which device behind the router was the offending device.  The IP address detected by the peer-to-

---

[1] A public or internet routable IP address is a router or computer's address on the internet at a specific time.  IP addresses uniquely identify a computer, as no two computers can have the same exact public, internet routable, IP address at the same time.  If the address is that of a router, the computer typically has a private address behind the router. In a typical home network, the ISP provides a 'box,' which is often both a modem and a router / firewall / DHCP server.  The router has a public or internet facing IP address assigned to it.  On the back side of the router, several devices (computers, smart phones, etc.) are connected using private addresses.  Thus, several devices in a home network share the public internet routable address assigned to the ISP's box (router).  Other computers on the internet, including peer- to-peer software, see and use the public facing IP address assigned to the customer's router. The router routes network traffic for specific devices on the private side or behind the router using a protocol called NAT (Network Address Translation), thus assuring network traffic is sent to the correct computer.  IP addresses, as mentioned, are often time specific. These IP addresses are called dynamic IP addresses. They are assigned for certain periods of time, called leases.  There is great variability in how often dynamic IP addresses change, but because they can and do change, the specific time of the offense is necessary to determine which subscriber was assigned a specific IP address at a specific time.  ISP's maintain connection logs that record to whom a specific IP address is assigned and exactly when.  By contrast, an IP address can be a fixed IP address.  Even they can change and, as an investigator, you do not know which type a subscriber has and thus the exact time is always obtained and submitted to an ISP when requesting subscriber information.

S3H (217-cv-01731)  000158

peer software was the public facing internet addressable IP address of the router, which is associated with the subscriber and their residence and not to a specific computer in the residence. Because it was a criminal investigation, we requested that the subscriber not be notified of the subpoena so that digital evidence would not be destroyed.  Thus, in nearly all cases, the offending subscribers were surprised by the execution of the search warrant.  In all the times that we did so, not once did the IP address lead to an innocent person's residence. Rather, we always found evidence therein of child sexual exploitation media on the computer system(s) therein.

14.     I have found that the Wyoming Toolkit was a most reliable tool for identifying the IP addresses for peer-to-peer clients that were hosting child sexual exploiting images and video.

15.     Most recently, I tested the infringement detection software by a company called MaverickEye UB (MEU).  This software and hardware platform is owned and run by GuardaLey, LTD ("GuardaLey"), a German company located in Eggenstein, Germany.  It is my understanding that GuardaLey's system is substantially similar to another German company called IPP International UG ("IPP").

16.     I constructed and then conducted a test to determine the accuracy of the GuardaLey's system as to its ability to detect an infringing party's IP address, identifying metadata (client software and version used by infringer), and identifying the known test files distributed on the torrent network.  The manner in which GuardaLey's system works and the manner in which the software that I have used in my law enforcement capacity (Wyoming Toolkit) work to connect a peer-to- peer violation with an IP and subsequently with a subscriber are quite similar.  In fact, in my opinion, GuardaLey's system is much better with greater integrity features.  Further, my test confirmed that GuardaLey's system is accurate.  My report illustrating this conclusion is attached hereto as Exhibit "B."

17.     I have been retained by Strike 3 Holdings, LLC to provide digital forensic services and consulting in matters of copyright infringement.  I am paid on an hourly basis by Strike 3 Holdings, LLC at the rate of $250 / hour for my digital forensics services.

18.     I have read through the Honorable Judge Royce C. Lamberth's Memorandum Opinion ("DC Opinion") in the matter *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.180.154.14*, No. CV 18-1425, (D.D.C. Nov. 16, 2018).   The instant declaration specifically addresses the portion of the DC Opinion discussing the technology behind Strike 3 Holdings' case.  And more specifically, the portion of the DC Opinion which states:

> Since Bittorrent masks users' identities, Strike 3 can only identify an infringing Internet protocol (IP) address, using geolocation technology to trace that address to a jurisdiction. This method is famously flawed: virtual private networks and onion routing spoof IP addresses (for good and ill); routers and other devices are unsecured; malware cracks passwords and opens backdoors; multiple people (family, roommates, guests, neighbors, etc.) share the same IP address; a geolocation service might randomly assign addresses to some general location if it cannot more specifically identify another.

*STRIKE 3 HOLDINGS, LLC, Plaintiff, v. JOHN DOE subscriber assigned IP address 73.180.154.14*, Defendant., No. CV 18-1425, 2018 WL 6027046, at *1 (D.D.C. Nov. 16, 2018).

19.     Below, I address each of the foregoing issues in turn.

**Virtual Private Networks and Onion Routing Spoofing of IP Addresses**

20.     Often times, in cases involving cybercrimes and IP addresses, defendants claim that their IP address was "spoofed."   However, in cases involving detection systems that connect to peers using a TCP/IP connection, such as the Wyoming Toolkit, GuardaLey's system, or IPP's system, spoofing cannot be accomplished.

21.     IP spoofing is typically used in DDOS (denial of service) attacks.  Indeed, specially crafted network packets can be used to create denial of service attacks, but these packets are small and usually involve repeatedly sending the same small crafted packet over and over again, creating

S3H (217-cv-01731)-000160

a flood of messages that results in a denial of service attack. Creating a few small, specially crafted packets that are sent repeatedly is a completely different task than trying to do so for a BitTorrent stream, where tens of thousands of packets, mostly all of which are different, are involved.

22.     With respect to spoofing in the BitTorrent context, in a practical sense, a very technically adept person would have to know a victim's IP address. This person would have to physically connect a computer into the same network segment as the intended victim in order to intercept the network traffic involved. Doing so would involve considerable knowledge and skills, in and of itself, and could involve illegal access to a building or ISP network equipment. The person would need to have the file in question on their computer, be sharing it using BitTorrent software, and have some software or code capable of or rewriting tens of thousands of BitTorrent packets on the fly, as any delay could cause a time-out. While many things are theoretically possible, I am unaware of any such software being available. Such an endeavor would involve tremendous effort and resources. In addition, the person would have to know that a particular file was being monitored for copyright infringement downloading. And finally, such a person would have to have a very strong motivation to undertake such a task and to target a particular person and/or IP address. Considering all that would be involved in such an endeavor, it is so unlikely to occur as to be nearly impossible.

23.     Often IP spoofing, as described above, is interpreted or confused by many, including Google's search engine, with IP address hiding. If you search for "IP spoofing software," you will find most of the search results will involve VPN (Virtual Private Network) software. VPN software allows the user of a computer to create an encrypted tunnel to a VPN server from which the internet traffic emerges unencrypted, provided of course it was unencrypted to begin with. The VPN server's internet facing IP address becomes the user's public internet-

7

routable IP address.  It acts as a proxy and becomes the user's frontend IP address on the internet. VPN's are intended for privacy of a user's internet traffic and also for protecting the identity of a user's true IP address (the IP address which their ISP has assigned to them).  If an infringer uses a VPN to engage in BitTorrent file sharing, other peers within the swarm will be able to identify the infringer by the infringer's public facing internet routable IP address which would the VPN's IP address.  In other words, when a VPN is being used, other peers can only trace the connection to the front-end or public-facing, internet routable IP address – which would be the VPN IP address. To obtain the true IP address of the user behind the VPN, one would have to contact the VPN owner or manager.  If the VPN owner maintain logs, and many intentionally do not, the connection to the source can then be identified through the subpoena process.

24.      In the past, I actually conducted a test on this exact VPN issue.  Indeed, earlier this year, when I tested Guardaley's system, I also tested this VPN theory.  To do so, I configured one test laptop (MacBook Pro – High Sierra) with a VPN service.  With the VPN enabled, I launched Transmission (a popular BitTorrent client) and shared four separate test files.  I noted the public, internet-routable, frontend VPN IP address in use by the test laptop.  After running this BitTorrent configuration overnight using the VPN service, GuardaLey reported to me that their system captured and downloaded the test files from the IP address that I had recorded for the test laptop. It was, as expected, the IP address of the VPN server.  Thus, a test of the scenario, establishes that the VPN IP address, and not my true ISP's IP address was being made public via the BitTorrent network.

### Unsecured Routers and Other Devices

25.      The DC Opinion also lists concerns about unsecured routers and devices.

8

26.     During my time at Bunting Digital Forensics, LLC, I was involved in a case where the owner of the computer and charged party was professing his innocence, claiming someone else must have used his wireless network, citing a neighbor who reportedly engages in photography of a questionable nature.  However, the evidence on his computer suggested otherwise.  The software used by the investigators detected the name and version of the peer-to-peer software client involved, which happened to match the one found on his machine.  Further, the same exact images detected by the investigative software were found on his machine.  His claims were without merit and in direct contradiction to the overwhelming digital evidence found on his computer.

27.     Unsecured wireless routers in homes used to be commonplace 15 years ago.  In recent years, however, Internet Service Providers (ISP's) have undertaken great effort to provide and deploy secured wireless systems.  Most "internet interface boxes" (combination modem / router / firewall / DHCP server) which are rented to subscribers are preconfigured to operate with WPA2 security with a complex password already set.  These devices are secure out of the box with strong encryption and complex passwords that are lengthy alpha numeric passphrases.  Thus, valid claims of compromised home wireless systems today are, in my experience, rare compared to 15 years ago.

**Malware Cracks Passwords and Open Backdoors**

28.     The DC Opinion states, that "malware cracks passwords and opens backdoors."  However, I have never heard of or encountered malware which accesses a user's computer, automatically downloads and installs a BitTorrent client, and then proceeds to download .torrent files correlating to several of Plaintiff's works over the course of several months.

S3H (217 cv 01731) 000163

**Multiple People Share the Same IP Address**

29.     Although there may be several household members who access the internet with the same router, learning the identity of the subscriber to an IP address user in connection with commission of a crime is instrumental, necessary, and the only means of learning the perpetrator's true identity – even if the subscriber is not the perpetrator.

30.     And, in my experience, the IP address's subscriber, or a family member thereof, is likely the offending party.

**Geolocation Technology**

31.     Lastly, the DC Opinion states, "a geolocation service might randomly assign addresses to some general location if it cannot more specifically identify another."

32.     Geolocation services are used to approximate locations of IP addresses.   Such geolocation services are often used as a tool in e-commerce fraud prevention measures.   Further, the Wyoming Tool Kit that I used as a law enforcement officer to identify offenders distributing sexual exploitive images of children using peer-to-peer software, used commercial geolocation services to obtain the approximate location of IP addresses for purposes of assigning IP addresses to various law enforcement jurisdictions.   Geolocation databases are not used to determining the exact address of a subscriber of an IP address for purposes of executing a search warrant.   Rather, to determine an IP address subscriber's physical address on which to execute a search warrant, law enforcement relies on a subpoena that is served upon the ISP.   When law enforcement uses this technology and methodology to identify and arrest those creating and exchanging sexually exploitive images of children, they are applauded for their efforts.   Similarly, Strike 3 Holdings, LLC uses geolocation services to determine an approximate location of an IP address so as to identify a court with jurisdiction in that region.   Once that court issues a subpoena, the exact name

and specific physical address of the party responsible for the offending IP is identified.  Strike 3 Holdings, LLC is, thus, using a process very much like that used by law enforcement.

**FURTHER DECLARANT SAYETH NAUGHT**

<strong>DECLARATION</strong>

**PURSUANT TO 28 U.S.C SS 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed December 11, 2018.

Stephen M. Bunting

11

# — EXHIBIT  3 —

## DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration.  The facts stated in this declaration are based upon my personal knowledge.

2.      I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Department.  And, from 2000-2011, I was a detective in the computer crimes unit.

3.      As a detective in the computer crimes unit, I investigated internet child pornography and computer crime cases.

4.      I have conducted forensic computer examinations for:

(a)      Broward County Sheriff's Office (BSO);

(b)      Federal Bureau of Investigation (FBI);

(c)      U.S. Customs and Border Protection (CBP);

(d)      Florida Department of Law Enforcement (FDLE);

(e)      U.S. Secret Service;

(f)      Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

(g)      Various municipalities in the jurisdiction of Palm Beach County.

5.      I was also previously assigned to a police unit working in conjunction with TLO Corp., which is a private company.

6.      When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which was consisted of six online investigators and two computer forensic examiners.

7.      I am familiar with software programs used to investigate computers, including EnCase and Access Data.

1

8.      I have taken over 400 hours of courses designed to teach people how to investigate computers.

9.      Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I have taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

10.     I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency, and (e) individuals from other branches of government and the private sector.

11.     After leaving the Palm Beach County Sherriff's office, I founded Computer Forensics, LLC, where I am currently employed.

12.     I have received the following awards and commendations:

(a)     1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

(b)     1997 – Deputy of the Month for June.

(c)     2001 – Detective of the Month for October.

(d)     2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

(e)     2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet.  Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

(f)     2005 – Detective of the Month for December.

(g)     2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

(h)     2008 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

2

S3H (217-cv-01731)-000167

13.     I have been called to testify as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in Florida, California, New Jersey, and New York.

14.     No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics.  My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

15.     With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet.

16.     The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

17.     An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

18.     In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

19.     After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

20.     I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally.

S3H (2:17-cv-01731)_000168

21.     I can recall only one instance in all the times that we executed a search warrant and seized computers where we did not find the illegal content at the dwelling identified in the search warrant.

22.     In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

23.     I never came across a Wi-Fi hacker situation.

24.     In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

25.     I tested IPP International U.G.'s ("IPP") IP detection process.

26.     To do so, I downloaded four public domain movies from the national archive.

27.     I then encoded text into the videos, so that I would know whether someone that downloaded that particular movie downloaded the version of the movie that I created.

28.     I then rented four virtual servers, each of which was connected to the Internet and used a unique IP addresses.

29.     I then configured the servers so that all of them were running Windows 2008 server edition, and I put a different BitTorrent client onto each server.

30.     A BitTorrent "client" is software that enables the BitTorrent protocol to work.

31.     After installing the BitTorrent clients, I also installed Wireshark onto each server. "Wireshark" is a program that captures network traffic and creates PCAPs, just as TCP Dump, which IPP uses, does.   A PCAP is like a video recording of all the incoming and outgoing transactions of a computer.

4

S3H (2:17-cv-01731)-000169

32.     After installing Wireshark onto each of the servers, I transferred the movies from my local computer to the servers.

33.     I then used the BitTorrent clients on each of the servers to make .torrent files.  I uploaded these .torrent files onto various torrent websites.

34.     I then informed IPP of the movie names.  Thereafter, IPP sent me screen captures of the movies I had seeded.

35.     The screen captures sent by IPP had my codes on them; thus, I knew that IPP had caught the movies I had seeded.

36.     IPP also sent me additional data identifying the IP Address used by each of the four servers, and sent me PCAPs.

37.     I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test servers, and determined that IPP's PCAPs match my PCAPs.  This could not have happened unless IPP's server was connected to the test server because the transactions would not match.

38.     From this test, I concluded that IPP's software worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity.

**FURTHER DECLARANT SAYETH NAUGHT.**

<u>**DECLARATION**</u>

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of November, 2013.

By: Patrick Paige

Digitally signed by Patrick Paige
DN: cn=Patrick Paige, o=Computer Forensics LLC,
ou, email=patrick@patrickpaige.com, c=US
Date: 2013.11.11 15:53:41 -05'00'

**PATRICK PAIGE**

5

S3H (217-cv-01731)-000170

— **EXHIBIT 4** —



Computer Forensics, LLC
1880 N. Congress Ave Suite 333
Boynton Beach, FL 33426
Main: 561.404.3074
www.ComputerForensicsLLC.com

## EXPERT REPORT REGARDING TESTING OF IPP INTERNATIONAL UG'S INFRINGEMENT DETECTION SYSTEM

Prepared By:          Patrick Paige, EnCE SCERS
                      Managing Member
                      Computer Forensics, LLC

1

Exhibit B

## DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration.  The facts stated in this declaration are based upon my personal knowledge.

2.      I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Office.  And, from 2000-2011, I was a detective in the Computer Crimes Unit.  After leaving the Palm Beach County Sherriff's Office, I founded Computer Forensics, LLC, where I am currently employed.

3.      I have taken over 400 hours of courses designed to teach people how to conduct computer forensic examinations.

4.      Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

5.      As a computer crimes detective for the Palm Beach County Sheriff's Office, I have conducted forensic computer examinations for:

      (a)      Broward County Sheriff's Office (BSO);

      (b)      Federal Bureau of Investigation (FBI);

      (c)      U.S. Customs and Border Protection (CBP);

      (d)      Florida Department of Law Enforcement (FDLE);

      (e)      U.S. Secret Service;

      (f)      Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

      (g)      Various municipalities in the jurisdiction of Palm Beach County.

2

6.      I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency; and (e) individuals from other branches of government and the private sector.

7.      I have received the following awards and commendations:

(a)      1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

(b)      1997 – Deputy of the Month for June.

(c)      2001 – Detective of the Month for October.

(d)      2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

(e)      2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet. Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

(f)      2005 – Detective of the Month for December.

(g)      2006 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

(h)      2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

8.      I have testified as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in California, Florida, Indiana, New Jersey, New York, and Pennsylvania.

9.      No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics. My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

3

10.     As part of my duties within the Computer Crimes Unit at the Palm Beach County Sherriff's Office, I investigated cases involving the use of the Internet, including cases involving peer-to-peer file sharing networks.  In this role, I also investigated Internet child pornography and computer crime cases.

11.     I was assigned to the Computer Crimes Unit that worked in conjunction with a private company called TLO Corp.

12.     When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which consisted of six online investigators and two computer forensic examiners.

13.     In my experience, during the initial phase of Internet based investigations, the offender is only known to law enforcement by an IP address.

14.     The only entity able to correlate an IP address to a specific individual at a given date and time is the Internet Service Provider ("ISP").

15.     Once provided with the IP Address, plus the date and time of the detected and documented activity, ISP's can use their subscriber logs to identify the name, address, email address and phone number of the applicable subscriber in control of that IP address at the stipulated date and time.

16.     With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet using peer-to-peer file sharing programs.

17.     The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

S3H (217-cv-01731) 000174

18.     An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

19.     In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

20.     After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

21.     I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally while at the Computer Crimes Unit.

22.     From my experience, Plaintiff is likely to identify the infringer.  Indeed, during my time in the Computer Crimes Unit, I can recall only one instance in all the times that we executed a search warrant and seized computers, where we did not find the alleged illegal activity at the dwelling identified in the search warrant.

23.     In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

24.     I never came across a Wi-Fi hacker situation.

25.     In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

26.     The process used by law enforcement mirrors the process used by Malibu Media and IPP to correlate an IP address to an individual.

5

27.     In order to ascertain the identity of the infringer, just as with law enforcement, Malibu Media must subpoena the ISP to learn the subscriber's true identity.

28.     I tested IPP International U.G.'s ("IPP") infringement detection system.   The infringement detection system is named "Observer."   It is owned and used by IPP to identify individuals who are illegally downloading and distributing content via BitTorrent.   This technology and similar investigative methods are used by law enforcement officials when tracking individuals who transmit contraband files such as child pornography via the Internet.

29.     I tested IPP's infringement detection system for its accuracy in detecting and recording infringement via BitTorrent, ascertaining an infringing IP address[1], and identifying the "test" files being distributed on BitTorrent.

30.     To conduct this test, I first downloaded four public domain movies from the national archive.

31.     I then encoded text into each video. The purpose of this encoding was to ensure that when the file is located and download by IPP, it could be easily identified as the videos I personally encoded and seeded.

32.     I then setup and configured four computers, each of which was connected to the Internet and each computer was configured with its own unique static IP address.

33.     I then configured three computers with a Windows 7 operating system, and the fourth computer was a MacBook Pro configured with OS X El Capitan version 10.11.4.   I installed a different BitTorrent client[2] onto each computer system as listed below:

---

[1] An IP address is a numerical value assigned to a computer or device that transmits and receives data via the Internet.   When a computer user accesses the Internet, their Internet Service Provider assigns them a unique IP address for that session.   In order to identify a computer user who is downloading files via the Internet, one must be able to identify the IP address the user was using at that exact time and date of downloading.
[2] A BitTorrent client is software that enables the BitTorrent protocol to work.

6

| Computer | Operating System | BitTorrent Client |
|---|---|---|
| Dell Laptop | Windows 7 | uTorrent Version 3.4.7 |
| Dell Laptop | Windows 7 | qBittorrent Version 3.3.4 |
| Dell Laptop | Windows 7 | Transmission  Version 2.84 |
| MacBook Pro Laptop | OS X El Capitan 10.11.4 | uTorrent  Version 1.8.7 |

34.     After installing the BitTorrent clients, I also installed Wireshark and WinDump onto each computer.  Wireshark and WinDump are programs that capture network traffic and create PCAP files.  PCAP stands for "packet capture."  PCAPs are akin to videotapes.  Indeed, a PCAP is like a video recording of all the incoming and outgoing transactions of a computer.   I have used Wireshark and WinDump software while in law enforcement to examine network traffic while investigating P2P cases.

35.     After installing Wireshark and WinDump onto each of the computers, I transferred the movie files that I created for the test to each of the four computers.

36.     I then used one of the BitTorrent clients on the test computers to make .torrent files.  I then seeded the four test movies.

37.     On June 3, 2016 the test was conducted.  Given only the torrent files, IPP was able to correctly identify all four static IP addresses for each of the test computers that were seeding the movies within minutes of starting the test.  Soon after the test, IPP sent me the PCAP files they recorded during the test for each one of my static IP addresses.

38.     I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test computers, and determined that IPP's PCAPs match my PCAPs.  This could not have happened unless IPP's server was connected to the test computers because the transactions would not match.

39.     I also conducted an examination of IPP's PCAPs to determine if the detection software can accurately identify the BitTorrent clients I used during the test.  Using Wireshark

7

software I loaded IPP's PCAPs recorded on the day of the test. IPP's system was able to accurately record the names and version numbers of all four BitTorrent client's software I used on each of the test computers.

40.     When a BitTorrent client is installed onto a computer, the computer randomly selects a port number for its network communication. A port number is an integer ranging from 0 to 65535. The following is a chart listing the port number assigned to each of the test computers:

| Computer | BitTorrent Client | Port |
|----------|-------------------|------|
| Dell Laptop | uTorrent Version 3.4.7 | 51892 |
| Dell Laptop | qBittorrent Version 3.3.4 | 8999 |
| Dell Laptop | Transmission  Version 2.84 | 51413 |
| MacBook Pro Laptop | uTorrent  Version 1.8.7 | 10088 |

41.     Examination of IPP's PCAP revealed that the port numbers recorded by IPP's system matched the port numbers from the test computers used for BitTorrent communications. Accordingly, my analysis confirmed that IPP was able to accurately identify the port number assigned to each test computer's BitTorrent client.

42.     From this test, I concluded that IPP's infringement detection system worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity. I also concluded that IPP's infringement detection system accurately identifies the BitTorrent clients as well as the BitTorrent client's port number.

43.     In the past, Malibu has also retained Excipio GmbH's ("Excipio") to track infringement of Malibu's copyrighted works. In June 2013, in anticipation of the Bellwether trial in the Eastern District of Pennsylvania, I conducted a test of Excipio's infringement detection system. After performing the test, I concluded that Excipio's infringement detection system works. Specifically, the system accurately records the IP address of a person using

8

BitTorrent to transmit data to Excipio's computer servers.  Excipio's system operates nearly the same fashion as IPP's system.

44.     In addition to testing Malibu's investigators' systems, I have also conducted computer forensic examinations for Malibu in their copyright infringement cases throughout the country.

45.     Indeed, in my role as an expert for Plaintiff, I have examined countless computer hard drives for evidence of: (a) the use of BitTorrent; (b) infringement of the copyrighted "X-Art" works owned by Plaintiff; (c) spoliation of evidence; and (d) suppression of evidence. These examinations have revealed either: (1) evidence of copyright infringement of Malibu Media, LLC's works; or (2) evidence of suppression and spoliation.  Sometimes I have found both.  By way of illustration, below are examples where Malibu obtained a Defendant's hard drive and discovered evidence of its movies, spoliation, and/or  defendants' failures to disclose all hard drives.

        a.  *Malibu Media, LLC v. Weaver*, No. 8:14-cv-01580-VMC-TBM (M.D. Fla. 2015): In *Weaver*, the Court ordered production of the hard drives, and my forensic examination revealed evidence which irrefutably demonstrated: (a) Defendant's BitTorrent use; (b) the prior existence of numerous X-Art titles; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that have not been produced. Because of this examination, Malibu was able to successfully disprove Defendant's denial of infringement.

        b.  *Malibu Media, LLC v. Huseman*, No. 1:13-cv-02695-WYD-MEH (D. Colo. 2014): In the *Huseman* case, I discovered evidence of: (a) BitTorrent use; (b) the prior existence of numerous X-Art titles; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that had not been produced to me for examination, one of which *contained* titles of Plaintiff's copyrighted works. Ultimately, the parties stipulated to a final judgment in favor of Malibu Media, LLC.

        c.  *Malibu Media, LLC v. John Doe*, No. 1:14-cv-10155-KBF (S.D.N.Y. 2015): My forensic examination revealed that defendant had over eleven different file destruction software programs on his hard drive – each with the capability of destroying substantial amounts of data. He used several of the software programs

S3H (2:17-cv-01731) 000179

just days before turning it over for imaging and examination. I also detected that prior to defendant's use of the file destruction software, the defendant connected another undisclosed external storage device to his hard drive. This suggested that defendant was storing data which he wanted to retain prior to using the file destruction software programs on his hard drive. Ultimately, the defendant admitted to his infringement and apologized to Malibu.

d. *Malibu Media, LLC v. Tashiro*, No. 1:13-cv-00205-WTL-MJD (S.D. Ind. 2014): My examination revealed that defendants deleted thousands of BitTorrent files the night before producing the hard drives for imaging. My examination also revealed that defendants possessed and used other hard drives which were never disclosed or produced during discovery. Ultimately, the court imposed terminating sanctions against defendants for failure to disclose documents, spoliation, and perjury.

e. *Malibu Media, LLC v. John Doe*, No. 12-2078 (E.D. Pa. 2013): In this "Bellwether" case, my examination of defendant's hard drive revealed that he installed a Windows operating system three (3) days after being served with a subpoena for production of his computer device. This installation resulted in the complete destruction of all files contained within the hard drive prior to the Windows installation. After falsely testifying, Defendant admitted that he had downloaded Plaintiff's copyrighted works and had wiped his desktop computer (by installing a new Windows operating system) to conceal the infringements. In the end, the Court entered a substantial judgment in favor of Malibu.

46.     I am paid on an hourly basis by Malibu Media, LLC, at the rate of $325.00 per hour for pre-trial investigative work, although the fee increases if I am required to testify at trial.

**FURTHER DECLARANT SAYETH NAUGHT.**

**DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of August, 2016.

By: _____
PATRICK PAIGE

S3H (217-cv-01731) 000180

# — EXHIBIT  5 —

Honorable Thomas S. Zilly

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

## AT SEATTLE

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>Defendant. | Case Number: 2:17-cv-01731-TSZ<br><br>**PLAINTIFF'S EXPERT WITNESS LIST AND PARTIAL EXPERT REPORTS** |

Plaintiff, Strike 3 Holdings, LLC ("Plaintiff"), hereby submits the following list of expert witnesses that it presently believes it may call at trial.  Plaintiff reserves the right to supplement or amend this list at any time prior to trial.

## Witnesses:

1.      Mr. Patrick Paige:  Mr. Paige's address is 8461 Lake Worth Road, Suite 427, Lake Worth, FL 33467.  Plaintiff intends on calling Mr. Paige for the purpose of: (a) opining about IPP International U.G.'s software, and (b) reviewing the Defendant's computers and hard drives and opining about anything he may discover.  Mr. Paige's declaration regarding his examination of IPP International U.G.'s infringement detection system and his curriculum vitae is attached as

PLAINTIFF'S EXPERT WITNESS LIST
AND PARTIAL EXPERT REPORTS
(2:17-cv-01731-TSZ)

**FOX ROTHSCHILD LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

Exhibit A.  Mr. Paige's curriculum vitae outlines his qualifications as an expert witness and listing all the other cases in which, during the previous four years, Mr. Paige has testified as an expert at trial or by deposition.  Mr. Paige is compensated $325.00 per hour to provide his expert opinion on the above matters.

2.      Mr. Stephen Bunting:  Mr. Bunting's address is 33579 Blue Heron Dr. Lewes, DE 19958.  Plaintiff intends on calling Mr. Bunting for the purpose of: (a) opining about IPP International U.G.'s infringement detection system, which it licenses from GuardaLey, Ltd.  Mr. Bunting's declaration regarding his examination of IPP's infringement detection system and his curriculum vitae is attached as Exhibit B.  Mr. Bunting's curriculum vitae outlines his qualifications as an expert witness and listing all the other cases in which, during the previous four years, Mr. Bunting has testified as an expert at trial or by deposition.  Mr. Bunting is compensated $250.00 per hour to provide his expert opinion on the above matters.

Plaintiff reserves the right to call any additional individuals revealed in discovery not yet conducted or completed which may be necessary to respond to witnesses, documents, facts or opinions not yet disclosed to Plaintiff.  Plaintiff further reserves the right to call any additional witnesses needed to rebut any defenses not raised by Defendant as of the time of service of this list.

DATED this 15th day of March, 2019          Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: /s/ *Bryan J. Case*
Bryan J. Case, WSBA #41781
1001 Fourth Avenue Suite 4500
Seattle, WA 98154
Telephone: 206-625-3600
Facsimile: 206-389-1708
Email: bcase@foxrothschild.com

*Attorneys for Plaintiff*

PLAINTIFF'S EXPERT WITNESS LIST
AND PARTIAL EXPERT REPORTS
(2:17-cv-01731-TSZ)

1

2

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2019, I electronically filed the foregoing document was served via U.S. Mail and/or email to the following:

4

5

6

7

J. Curtis Edmondson, WSBA #43795
EDMONDSON IP LAW
399 NE John Olsen Avenue
Hillsboro, Oregon 97124
Telephone: (503) 336-3749
Email: jcedmondson@edmolaw.com

8

9

10

11

Adrienne D. McEntee, WSBA #34061
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Email: amcentee@terrellmarshall.com

12

By: /s/ *Bryan J. Case*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S EXPERT WITNESS LIST
AND PARTIAL EXPERT REPORTS
(2:17-cv-01731-TSZ)

Fox Rothschild LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
(206) 624-3600

# — EXHIBIT  6 —



Computer Forensics, LLC
8461 Lake Worth Road, Suite 427
Lake Worth, FL 33467
Main: 561.404.3074
www.ComputerForensicsLLC.com

**EXPERT REPORT REGARDING TESTING OF IPP INTERNATIONAL UG'S INFRINGEMENT DETECTION SYSTEM**

Prepared By:       Patrick Paige, EnCE SCERS
                   Managing Member
                   Computer Forensics, LLC

## DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration.  The facts stated in this declaration are based upon my personal knowledge.

2.      I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Office.  And, from 2000-2011, I was a detective in the Computer Crimes Unit.  After leaving the Palm Beach County Sherriff's Office, I founded Computer Forensics, LLC, where I am currently employed.

3.      I have taken over 400 hours of courses designed to teach people how to conduct computer forensic examinations.

4.      Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

5.      As a computer crimes detective for the Palm Beach County Sheriff's Office, I have conducted forensic computer examinations for:

    (a)      Broward County Sheriff's Office (BSO);

    (b)      Federal Bureau of Investigation (FBI);

    (c)      U.S. Customs and Border Protection (CBP);

    (d)      Florida Department of Law Enforcement (FDLE);

    (e)      U.S. Secret Service;

    (f)      Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

    (g)      Various municipalities in the jurisdiction of Palm Beach County.

6.      I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency; and (e) individuals from other branches of government and the private sector.

7.      I have received the following awards and commendations:

(a)     1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

(b)     1997 – Deputy of the Month for June.

(c)     2001 – Detective of the Month for October.

(d)     2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

(e)     2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet.  Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

(f)     2005 – Detective of the Month for December.

(g)     2006 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

(h)     2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

8.      I have testified as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in California, Florida, Indiana, New Jersey, New York, and Pennsylvania.

9.      No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics.  My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

10.    As part of my duties within the Computer Crimes Unit at the Palm Beach County Sherriff's Office, I investigated cases involving the use of the Internet, including cases involving peer-to-peer file sharing networks.  In this role, I also investigated Internet child pornography and computer crime cases.

11.    I was assigned to the Computer Crimes Unit that worked in conjunction with a private company called TLO Corp.

12.    When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which consisted of six online investigators and two computer forensic examiners.

13.    In my experience, during the initial phase of Internet based investigations, the offender is only known to law enforcement by an IP address.

14.    The only entity able to correlate an IP address to a specific individual at a given date and time is the Internet Service Provider ("ISP").

15.    Once provided with the IP Address, plus the date and time of the detected and documented activity, ISP's can use their subscriber logs to identify the name, address, email address and phone number of the applicable subscriber in control of that IP address at the stipulated date and time.

16.    With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet using peer-to-peer file sharing programs.

17.    The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

18.     An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

19.     In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

20.     After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

21.     I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally while at the Computer Crimes Unit.

22.     From my experience, Plaintiff is likely to identify the infringer.  Indeed, during my time in the Computer Crimes Unit, I can recall only one instance in all the times that we executed a search warrant and seized computers, where we did not find the alleged illegal activity at the dwelling identified in the search warrant.

23.     In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

24.     I never came across a Wi-Fi hacker situation.

25.     In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

26.     The process used by law enforcement mirrors the process used by Strike 3 Holdings, LLC and IPP to correlate an IP address to an individual.

27.     In order to ascertain the identity of the infringer, just as with law enforcement, Strike 3 Holdings, LLC must subpoena the ISP to learn the subscriber's true identity.

28.     I tested IPP International U.G.'s ("IPP") infringement detection system.   The infringement detection system is referred to as "Observer" or "International IPTracker."  It is used by IPP to identify IP addresses used to illegally download and distribute content via BitTorrent. This technology and similar investigative methods are used by law enforcement officials when tracking individuals who transmit contraband files such as child pornography via the Internet.

29.     I tested IPP's infringement detection system for its accuracy in detecting and recording infringement via BitTorrent, ascertaining an infringing IP address[1], and identifying the "test" files being distributed on BitTorrent.

30.     To conduct this test, I first downloaded four public domain movies from the national archive.

31.     I then encoded text into each video. The purpose of this encoding was to ensure that when the file is located and download by IPP, it could be easily identified as the videos I personally encoded and seeded.

32.     I then setup and configured four computers, each of which was connected to the Internet and each computer was configured with its own unique static IP address.

33.     I then configured three computers with a Windows 7 operating system, and the fourth computer was a MacBook Pro configured with OS X El Capitan version 10.11.4.  I installed a different BitTorrent client[2] onto each computer system as listed below:

---

[1] An IP address is a numerical value assigned to a computer or device that transmits and receives data via the Internet. When a computer user accesses the Internet, their Internet Service Provider assigns them a unique IP address for that session.  In order to identify a computer user who is downloading files via the Internet, one must be able to identify the IP address the user was using at that exact time and date of downloading.
[2] A BitTorrent client is software that enables the BitTorrent protocol to work.

| Computer | Operating System | BitTorrent Client |
|---|---|---|
| Dell Laptop | Windows 7 | uTorrent Version 3.4.7 |
| Dell Laptop | Windows 7 | qBittorrent Version 3.3.4 |
| Dell Laptop | Windows 7 | Transmission Version 2.84 |
| MacBook Pro Laptop | OS X El Capitan 10.11.4 | uTorrent Version 1.8.7 |

34.    After installing the BitTorrent clients, I also installed Wireshark and WinDump onto each computer.  Wireshark and WinDump are programs that capture network traffic and create PCAP files.  PCAP stands for "packet capture."  PCAPs are akin to videotapes.  Indeed, a PCAP is like a video recording of all the incoming and outgoing transactions of a computer.  I have used Wireshark and WinDump software while in law enforcement to examine network traffic while investigating P2P cases.

35.    After installing Wireshark and WinDump onto each of the computers, I transferred the movie files that I created for the test to each of the four computers.

36.    I then used one of the BitTorrent clients on the test computers to make .torrent files. I then seeded the four test movies.

37.    On June 3, 2016 the test was conducted.  Given only the torrent files, IPP was able to correctly identify all four static IP addresses for each of the test computers that were seeding the movies within minutes of starting the test.  Soon after the test, IPP sent me the PCAP files they recorded during the test for each one of my static IP addresses.

38.    I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test computers, and determined that IPP's PCAPs match my PCAPs.  This could not have happened unless IPP's server was connected to the test computers because the transactions would not match.

39.    I also conducted an examination of IPP's PCAPs to determine if the detection software can accurately identify the BitTorrent clients I used during the test.  Using Wireshark software I loaded IPP's PCAPs recorded on the day of the test.  IPP's system was able to accurately

record the names and version numbers of all four BitTorrent client's software I used on each of the test computers.

40.      When a BitTorrent client is installed onto a computer, the computer randomly selects a port number for its network communication.  A port number is an integer ranging from 0 to 65535.  The following is a chart listing the port number assigned to each of the test computers:

| Computer | BitTorrent Client | Port |
|----------|-------------------|------|
| Dell Laptop | uTorrent Version 3.4.7 | 51892 |
| Dell Laptop | qBittorrent Version 3.3.4 | 8999 |
| Dell Laptop | Transmission  Version 2.84 | 51413 |
| MacBook Pro Laptop | uTorrent  Version 1.8.7 | 10088 |

41.      Examination of IPP's PCAP revealed that the port numbers recorded by IPP's system matched the port numbers from the test computers used for BitTorrent communications. Accordingly, my analysis confirmed that IPP was able to accurately identify the port number assigned to each test computer's BitTorrent client.

42.      From this test, I concluded that IPP's infringement detection system worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity.  I also concluded that IPP's infringement detection system accurately identifies the BitTorrent clients as well as the BitTorrent client's port number.

43.      In addition to testing IPP's system, I have also conducted computer forensic examinations for another production company (Malibu Media, LLC) who also used IPP's system to collect evidence for their copyright infringement cases.

44.      In my role as an expert in BitTorrent copyright infringement cases, I have examined countless computer hard drives for evidence of: (a) the use of BitTorrent; (b) infringement of the copyrighted works which IPP tracked; (c) spoliation of evidence; and (d) suppression of evidence. These examinations have revealed either: (1) evidence of copyright infringement of the plaintiff's

works; or (2) evidence of suppression or spoliation.  Sometimes I have found both.  By way of illustration, below are examples where a plaintiff obtained a defendant's hard drive and discovered evidence of its movies, spoliation, and/or a defendant's failure to disclose all hard drives.

a. *Malibu Media, LLC v. Gregory Weaver*, No. 8:14-cv-01580-VMC-TBM (M.D. Fla. 2015):  In *Weaver*, my forensic examination revealed evidence which irrefutably demonstrated: (a) defendant's BitTorrent use; (b) the prior existence of numerous titles belonging to plaintiff; (c) the deletion of BitTorrent files and the uninstallation of a BitTorrent client; and (d) the existence of other computer devices that had not been produced.

b. *Malibu Media, LLC v. Lawrence Huseman*, No. 1:13-cv-02695-WYD-MEH (D. Colo. 2014): In the *Huseman* case, on the hard drives I discovered evidence of: (a) BitTorrent use; (b) the prior existence of numerous titles belonging to plaintiff; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that had not been produced for examination, one of which *contained* titles of plaintiff's copyrighted works.

c. *Malibu Media, LLC v. John Doe*, No. 1:-14-cv-10155-KBF (S.D.N.Y. 2015): My forensic examination revealed that defendant had over eleven different file destruction software programs on his hard drive – each with the capability of destroying substantial amounts of data.  He used several of the software programs just days before turning it over for imaging and examination.  I also detected that prior to defendant's use of the file destruction software, the defendant connected another undisclosed external storage device to his hard drive.  This suggested that defendant was storing data which he wanted to retain prior to using the file destruction software programs on his hard drive.  Ultimately, the defendant admitted to infringing plaintiff's movies.

d. *Malibu Media, LLC. v. Kelley Tashiro and Charles Tashiro*, No. 1:13-cv-00205-WTL-MJD (S.D. Ind. 2014):  My examination revealed that defendants deleted thousands of BitTorrent files the night before producing the hard drives for imaging.  My examination also revealed that defendants possessed and used other hard drives which were never disclosed or produced during discovery.  Ultimately, the Court imposed terminating sanctions against defendants for failure to disclose documents, spoliation, and perjury.

e. *Malibu Media, LLC v. John Doe*, No. 12-cv-2078 (E.D. Pa. 2013):  In this "Bellwether" case, my examination of defendant's hard drives revealed that he installed a Windows operating system on his hard drive three (3) days after being served with a subpoena for production of his computer device.  This installation resulted in the complete destruction of all files contained within the hard drive prior to the Windows installation.  After falsely testifying, Defendant admitted that he downloaded Plaintiff's copyrighted works and had wiped his desktop computer (by

installing a new Windows operating system) to conceal the infringement.  In the end, the Court entered a substantial judgment in favor of plaintiff.

45.     I am paid on an hourly basis by Strike 3 Holdings, LLC, at the rate of $325.00 per hour for pre-trial investigative work, although the fee increases if I am required to testify at trial.

**FURTHER DECLARANT SAYETH NAUGHT.**

## DECLARATION

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this  15th  day of March, 2019.


By:_____
     **PATRICK PAIGE**

**Curriculum Vitae**

# Patrick L. Paige

**8461 Lake Worth Road Suite 427**
**Lake Worth, FL 33467**
**Main: 561.404.3074**
[Patrick@computerforensicsllc.com](mailto:Patrick@computerforensicsllc.com)
[http://www.ComputerForensicsLLC.com](http://www.ComputerForensicsLLC.com)



## Summary of Experience

I have more than 25 years of law enforcement investigation experience, including more than 10 years as a computer crimes detective. I have performed computer forensic examinations for the Palm Beach County Sheriff's Office and surrounding cities, FBI, U.S. Customs, FDLE, Secret Service, ATF, and was a member of the South Florida ICAC taskforce for 10 years. In 2009 I was assigned to supervise the law enforcement operations for the Palm Beach County Sexual Predator Enforcement (SPE) at the located in Boca Raton FL. I have extensive knowledge of undercover online investigations including online enticement and Peer-to-Peer networks. I have been involved with hundreds of cases and have testified in State, Federal, Appellate, and Military courts as a computer expert including testifying as an expert in the functionality of Encase® at a murder trial. I have many forensic certifications including EnCE, and SCERS, additionally I was an EnCase® certified instructor for Guidance Software and have taught many forensic analysts around the country. I have earned many awards including Detective of the Month, U.S. Customs Service Unit Commendation Citation Award for computer forensic work, and have twice earned the Outstanding Law Enforcement Officer of the Year citation awarded by the United States Justice Department.

## Computer Expert Witness Experience

During my tenure as a law enforcement officer and in private practice, I have been called to testify as an expert on numerous occasions in the field of computer forensics in Federal Courts in FL, CA, NJ, PA, IN, and NY, Appellate Courts, State Courts, and Military courts. The following is a list of cases I assisted in or have testified, either at trial or by deposition.

**U.S District Court Southern District of Florida, Hayes Healthcare Services LLC, Hayes Medical Staffing LLC v. Chase Meacham, CASE NO. 0:19-cv-60113-JIC –** January 28, 2019
**Testimony:** Hearing in front of Judge Cohn relating computer forensic protocol and procedures.

**Circuit Court of the 11th Judicial Circuit of Miami Dade County, Schmitz Development Company v. Dorothy Joan Schmitz, Case No.: 2018-000931 CA (44) –** September 21, 2018
Appointment: Appointed by Judge Thomas as a neutral expert to image and extract all company related ESI related to the case.

**Circuit Court of the 17th Judicial Circuit of Broward County, Doris Hamaway MD & Bridget Silva MD PA v. Bridget Silva MD, Case No.: CACE17020169 –** September 5, 2018
**Appointment:** Appointed by Judge Tuter as a neutral expert to server as an office of the court for the purpose of imaging, review and production of certain ESI requests and to protect attorney-client work product.

**U.S District Court Southern District of Florida, CASE NO. 17-CV-61937, Federal Trade Commission v. Student Debt Doctor, LLC, a Florida corporation –** October 2, 2017
**Appointment:** Appointed by the federal court ordered receiver Robert Carey, Esq. to oversee all the computer forensic imaging and data recovery of company servers. Work with investigators to secure company domains and locate company assets.

**Estate of Aida Marie Gonzalez v. Delray Medical Center, INC. d/b/a Fair Oaks Pavilion, Praturi Sharma, MD, Miguel W. Mandoki, MD, The Chrysalis Center, Inc. Miriam R. Davis, LMHC; Antonio De Filippo, MD, Circuit Court of the 15th Judicial Circuit of Palm Beach County, Civil Division, Case No.: 2014CA014731 AH –** November 2, 2016
**Testimony:** Hearing in front of Judge Small relating to the processes involved in conducting computer forensic examination.

**Circuit Court of the 17th Judicial Circuit of Broward County, State of Florida v. Richard Taffee, Criminal Division, Case No.: 14006795CF10A** – August 25, 2016
**Testimony:** Hearing in front of Judge Bidwill regarding Cellebrite's cell phone forensic hardware and the reports it produces.

**U.S District Court Southern District of Florida, CASE NO. 9:16-cv-80060-MARRA, PROJECT INVESTORS, INC. d/b/a CRYPTSY, a Florida corporation** – May 6, 2016
**Appointment:** Appointed by the federal court ordered receiver James D. Sallah, Esq. to oversee all the computer forensic imaging and data recovery of company servers.  Oversee and recover numerous cryptocurrency wallets from company servers.

**Malibu Media, LLC v. John Doe, U.S. District Court Southern District of New York, Civil Action, CASE NO.: 1:14-cv-03504-JFB-SIL** – April 20, 2016
**Testimony**: Hearing in front of Judge Steven I. Locke regarding BitTorrent testing and software.

**Malibu Media, LLC v. John Doe, U.S. District Court Southern District of New York, Civil Action, CASE NO.: 1:14-cv-10151-KBF** – November 12, 2015
**Testimony**: Deposition, Computer forensic examination findings & BitTorrent.

**Malibu Media, LLC v. Tashiro, U.S. District Court Southern District of Indiana, Civil Action, CASE NO.: 1:13-cv-00202-WTL-MJD** – April 30, 2015
**Testimony:** Evidentiary hearing in front of Judge Dinsmore regarding spoliation of evidence, computer forensic examination of digital evidence and matters relating to BitTorrent.

**Malibu Media, LLC v. John Doe subscriber assigned to IP Address 24.14.81.195, U.S. District Court Northern District of Illinois, Civil Action, CASE NO.: 1:13-cv-006312** – February 17, 2015
**Testimony:** Deposition, Computer forensic examination findings & BitTorrent.

**U.S District Court Southern District of Florida, CASE NO.: 14-cv-60468-MIDDLEBROOKS/BRANNON, Securities and Exchange Commission v. JCS Enterprises, Inc., d/b/a JCS Enterprises Services, Inc., T.B.T.I. Inc. –** April 7, 2014
**Appointment:** Appointed by the federal court ordered receiver James D. Sallah, Esq. to oversee all the computer forensic imaging and data recovery of company computers.  Assist federal prosecutors and defense council in the search and production of email.  Search and production of financial data to forensic accountants.

**Malibu Media, LLC v. Michael Harrison, U.S. District Court Southern District of Indiana, Civil Action, CASE NO.: 1:12-cv-01117-WTL-MJD** – December 18, 2014
**Testimony:** Evidentiary hearing in front of Judge Dinsmore regarding spoliation of evidence, computer forensic examination of digital evidence and matters relating to BitTorrent.

**Malibu Media, LLC v. Michael Harrison, U.S. District Court Southern District of Indiana, Civil Action, CASE NO.: 1:12-cv-01117-WTL-MJD** – December 10, 2014
**Testimony**: Deposition, Computer forensic & BitTorrent.

**Salvador Lopez Collazo and his wife Angelica Lopez Lopez, Plaintiffs VS. FEDEX GROUND PACKAGE SYSTEMS, INC., and BRUTIS TRUCKING, INC. and DAVID JAMES WIDELL, Defendants.  Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida Civil Division Case No: 12-018873** – April 8, 2014
**Testimony:** Deposition, cell phone forensics.

**Restoration Management, Inc. v. James & Dana Pelletier, et al Eleventh Judicial Circuit of Florida Office of the General Magistrate before Magistrate Judge Schwabedessien Case No. 09-52134CA40** – November 4, 2013
**Testimony:** Expert testimony regarding forensic procedures involving QuickBooks software in the area of database files and program feature including audit trail.

**State of Florida v. Michael Render, Second Judicial Circuit Leon County, FL Motion to Suppress Hearing Case No. 2011 CF 3514** – July 30, 2013
**Testimony:** Expert testimony regarding police procedures on conducting online investigations including peer2peer undercover operation.  Computer forensics regarding peer2peer file sharing programs and how they work.

**Malibu Media, LLC v. JOHN DOES 1, 6, 13, 14, and 16, U.S. District Court Eastern District of Pennsylvania, Civil Action No. 2012-2078 Consolidated from Cases: 2:12-cv-02078-MMB, 2:12-cv-02078-MMB, 5:12-cv-02088-MMB** – June 10, 2013
**Testimony**: Expert testimony of my findings of the computers used by defendant Doe 16.  Matters relating to the software used by IPP International, Germany to monitor and identify copyright infringers.

**Malibu Media, LLC v. JOHN DOES 1, 6, 13, 14, and 16, U.S. District Court Eastern District of Pennsylvania, Civil Action No. 2012-2078 Consolidated from Cases: 2:12-cv-02078-MMB, 2:12-cv-02078-MMB, 5:12-cv-02088-MMB** – May, 2013
**Testimony**: Evidentiary hearing in front of Judge Baylson via video, regarding spoliation of evidence, computer forensic examination of digital evidence and matters relating to BitTorrent.

**Cypress Capital Group, Plaintiff v. Michael G. Blackmon, Defendant, Circuit of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida - Case No: 502008CA033553MB** – July 20, 2011
**Testimony**; Deposition, labor dispute.

**United States v. Michael Faxon, United States District Court, S.D. Florida, Fort Pierce Division – Case No. 09-14030-CR** – February 5, 2010
**Testimony**; Forensic examination on the defendants' computer.  Explained how the Defendant's computers was using peer-to-peer file sharing software known as LimeWire and GigaTribe.

**United States Court of Appeals, Ninth Circuit. No. 07-10288.**
**United States of America, Plaintiff-Appellee, v. Walter M. SCHALES, Defendant-Appellant.** - Argued April 15, 2008. - October 20, 2008
**Testimony**: Detective Paige of the Palm Beach County Sheriff's Office also testified that he recognized images on the CD-ROM depicting a child and an adult male that he arrested. The minor female depicted was five years old at the time of the photograph.

**United States v.  Kenneth WILK, U.S. District Court Southern District of Florida, Broward, Case No. 0:04-cr-60216-JIC** – 2007.  Capital Punishment Trail for Murder
**Court**: Testimony surrounding the intricate workings of Guidance's software EnCase®.  EnCase is one of the top forensics software utilized by forensics analysts throughout the world.

**United States Court of Appeals, Eleventh Circuit. No. 02-16809**
**United States of America, Plaintiff-Appellee, v. Samuel Alan MORTON, Defendant-Appellant**. - April 01, 2004
**Testimony**: The government next called Patrick Paige, a detective with the Palm Beach County Sheriff's Office. Paige testified that he created a forensics report regarding the material on Morton's computer hard drive. Included in the report were downloaded movies that contained teen sex and a minor female and adult male engaged in sexual conduct. Paige also testified that he found approximately 30 images of minors. On re-direct Paige testified that Morton had approximately 50-100 images in his AOL account.

## *Work Experience*

### *Computer Forensics LLC*                                                    *(2012 - Present)*

I'm currently a managing member of Computer Forensics LLC.  The company is committed to providing top quality service and knowledge in the E-Discovery, Computer Forensics fields.

## Guidance Software (Creators of EnCase® Software)                    9 Years (2003 - 2012)

During the years listed was employed as an Instructor with Guidance Software.  Guidance Software is the world leader in providing computer and enterprise investigation solutions. Founded in 1997 and headquartered in Pasadena, CA, Guidance Software Inc., has offices and training facilities in California, Virginia, Texas and the United Kingdom.  My duties as Instructor were to instruct students in the use of computer forensic software EnCase® made by Guidance Software.  I also instruct students in other aspects of computer forensics like identifying and collecting computer evidence, how computers work, storage of electronic data and how files are deleted to name a few.  Students who have attended classes I've taught include all branches of the military, local, state and federal officers.  I have also assisted in the collection of data in the field for the Professional Division of Guidance Software who was contracted by the Department of Justice in the Sprint/Nextel merger in 2005.

## Palm Beach County Sheriff's Office                    21+ Years Employed (Ex: 1989 - 2011)

### Detective Computer Crimes Unit (2000 - 2011)

2000 to present, I've been assigned to the Computer Crimes Unit.  During my current assignment to the Computer Crimes Unit I've investigated numerous Internet and computer related crimes.  I've conducted many undercover online investigations resulting in the arrests of individuals around the United States.  I have been involved in numerous search warrants involving online and child pornography investigations.  I conduct computer forensic examinations for the Palm Beach County Sheriff's Office as well as local Law Enforcement.  I've also done computer forensic examinations for the Broward County Sheriff's Office, FBI, U.S. Customs, FDLE, Secret Service, ATF and local cities.  I have been a member of the South Florida ICAC (Internet Crimes Against Children) taskforce since January 2001.  As the Senior Computer Forensic Examiner for the Sheriff's Office I was assigned to train new computer forensic examiners assigned to the unit.  I served as point of contact for 2 known series of child pornography maintained by NCMEC (National Center for Missing and Exploited Children).

In 2009 I was assigned to supervise the law enforcement operations for the Palm Beach County Sexual Predator Enforcement (SPE) located in Boca Raton FL with offices provided by the TLO Corp.  The TLO facility housed the computer servers used by law enforcement around the word to conduct P2P (Peer to peer) investigations.  My assignments were as follows:

- Supervise the Detectives assigned to the unit which was consisted of 6 Online Investigators and 2 Computer Forensic Examiners.
- Conduct computer forensic analysis on computers seized by the unit and testify to the findings.
- Coordinate and supervise the execution of search warrants developed by Detectives assigned to the unit.  Detectives assigned to the unit conducted undercover Online investigations and peer to peer investigation via commonly used file sharing programs like LimeWire, GigaTribe, eMule to name a few.
- Worked with TLO software engineers on developing and enhancing software tools used by law enforcement officers.
- Prepared weekly reports of statistics and arrests made by the unit which were distributed the local Chiefs of Police.
- Order and maintain computer forensic equipment, computers and software.
- Responsible for maintaining and tracking of all computer evidence seized for examination.

### Detective Fraud Unit (1999)

This unit conducts investigations of criminal conduct in violation of Florida Laws concerning property crimes, fraud, forgery, and computer crimes.  While I was assigned to this unit I was tasked with investigating cases connected with the Internet.

### Agent Organized Crime Unit (1997 - 1999)

I was assigned to the Tactical Unit of the Palm Beach Sheriff's Office for two (2) years. During my assignment, I assisted in long term investigations, surveillances, dignitary protection and was assigned to aid the FBI, DEA, ATF and local law enforcement in investigations.  I was also assigned to aid the Secret Service in the protection of heads of state, Vice President and President of the United States when they entered Palm Beach County.

### Road Patrol Officer (1989 - 1997)

While assigned to the Road Patrol Division of the Palm Beach County Sheriff's Office, I developed a practical working knowledge of conducting investigations, evidence handling, and search and seizure laws. I also served as a FTO (Field Training Officer) for 3 years and was responsible for training over 35 new deputies hired by the Sheriff's Office.

### Delray Beach Police Department                          3 Years Employed (Ex: 1986 - 1989)

While assigned to the Delray Beach Police Department I mainly worked in the road patrol division. I also served as a FTO (Field Training Officer) for a year.

### ADVANCED LAW ENFORCEMENT & COMPUTER FORENSICS TRAINING

1. Seized Computer Evidence Recovery Specialist (SCERS) Federal Law Enforcement training Center in Glynco, GA 80HRS (2/2001)
2. Investigations of Computer Crimes (The International Association of Chiefs of Police) 40HRS
3. EnCase® Intermediate Analysis & Reporting course (Guidance Software Inc.) 32HRS
4. EnCase® Expert Series Internet & E-mail Examination course (Guidance Software Inc.) 32HRS
5. Conducting Online ICAC Investigations (Law Enforcement Against Child Harm Taskforce) 40HRS
6. Investigating Computer Use of the Internet by Child Sex Offenders (Institute of Child Advocacy)
7. Advanced Sex Crimes Investigations course (Palm Beach Community College) 40HRS
8. Organized Crimes Investigations course (Palm Beach Community College) 40HRS
9. Field Training Officer course (Palm Beach Community College) 40HRS
10. Advance Narcotics Identification (Palm Beach Community College) 40HRS
11. Dignitary Protection Operations (Tactical Response Training) 32HRS
12. Forensic Computer Examiner Training Program (International Association of Computer Investigation Specialists - IACIS) 80HRS (5/2004)
13. 17th Annual Crimes Against Children Conference (Dallas, TX) 20HRS August 15-18, 2005
    (Conference courses attended: Forensics on Portable Devices, AOL & Yahoo investigations, Email Tracing and Techniques for Investigating Wireless Devices.
14. 18th Annual Crimes Against Children Conference (Dallas, TX) 20HRS August 21-24, 2006
    (Conference courses attended: Email and IP Tracing, Windows XP Forensic Gems, Digital Imaging Forensics and Investigating Wireless Devices.
15. CEIC 2012 (Computer and Enterprise Investigations Conference) 4 days (Summerlin, Nevada) May 21-24 2012
    (Conference courses attended: EnCase® version 7 training updates, Using cloud computing in forensics and electronic discovery, Embedded EnScripts®, Forensic tracking of USB devices, TD2, TD3 and the future of the forensic duplicator, exFat forensics and revealing Windows® 7 artifacts.
16. CEIC 2015 (Computer and Enterprise Investigations Conference) 4 days (Las Vegas, Nevada) May 18-21 2015
    Conference courses/labs attended:
    1. Investigating a User's Internet Activity Across Computers, Smartphones and Tablets.
    2. Tracking the Use of USB Storage on Windows 8 & Windows Shellbag Forensics in Depth.
    3. Investigating Exchange, Microsoft Cloud Services and Office 365.
    4. Tips and Tricks from Guidance Software Technical Services.
    5. Practical Python Forensics, Practical Python Forensics & Advanced Examination Reporting.
    6. Windows 8 - Deconstructing the Catalog and Other Artifacts.
17. Enfuse 2018 (Security, Digital Investigation and eDiscovery Conference) 3 Days (Las Vegas, Nevada) May 21-24 2018
    Conference courses/labs attended:
    1. Digital Evidence from Social Networking Sites & Smartphone Apps.
    2. The future of EnCase.
    3. The Art & Science of Incident Response.
    4. The New Apple File System (APFS).
    5. Customized Reports with EnCase.

6. The Bits behind the Coin: Following the Trail of a Cryptocurrency Investigation.
7. EnScript for Examiners & Index in EnCase software
8. Logical Imaging with Tableau TX1

## AWARDS

### Delray Beach Police Department

3 – Patrol Division Commendations.
1987 – Rookie of the year.
1988 – Police officer of the month for March and August.

### Palm Beach County Sheriff's Office

1991 – Deputy of the year awarded by the 100 Men's Club of Boca Raton & Rotary Club.
1997 – Deputy of the Month for June.
2001 – Detective of the Month for October.
2002 – Outstanding Law Enforcement Officer of the Year awarded by the United States Department of justice for work in the U.S. v Jerrold Levy case. News Articles  Certificate of Achievement issued by the National Center for Missing & Exploited Children for work performed in the Levy case.
2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet.  Operation Hamlet was one of the largest rings in U.S. Customs history of individuals who were molesting their own children, and transmitting the images and video via the Internet. News Articles 2005 – Detective of Month for December.
2006 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the U.S. v Frank Grasso case. Article
2007 – Outstanding Law Enforcement Officer of the Year awarded by the United States Department of Justice for work in the U.S. v Jimmy Oliver case. Press Release
2009 – 20 Year Good Conduct Medal – For honorable and faithful service for a period of twenty years.
2009 – 20 Year Honorable Service Medal – For exemplary conduct, efficiency and fidelity for a period of twenty years.

## CERTIFICATIONS / MEMBERSHIPS

EnCE – EnCase® Certified Examiner (Cert# 15-0703-1199 Exp. 7/21/2021)
CEECS – Certified Electronic Evidence Collection Specialist – IACIS
SCERS – Seized Computer Evidence Recovery Specialist – FLETC (Federal Law Enforcement Training Center in GA)
CFCE – Certified Forensic Computer Examiner – IACIS – CFCE from 2005 to 2008
Member of IACIS – International Association of Computer Investigative Specialists
Member of MECTF – Miami Electronics Crimes Task Force hosted by the United States Secret Service

## COURSES TAUGHT FOR GUIDANCE SOFTWARE

1) Intermediate Analysis & Reporting – Sterling, VA December 2nd – 5th 2003 (32 hrs)
2) Introductory Computer Forensics – Sterling, VA August 12th – 15th 2003 (32 hrs)
3) Introductory Computer Forensics – Sterling, VA September 16th – 19th 2003 (32 hrs)
4) Incident Response, Forensic Analysis & Discovery – Sterling, VA September 29th – October 3rd 2003 (40 hrs)
5) Introductory Computer Forensics – Sterling, VA January 6th – 9th 2004 (32 hrs)
6) Introductory Computer Forensics – Sterling, VA August 10th – 13th 2004 (32 hrs)
7) Introductory Computer Forensics – Sterling, VA June 28th – July 1st 2005 (32 hrs)
8) Intermediate Analysis & Reporting (Special Class for U.S. Military) – Sterling, VA October 16th – 20th 2006 (40 hrs)
9) EnCase® Computer Forensics II – Sterling, VA January 29th – February 4th 2007 (32 hrs)
10) EnCase® Computer Forensics I – Sterling, VA April 23rd – April 29th 2007 (32 hrs)
11) EnCase® Computer Forensics I – Sterling, VA September 11th – September 14th 2007 (32 hrs)

— **EXHIBIT 7** —

## DECLARATION OF STEPHEN M. BUNTING

I, STEPHEN M. BUNTING, DO HEREBY DECLARE:

1.      My name is Stephen Michael Bunting.  I am over the age of twenty-one (21), and I am competent to make this Declaration.  I make this Declaration voluntarily and the facts stated herein are based on my personal knowledge and information.

2.      Attached hereto as Exhibit "A" is a true and accurate copy of my Curriculum Vitae which truly and accurately represents my relevant employment history, training, experience, certifications, and expert-witness experience.

3.      I currently work as Director of Services for SUMURI, LLC and as independent forensic consultant as owner of Bunting Digital Forensics, LLC.  Prior to that, I was a police officer from 1980 until 2009 with the University of Delaware Police from which I retired as a Captain.  During the last ten years with the University of Delaware Police, I was in charge of the digital forensics and cyber investigations unit, that I founded.  From 2009 until early 2013, I was a Senior Forensic Consultant with Forward Discovery, LLC, which in late 2012 was acquired by Alvarez and Marsal (NY) where I was a manager in the digital forensics division.  I founded Bunting Digital Forensics, LLC in early 2013.

4.      I have taken hundreds of hours of training in digital forensics, network forensics, and cyber investigations.  I have provided training in the same topic areas, from beginner to expert levels, to members of various local, state, and federal law enforcement agencies and private sector examiners.  I have trained like personnel internationally in over twenty-one (21) different countries.  I have provided training, as either a part-time employee or contractor, for Guidance Software, Magnet Forensics, MicroSystemation, A.B., Organization of American States, and the

U.S. Department of State Anti-Terrorism Assistance Program (Cyber Division).  I have developed digital forensic or cyber training programs for several government and private entities.

5.      I hold several industry-related certifications. I was the recipient of the 2002 Guidance Software Certified Examiner Award of Excellence for receiving the test score on my certification examinations.  Among my varied certifications I am an EnCase Certified Examiner EnCE (Guidance Software), an AccessData Certified Examiner (ACE), Certified Computer Forensics Technician (HTCN), and a Certified XRY Instructor.

6.      I am the principle author of *EnCase Computer Forensics - The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition,* the co-author of *Mastering Windows Network Forensics and Investigation, the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 2nd Edition*, and the co-author of *Mastering Windows Network Forensics and Investigation 2nd Edition, the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition* (all published by Wiley).

7.      I have written numerous articles in the field of digital forensics over my career. Most recently, I published two articles regarding spoliation examinations in which several peer-to- peer cases on which I have consulted were referenced in a hypothetical context: *Forensic Analysis of Spoliation and Other Discovery Violations - Part 2 of a 2-Part Series - Windows Examinations* - eForensics Magazine - December 2016

*Forensic Analysis of Spoliation and Other Discovery Violations - Part 1 of 2-Part Series - Macintosh Examinations* - eForensics Magazine - October 2016

8.      I have testified as a fact and expert witness numerous times in the field of computer forensics before state and federal courts in Delaware and New Jersey.  I have submitted affidavits,

2

as an expert in digital forensics, on many matters in several states, including Delaware, Georgia, and South Carolina.

9.      No court has ever refused nor has any attorney ever challenged to accept my testimony on the basis that I was not an expert or not qualified in the field of computer forensics.

10.     As a digital forensics examiner I have acquired and examined hundreds of computer systems and mobile devices for various local, state, and federal agencies, in addition to scores of private clients. The types of cases or examinations include: homicide, child-exploitation, fraud, Medicaid fraud, unlawful intrusion into computer systems (hacking), intellectual property theft, research fraud, email forgery, criminal impersonation, forgery, sexual harassment, peer-to-peer, and spoliation.  I have acquired computer systems of many types, including servers, virtual servers, desktops, and laptops.  I have acquired hundreds of mobile devices (feature phones and smart phones), both logically and physically.  I also have acquired smart phones using JTAG and chip-off techniques, both of which require disassembly and working with the printed circuit boards inside a smart phone.

11.     I have considerable experience with network-related cases, such as unlawful intrusions and peer-to-peer cases.  I have investigated or provided digital forensics support to several unlawful intrusion incidents in both a law enforcement and a private sector capacity.

12.      In the past, I have consulted with Computer Forensics, LLC, in copyright infringement cases utilizing IPP's technology.  I'm familiar with the technology that was used in those cases to detect the copyright infringement offenders.

13.     As a police officer I received specialized training in conducting peer-to-peer investigations by S.A. Flint Waters with the Wyoming Internet Crimes Against Children (ICAC) Task Force. S.A.  Waters developed the Wyoming Toolkit, a customized version of Phex, a peer-

to-peer client on the Gnutella network.  I participated with members of the State of Delaware ICAC in this training program and afterwards in a task force conducting peer-to-peer investigations. Using the Wyoming Toolkit, we searched for child sexual exploitation images and movies on the peer-to-peer networks. When images were found, the software identified offending computers by their IP addresses.[1]  The IP addresses hosting the illegal images are parsed by the toolkit using an IP geolocation database by which offending IP's are isolated or filtered to only those within our police jurisdiction.  Once offending IP's were found in Delaware, we would request that the Attorney General's office submit subpoenas to the ISP (Internet Service Provider) for specific customer information and address of the offending IP address.  As IP addresses are often time-specific, we submitted the exact date / time (along with time zone offset) for the offending IP address.  The ISP would return to us the customer or subscriber information (name, address, account information, etc.) for the ISP in question.  We would investigate further and obtain a search warrant for the premises at which the IP was hosted.  The search warrant would permit us to seize all media and electronic devices capable of holding digital media, as we did not know specifically which device behind the router was the offending device.  The IP address detected by the peer-to-

---

[1] A public or internet routable IP address is a router or computer's address on the internet at a specific time.  IP addresses uniquely identify a computer, as no two computers can have the same exact public, internet routable, IP address at the same time.  If the address is that of a router, the computer typically has a private address behind the router.  In a typical home network, the ISP provides a 'box,' which is often both a modem and a router / firewall / DHCP server.  The router has a public or internet facing IP address assigned to it.  On the back side of the router, several devices (computers, smart phones, etc.) are connected using private addresses.  Thus, several devices in a home network share the public internet routable address assigned to the ISP's box (router).  Other computers on the internet, including peer- to-peer software, see and use the public facing IP address assigned to the customer's router. The router routes network traffic for specific devices on the private side or behind the router using a protocol called NAT (Network Address Translation), thus assuring network traffic is sent to the correct computer.  IP addresses, as mentioned, are often time specific. These IP addresses are called dynamic IP addresses. They are assigned for certain periods of time, called leases.  There is great variability in how often dynamic IP addresses change, but because they can and do change, the specific time of the offense is necessary to determine which subscriber was assigned a specific IP address at a specific time.  ISP's maintain connection logs that record to whom a specific IP address is assigned and exactly when.  By contrast, an IP address can be a fixed IP address.  Even they can change and, as an investigator, you do not know which type a subscriber has and thus the exact time is always obtained and submitted to an ISP when requesting subscriber information.

peer software was the public facing internet addressable IP address of the router, which is associated with the subscriber and their residence and not to a specific computer in the residence. Because it was a criminal investigation, we requested that the subscriber not be notified of the subpoena so that digital evidence would not be destroyed.  Thus, in nearly all cases, the offending subscribers were surprised by the execution of the search warrant.  In all the times that we did so, not once did the IP address lead to an innocent person's residence.  Rather, we always found evidence therein of child sexual exploitation media on the computer system(s) therein.

14.     I have found that the Wyoming Toolkit was a most reliable tool for identifying the IP addresses for peer-to-peer clients that were hosting child sexual exploiting images and video.

15.     Most recently, I tested the infringement detection software by a company called MaverickEye UB (MEU).  This software and hardware platform is owned and run by GuardaLey, LTD ("GuardaLey"), a German company located in Eggenstein, Germany.  It is my understanding that GuardaLey's system is also licensed to another German company called IPP International UG ("IPP").

16.     I constructed and then conducted a test to determine the accuracy of the GuardaLey's system as to its ability to detect an infringing party's IP address, identifying metadata (client software and version used by infringer), and identifying the known test files distributed on the torrent network.  The manner in which GuardaLey's system works and the manner in which the software that I have used in my law enforcement capacity (Wyoming Toolkit) work to connect a peer-to- peer violation with an IP and subsequently with a subscriber are quite similar.  In fact, in my opinion, GuardaLey's system is much better with greater integrity features.  Further, my test confirmed that GuardaLey's system is accurate.  My report illustrating this conclusion is attached hereto as Exhibit "B."

17.     I have been retained by Strike 3 Holdings, LLC to provide digital forensic services and consulting in matters of copyright infringement.  I am paid on an hourly basis by Strike 3 Holdings, LLC at the rate of $250 / hour for my digital forensics services.

18.     I have read through the Honorable Judge Royce C. Lamberth's Memorandum Opinion ("DC Opinion") in the matter *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.180.154.14*, No. CV 18-1425, (D.D.C. Nov. 16, 2018).  The instant declaration specifically addresses the portion of the DC Opinion discussing the technology behind Strike 3 Holdings' case.  And more specifically, the portion of the DC Opinion which states:

> Since Bittorrent masks users' identities, Strike 3 can only identify an infringing Internet protocol (IP) address, using geolocation technology to trace that address to a jurisdiction. This method is famously flawed: virtual private networks and onion routing spoof IP addresses (for good and ill); routers and other devices are unsecured; malware cracks passwords and opens backdoors; multiple people (family, roommates, guests, neighbors, etc.) share the same IP address; a geolocation service might randomly assign addresses to some general location if it cannot more specifically identify another.

*STRIKE 3 HOLDINGS, LLC, Plaintiff, v. JOHN DOE subscriber assigned IP address 73.180.154.14*, Defendant., No. CV 18-1425, 2018 WL 6027046, at *1 (D.D.C. Nov. 16, 2018).

19.     Below, I address each of the foregoing issues in turn.

**Virtual Private Networks and Onion Routing Spoofing of IP Addresses**

20.     Often times, in cases involving cybercrimes and IP addresses, defendants claim that their IP address was "spoofed."  However, in cases involving detection systems that connect to peers using a TCP/IP connection, such as the Wyoming Toolkit, GuardaLey's system, or IPP's system, spoofing cannot be accomplished.

21.     IP spoofing is typically used in DDOS (denial of service) attacks.  Indeed, specially crafted network packets can be used to create denial of service attacks, but these packets are small and usually involve repeatedly sending the same small crafted packet over and over again, creating

a flood of messages that results in a denial of service attack.  Creating a few small, specially crafted packets that are sent repeatedly is a completely different task than trying to do so for a BitTorrent stream, where tens of thousands of packets, mostly all of which are different, are involved.

22.     With respect to spoofing in the BitTorrent context, in a practical sense, a very technically adept person would have to know a victim's IP address.  This person would have to physically connect a computer into the same network segment as the intended victim in order to intercept the network traffic involved.  Doing so would involve considerable knowledge and skills, in and of itself, and could involve illegal access to a building or ISP network equipment.  The person would need to have the file in question on their computer, be sharing it using BitTorrent software, and have some software or code capable of or rewriting tens of thousands of BitTorrent packets on the fly, as any delay could cause a time-out.  While many things are theoretically possible, I am unaware of any such software being available.  Such an endeavor would involve tremendous effort and resources.  In addition, the person would have to know that a particular file was being monitored for copyright infringement downloading.  And finally, such a person would have to have a very strong motivation to undertake such a task and to target a particular person and/or IP address.  Considering all that would be involved in such an endeavor, it is so unlikely to occur as to be nearly impossible.

23.     Often IP spoofing, as described above, is interpreted or confused by many, including Google's search engine, with IP address hiding.  If you search for "IP spoofing software," you will find most of the search results will involve VPN (Virtual Private Network) software.  VPN software allows the user of a computer to create an encrypted tunnel to a VPN server from which the internet traffic emerges unencrypted, provided of course it was unencrypted to begin with.  The VPN server's internet facing IP address becomes the user's public internet-

routable IP address.  It acts as a proxy and becomes the user's frontend IP address on the internet. VPN's are intended for privacy of a user's internet traffic and also for protecting the identity of a user's true IP address (the IP address which their ISP has assigned to them).  If an infringer uses a VPN to engage in BitTorrent file sharing, other peers within the swarm will be able to identify the infringer by the infringer's public facing internet routable IP address which would the VPN's IP address.  In other words, when a VPN is being used, other peers can only trace the connection to the front-end or public-facing, internet routable IP address – which would be the VPN IP address. To obtain the true IP address of the user behind the VPN, one would have to contact the VPN owner or manager.  If the VPN owner maintain logs, and many intentionally do not, the connection to the source can then be identified through the subpoena process.

24.     In the past, I actually conducted a test on this exact VPN issue.  Indeed, earlier this year, when I tested Guardaley's system, I also tested this VPN theory.  To do so, I configured one test laptop (MacBook Pro – High Sierra) with a VPN service.  With the VPN enabled, I launched Transmission (a popular BitTorrent client) and shared four separate test files.  I noted the public, internet-routable, frontend VPN IP address in use by the test laptop.  After running this BitTorrent configuration overnight using the VPN service, GuardaLey reported to me that their system captured and downloaded the test files from the IP address that I had recorded for the test laptop. It was, as expected, the IP address of the VPN server.  Thus, a test of the scenario, establishes that the VPN IP address, and not my true ISP's IP address was being made public via the BitTorrent network.

### Unsecured Routers and Other Devices

25.     The DC Opinion also lists concerns about unsecured routers and devices.

26.     During my time at Bunting Digital Forensics, LLC, I was involved in a case where the owner of the computer and charged party was professing his innocence, claiming someone else must have used his wireless network, citing a neighbor who reportedly engages in photography of a questionable nature.  However, the evidence on his computer suggested otherwise.  The software used by the investigators detected the name and version of the peer-to-peer software client involved, which happened to match the one found on his machine.  Further, the same exact images detected by the investigative software were found on his machine.  His claims were without merit and in direct contradiction to the overwhelming digital evidence found on his computer.

27.     Unsecured wireless routers in homes used to be commonplace 15 years ago.  In recent years, however, Internet Service Providers (ISP's) have undertaken great effort to provide and deploy secured wireless systems.  Most "internet interface boxes" (combination modem / router / firewall / DHCP server) which are rented to subscribers are preconfigured to operate with WPA2 security with a complex password already set.  These devices are secure out of the box with strong encryption and complex passwords that are lengthy alpha numeric passphrases.  Thus, valid claims of compromised home wireless systems today are, in my experience, rare compared to 15 years ago.

### Malware Cracks Passwords and Open Backdoors

28.     The DC Opinion states, that "malware cracks passwords and opens backdoors."  However, I have never heard of or encountered malware which accesses a user's computer, automatically downloads and installs a BitTorrent client, and then proceeds to download .torrent files correlating to several of Plaintiff's works over the course of several months.

## Multiple People Share the Same IP Address

29.    Although there may be several household members who access the internet with the same router, learning the identity of the subscriber to an IP address user in connection with commission of a crime is instrumental, necessary, and the only means of learning the perpetrator's true identity – even if the subscriber is not the perpetrator.

30.    And, in my experience, the IP address's subscriber, or a family member thereof, is likely the offending party.

## Geolocation Technology

31.    Lastly, the DC Opinion states, "a geolocation service might randomly assign addresses to some general location if it cannot more specifically identify another."

32.    Geolocation services are used to approximate locations of IP addresses. Such geolocation services are often used as a tool in e-commerce fraud prevention measures. Further, the Wyoming Tool Kit that I used as a law enforcement officer to identify offenders distributing sexual exploitive images of children using peer-to-peer software, used commercial geolocation services to obtain the approximate location of IP addresses for purposes of assigning IP addresses to various law enforcement jurisdictions. Geolocation databases are not used to determining the exact address of a subscriber of an IP address for purposes of executing a search warrant. Rather, to determine an IP address subscriber's physical address on which to execute a search warrant, law enforcement relies on a subpoena that is served upon the ISP. When law enforcement uses this technology and methodology to identify and arrest those creating and exchanging sexually exploitive images of children, they are applauded for their efforts. Similarly, Strike 3 Holdings, LLC uses geolocation services to determine an approximate location of an IP address so as to identify a court with jurisdiction in that region. Once that court issues a subpoena, the exact name

and specific physical address of the party responsible for the offending IP is identified.  Strike 3 Holdings, LLC is, thus, using a process very much like that used by law enforcement.

**FURTHER DECLARANT SAYETH NAUGHT**

**DECLARATION**

**PURSUANT TO 28 U.S.C SS 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed December 21, 2018.

Stephen M. Bunting

11

# EXHIBIT A

# Curriculum Vitae of Stephen Michael Bunting

*Bunting Digital Forensics, LLC* ● 33579 Blue Heron Drive ● Lewes, DE 19958
Phone: +1.302.260.2633 ● E-Mail: stephenbunting@mac.com

## Summary of Experience

Mr. Bunting is an experienced digital forensics examiner and currently works as the Senior Manager of Services for SUMURI, LLC as an independent consultant and as CEO and Senior Forensic Consultant of Bunting Digital Forensics, LLC.  Formerly Mr. Bunting was a Manager with Alvarez & Marsal (Sept 2012 to Feb 2013) and prior to that a Senior Forensic Consultant with Forward Discovery (Sept 2009 to Sept 2012).   (Alvarez and Marsal acquired Forward Discovery in Sept 2012) His responsibilities with Bunting Digital Forensics, Alvarez & Marsal, and Forward Discovery include:

- Acquisition and forensic examination of digital media using industry standard forensics tools;

- Develop & instruct classes on Windows, Macintosh and Mobile Device Forensics;

- Develop & instruct classes on cyber investigations and related course work;

- Investigative consultation and digital forensics examinations in many areas including spoliation, theft of intellectual property, malware analysis, unlawful access of computer systems, theft of corporate resources, employee misuse of computer systems, Medicaid fraud, and support of various types of criminal investigations (prosecution only – no criminal defense work);

- Consult with clients and develop E-Discovery plans;

- Carry out electronic discovery processing from initial acquisition to final load file;

- Under sub-contract (multiple vendors) to the U.S. Department of State, develop & instruct various cyber-based anti-terrorism courses to international law enforcement agencies.

- Under Bunting Digital Forensics, instruct XRY Foundation, Intermediate, PinPoint, XAMN, and Kiosk Courses.  Currently the only contract instructor for MSAB (XRY) in the U.S.

- Under Bunting Digital Forensics, instruct courses for Magnet Forensics as a contract instructor.

- Bunting Digital Forensics is under contract to SUMURI, LLC, whereby Steve Bunting manages the services division of SUMURI.

Mr. Bunting retired from a law enforcement career spanning over three decades, during which he conducted hundreds of examinations of computer systems for the University of Delaware Police as well as federal, state, and local law enforcement and prosecutorial agencies.  He is also a trained and experienced forensic video analyst using the Ocean Systems dTective® and Avid software systems.  He is a frequent lecturer and instructor on computer forensics, cyber-crime, and incident response.

Mr. Bunting has testified in many trials as a computer forensics expert.  He was the recipient of the 2002 Guidance Software Certified Examiner Award of Excellence for receiving the highest

test score on his certification examinations.  Among his varied certifications he is an EnCase Certified Examiner EnCE  (Guidance Software), an AccessData Certified Examiner (ACE), Certified Computer Forensics Technician (HTCN),  Certified XRY Instructor, BERLA Certified Vehicle Forensics, Magnet Certified Forensics Examiner.

Mr. Bunting is a retired a police captain, having served in the State of Delaware for over thirty-five years.   He created and developed the University of Delaware Police Department's Computer Forensic Lab.  He has taught computer forensics for Guidance Software, makers of EnCase, and taught as a Lead Instructor at all course levels, including the Expert Series with particular emphasis on "Internet and Email Examinations" course.  He has instructed students in computer forensics on an independent study basis for the University of Delaware and is an adjunct faculty member of Goldey-Beacom College, teaching computer forensics.  He has been a presenter at several seminars and workshops, the author of numerous "white papers",  the principle author of *EnCase Computer Forensics – The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition*, the co-author *Mastering Windows Network Forensics and Investigation* , *the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 2nd Edition,* the co-author *Mastering Windows Network Forensics and Investigation 2nd Edition,* *the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition (*all published by Wiley), and maintains a website for cyber-crime and computer forensics issues.

## Recent Consulting Engagements

While Mr. Bunting engages in a significant number of instructional endeavors, a number of consulting engagements have been untaken.  Some of those engagements are described below:

Recovered data from an Android phone that had been underwater and was delivered 'in pieces'.  Using chip-off technique, all data was fully recovered including data that had been deleted.

Served as an expert for two defendants who were facing spoliation claims.  Established that opposing expert had failed to discover settings whereby SMS's messages were forwarded from an iPhone to a MacBook Pro.  Opposing expert claimed SMS messages were deleted from the iPhone when in fact they were in the opposing expert's possession on the MacBook Pro.  Said deletions were offered as evidence of spoliation.  Opposing expert also failed to find over 11,000 AIM Messenger chats that were on the iPhone.

Served as a trusted third-party digital forensic examiner in a Virginia case where a former employee was accused of theft of intellectual property, specifically programming code.  Determined that accused party provided fabricated exhibits to examine in the form of a contrived MacBook Pro in which the time had been altered to appear to contain historical data when in fact it was only 3 weeks old.

Conducted digital forensics examinations of computers believed to be involved in a telecommunications fraud in the Middle East region, whereby perpetrators were conducting a multi-million dollar fraud in a balance transfer scheme exploiting a software defect.

Conducts ongoing training and course development for the U.S Department of State's Anti-Terrorism Assistance Program Cyber Division.  As such six to eight courses are delivered each year in varying international locations.

Ongoing consultation with a digital forensics firm that specializes in examinations for copyright infringement cases in the motion picture industry involving peer-to-peer clients to download movies and other protected media.

Ongoing consultation with a digital security company in the UAE, providing incident response support services.

Developed a new Macintosh Digital Forensics course for the Delaware State Police Child Predator Task Force.  The course is an in-depth program intended for those with significant digital forensics experience.  It includes a unique module entitled "Digging Deeper – Research Techniques to Establish User Culpability", which is the first of it kind.

Developed and delivered a virtual course entitled: Cyber Security Investigations: Incident Response for the FedCTE program.  The course was developed for virtual delivery using the AvayaLive virtual classroom and first delivered on June 25, 2014.

Provided expert witness services establishing that the plaintiff fabricated an email submitted during discovery in a civil matter.  Testified in US District Court (Princeton, NJ) as expert for defense in computer forensics analysis and email analysis in a hearing to dismiss based on fraudulent documents offered into evidence by plaintiff.  Specifically, testified that document proffered as an email was in fact fabricated to appear as such. – July 09, 2014.  The matter is still under litigation.

As a member of a team, conducted an on-site assessment of a major middle east country's governmental cybercrime unit and digital forensics unit, prepared gap analysis reports, and prepared recommendations for creating ISO 17025 compliant laboratory operations, a modern cybercrime investigation and intelligence gathering unit, as well as country-wide expansion of capabilities for both units.

Assigned as principal leak investigator for a major mobile device manufacturer.  Investigated significant intellectual property losses on a global basis.

Conducted a security assessment, as part of a team, of a Caribbean country's government IT infrastructure and made recommendations for securing their systems according to best practices.

Conducted computer forensic examination of all computers from a dental practice in a Medicaid fraud case. Examination involved reconstruction of a dental practice's business transactions spanning several years through analysis of SQL transaction logs from Patterson's *Eaglesoft* dental practice software. The findings in the report submitted substantiated ongoing fraud and induced a guilty plea, resulting in the incarceration of the offending dentist.

Conducted computer forensic examination of over two-dozen laptops belonging to employees of a major brand integrity unit, which investigates and mitigates brand piracy for its parent company. The unit was distributed in six countries and had been accused of various breaches of duty and unlawful acts. The examination took several months to complete and findings documented and substantiated the majority of the allegations, resulting in the dismissal of several employees.

## Certifications

| | |
|---|---|
| Magnet Certified Forensics Examiner | March 2018 |
| BERLA Certified Vehicle Forensics | September 2017 |
| Certified XRY Instructor, MSAB (Sweden) | October 2013 |
| Certified ACE AccessData Certified Examiner | April 2011 |
| Certified iPhone Examiner, MSAB | November 2010 |
| Certified XRY Complete Examiner, MSAB | October 2010 |
| Certified LAW PreDiscovery Administrator, LexisNexis | January 2010 |
| Certified LAW PreDisovery User, LexisNexis | January 2010 |
| Certified Computer Forensic Technician, High Tech Crime Network | September 2001 |
| EnCase Certified Examiner, Guidance Software | April 2002 |
| Certified Cell Phone Examiner, Paraben Corporation, | May 2005 |
| Certified PDA Examiner, Paraben Corporation | May 2005 |
| State of Delaware Council on Police Training Certified Police Officer | April 1975 |

## Employment History

**SUMURI, LLC** – Camden, DE – Senior Manager of Services – November 2016 to present

- Provide management services for SUMURI's Services Division
- Develop and carry out the business plan for services
- Coordinate services, match resources with service needs, and ensure quality control

- Conduct digital forensic examinations and investigations

**Bunting Digital Forensics, LLC** – Lewes, DE – CEO & Senior Digital Forensic Consultant – February 2013 to present

- Conduct digital forensics examinations on a variety of media, including mobile devices
- Develop training programs for various cyber related topics
- Deliver training programs as an independent contractor for the Antiterrorism Assistance Program Cyber Division (see NDI below)
- Conduct assessments of digital forensics laboratories, conduct a gap analysis, and recommend a roadmap for improvements leading to accreditation
- Conduct specialized digital forensics examinations in support of Medicaid fraud cases

**Microsystemation (MSAB)** – Stockholm, Sweden – Contract instructor for XRY training courses – October 2013 to present

Teach XRY Mobile Device Forensic Solutions Courses

**Alvarez and Marsal**, Washington, DC – Manager, Forensic Technology Services – September 2013 to February 2013

- Develop and deliver a variety of training courses, including Macintosh Forensics, Incident Response, and Advanced Digital Forensics Courses.
- Developed and facilitated a table top training exercise to test and enhance the incident response capabilities of a large web hosting company
- Conduct digital forensic examinations on media associated with compromised systems.
- Interim Management, specifically Principle Leak Investigator for a large telecommunications company experiencing a significant loss of intellectual property.

**Forward Discovery, Inc** – San Antonio, TX – Senior Forensic Consultant – September 2009 to September 2012

Information security company that provides digital investigation, electronic discovery, vulnerability assessments and training services to corporate and government clients.

- Acquisition and forensic examination of digital media using industry standard forensics tools
- Develop & Instruct classes on Windows, Macintosh and Mobile Device Forensics
- Develop & Instruct classes on Cyber Investigations and related course work
- Investigative consultation in areas including theft of intellectual property, malware analysis, unlawful access of computer systems, theft of corporate resources, employee misuse of computer systems, and support of various types of criminal investigations (prosecution only – no criminal defense work).

• Consult with clients and develop E-Discovery plans

• Carry out electronic discovery processing from initial acquisition to final load file

**Network Designs, Inc**. – McLean, VA – Senior Instructor ATA Cyber Division as an Independent Contractor – September 2009 to present.  On a contract basis to NDI, work as a Senior Instructor supporting the U.S Department of State Anti-Terrorism Assistance Program's Cyber Division, which included the following:

• Develop training modules for new training programs

• Provide advisement, briefings and presentations to foreign law enforcement officers on areas including cyber terrorism and cyber crime

• Provide technical computer investigation training to law enforcement and governmental agencies worldwide. Course taught include: Identification & Seizure of Digital Evidence, Introduction to Digital Forensics & Investigations, Macintosh Forensics, Cell Phone Forensics Consultation, EnCase Software Consultation, Server Incident Response (ADFC), Fundamentals of Network Security, Cyber Unit Management Consultation Proactive Internet Investigations Course, Forensic Equipment Grant Consultation, and Digital Forensic Lab Mentoring and Consulting.

**Guidance Software** – Pasadena, CA – Part-time Instructor - 2004 - 2005.

• Lead instructor teaching courses at all levels (Beginning to Expert)

• Assisted in course development and review

**University of Delaware Police Department** – Newark DE – Captain - July 1980 to August 2009. Principle duties were:

• Computer Forensics Unit

• Accreditation

• Southern Operations

### Education

University of Delaware – Computer Applications Certificate – Concentration in Network Environments – August 2004

Wilmington College – Bachelor of Science Applied Professions / Business Management – May 1986

Delaware Technical and Community College – 52 credit hours in the Criminal Justice Program

University of Delaware – Associate in Art – May 1973

### Publications

**Forensic Analysis of Spoliation and Other Discovery Violations – Part 2 of a 2-Part Series - Windows Examinations - eForensics Magazine – December 2016**

***Forensic Analysis of Spoliation and Other Discovery Violations* – Part 1 of a 2-Part Series - Macintosh Examinations - eForensics Magazine - October 2016**

***EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide*, 3rd Edition  - author - Wiley - September 2012**

***Mastering Windows Network Forensics and Investigation* (one of four co-authors) - Wiley -  2012**

***EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide*, 2nd Edition  - author - Wiley - November 2007**

***Mastering Windows Network Forensics and Investigation* (one of two co-authors) - Wiley - April 2007**

***Encase Computer Forensics—The Official EnCE: Encase Certified Examiner Study Guide* - primary author - Wiley - January 2006**

### Memberships and Affiliations

Infragard – secure member of the Wilmington, Delaware Chapter since June 2004.

High Technology Crime Investigation Association – member since August 2002.

High Tech Crime Network – member from September 2001 to date.

National White Collar Crime Center – designated agency contact person for agency membership in the organization – January 2001 to 2009.

## Courses Recently Developed

Chip-off / JTAG Bootcamp – A two-day course intended for stand-alone or to supplement a forensic software course. A pilot was recently delivered in January 2017.

Macintosh Digital Forensics – A new course for delivery by Bunting Digital Forensics to various clients. August 2015.

Cyber Security Investigations: Incident Response – New course development and delivery (part of two-person teams) – course was created for virtually delivery using the AvayaLive virtual classroom, with first delivery on June 25, 2014.

Mastering Macintosh Forensics – Rewrite (part of a four-person team) – Alvarez & Marsal for U.S. Department of State ATA – February 2013 – March 2013

Introduction to Digital Forensics and Investigation – Rewrite (part of two-person team) – U.S. Department of State ATA (Humtech) May 2012 – January 2013

Windows Server Incident Response – New course (part of two-person team) – Organization of American States May 2012 – Sept 2012

Advanced Digital Forensics Consultation (Windows / Linux / Macintosh Server Incident Response), New course (solo assignment) plus developed and built portable server lab –U.S. Department of State ATA – Sept 2011 – March 2012

Mastering Macintosh Forensics – New course (solo assignment) – U.S. Department of State ATA – Jan – June 2011

## Languages

Primary language is English, however during last several years have spent considerable time teaching and consulting in Latin American countries through interpreters, during which some Spanish skills have been acquired. Currently have the ability and experience demonstrating, teaching, and using EnCase and XRY software using the Spanish interface.

## Teaching and Presentation Experience

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Aug 6 – 10, 2018, Naperville, IL.

Digital Forensic Lab Mentoring and Consulting – U.S. Department of State ATA, July 23 – Aug 3, 2018, Beirut, Lebanon.

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – June 18 – 22, 2018, Naperville, IL.

Magnet AXIOM Forensics Course (Online) -Magnet Forensics - Apr. 24–27 2018

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Dec 11-15, 2017, Nigerian MOI in Dubai, UAE.

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Nov 27- Dec 1, 2017, Nokesville, VA.

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Aug 21-25, 2017, Lansing, MI.

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Mar 6-10, 2017, Singapore.

Chip-off Forensics Bootcamp – Sumuri, LLC – January 30, 2017, Dover, DE.

Foundation, Intermediate, XAMN XRY Mobile Phone Forensics – Micro Systemation, A.B. – Oct 24–28, 2016, Nairobi, Kenya.

Introduction to Digital Forensics and Investigation - U.S. Department of State ATA, July 18 - 29, 2016, Shillong, Meghalaya - India.

Identification & Seizure of Digital Evidence - U.S. Department of State ATA – July 6-15, 2016 – Shillong, Meghalaya – India.

Foundation XRY Mobile Phone Forensics – Micro Systemation, A.B. – May 16-17, 2016, U.S. Secret Service National Computer Forensics Institute Hoover, AL.

Foundation and Intermediate XRY Mobile Phone Forensics (private course for 5 members of the Kingdom of Saudi Arabia Ministry of the Interior) – Micro Systemation, A.B. – May 9-13, 2016, London, UK.

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Feb 22-26, 2016, Jakarta, Indonesia.

Mobile Device Forensics Consultation, U.S. Department of State ATA, Feb 8-19, 2016, Jakarta, Indonesia.

Foundation & Kiosk XRY Mobile Phone Forensics - Micro Systemation, A.B. – Feb 2-4, 2016 – Singapore

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Oct 21-25, 2015 – Washington, DC

Proactive Internet Investigations Course - U.S. Department of State ATA – Aug 10 - 21, 2015 – Mexico City, Mexico

EnCase Transition Training, Bunting Digital Forensics Custom Course, May 26 – 27, 2015
Delaware State Police Child Predator Task Force, Dover, DE

Foundation and Intermediate XRY Mobile Phone Forensics (private course for 5 members of
the Kingdom of Saudi Arabia Ministry of the Interior) – Micro Systemation, A.B. – May 18-22,
2015 – New York, NY

Introduction to Digital Forensics and Investigation - U.S. Department of State ATA, May 3 -
14, 2015, Muscat, Oman

EnCase I (Guidance Software Course - ATP) – Abu Dhabi Police Department – Mar 1 – Mar 5,
2015 – Abu Dhabi, United Arab Emirates

Proactive Internet Investigations Course - U.S. Department of State ATA – Jan 26 - Feb 6,
2015 – Cuernavaca, Mexico

Identification & Seizure of Digital Evidence - U.S. Department of State ATA – Jan 16-23, 2015
– Cuernavaca, Mexico

Proactive Internet Investigations Course - U.S. Department of State ATA – Nov 17 - 28, 2014
– Tijuana, Mexico

Identification & Seizure of Digital Evidence - U.S. Department of State ATA – Nov 6-14, 2014
– Tijuana, Mexico

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Oct
20-24, 2014 – Alexandria, VA

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Sep
22-26, 2014 – Santiago, Chile

Proactive Internet Investigations Course – U.S. Department of State ATA – August 11 – 22,
2014 – Ciudad de México, México

Digital Forensic Lab Mentoring and Consulting – Lead Instructor - U.S. Department of State
ATA, July 14 – 25, 2014, Medellin & Bucaramanga, Colombia

Cyber Security Investigations: Incident Response – U.S. Department of State FedCTE
Program – June 24, 2014, Virtual Class - AvayaLive

Digital Forensic Lab Mentoring and Consulting – Lead Instructor U.S. Department of State
ATA, May 5 – 16, 2014, Cali & Pereira, Colombia

Digital Forensic Lab Mentoring and Consulting - U.S. Department of State ATA, Mar 24 –
Apr 4, 2014, Bogota, Colombia

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Apr
7-11, 2014 – Alexandria, VA

Foundation and Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Mar 3-7, 2014 – Vancouver, BC

Proactive Internet Investigations Course - Lead Instructor - U.S. Department of State ATA – Jan 27 – Feb 7, 2014 – Cuidad Juarez, Mexico

Identification & Seizure of Digital Evidence - U.S. Department of State ATA – Jan 20-25, 2014 – Cuidad Juarez, Mexico

Intermediate XRY Mobile Phone Forensics – Micro Systemation, A.B. – Nov 20-22, 2013 – San Diego, CA

Identification & Seizure of Digital Evidence - U.S. Department of State ATA – Nov 4-9, 2013 – Chihuahua, Mexico

Computer Forensics for Legal Professionals, September 24, 2013, Widener University School of Law, Wilmington, DE

Introduction to Digital Forensics and Investigation - Lead Instructor - U.S. Department of State ATA, September 2-13, 2013, Mexico City, Mexico

Digital Forensic Lab Mentoring and Consulting - U.S. Department of State ATA, July 15-26, 2013, Dakar, Senegal

Introduction to Digital Forensics and Investigation (New Version Pilot) - Lead Instructor - U.S. Department of State ATA, April 8-19, 2013, Manila, Philippines

Identification & Seizure of Digital Evidence - Lead Instructor - U.S. Department of State ATA – Mar 9-17, 2013 – Muscat, Oman

Identification & Seizure of Digital Evidence - U.S. Department of State ATA - Feb 11-21, 2013 - Dakar, Senegal

Mastering Macintosh Forensics, Alvarez & Marsal, Oct 29 - Nov 2, 2012, 2012, Washington, DC

Incident Response Tabletop Exercise, large web hosting client, Oct 16-17, 2012, San Antonio, TX

Macintosh Incident Response, HTCIA, Sept 16-19, 2012, Hershey, PA

Windows Server Incident Response - Lead Instructor - Organization of American States, Sept 3-7, 2012, Trinidad & Tobago

Fundamentals of Network Security, U.S. Department of State ATA, July 23 - Aug 3, 2012, Bogota, Colombia

Introduction to Digital Forensics and Investigation (Pilot for revised program) - U.S. Department of State ATA, April 23 – May 4, 2012, Mexico City, Mexico

Mastering Macintosh Forensics, Ocean County Prosecutor's Office, April 16-20, 2012, Tom's River, NJ

Advanced Digital Forensics Consultation (Windows / Linux / Macintosh Server Incident Response), Developer and Lead Instructor – U.S. Department of State ATA Mar 5-16, 2012, Bogota, Colombia

Cyber Unit Management Consultation, U.S. Department of State ATA, Sept 5-16, 2011, Bogota, Colombia

Cell Phone Forensics Consultation, U.S. Department of State ATA, July 11-22, 2011, Antigua.

Macintosh Forensics & Advanced Forensics Consultation, Developer and Lead Instructor – U.S. Department of State ATA, June 6-17, 2011, Bogota, Colombia.

Forensic Equipment Grant Consultation, U.S. Department of State ATA, May 17-31, 2011, Bangkok, Thailand

Introduction to Digital Forensics and Investigation – U.S. Department of State ATA, May 2-13, 2011, Mauritius

Advanced Forensic Acquisition & Analysis – Delaware ICAC – March 21-25, 2011, Dover, DE

Forensic Acquisition & Analysis – Delaware ICAC– Feb 21-25, 2011, Dover, DE

Cyberbullying – Cape Henlopen High School – January 27, 2011, Lewes, DE

Software Consultation: EnCase 1 & EnCase 2, U.S. Department of State ATA, Jan 10-21, 2011, Bangkok, Thailand

Incident Response & Forensic Tools Overview – Delaware Cyber Terrorism Exercise, Oct 27, 2010, Smyrna, DE

Identification & Seizure of Digital Evidence – U.S. Department of State ATA – June 3 – 11, 2010 – Mexico City, MX

EnCase Computer Forensics I – Lead Instructor – North Carolina ICAC– April 26 – 30, 2010 – Raleigh – Durham, NC

EnCase Computer Forensics II – Lead Instructor – Sidley Austin LLP – February 22 – 25, 2010 – Chicago, IL

EnCase Computer Forensics I – Qatar National Bank – October 11 – 15, 2009 – Doha, Qatar

EnCase Computer Forensics I – Abu Dhabi Police Department – October 4 – 8, 2009 – Abu Dhabi, UAE

Introduction to Computer Forensics – University of Delaware Police – August 17-21, 2009 – Lewes, DE

Advanced Computer Forensics Techniques – Computer Forensics Analysis and Training Center – June 4-5, 2009 – Sharon Hill, PA.

Cyberbullying – May 11, 2009 – Long Neck Elementary School – Millsboro, DE

"Computer Forensics – Current State and Future Challenges" – Computer Crimes Colloquium – April 7, 2009 – Wilmington University – Dover, DE

Identity Theft – City of Lewes Neighborhood Watch Meeting – March 23, 2009 – Lewes, DE

Disaster Recovery (CIS 486) – Goldey-Beacom College – January to March 2008 – Wilmington, DE.

Forensic Acquisition and Analysis – November 16-20, 2008, Dubai Police Department, Dubai, UAE

Cyber Stalking – Delaware Domestic Violence Council – Dover Police Department, November 7, 2008, Dover, DE

Computer Forensics (CIS 362) – Goldey-Beacom College – October to December 2008 – Wilmington, DE.

Advanced Computer Forensics – September 22-26, 2008, Sidley – Austin in Chicago, IL

Computer Forensics Primer for the Press – September 17, 2008 – Delaware Valley Press Club – Chester, PA.

Investigation Crimes Involving Computers – August 28-29, 2008 – Newark, DE.

Introduction to Computer Forensics – Computer Forensics and Analysis Training Center – August 26-27, 2008 – Sharon Hill, PA.

Disaster Recovery (CIS 486) – Goldey-Beacom College – March to April 2008 – Wilmington, DE.

Computer Forensics (CIS 362) – Goldey-Beacom College – October to December 2007 – Wilmington, DE.

Computer Forensics for Medical / Legal Professionals – University of Delaware Special Programs – November 9, 2007

Windows Network Investigations and Forensics – HTCIA Regional Training – June 19, 2007 – Newark, DE

User Services – First Response to Crime Scenes Workshop – Special Interest Group on University and College Computing Services – Edmonton, Canada – November 5, 2006

Cyber Stalking – Delaware Domestic Violence Council – November 16, 2006 – Dover, DE.

Computer Forensics for Prosecutors – Delaware Attorney General Staff – September 28, 2006 – Dewey Beach, DE.

CyberSpeak Podcast – Microsoft Log Parser Forensic Applications – June 3, 2006

CyberSpeak Podcast – User Assist Registry Key and Restore Point Forensics – May 13, 2006

Investigation of Cyber Incidents – University of Delaware System Administrators Group – May 17, 2006 – Newark, DE

Identity Theft and Cyber Safety – DuPont Experimental Station Staff – March 14, 2006 – Wilmington, DE.

Computer Forensics for Prosecutors – Delaware Attorney General Staff – September 22, 2005 – Lewes, DE.

First Response Issues for Crimes Involving Computers – Hosted by the U.S. Attorney's Office – September 16, 2005 – Dover, DE.

Examination of Photoshop Layer Data –  RCFG GMU 2005 – August 15 & 18, 2005 – Fairfax, VA

Cyber-sabotage, Espionage, & Other Security Threats, February 23, 2005, Lorman Education Services, Newark, DE

Computer Forensics in the Courtroom, January 7, 2005, Widener University School of Law, Wilmington, DE

Computer Forensics for Prosecutors – Delaware Attorney General Staff – September 30 – October 1, 2004 – Dewey Beach, DE.

Forensic Examination of Peer-to-Peer Client Software Artifacts –NJSP High Tech Crime Unit. September 22, 2004, Trenton, NJ.

Introductory Computer Forensics Guidance Software – Sterling, VA Jun 29 – Jul 2, 2004 (32 hrs) Lead Instructor

Internet / Email Examinations Guidance Software – Sterling, VA Jun 22 – 25, 2004 (32 hrs) Lead Instructor

Email Examinations Lab at CEIC 2004 Myrtle Beach, SC Jun 6 – 9, 2004 (7.5 hrs – five presentations) Lead Instructor

Photoshop Layer Metadata Examinations CEIC 2004 Myrtle Beach, SC Jun 8, 2004 (1.5 hrs) Lead Instructor

Introductory Computer Forensics Guidance Software – Sterling, VA Apr 27 – 30, 2004 (32 hrs) Lead Instructor

Internet / Email Examinations Guidance Software - Sterling, VA Mar 30 - Apr 2, 2004 (32 hrs) Instructor

Internet / Email Examinations Guidance Software - Sterling, VA Feb 3-6, 2004 (32 hrs) Instructor

Introductory Computer Forensics Guidance Software - Sterling, VA Jan 6-9, 2004 (32 hrs) Lead Instructor

Internet / Email Examinations Guidance Software - Sterling, VA Nov 18-21, 2003 (32 hrs) Instructor

Introductory Computer Forensics Guidance Software - Sterling, VA Oct 21-24, 2003 (32 hrs) Instructor

Intermediate Analysis & Reporting Guidance Software - Sterling, VA Sept 9-12, 2003 (32 hrs) Instructor

Introductory Computer Forensics Guidance Software - Sterling, VA Aug 12-15, 2003 (32 hrs) Instructor

Introductory Computer Forensics Guidance Software - Sterling, VA July 8-11, 2003 (32 hrs) Instructor

Intermediate Analysis & Reporting Guidance Software - Sterling, VA June 17-20, 2003 (32 hrs) Instructor

Internet / Email Guidance Software - Sterling, VA May 6-9, 2003 (32 hrs) Instructor

Intermediate Analysis & Reporting Guidance Software - Sterling, VA Mar 4-7, 2003 (32 hrs) Instructor

Introductory Computer Forensics Guidance Software - Sterling, VA Feb 25-28, 2003 (32 hrs) Instructor

Internet Safety for Children - Winter / Spring 2003 semester offering through the University of Delaware Continuing Education Division

Cyber-Stalking and Related Crimes Involving Computers: October 7, 2002 in Newark, DE.

Computer Crime Issues for Prosecutors: - Presented to the Wicomico County States Attorney's Office (4/20/01) and to the Attorney General's Office for the State of Delaware Sex Crimes Unit (10/4/02).

Computer Forensics: - during the spring semester 2002, supervised and directed an independent course of study in computer forensics for a University of Delaware senior majoring in computer science. Program was under the auspices of Professor Chien-Chung

Shen. Student is now employed with Price, Waterhouse, Cooper in the computer forensics division.

The Internet as an Investigative Tool:  Presented at the University of Delaware (5 presentations: 12/5/00, 1/8/01, 8/6/01, 8/13/01, & 8/26-27/02), at the Eastern Shore Criminal Justice Academy (3 presentations: 2/16/01, 3/8/01, and 3/20/01), and at Mount St. Mary's College (6/26/02).

Computer Crimes: 1st Responder Issues – course developed and presented to the University of Delaware Police as a 2-hour block during in-service training. Presented May 31, 2001, June 7, 2001, May 30, 2002, and June 5, 2002.

## Training Courses Completed

| | |
|---|---|
| AX300 – AXIOM Advanced Mobile Examinations | Magnet Forensics – Oct 24-27, 2017 Sterling, VA |
| iVE Vehicle Forensics | Berla – Sep 25-29, 2017 Annapolis, MD |
| AX200 - AXIOM Examinations | Magnet Forensics – Sep 19-22, 2017 Online |
| XRY Train-the-Trainer Training | MSAB – Aug 30– Sep 1, 2017 Stockholm, SE |
| XRY Version 7 Training | MSAB – Aug 22–26, 2016 Stockholm, Sweden |
| XRY Version 7 Training | MSAB – Mar 28–Apr 1, 2016 Stockholm, Sweden |
| XRY Advanced Acquisitions | MSAB – Mar 21 – 25, 2016 Freehold, NJ |
| XRY Advanced Applications Analysis | MSAB – Dec 14 – 18, 2015 Washington, DC |
| XRY Train-the-Trainer Annual Training | MSAB – Sept 7-11, 2015 Stockholm, Sweden |
| XRY Train-the-Trainer Course | MSAB – Sept 30- Oct 11, 2013 Stockholm, Sweden |
| FTK Bootcamp Version 3 | Access Data – April 5-7, 2011 – Online |
| XRY Physical Acquisition & Analysis Training | MSAB - Oct 6-8, 2010 - Alexandria, VA |
| XRY Logical Acquisition & Analysis Training | MSAB - Oct 4-5, 2010 - Alexandria, VA |
| Basic Malware Analysis | HB Gary - April 20-21, 2010 - Columbia, MD |
| LAW PreDiscovery Certified Administrator Course | LexisNexis - Jan 14, 2010 - Washington, D.C. |
| LAW PreDiscovery EDD Certified User Course | LexisNexis - Jan 12-13, 2010 - Washington, D.C |
| Microsoft Exchange Server 2007 | Global Knowledge - Jan 26 - 30, 2009 - Arlington, VA |

| | |
|---|---|
| HTCIA Conference (24 hrs) | High Tech Crime Investigator's Association – Oct 20-22, 2008, Atlantic City, NJ |
| Operation Fair Play (40 hrs) | Delaware State Police ICAC – Wyoming Tool Kit Training  – Mar 31-Apr 4, 2008, Dover, DE |
| Neutrino Cell Phone Forensics (16 hrs) | Guidance Software –  January 15 – 16, 2008, Sterling, VA. |
| Macintosh Forensics (40 hrs) | Phoenix Data Group – October 15-19, 2007 – Sharon Hill, PA |
| Vista Forensics | Access Data – July 20, 2007 – Washington, DC |
| Advanced Windows Intrusion Investigator's Course (40 hrs) | SYTEX – February 27 – March 3, 2006, FBI Academy, Quantico, VA |
| Adobe Photoshop for Forensic Video Analysts ( 16 hrs) | Resolution Video – December 14-15, 2005 – Reston, VA |
| Regional Computer Forensics Group Seminar (40 hrs) | RCFG / HTCIA – August 15-19, 2005 – GMU – Fairfax, VA. |
| Cell Seizure (16 hrs) | Paraben – May 18-19, 2005 in Newark, DE |
| PDA Seizure (16 hrs) | Paraben – May 16-17, 2005 in Newark, DE |
| Enterprise Security & Vulnerability (36 hrs) | USSS / SEARCH – April 18-22, 2005 in Cherry Hill, NJ |
| Access Data FTK Advanced Internet Training Course (24 hrs) | Access Data – March 15 – 17, 2005 in Dover, DE. |
| Ocean Systems: dTective (Advanced Video Forensic Analysis ) (16 hrs) | Ocean Systems – Feb.  24 – 25, 2005 in Burtonsville, MD. |
| Advanced UNIX Investigator's Course  (40 hrs) | SYTEX – December 6 – 10, 2004, Ellicott City, MD. |
| EnCase EnScript Programming  (32 hrs) | Guidance Software – November 16 – 19, 2004, Sterling, VA. |
| Networks and Networking for Agents / System Security and Exploitation  (80 hrs) | SYTEX – October 18 – 29, 2004, Ellicott City, MD. |
| Law Enforcement Video Association Annual Training Conference 2004   (16 hrs) | LEVA – October 6 – 7, 2004 Washington, D.C. |

| | |
|---|---|
| NIJ Law Enforcement Technology Institute 2004 (40 hrs) | NIJ - July 11 – 16, 2004, Washington, D.C. |
| Computer and Enterprise Investigations Conference / TechnoSecurity Conference 2004 (28 hrs) | Guidance Software - June 6 – 9, 2004 in Myrtle Beach, SC. |
| Ocean Systems: dTective (Advanced Video Forensic Analysis ) (16 hrs) | Ocean Systems - May 6 – 7, 2004 in Burtonsville, MD. |
| Ocean Systems: Introduction to Forensic Video Examinations (24 hrs) | Ocean Systems - May 3 – 5, 2004 in Burtonsville, MD. |
| Access Data FTK Intermediate Training Course (24 hrs) | Access Data - April 5 – 7, 2004 in Dover, DE. |
| EnCase Expert Series: Internet & Email Examinations (32 hrs) | Guidance Software - February 4 - 7, 2003 in Sterling, VA. |
| EnCase Advanced Computer Forensics  (32 hrs) | Guidance Software - January 21- 24, 2002 in Sterling, VA. |
| Introduction to Programming Concepts (Visual Basic 6) (50 hrs) | University of Delaware Course - Wilm, DE – Fall 2002 |
| Computer and Enterprise Investigations Conference 2002 (16 hrs) | Guidance Software - September 16-17, 2002 Chantilly, VA. |
| Regional Computer Forensics Group Seminar (40 hrs) | RCFG / HTCIA - August 12-16, 2002 - GMU - Fairfax, VA. |
| ILook Computer Forensics Software  (24 hrs) | ACES / FBI / IRS / NCFS - July 23-25, 2002 Orlando, FL. |
| Firewalls and Virtual Private Networks  (16 hrs) | CSI / NIPC / FBI - May 22-23, 2002  MSP - Columbia, MD. |
| Internet Investigations and Child Exploitation Overview (8 hrs) | SEARCH - April 6, 2002, CCU - Conway, SC. |
| Techno-Security 2002 Conference  (28 hrs) | The Training Company  - April 7-10, 2002 - Myrtle Beach, SC |
| Enterprise Networks  (50 hrs) | University of Delaware - Wilm, DE - Spring 2002 |
| EnCase Advanced Computer Forensics (32 hrs) | Guidance Software - February 19-22, 2002 - Leesburg, VA. |

| | |
|---|---|
| LAN (Local Area Networks)  (50 hrs) | University of Delaware – Newark, DE – Fall 2001 |
| EnCase Intermediate Computer Forensics (32 hrs) | Guidance Software – August 7-10, 2001 – Leesburg, VA . |
| Techno-Security 2001 Conference (28 hrs) | The Training Company April 22-25, 2001 – Myrtle Beach, SC |
| WAN (Wide Area Networks)  (50 hrs) | University of Delaware – Newark, DE – Spring 2001 |
| Advanced Data Recovery and Analysis Course (40 hrs) | NW3C – October 23-27, 2000 – Fairmont, WV. |
| The Internet as in Investigative Tool (8 hrs) | NW3C / IFCC – October 12, 2000 – Fairmont, WV. |
| Basic Data Recovery and Analysis Course (40 hrs) | NW3C  July 24-28, 2000 in Myrtle Beach, SC. |

## Computer Forensics Expert Witness Experience

Crawford and Company v Larry W. Daniel and Cunningham Lindsey Claims Management, Inc Civil Case No 17-1-01244 – Superior Court of Cobb County State of Georgia – Submitted affidavit on September 12, 2017 on behalf of Crawford that an iPhone submitted by the defendant as part of electronic discovery had the messages set to delete after 30 days and that the user has enabled backup encryption, thereby preventing the contents from being acquired.  Case settled without going to trial.

AdMarketer, LLC and Credit Benefit Services, LLC v Isaac "Zack" Bernato; Dennis H. James; CRM Holding Company, LLC; IMT Marketplace, LLC; World Clicks, LLC; and Valerie DiNardo – Civil Action File No: 2015CV267337 in the Superior Court of Fulton County State of Georgia – Submitted affidavit on March 31, 2017 on behalf of the defendant that opposing expert had made a finding that defendant had deleted messages, thuls supporting a spoliation claim.  Affidavit stated that opposing expert had not discovered iPhone message setting for 'delete after 30 days' nor had he discovered that SMS forwarding was enabled, enabled specifically to a Mac laptop that was in the possession of the opposing expert and which opposing expert had failed to examine.  This laptop contained all the chat messages that the expert claimed were deleted.  Further the affidavit stated that the opposing expert had used only one tool in his examination and in doing so missed over 11,000 AIM messages, many of which were relevant to the case.  Defendants filed bankruptcy and case settled without trial.

Tamika Covington vs International Association of Approved Basketball Officials, Board 193, et al. (CIVIL ACTION NO. 3:08-cv-03639) -  US District Court (Princeton, NJ) – Testified as expert for defense in computer forensics analysis and email analysis in a hearing to dismiss based on fraudulent documents offered into evidence by plaintiff.  Specifically, testified that document proffered as an email was in fact fabricated to appear as such. – July 09, 2014.

Network Computing Services Corporation vs Haynsworth, Sinkler, P.A. Belton T. Zeigler and John Tiller (South Carolina) – Submitted two affidavits for the plaintiff regarding deleted emails in a case alleging legal malpractice – April 2010

State of Delaware vs Irina Malinovskaya (3rd trial - Murder 1st) – Testified as computer forensics expert regarding analysis of defendant's computer. Also testified that an email offered by the defendant after the 2nd trial was fabricated and offered as evidence. The defendant was convicted of tampering with physical evidence. - 2007

Cpl B. Kurt Price et al. vs Colonel L. Aaron Chaffinch et al. (US District Court) Submitted affidavit as to wiping of a hard drive by the plaintiff - May 2006

State of Delaware vs Irina Malinovskaya (2nd trial - Murder 1st) Testified - 2006

State of Delaware vs Stephanie McMullen (Munchausen's Nurse case) Testified - 2006

State of Delaware vs Eric Kemske (Manufacture, distribute, possess child pornography – peer-to-peer software involved) – Testified - 2005

State of Delaware vs Keith Appleby (Suppression Hearing - Computer Intrusion Case) Testified - 2003

# EXHIBIT B



Bunting Digital Forensics, LLC
33579 Blue Heron Drive
Lewes, DE 19958
Phone: +1.302.260.2633
www.BuntingDigitalForensics.us

**Expert Report – Testing of GuardaLey LTD's MaverickEye UB (MEU) Copyright Infringement Detection System**

Prepared by:    Stephen M. Bunting, EnCE, CCFT
                 CEO / Senior Forensic Consultant
                 Bunting Digital Forensics, LLC

## DECLARATION OF STEPHEN M. BUNTING

I, STEPHEN M. BUNTING, DO HEREBY DECLARE:

1.      My name is Stephen Michael Bunting. I am over the age of twenty-one (21), and I am competent to make this Declaration. I make this Declaration voluntarily and the facts stated herein are based on my personal knowledge and information.

2.      I currently work as Director of Services for SUMURI, LLC and as independent forensic consultant as owner of Bunting Digital Forensics, LLC. Prior to that, I was a police officer from 1980 until 2009 with the University of Delaware Police from which I retired as a Captain. During the last ten years with the University of Delaware Police, I was in charge of the digital forensics and cyber investigations unit, that I founded. From 2009 until early 2013, I was a Senior Forensic Consultant with Forward Discovery, LLC, which in late 2012 was acquired by Alvarez and Marsal (NY) where I was a manager in the digital forensics division. I founded Bunting Digital Forensics, LLC in early 2013.

3.      I have taken hundreds of hours of training in digital forensics, network forensics, and cyber investigations. I have provided training in the same topic areas, from beginner to expert levels, to members of various local, state, and federal law enforcement agencies and private sector examiners. I have trained like personnel internationally in over twenty-one (21) different countries. I have provided training, as either a part-time employee or contractor, for Guidance Software, Magnet Forensics, MicroSystemation, A.B., Organization of American States, and the U.S. Department of State Anti-Terrorism Assistance Program (Cyber Division). I have developed digital forensic or cyber training programs for several government and private entities.

4.      I hold several industry-related certifications. I was the recipient of the 2002 Guidance Software Certified Examiner Award of Excellence for receiving the test score on my certification examinations. Among my varied certifications I am an EnCase Certified Examiner EnCE (Guidance Software), an AccessData Certified Examiner (ACE), Certified Computer Forensics Technician (HTCN), and a Certified XRY Instructor.

5.      I am the principle author of *EnCase Computer Forensics - The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition,* the co-author *Mastering Windows Network Forensics and Investigation, the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 2nd Edition,* the co-author *Mastering Windows Network Forensics and Investigation 2nd Edition, the author of EnCase Computer Forensics—The Official EnCE: EnCase Certified Examiner Study Guide, 3rd Edition* (all published by Wiley).

6.      I have written numerous articles in the field of digital forensics over my career. Most recently I published two articles regarding spoliation examinations in which several peer-to-peer cases on which I have consulted were referenced in a hypothetical context:

> *Forensic Analysis of Spoliation and Other Discovery Violations - Part 2 of a 2-Part Series - Windows Examinations* - eForensics Magazine - December 2016
>
> *Forensic Analysis of Spoliation and Other Discovery Violations - Part 1 of 2-Part Series - Macintosh Examinations* - eForensics Magazine - October 2016

7.      I have testified as a fact and expert witness numerous times in the field of computer forensics before state and federal courts in Delaware and New Jersey. I have submitted affidavits, as an expert in digital forensics, on many matters in several states, including Delaware, Georgia, and South Carolina.

8.      No court has ever refused nor has any attorney ever challenged to accept my testimony on the basis that I was not an expert or not qualified in the field of computer forensics.

9.      As a digital forensics examiner I have acquired and examined hundreds of computer systems and mobile devices for various local, state, and federal agencies, in addition to scores of private clients. The types of cases or examinations include: homicide, child-exploitation, fraud, Medicaid fraud, unlawful intrusion into computer systems (hacking), intellectual property theft, research fraud, email forgery, criminal impersonation, forgery, sexual harassment, peer-to-peer, and spoliation. I have acquired computer systems of many types, including servers, virtual servers, desktops, and laptops. I have acquired hundreds of mobile devices (feature phones and smart phones), both logically and physically. I also have acquired smart phones using JTAG and chip-off techniques, both of which require disassembly and working with the printed circuit boards inside a smart phone.

10.     I have considerable experience with network-related cases, such as unlawful intrusions and peer-to-peer cases. I have investigated or provided digital forensics support to several unlawful intrusion incidents in both a law enforcement and a private sector capacity.

11.     As a police officer I received specialized training in conducting peer-to-peer investigations by S.A. Flint Waters with the Wyoming Internet Crimes Against Children (ICAC) Task Force. S.A. Waters developed the Wyoming Toolkit, a customized version of Phex, a peer-to-peer client on the Gnutella network. I participated with members of the State of Delaware ICAC in this training program and afterwards in a task force conducting peer-to-peer investigations. Using the Wyoming Toolkit, we searched for child sexual exploitation images and movies on the peer-to-peer networks. When images were found, the software identified offending computers by their IP addresses [Note 1].

> [Note 1:] A public or internet routable IP address is a router or computer's address on the internet at a specific time. IP addresses uniquely identify a computer, as no two computers can have the same exact public, internet routable, IP address at the same time. If the address is that of a router, the computer typically has a private address

behind the router. In a typical home network, the ISP provides a 'box', which is often both a modem and a router / firewall / DHCP server. The router has a public or internet facing IP address assigned to it. On the back side of the router, several devices (computers, smart phones, etc) are connected using private addresses. Thus several devices in a home network share the public internet routable address assigned to the ISP's box (router). Other computers on the internet, including peer-to-peer software, see and use the public facing IP address assigned to the customer's router. The router routes network traffic for specific devices on the private side or behind the router using a protocol called NAT (Network Address Translation), thus assuring network traffic is sent to the correct computer.

IP addresses, as mentioned, are often time specific. These IP addresses are called dynamic IP addresses. They are assigned for certain periods of time, called leases. There is great variability in how often dynamic IP addresses change, but because they can and do change, the specific time of the offense is necessary to determine which subscriber was assigned a specific IP address at a specific time. ISP's maintain connection logs that record to whom a specific IP address is assigned and exactly when. By contrast, an IP address can be a fixed IP address. Even they can change and, as an investigator, you do not know which type a subscriber has and thus the exact time is always obtained and submitted to an ISP when requesting subscriber information.

The IP addresses hosting the illegal images are parsed by the toolkit using an IP geolocation database by which offending IP's are isolated or filtered to only those within our police jurisdiction. Once offending IP's were found in Delaware, we would request that the Attorney General's office submit subpoenas to the ISP (Internet Service Provider) for specific customer information and address of the offending IP address. As IP addresses are often time-specific, we submitted the exact date / time (along with time zone offset) for the offending IP address. The ISP would return to us the customer or subscriber information (name, address, account information,

etc.) for the ISP in question. We would investigate further and obtain a search warrant for the premises at which the IP was hosted. The search warrant would permit us to seize all media and electronic devices capable of holding digital media, as we did not know specifically which device behind the router was the offending device. The IP address detected by the peer-to-peer software was the public facing internet addressable IP address of the router, which is associated with the subscriber and their residence and not to a specific computer in the residence. Because it was a criminal investigation, we requested that the subscriber not be notified of the subpoena so that digital evidence would not be destroyed. Thus, in nearly all cases, the offending subscribers were surprised by the execution of the search warrant. In all the times that we did so, not once did the IP address lead to an innocent person's residence. Rather, we always found evidence therein of child sexual exploitation media on the computer system(s) therein.

12.     I have found that the Wyoming Toolkit was a most reliable tool for identifying the IP addresses for peer-to-peer clients that were hosting child sexual exploiting images and video.

13.     In my experience, the IP address's subscriber, or a family member thereof, is likely the offending party.

14.     I have been involved in a case where the owner of the computer and charged party was professing his innocence, claiming someone else must have used his wireless network, citing a neighbor who reportedly engages in photography of a questionable nature. However, the evidence on his computer suggests otherwise. The software used by the investigators detected the name and version of the peer-to-peer software client involved, which happened to match the one found on his machine. Further, the same exact images detected by the investigative software were found on his machine. His claims were without merit and in direct contradiction to the overwhelming digital evidence found on his computer.

15.     Unsecured wireless routers in homes used to be commonplace 15 years ago. In recent years, however, Internet Service Providers (ISP's) have undertaken great effort to provide and deploy secured wireless systems. Most "internet interface boxes" (combination modem / router / firewall / DHCP server) are preconfigured to operate with WPA2 security with a complex password already set. These devices are secure out of the box with strong encryption and complex passwords that are lengthy alpha numeric passphrases. Thus, valid claims of compromised home wireless systems today are, in my experience, rare compared to 15 years ago.

16.     In the past, I have consulted with Computer Forensics, LLC in copyright infringement cases where spoliation was an issue. I'm familiar with the technology that was used in those cases to detect the copyright infringement offenders.

17.     I have been retained by Voltage Pictures, LLC to provide digital forensic services and consulting in matters of copyright infringement. In anticipation of potential testimony in that regard, I have undertaken tests of the infringement detection software used, which is MaverickEye UB (MEU). This software and hardware platform is owned and run by GuardaLey, LTD, a German company located in Eggenstein, Germany. The CEO and Senior Developer at GuardaLey is Benjamin Perino.

18.     Mr. Perino has written an export report describing the features and functions of this proprietary software, MaverickEye UB, or MEU, in detail. I have read that report in its entirety.

19.     The manner in which MaverickEye works and the manner in which the software that I have used in my law enforcement capacity (Wyoming Toolkit) work to connect a peer-to-peer violation with an IP and subsequently with a subscriber are quite similar. In fact, MaverickEye UB, in my opinion, is much better with greater integrity features. Based on having read Mr. Perino's expert report on the function and features of the MaverickEye UB system, I note that the MaverickEye UB system is better because of the following: The law enforcement software

does not capture or retain any network packets, whereas MEU does. The law enforcement software does not use a WORM drive to store evidence, whereas MEU does. The law enforcement software is not housed or run in an ISO/IEC 270001:2013 compliant datacenter nor does it comply with PCI security specification, whereas MEU does.

20.     I constructed and then conducted a test to determine the accuracy of the MaverickEye software as to its ability to detect an infringing party's IP address, identifying metadata (client software and version used by infringer), and identifying the known test files distributed on the torrent network.

21.     To test the MaverickEye software, I created four video files, ones I created and owned from my archives. They were short clips of nature scenes, contained no people, and ones I could readily identify on site as being unique and ones I had in fact created. I embedded identifying metadata into these files, specifically my name, a description of the content, the data, and a statement that was placing them into the public domain. I also created MD5 and SHA1 hashes of each of the four files. A hash is an algorithm that produces a value that is best described as an electronic fingerprint. Files that are identical will have the same MD5 each time it is hashed. The slightest change by so little as one bit will produce a dramatically different hash value. Using this method, file integrity can be assured. Using two different hash algorithms eliminates any possible claims of hash value collisions.

22.     I configured four different computers each with a different operating system and each with a different bit torrent client software. Bit torrent client software is used to share files over the bit torrent network using the bit torrent protocol. The below matrix, Table 1 below, shows the test configurations:

| Computer | Operating System | Bit Torrent Client |
|---|---|---|

| Dell Laptop E6510 | Linux Ubuntu 16.04 LTS | KTorrrent 4.3.1 |
|---|---|---|
| Dell Laptop E5500 | Windows 7 Professional | BitTorrent 7.10 |
| HP Laptop Envy | Windows 10 Enterprise | uTorrent 3.5.1 |
| MacBook Pro 15" 2016 Touch Bar | High Sierra OS X 10.13.2 | Transmission 2.9.2 |

Table 1- The four test computers, their installed operating systems, and their installed bit torrent clients.

23.     After configuring the above laptops, I installed and tested the latest version of Wireshark on each laptop. Wireshark is a software tool that captures the network packets that traverse or are transmitted over any particular network interface on the host computer. Thus, it is a means of recording the traffic over the network. I have used Wireshark and its predecessor, Ethereal, for many years in both my law enforcement and private sector careers. I have also trained others to use it.

24.     On a fifth machine, not part of the test, I created torrents of the test or known movie files and allowed them to 'seed,' which means to share them on the torrent network and make them available for others to download. I took the four torrent files and physically placed them on the four test laptops, one unique file to each laptop. I started Wireshark on each test machine to capture the download and loaded the torrent files in each laptop's client software. In short order, each torrent file was able to locate the file and download it from the source machine that was initially sharing all four files. In so doing, the client software on each test machine was found to be working as designed. On each test machine, the newly downloaded movie file appeared to be identical to the original known files, as created. Each was found to contain the embedded metadata, including my name. To be absolutely certain the downloaded files were identical to the source files, each file was hashed and the hashes were found to be identical to those hashes the original files. The results are shown below:

| Computer | File Name | MD5 Hash Original | MD5 Hash Downloaded onto Test Machines |
|---|---|---|---|
| Dell Laptop E6510 | 01CanadianGooseHenonNest.m4v | a13a318a02c32b0d1a8e276ae92227d8 | a13a318a02c32b0d1a8e276ae92227d8 |
| Dell Laptop E5500 | 02GeeseHonkingOK.m4v | 6cdca839624df3e7c202766964394069 | 6cdca839624df3e7c202766964394069 |
| HP Laptop Envy | 03StripersJumpingOK.m4v | 5ae4fbf8a2b73e131e3f8030ad99242c | 5ae4fbf8a2b73e131e3f8030ad99242c |
| MacBook Pro 15" TouchBar | 04WinterWetlandsOK.m4v | 36c24f6d10c86df4994e435b055d01f9 | 36c24f6d10c86df4994e435b055d01f9 |

Table 2 - Test computers, the test or known file shared by each, and their hash values

25.     At this point in the test, the only sources for these four files anywhere were the four test machines and the source machine on which they were created. The source machine torrent client (Transmission) was stopped, making the four test machines now the only sources. The HP Laptop and the MacBook Pro was shut down for the first phase of the test, leaving the two Dell laptops the only sources for the first two files in the list. At this point, I provided the four torrent files to Mr. Perino in Germany. He loaded the torrent files onto the MaverickEye UB system so that the system could attempt to locate the known test files on the torrent network, download them, and identify the IP address of the device responsible for distributing the files.

26.     For the first phase of the test, the two Dell laptops were behind a firewall / DHCP server / router and would share the same public facing, internet-routable IP address. They could be distinguished by their port number for the connection, as well as by their bit torrent client and version number. The time was synchronized with a time server and the public, internet-routable address was checked and noted.

27.     Once I was informed that the MaverickEye system (MEU) had been loaded with the torrent files, I took the third laptop (HP Envy) to another location to use a different network configuration. The laptop was connected to a network at which I had an account and was configured directly with a public internet-routable IP address, such that the IP address of the laptop itself would be exposed directly to the internet. The time was synchronized with a time server and the public, internet-routable address was checked and noted. After running the test for a little more

than an hour, I was informed that the MEU system had detected all three files thus far placed into the torrent network. I shutdown the HP Envy laptop and returned to my original location where the first two laptops were still running the torrent clients.

28.     I connected the fourth laptop to the original network, adding a third machine to the public IP address shared by the first two laptops. The fourth laptop was a MacBook Pro and was sharing the fourth file. The time was synchronized with a time server and the public, internet-routable address was checked and noted. Late in the afternoon, I was notified that all four files had been detected by the MEU system and that the test was concluded.

29.     Mr. Perino sent me, via email, a copy of the network packet [Note 2] captures (PCAP files) and a spreadsheet summarizing the captures. In addition, he sent me copies of the four files that the MEU downloaded based on the torrent files that I send to him.

[Note 2] – Information sent over a network travels in packets. Each packet contains, among other data, a destination IP address, a destination port, a source IP address, and a source port. Thus, every packet contains what amounts to a delivery address and a return address, to make this somewhat analogous to the postal system by which mail travels. A stream of packets constituting a bit torrent download will often contain thousands of packets, each and every one of them containing source and destination IP addresses. As those packets also contain the file data of the bit torrent file, the source IP address for packets containing the file data itself is demonstrable evidence of the source of the file captured by the MEU system. A bit torrent network shares files on a peer-to-peer basis, meaning the two computers actually connect to each other. Hence the destination and source IP's represent the two computers involved in this file sharing. Further, these packets travel via a TCP protocol, which is a guaranteed delivery system. If a packet sent is not acknowledged as received, it is sent again and again, until it either is acknowledged or times out and fails.

30.     For all four files, the MEU system captured the public, internet-routable IP address for the source of the test or known files that I was sharing on the bit torrent network. I knew exactly what the IP addresses were, as I had recorded them before and after the downloads. The IP addresses involved were dynamic IP addresses and thus time sensitive. The ISP's for those IP addresses maintain logs that record which subscriber or user is assigned a particular IP address at a particular time. Had a subpoena been served on either of the two different ISP's used in this test, I would have been correctly identified as the responsible subscriber / user at those exact times for those involved IP addresses.

31.     Further, the MEU correctly captured the exact name of the bit torrent client and version numbers that were in use by each test computer. This capture is possible because when the MEU first connects to the computer hosting a file to be shared on the bit torrent network, a handshake occurs. Each machine's bit torrent client sends a packet to the other stating, among other things, their peer ID. Part of the peer ID is the name of the bit torrent client followed by its version number. Table 3, below, is a copy of Table 1, above, with an added column at the right showing the Bit Torrent client and version number as it was exchanged in the handshake. You can see that they were correctly identified in each instance.

| Computer | Operating System | Bit Torrent Client | Bit Torrent Client Captured by MEU |
|---|---|---|---|
| Dell Laptop E6510 | Linux Ubuntu 16.04 LTS | KTorrrent 4.3.1 | KT4310 |
| Dell Laptop E5500 | Windows 7 Professional | BitTorrent 7.10 | BT71000 |
| HP Laptop Envy | Windows 10 Enterprise | uTorrent 3.5.1 | UT351S |
| MacBook Pro 15" 2016 Touch Bar | High Sierra OS X 10.13.2 | Transmission 2.9.2 | TR2920 |

Table 3 - The 4th column shows the bit torrent client and version number, as captured in the handshake, which

corresponds currently with the installed client.

32.     As previously mentioned, the MEU captures the source port number in addition to the source IP address, as they are parts of the 'address' of each packet. I confirmed that the port numbers captured by the MEU system were accurate. I did this by spot checking packet captures on both systems. By that, I mean that packets sent and received from a test machine are captured as they are sent. Simultaneously, packets sent and received on the MEU system are likewise captured. As the two machines are connected, peer-to-peer, and the MEU is downloading a file from the test machine, the packets sent and received between the machines are the same packets of data and are being captured simultaneously. Thus, one can examine packets from both machines and can identify them as one and the same. I did this with several packets and this confirms positively that the MEU is accurately reporting the source IP address and other metadata (port numbers, client name, & client version). While making these packet comparisons, I examined the TCP (Transmission Control Protocol) layer of the packets, wherein the port numbers are found and noted that the port numbers are being correctly reported. Figure 1, below, shows the TCP layer information. The top one is from a packet captured on the MEU system, showing the Destination Port for this packet as 54702. The bottom one is from a packet captured on the Windows 10 test laptop (HP Envy). The Destination Port for this packet is also 54702.

```
▼ Transmission Control Protocol, Src Port: 21541, Dst Port: 54702,
    Source Port: 21541
    Destination Port: 54702
▼ Transmission Control Protocol, Src Port: 21541, Dst Port: 54702,
    Source Port: 21541
    Destination Port: 54702
```

Figure 1 - TCP layers from MEU on top and Windows 10 test machine on bottom. Port numbers match and are being correctly reported by MEU

They are identical and should be for the connection to have been successful. Packets are sent back and forth during a file sharing exchange, regardless of which party is downloading. In this case, the MEU is requesting a segment of the file that is being shared by this machine and identifies it by an index number. The Windows 10 test laptop (HP Envy) machine is using port 54702 for its client (UTorrent) to share files. So, when the MEU sends the request to the Windows 10 test machine, the destination port is 54702. When the Windows 10 test machine sends a packet to the MEU, the Windows 10 machine then becomes the source for the packet and thus the port would be listed as the source port. Thus, the MEU network packet captures are correctly reporting the port on the computer hosting the shared file that is also being identified by its IP address. As the MEU system is obtaining the port information from the network packets and, since the packets are reporting correctly (matching on both sides of the transmission), the summary report from Mr. Perino is listing port 54702 for this particular download is, as to be expected, correct and accurate.

33.     In addition to providing PCAP network capture data, the MEU also stores and produces what are called PCAP event reports.  These reports summarize the captured network packet data, making it easier to visualize the network transactions.  For the test data, I have reviewed the entries in the PCAP event reports and compared them to their corresponding PCAP network capture data.  I found that the data in former accurately represents, in summary form, the data contained in the latter.

34.     Whenever the MEU was connected to my torrent clients to download from them, never did I see it offer any portion of the file to share. At all times it listed it as 0% available when using the inspector to look at connected peers. At one point after the regular test was concluded, I allowed one test machine to download all four files so they could be shared and subsequently detected by the MEU again, this time via a VPN. At that point, minimally, those four files were

present on the one source machine on my network and also on the MEU, as all four had been detected and downloaded onto the MEU software. Since I was requesting those same files, were the MEU sharing files it has downloading, it would have responded as a normal torrent client would have responded and allowed my client to download them. The MEU did not connect and provide any download to my test laptop that was seeking those four files for download. Rather, they were downloaded only from sources within my local network of test machines. Thus, based on the observation I made during a test, I agree with Mr. Perino's description of the MaverickEye software in that it only downloads from clients offering files to share and does not share any files in return.

35.    To protect my privacy and to preserve the integrity and confidentiality of the MEU system, no IP addresses for those systems are being specified in this declaration nor are any screen captures of those IP addresses by shown.

36.    As previously stated, Mr. Perino provided copies of the test or known files that were downloaded from the test machines by the MEU system. I examined those files and, on visual inspection, I identified them as the same files that I had prepared for this test. I looked inside the files and noted that the metadata was still present exactly as I had inserted the data, including my name. Next, I hashed the known or test files provided by Mr. Perino using both MD5 and SHA1 hashing algorithms. I compared the hashes from the MEU download to the hashes in the original set and found them to be identical. Thus, the files downloaded by the MEU from the test machines, via the bit torrent (peer-to-peer) network were identical, bit-for-bit copies of the original source test or known files.

37.    I have concluded, based on this test, that the MaverickEye UB (MEU) infringement detection software works and accurately identifies the IP address of the device responsible for sharing of a particular file on the bit torrent network and the exact time of the violation. The MEU

connects to the computer hosting a file that is being shared, peer-to-peer (computer-to-computer). The MEU downloads that file or portions of that file. In our test case, it downloaded the entire file from the test machines, as they existed nowhere else. The files downloaded by the MEU from the test machines were identical in all regards. The hash values matched, proving they were bit-for-bit, identical copies. The MEU captures and retains the network packets involved in the file sharing process, as such network packet captures were made and provided to me as part of the test. Those network packets contain, among other data, the actual data (shared file content) from the machine that is sharing the file, along with the IP address of the computer sharing that data. MEU will, in fact, often capture hundreds or thousands of packets of data, with each and every packet identified by and containing the violator's IP address, bit torrent sharing port, bit torrent client, and bit torrent client version. Each packet captured will contain the exact time that the packet was transmitted. Per Mr. Perino's expert report, MEU's time is being synchronized with an atomic clock for accuracy. The MEU will not capture every file being shared on the bit torrent network, but for those it is configured to monitor and does capture, that data capture will, in my opinion and based on my testing, accurately identify the public facing, internet-routable IP address of the device sharing that file, as well as the exact time the file was shared. Likewise, it will, in my opinion and based on my testing, also identify the port used by the bit torrent client on the internet facing device if not the computer itself, the actual name of the bit torrent, and the version number of that bit torrent software. Furthermore, based on my testing, the MEU performed accurately regardless of the operating system or the torrent client being used.

38.    Based on a combination of my testing and of my understanding of the features and function of the MEU system, having read Mr. Perino's expert report on the MEU system, I am of the opinion that it was designed to maintain the accuracy and integrity of the evidence throughout. For example, as per Mr. Perion's export report, the MEU:

- Captures and retains the actual network packets whereby a file is downloaded from a copyright infringement violator. As noted previously each and every one of those packets identifies the source IP address of the violator and the exact time.

- Said captures are stored on a WORM drive. A WORM drive is a Write Once, Read Many drive, meaning once the evidentiary network packets are written to the drive, they cannot be altered, thus maintaining evidentiary integrity.

- WORM drives containing evidence are stored in a vault

- A log is automatically maintained of each copyright infringement violating download that occurs

- Time accuracy is maintained by synchronization with an atomic clock

- MEU is housed in an ISO/IEC 270001:2013 compliant datacenter

- MEU complies with the PCI security specification

39.     As to the possibility of the MEU yielding false positive, I have read Mr. Perino's expert report, specifically section B, items 26, 27, 28, and 29, which deal with "TCP/IP Connections cannot be spoofed and cannot yield false positives." I concur with his statements in 26, 27, 28, and 29.

40.     With regard to item 26, it is important to understand that the bit torrent protocol is a peer-to-peer file sharing protocol. Peer-to-peer means just that, a computer-to-computer connection. This means that files or portions of files are shared by direct connections between computers. When a direct connection occurs and packets are exchanged, the destination and source IP addresses of the two connected computers are found in the packets that are exchanged. They must be for the connection to be established and the stream of packets containing the file segments to transmit. Each and every packet contains the IP address of the sender and receiver (source and destination) and this goes for every packet involved in the transaction, not just those containing

data. The TCP protocol is, as previously mentioned, an assured delivery system in that packets sent must be acknowledged as received. All the traffic associated with that acknowledgement process also must contain the IP addresses of the sender and receiver.

41.     With regard to item 27, IP spoofing can be done by an experienced network specialist. Specially crafted network packets can be used to create denial of service attacks, but these packets are small and usually involve repeatedly sending the same small crafted packet over and over again, creating a flood of messages that results in a denial of service attack. Creating a few small, specially crafted packets that are sent repeatedly is a completely different task than trying to do so for a bit torrent stream, where tens of thousands of packets, mostly all different, are involved.

42.     With regard to item 28, Mr. Perino is accurate in his assessment of complexities and enormity of the task that would be involved in trying to do an IP spoof of a bit torrent stream. In a practical sense, a very technically adept person would have to know a victim's IP address. This person would have to physically connect a computer into the same network segment as the intended victim in order to intercept the network traffic involved. Doing so would involve considerable knowledge and skills, in and of itself, and could involve illegal access to a building or ISP network equipment. The person would need to have the file in question on their computer, be sharing it using bit torrent software, and have some software or code capable of or rewriting tens of thousands of bit torrent packets on the fly, as any delay could cause a time-out. While many things are theoretically possible, I am unaware of any such software being available. Such an endeavor would involve tremendous effort and resources. In addition, the person would have to know that a particular file was being monitored for copyright infringement downloading. And finally, such a person would have to have a very strong motivation to undertake such a task and to

target a particular person and/or IP address. Considering all that would be involved in such an endeavor, it is so unlikely to occur as to be nearly impossible, as Mr. Perino states.

43.     With regard to item 29, often IP spoofing, as described above, is interpreted or confused by many, including Google's search engine, with IP address hiding. If you search for "IP spoofing software," you will find most of the hits will involve VPN (Virtual Private Network) software. VPN software allows the user of a computer to create an encrypted tunnel to a VPN server from which the internet traffic emerges unencrypted. The VPN server's internet facing IP address also becomes the user's public internet-routable IP address. It acts as a proxy and is your frontend IP or point of presence IP on the internet. All network traffic between the user and the VPN server is encrypted. VPN's are intended for privacy of a user's internet traffic and also for protecting the identity of their IP address. A proxy server is similar in function to a VPN server. The major difference is that there is no encrypted tunnel between the user and the proxy server. The proxy server still serves, however, as the user's frontend IP or point of presence IP on the internet. A proxy server is not as secure as a VPN server because there is no encrypted tunnel. A proxy server is, however, faster than a VPN server because encryption requires time resources to achieve and results in slower network speeds, all other things being equal. If a VPN or a proxy server is used to engage in bit torrent file sharing, the MEU will see the source IP of the infringer as the public facing, internet routable IP address that of the VPN or proxy server, as that is the user's IP address, by proxy. This is not a false positive by any definition. Rather, the MEU is capturing packets that contain the source IP for the file as that of the VPN or proxy. When a VPN or proxy is being used, MEU can only trace the connection to the front-end or public-facing, internet routable IP address, which is accurate to that point. To obtain the IP of the user behind the VPN or proxy who is responsible for download, the VPN or proxy server owner or manager would have to be contacted. If they maintain logs, and many quite intentionally do not, the connection to

the source can then be identified through the subpoena process. Because the front-end interface to the MEU used by plaintiff's counsel only has filters for known ISP's (Comcast, Verizon, AT&T, etc), IP addresses for VPN's and Proxy services are not in those filtered groups and will not be visible.

44.     With regard to item 29, I conducted a separate test, after concluding the one described above whereby I configured one laptop (MacBook Pro – High Sierra) with a VPN service. With the VPN enabled, I launched Transmission (bit torrent client) and shared all four test or known files. I noted the public, internet-routable, frontend IP address in use by the test computer. After running this bit torrent configuration overnight using the VPN service, Mr. Perino reported to me that the MEU captured and downloaded the known or test files from the IP address that I had recorded for the computer. It was, as expected, the IP address of the VPN server. Thus a test of the scenario, as described by Mr. Perino in item 29, it absolutely correctly stated and accurate.

45.     When a user adds a torrent file for a file that they want to download, the "Trackers" that are included in the torrent file actively work to connect torrent clients that have either all or parts of a requested file with those seeking those files. In doing so, the IP addresses and port numbers, along with other metadata are shared, visible, and otherwise made public within that 'swarm' of torrent users. It is by this mechanism of identifying each computer in the swarm by its IP address and port number that computers in the swarm can connect directly to one another and share parts of the file. It is also by this mechanism that MEU system can see the public IP addresses and port numbers of copyright infringers and connect directly with them to download files and capture evidence of copyright infringement. Such a process is akin to going to a coffee shop and asking if anyone in the room has sugar on their table, as you do not. Perhaps you want 6 packets of sugar and you need a a packet or two from several tables to get your 6 packets. The conversations that take place during this discovery and sharing process are very much out in the public for all in

the coffee shop to hear. There is no expectation of privacy when such a request is made. Anyone in the coffee shop can see who you are and hear what it is that you are requesting. The swarm works much the same way. Once you announce that you want a file, the trackers in that torrent file being asking other users if they have that file, sharing your IP and port, and thereby facilitating the download of segments of the requested file from many users in the swarm. It matters not where the various torrent clients are located, as the internet is global and crosses nearly all country boundaries. In this case, the MEU happens to be in Germany, but could be anywhere. The simple fact is that if you wish to join a peer-to-peer, file-sharing network, you have to share your IP address and port with those in that public pool of persons doing likewise. You are agreeing to and consenting to allowing others to connect to your computer in order that you can exchange files. As with asking for a packet of sugar in a crowded coffee shop, those in a swarm will hear your request and know who you are by your public routable IP address.

46.     In Mr. Perino's expert report, in number 44, he defines what Bitfield is within the context of the bit torrent network. Each shared file is divided into 16 KB segments or blocks and is shared in increments of 16 KB segments. If a file consists of 5,000 segments and a user had 2,500 segments, that user has 50% of the file and would show a Bitfield value of 50%. When I conducted the test, each of the four laptops had one of each of the four files in its entirety (100%) on each of the laptops. The summary report provided by Mr. Perino after the test showed that the MEU system accurately detected that each of the four files had a Bitfield value of 100%, meaning each laptop had the entire test or known file.

47.     Attached hereto as Declaration Exhibit 1 is a true and accurate copy of my Curriculum Vitae which truly and accurately represents my relevant employment history, training, experience, certifications, and expert-witness experience.

48.     I am paid on an hourly basis by Voltage Pictures, LLC at the rate of $250 / hour for my digital forensics services.


**FURTHER DECLARANT SAYETH NAUGHT**

<u>**DECLARATION**</u>

**PURSUANT TO 28 U.S.C SS 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.


Executed June 11, 2018.

By: _____

**Stephen M. Bunting**