THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>     Plaintiff,<br><br> vs.<br><br>JOHN DOE, subscriber assigned IP address 73.225.38.130,<br><br>     Defendant.<br> | NO. 2:17-cv-01731-TSZ<br><br>**DECLARATION OF ADRIENNE D. McENTEE IN SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF DOCUMENTS (ECF 94 AND 96).** |
| JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>     Counterclaimant,<br><br> vs.<br><br>STRIKE 3 HOLDINGS, LLC,<br><br>     Counterdefendant.<br> | |

I, Adrienne D. McEntee, hereby declare as follows:

1. I am a member of Terrell Marshall Law Group PLLC and counsel of record for Defendant in this matter. I have personal knowledge of the facts set forth in this declaration.

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF
DOCUMENTS (ECF 94 AND 96). - 1
CASE NO. 2:17-CV-01731-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2.     On February 26th, I emailed Strike 3's counsel requesting a time to meet and

2

confer regarding Strike 3's responses to Doe's requests for production.

3

3.     On March 1st, having not heard from Strike 3's counsel, I emailed again, asking

4

to meet and confer about Strike 3's discovery responses on March 4th. Strike 3's counsel

5

responded that they were unavailable to confer until March 7th.

6

4.     Prior to the March 7th conference, counsel exchanged emails regarding the

7

parties' respective positions on whether Strike 3 should produce the IPP software. Strike 3's

8

counsel represented that it would "ask IPP [for the software], but my client cannot compel or

9

order them to produce the information that you request. It appears to us that Defendant serving

10

a subpoena on IPP for the materials it wants is the proper discovery mechanism."

11

5.     On March 7th, the parties conferred by telephone regarding all requests for

12

production that are the subject of Doe's motions to compel, filed at ECF 94 and 96. At no point

13

during the conversation did Strike 3 indicate it had the authority to accept a subpoena on behalf

14

of IPP. Nor did Strike 3 confirm it asked IPP for the software, as it promised to do. Instead,

15

Strike 3's counsel maintained that Strike 3 did not have possession, custody, or control of the

16

software.

17

6.     The parties reiterated their respective positions regarding the outstanding

18

requests for production in March 11th and March 12th emails. Absent from these emails is any

19

offer by Strike 3's counsel to accept a subpoena on behalf of IPP.

20

7.     On March 13, I wrote to Strike 3's counsel: "In the telephonic meet and confer

21

we had last week, we made clear that we disagree with your objections. We also explained why

22

we believe our requests are relevant and proportional to our counterclaims. The purpose of the

23

call was to give your client another opportunity to provide documents and ESI in response to

24

the requests at issue. You have provided your client's position on these issues below. If your

25

client changes its mind, I am available to meet and confer tomorrow or Friday." Strike 3's

26

counsel did not respond to this offer.

27

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF
DOCUMENTS (ECF 94 AND 96). - 2
CASE NO. 2:17-CV-01731-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

8.      In their March 12th email, Strike 3's counsel promised to send an electronic link with public articles about Strike 3, and additional evidence about other BitTorrent swarms in response to Requests 21 and 22. The next day, we notified Strike 3's counsel that we had not received the link and asked whether it had been sent. Strike 3's counsel did not respond.

9.      After we read Strike's opposition, we searched and regrettably found that someone else in Fox Rothschild's office (not Mr. Bandlow or Mr. Case) later sent a link to these documents, but the link had expired. We immediately requested the documents from Strike 3's counsel, who timely reproduced the documents.

10.     Doe's counsel has since reviewed the documents, which are comprised of screenshots from public websites containing pornographic images and charts indicating top selling adult DVDs, and publicly available public relations articles regarding Mr. Lansky and Strike 3. There are no internal documents regarding the piracy Strike 3 alleges it endured, and no internal documents regarding Strike 3's DVD sales.

11.     Attached as Exhibit A is a true and correct copy of counsel's email exchanges between February 26 and March 13.

12.     Attached as Exhibit B is a true and correct excerpt from the rough transcript of Jessica Fernandez, one of Strike 3's in-house lawyers and its primary Rule 30(b)(6) designee. Ms. Fernandez testified that Strike 3 did not ask IPP whether it would produce the software until last week.

13.     Counsel does not yet have a copy of Mr. Lansky's deposition. However, counsel recalls that Mr. Lansky testified he was unable to provide the names of Strike 3's licensees (except for one) because the company has thousands.

14.     I searched Westlaw's dockets to determine the number of lawsuits Strike 3 filed since 2017 and found over 3,000. In many, if not most of these cases, Strike 3 relied on form declarations from Tobias Fieser, Susan Stalzer, and John Pasquale to support motions for early discovery.

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF
DOCUMENTS (ECF 94 AND 96). - 3
CASE NO. 2:17-CV-01731-TSZ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

15.     In contrast, I found just two lawsuits by Disney Enterprises, Inc. during the same period.

16.     Attached as <u>Exhibit C</u> is a true and correct copy of a document identified as numbers S3H (217-cv-01731)_000427 to S3H (217-cv-01731)_000445.

17.     Our firm never litigated against or met Emilie Kennedy or Lincoln Bandlow prior to this case.

18.     Attached as <u>Exhibit D</u> is a true and correct excerpt from the rough transcript of Susan Stalzer.

19.     Attached as <u>Exhibit E</u> is a true and correct excerpt from the rough transcript of John Pasquale.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED in Seattle, Washington, this 19th day of April, 2019.


  /s/ Adrienne D. McEntee, WSBA #34061
Adrienne D. McEntee, WSBA #34061

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF
DOCUMENTS (ECF 94 AND 96). - 4
CASE NO. 2:17-cv-01731-TSZ

1

<u>CERTIFICATE OF SERVICE</u>

2

I, Adrienne D. McEntee, hereby certify that on April 19, 2019, I electronically filed the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the following:

5

6

Bryan J. Case, WSBA #41781
Email: bcase@foxrothschild.com

7

FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4500

8

Seattle, Washington 98154
Telephone: (206) 624-3600

9

Facsimile: (206) 389-1708

10

Lincoln D. Bandlow, *Admitted Pro Hac Vice*
Email: lbandlow@foxrothschild.com

11

FOX ROTHSCHILD LLP
10250 Constellation Blvd., Suite 900

12

Los Angeles California 90067
Telephone: (310) 598-4150

13

Facsimile: (310) 556-9828

14

John C. Atkin, *Admitted Pro Hac Vice*

15

Email: jatkin@atkinfirm.com
THE ATKIN FIRM, LLC

16

55 Madison Avenue, Suite 400
Morristown, New Jersey 07960

17

Telephone: (973) 285-3239

18

*Attorneys for Plaintiff*

19

20

Joshua L. Turnham, WSBA #49926
E-mail: joshua@turnhamlaw.com

21

THE LAW OFFICE OF JOSHUA L. TURNHAM PLLC
1001 4th Avenue, Suite 3200

22

Seattle, Washington 98154
Telephone: (206) 395-9267

23

Facsimile: (206) 905-2996

24

*Attorneys for Non-Party Donald Isaksen, Jr.*

25

26

27

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF
DOCUMENTS (ECF 94 AND 96). - 5
CASE NO. 2:17-CV-01731-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    DATED this 19th day of April, 2019.

2                                    TERRELL MARSHALL LAW GROUP PLLC

3

4                                    By:  /s/ Adrienne D. McEntee, WSBA #34061
                                          Adrienne D. McEntee, WSBA 34061
5                                         Email: amcentee@terrellmarshall.com
                                          936 North 34th Street, Suite 300
6                                         Seattle, Washington 98103-8869
                                          Telephone: (206) 816-6603
7                                         Facsimile: (206) 319-5450

8                                    *Attorneys for Defendant*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF MOTIONS TO COMPEL PRODUCTION OF
DOCUMENTS (ECF 94 AND 96). - 6
CASE NO. 2:17-cv-01731-TSZ

- Exhibit A -

## Adrienne McEntee

**From:**           Adrienne McEntee
**Sent:**           Wednesday, March 13, 2019 6:00 PM
**To:**           'Bandlow, Lincoln D.'; Case, Bryan J.
**Cc:**           J. Curtis Edmondson
**Subject:**           RE: Strike 3 v. Doe
**Attachments:**           Strike 3-Defendant's 30(b)(6) Notice.pdf

Mr. Bandlow,

Thank you for confirming April 11 and 12 for the deposition of Mr. Lansky and the Rule 30(b)(6) deposition. As requested, attached please find the Rule 30(b)(6) Notice and List of Topics. Please let us know who you intend to designate. If you need to designate more than one witness, we may need to spill into an additional day, so please let us know as soon as possible.

In the telephonic meet and confer we had last week, we made clear that we disagree with your objections. We also explained why we believe our requests are relevant and proportional to our counterclaims. The purpose of the call was to give your client another opportunity to provide documents and ESI in response to the requests at issue. You have provided your client's position on these issues below. If your client changes its mind, I am available to meet and confer tomorrow or Friday. However, we are not willing to extend non-productive telephonic conferences any longer than necessary.

We asked that you provide April deposition dates for Mr. Fieser, Mr. Pasquale, and Ms. Staltzer. Please provide dates by the end of the week. If you will not produce these witnesses, or believe that you cannot produce them for some reason, likewise, please let us know by the end of the week.

Our client is available to be deposed after April 15th.

Finally, we did not receive a link from Kiteworks. Did you send it? If not, please do so.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Sent:** Tuesday, March 12, 2019 6:14 PM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; Case, Bryan J. <bcase@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** RE: Strike 3 v. Doe

Ms. McEntee,

We are all set for Mr. Lansky's deposition on April 11, 2019. With respect to the 30(b)(6) deposition, we agree to the April 12, 2019 date. However, while I hope there are no issues, we reserve the right to object to any topics outside the knowledge of any Strike 3 representative. Please send me the Notice and List of Topics as soon as you are able and we can finalize the April 12 date.

1

ith regard to the documents sought in Defendant's RFPs Nos. 1-9, 16-22, 24, 25, and 26, please see the below:

· RFP 1: We maintain that we do not have possession, custody, or control of the "object code" of IPP's system.

· RFP 2: We maintain that we do not have possession, custody, or control of the "source code" of IPP's system.

· RFP 3: We maintain that we do not have possession, custody, or control of the "third-party software licenses" for IPP's system.

· RFP 4: We maintain that we do not know what "build files" even are. And, Defendant has not provided an explanation.

· RFP 5: To the extent our expert reports are considered "validation test files" we already produced our expert reports (bate stamped 000155-000180). Otherwise, we are not in possession, custody, or control of any "validation test files," if any even exist.

· RFP 6: We already produced all the PCAPs and .torrent files (Bate # 000280-000386), a single flash drive containing the infringed movies and the control copies of the movies (Bate # 000387), the infringement logs (Bate # 000278-000279). Please advise if there are other documents this request is referring to which you believe were not produced.

· RFP 7: We produced our expert reports already (bate stamped 000155-000180).

· RFP 8: We produced our expert reports already (bate stamped 000155-000180).

· RFP 9: The only such responsive documents in our possession, custody, or control are the PCAPs, which Plaintiff already produced (Bate # 000280-000386)

· RFP 16: We maintain our objections.

· RFP 17: All documents we already produced are responsive to this request (PCAPs, infringement log file, .torrent files, control copies of the movies, infringing copies of the movies, and expert reports – see bate stamp numbers above). Of course, discovery is ongoing and Plaintiff will continue to produce responsive documents as it discovers additional documents. At this time, all responsive documents in its possession, custody, or control have been produced.

· RFP 18: We maintain our objections.

· RFP 19: We maintain our objections.

· RFP 20: We maintain our objections.

· RFP 21: We maintain our objections. Although there is no obligation to produce public documents, as a courtesy we will provide some public documents which support this fact.

· RFP 22: We maintain our objections. Although there is no obligation to produce public documents, as a courtesy we will provide some public documents which support this fact.

· RFP 24: We produced all the PCAPs and .torrent files (Bate # 000280-000386), a single flash drive containing the infringed movies and the control copies of the movies (Bate # 000387), and the infringement logs (Bate # 000278-000279).

· RFP 25:  All the documents we produced are responsive to this request.

o  Copyright certificates (0001-000154)

o  Expert declarations of Stephen Bunting and Patrick Paige (000155-000180)

o  Internet posts (000181-000277)

o  infringement logs (000278-000279)

o  PCAP files and 107 torrent files (000280-000386)

o  A flash drive containing the infringing copies of the movies and the control copies (000387)

· RFP 26:  Plaintiff already produced a flash drive containing the infringing copies of the movies (previously referred to as .tar files) and the control copies (000387).

Finally, as a courtesy, we are also providing: numerous articles discussing Strike 3's piracy issues and its reputation and success in the adult entertainment industry, and the Additional Evidence listing other

BitTorrent swarms within which the relevant IP address participated. Since the files are large, we will need to send them to you through Kiteworks. I will send those shortly.

If there are any documents which you or your co-counsel believe are missing, please let me know and I can have them resent. Or if you disagree with any of our objections, we can set time aside to confer in detail.


Finally, please confirm the date of your client's deposition that we discussed.

Thanks,

**Lincoln Bandlow**
Partner
**Fox Rothschild LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
(310) 228-2913 - direct
(310) 556-9828- fax
lbandlow@foxrothschild.com
www.foxrothschild.com




**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Monday, March 11, 2019 10:23 AM
**To:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>; Case, Bryan J. <bcase@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** [EXT] RE: Strike 3 v. Doe

Mr. Bandlow and Mr. Case,

Thank you for speaking with us last Thursday.

As we discussed, attached please find the Amended Deposition Notice for Mr. Lansky's April 11th deposition in Pasadena.

We also discussed scheduling issues related to expert disclosures and the remaining depositions, including the Rule 30(b)(6), and the depositions of Mr. Fieser, Mr. Pasquale, and Ms. Staltzer. We understand that you will circulate a proposed stipulation to extend deadlines for expert disclosures and completion of discovery. Will you circulate the proposed stipulation today?

We would like to take the Rule 30(b)(6) deposition on April 12th to avoid making multiple trips to Los Angeles. Please let us know whether you can accommodate this date by tomorrow, if possible. We expect to provide the Rule 30(b)(6) notice this week.

Regarding Strike 3's responses to requests for production, you agreed to let us know the following by end of day on March 12th:

1. With respect to RFPs 1 through 9, whether IPP will produce documents and ESI that Strike 3 alleges are not in Strike 3's possession and control.
2. Whether your client's position has changed with respect to its refusal to produce documents or ESI in response to RFPs 16 through 22.

3. Whether Strike 3 has produced documents or ESI in response to RFPs 24, 25, and 27, and if so, identify the bates numbers.

Finally, we provided you with a link to the model ESI protocol in the Western District of Washington. We understand you will circulate the protocol with suggested revisions.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Adrienne McEntee
**Sent:** Thursday, March 07, 2019 2:11 PM
**To:** 'Bandlow, Lincoln D.' <lbandlow@foxrothschild.com>; Case, Bryan J. <bcase@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** RE: Strike 3 v. Doe

Mr. Bandlow,

Your client relied on the testimony of two witnesses (one of whom is an IPP employee), both of whom describe their use of, or reliance upon, IPP software. That testimony was used to justify your client's request to obtain early discovery. Moreover, your client's infringement claim was based entirely on the results of IPP's software. As you know, we challenge the software's reliability. If you decline to obtain the information requested in requests for production one through nine, we may move to compel the information and/or seek exclusion of any evidence (including testimony) that relies on the IPP software.

Thank you, again, for providing us the extension to March 18th to respond to your client's discovery requests. Your client should have the opportunity to have an expert review our production. We do not oppose a 30-day extension to April 15th for your client to produce an expert report for this purpose. We request a similar extension for our expert(s) to opine regarding the IPP software. We should also discuss deadlines for rebuttal reports.

We do not agree to the proposed protective order, however. The Western District of Washington has its own protocol governing ESI, found here: https://www.wawd.uscourts.gov/sites/wawd/files/61412ModeleDiscoveryProtocol.pdf . We are open to discussing revisions to the model protocol that make sense, but feel strongly that this is the starting point.

We are not opposed to the subpoena to Comcast, but ask that we receive contemporaneous production. Regarding Mr. Lansky's deposition, April 11th and 12th work well for us.

We can discuss the remaining requests for production, and whether your client will produce documents, during our call.

Finally, we would like to discuss scheduling the Rule 30(b)(6) deposition, and the depositions of Mr. Fieser, Mr. Pasquale, and Ms. Staltzer. April is generally open for us.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Sent:** Tuesday, March 05, 2019 9:38 AM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; Case, Bryan J. <bcase@foxrothschild.com>

4

. J. Curtis Edmondson <jcedmondson@edmolaw.com>
**ubject:** RE: Strike 3 v. Doe

Ms. McEntee,

I wanted to address a number of the points made in your prior letter.

First, as you are well aware, we have produced hundreds of ESI files demonstrating infringement through your client's IP address. We will produce our expert reports in accordance with the Court's deadlines.

I'm not sure how you expect my client to produce software code and a system inspection for software that my client does not own and which is in the possession, custody, and control of a third party, IPP. We would not ask your client (or your client's son) to produce the software code for the uTorrent BitTorrent system on his computer - obviously utilizing the software doesn't mean you have access to its code and system. My client will ask IPP, but my client cannot compel or order them to produce the information that you request. It appears to us that Defendant serving a subpoena on IPP for the materials it wants is the proper discovery mechanism. If you have authority stating that a party is required to obtain materials within the possession, custody, and control of a third party and then produce such material in discovery, please provide it so I can review it with my client.

Because we have been very generous in providing you with two lengthy extensions to respond to our discovery requests, we have yet to receive your client's hard drives, nor will we until after the expert deadline. I trust that you will consent to a reasonable thirty-day extension (from the date you actually provide us the hard drives) to accommodate the extension we provided you. Let us know if you will not so we can bring it to the attention of the court.

In connection with your producing that material, attached is a proposed protective order to govern your client's hard drives. Fair warning - it contains your client's name and address (which is necessary for it to be enforceable). Any filed version must redact this pursuant to the Court's order. The Western District of Washington standard order does not actually address hard drives, so it is necessary that we enter into one that does. Please advise if this is acceptable.

We intend to subpoena Comcast for additional discovery relating to the infringement that occurred through your client's IP address. Attached is our subpoena. We will seek a court order to do so. Please advise if you oppose.

Regarding the deposition of Mr. Lansky, he is not available until March 20, but unfortunately I am tied up in depositions and hearings almost all of March. Please let me know if the week of April 8-12 is open for you. I may also have availability April 3.

We can speak about this and any other issues in our call on Thursday.

Lincoln Bandlow
Partner
**Fox Rothschild LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
(310) 228-2913 - direct
(310) 556-9828- fax

indlow@foxrothschild.com
www.foxrothschild.com

**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Monday, March 04, 2019 2:01 PM
**To:** Case, Bryan J. <bcase@foxrothschild.com>; Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** [EXT] RE: Strike 3 v. Doe

Let's talk at 3pm Pacific on Thursday. We will send a calendar invite. Note that while our email focused on RFPs 1 through 9, we will also seek confirmation regarding whether Strike 3 intends to produce documents or ESI with respect to every other RFP in which Strike 3's responses indicated it did not intend to do so.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Case, Bryan J. <bcase@foxrothschild.com>
**Sent:** Sunday, March 03, 2019 5:50 PM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** RE: Strike 3 v. Doe

Hi Adrienne,

Unfortunately, Lincoln and I are unavailable Monday, Tuesday, and Wednesday due to other matters/conflicts. We are free Thursday. Let us know a time on Thursday that works for you to discuss and we will mark our calendars. In the meantime, Lincoln will be providing a substantive response to your email below.

Best,

Bryan

**Bryan Case**
Partner
**Fox Rothschild LLP**
Direct: (206) 389-1643
Cell: (425) 890-5112

**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Friday, March 1, 2019 4:39 PM
**To:** Case, Bryan J. <bcase@foxrothschild.com>; Bandlow, Lincoln D. <lbandlow@foxrothschild.com>

6

: J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** [EXT] RE: Strike 3 v. Doe

Bryan,

As we indicated in the response to the motion for summary judgment, we do not believe Strike 3 may rely on an investigation for which it has no supporting documentation/ESI. Strike 3 has repeatedly represented that evidence which would purportedly substantiate IPP's infringement detection investigation, including the object code, source code, testing, validation, or inspection of the software, and the monitoring IP addresses "are in the exclusive possession, custody, and control of IPP International, UG's ("IPP") a third party over whom Plaintiff has no control."

We would like to confer regarding whether you are going to maintain this position or whether you are willing to obtain the information from IPP. We would also like to confirm whether you have produced all expert reports covered by RFP 7 and RFP 8. We will call you <u>Monday afternoon at 3 p.m.</u> to confer about these issues unless we reach agreement on another time prior to Monday.

We also look forward to learning on Monday which specific dates Mr. Lansky will be available for his deposition, and have a further discussion regarding when we may schedule the remaining depositions.

Have a nice weekend.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Case, Bryan J. <bcase@foxrothschild.com>
**Sent:** Friday, March 01, 2019 1:35 PM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** RE: Strike 3 v. Doe


Hi Adrienne,

Adding Lincoln Bandlow to this email so he can respond.   In the interim, can you please provide us details with what you'd like to discuss regarding RFPs 1-9?

Bryan

**Bryan Case**
Partner
**Fox Rothschild LLP**
Direct: (206) 389-1643
Cell: (425) 890-5112

**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Friday, March 1, 2019 1:31 PM
**To:** Case, Bryan J. <bcase@foxrothschild.com>
**Cc:** J. Curtis Edmondson <jcedmondson@edmolaw.com>

**Subject:** [EXT] RE: Strike 3 v. Doe
**Importance:** High

Bryan,

We have not heard back from you regarding our request to confer regarding Strike 3's responses to requests for production one through nine. Are you available to confer on Monday, March 4th?

Thank you.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Adrienne McEntee
**Sent:** Tuesday, February 26, 2019 4:15 PM
**To:** 'bcase@foxrothschild.com' <bcase@foxrothschild.com>
**Cc:** 'J. Curtis Edmondson' <jcedmondson@edmolaw.com>
**Subject:** Strike 3 v. Doe

Bryan,

Thank you for your message. Curt and I tried you by phone a few minutes ago but ended up in voice mail. Please let us know when you're available to talk.

We would also like to schedule a time to meet and confer regarding Strike 3's responses to requests for production one through nine.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in

.s email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying
ɔ this email and delete the original and reply emails. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

- Exhibit B -

Sandra Mitchell
C.S.R. 12553

➤

```
1                    US. DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON

3

4   STRIKE 3 HOLDINGS, LLC, A        )
    DELAWARE CORPORATION,            )
5                                    )
                        PLAINTIFF,   )
6                                    )
            VS.                      )   CASE NO.
7   2:17-CV-01731TZS
                                     )
8   JOHN DOE SUBSCRIBER ASSIGNED IP  )
    ADDRESS 73.225.38.130,           )
9                    DEFENDANT.      )
    _____)
10

11

12

13

14            DEPOSITION OF JESSICA FERNANDEZ, taken on behalf

15   of the Counterclaimant, at 35 Hugus Alley, Pasadena,

16   California, commencing at 10:00 a.m, Friday, April 12, 2019,
```

17    before Sandra Mitchell, C.S.R. 12553, pursuant to Notice.

18

19

20

21

22

23

24

25

                    THIS IS A ROUGH TRANSCRIPT                    3
                         DO NOT CITE

⬆

 1    APPEARANCES:

 2    For the Plaintiff, STRIKE 3 HOLDINGS, LLC:

 3         Firm
           BY:  Attorney                   , ESQ.
 4

 5

 6

 7    For the        , Dft   :

 8         Firm Name
           BY:  Attorney Name              , ESQ.
 9

10

11

12    For the          , Dft    :

```
11      A    Yes.

12      Q    I'm not asking you to do it?

13      A    Fair enough.

14      Q    So we went through Dorcel, and that leaves us

15   with the fifth agreement Porn Hub?

16      A    Yes.

17      Q    And tell me about the distribution agreement

18   with the Porn Hub.  How do you -- what's your

19   understanding of Porn Hub?

20      A    Porn Hub is a website pornhub.com and they have

21   a number of different pornographic works on the website.

22   They also I believe offer membership, if you wanted get

23   a membership and have access to certain select content.

24   But it allows any average use who doesn't have a

25   membership to view content if they wanted to just go on
```

THIS IS A ROUGH TRANSCRIPT                    117
DO NOT CITE

```
1    the website.  A lot of like You tube if they wanted to

2    view pornography.

3       Q    So if you wanted to look at porn --

4       A    You could stream a lot.

5       Q    -- that's a good place to do it?

6       A    Sure.
```

7     Okay.   And you've looked at the Pornhub -- Pornhub?

8        A    The website?

9        Q    Yeah.

10       A    Yes.

11       Q    Okay.

12       A    I have viewed that website.

13       Q    Okay.   And have you seen your works on this

14   Pornhub site?

15       A    I have not seen.   I haven't logged in to view

16   our works from the Pornhub website.

17       Q    And is there any reason why not?

18       A    I have access to our works already, so I

19   wouldn't need to go on it.

20       Q    Well, I was just curious.

21            And you haven't seen -- when you perused the

22   Pornhub site, have you seen any of your works -- well,

23   let me back up a little bit.

24            When you went to Pornhub.com, did you see your

25   works?

                    THIS IS A ROUGH TRANSCRIPT              118
                         DO NOT CITE

1        A    I never went into Pornhub.com with the

2   intention of looking for the works.

3        Q    Okay.

4        A    Our works.

5        Q    Were you -- you were looking for other works?

6        A    Yes.

7        Q    Okay.   And was it just to get a sense of what

8    Pornhub's all about?

9        A    Not always.

10       Q    Okay.   I just -- I don't want to know what you

11    do on Pornhub.   I want to get an idea of what your

12    understanding of Pornhub is.

13       A    Yes.

14       Q    Because it's a -- apparently, you have an

15    agreement with them.

16       A    I would go on there and I've been on there

17    before in my capacity as representing Malibu Media.

18       Q    Okay.

19       A    So that's why.

20       Q    Oh, okay.   Did Malibu Media also have stuff on

21    this Pornhub?

22       A    I think there were a lot of infringements that

23    were happening on Pornhub from Malibu and -- so yeah.

24    Yes.

25       Q    What's your agreement with Pornhub?

THIS IS A ROUGH TRANSCRIPT                119
DO NOT CITE

1       A    So the agreement with Pornhub is it allows us

2    to provide -- or be able to upload some of our movies

3    through our own username so that people who have a

4    Pornhub membership have access to it.    In addition, it

5    also allows us to upload trailers if we would like to do

6    that.    But it's strictly for those with, like, a

7    membership access to Pornhub.com.

8       Q    So I can go to Pornhub and access the works via

9    Pornhub?

10       A    Right.    If you have a membership.

11       Q    Okay.    And is this membership -- help me with

12    this a little bit.    Is the membership a Pornhub --

13    Pornhub membership?

14       A    Yes.

15       Q    Okay.    So I'd get a user ID and password for

16    Pornhub?

17       A    Right.

18       Q    Give Pornhub some money?

19       A    Correct.

20       Q    And then I could get all the works of Strike 3

21    Holdings?

22       A    It wouldn't be all of the works.    It would be

23    just the ones we wanted to upload.    We decided to

24      upload.

25          Q    A subset of the works?


                        THIS IS A ROUGH TRANSCRIPT                    120
                              DO NOT CITE


1           A    Sure.  Yes.

2           Q    And how long has this Pornhub arrangement been

3    in place?

4           A    I don't recall.

5           Q    Did you look at the agreement with Pornhub?

6           A    I did.

7           Q    Okay.  Did you note any dates on it?

8           A    No.  I mean, I'm sure there is one.  I just

9    don't remember it right now.

10          Q    Okay.  And so if you go onto Pornhub and access

11   through their portal, do you see the -- through the

12   subscription site, do you see the entire work?

13              MR. BANDLOW:  Objection.  Lacks foundation.

14   BY MR. EDMONDSON:

15          Q    Well?

16          A    So if I'm a subscriber of Pornhub.

17          Q    Correct.

18          A    Some sort of premium membership.

19          Q    Okay.

20        A    It's called premium something.

21        Q    Yeah.

22        A    I don't know.  You would be able to see the

23   full -- any full work that our user account uploaded,

24   yes.

25        Q    Understood.  And so this full work, is it

                    THIS IS A ROUGH TRANSCRIPT                    121
                         DO NOT CITE

1   streamed?

2        A    Yes.  I believe so.

3        Q    And is it also downloadable?

4        A    I don't remember.  I don't remember if it was

5   downloadable.

6        Q    What about on Vixen, was it downloadable?

7        A    Yes.

8        Q    Okay.  And so you can save it as a MP4?

9        A    There's a number of different formats you can

10   save it in.

11        Q    Okay.  And have you ever gone on the Vixen or

12   Blacked site and downloaded directly from there?

13        A    No, I have not personally.

14        Q    So how do you know it works?

15        A    I have logged in to, I think it was the Vixen

16   website.  I was able to see that it was available in

17   different formats.  I just never clicked on it.

18        Q    Okay.

19        A    To download onto my computer.

20        Q    Okay.

21        A    But assume that if it did not work, we would

22   hear --

23        Q    You'd hear about it?

24        A    -- an earful from our subscribers and...

25        Q    And you mentioned that you worked with another

                    THIS IS A ROUGH TRANSCRIPT                122
                           DO NOT CITE

1    pornographic company, Malibu Media?

2         A    Yes, that's correct.

3         Q    And did have sort of a similar feature on their

4    site?

5              MR. BANDLOW:  I.e., that you could download

6    movies?

7              THE WITNESS:  Yes.

8    BY MR. EDMONDSON:

9         Q    Okay.  And did you ever try it on their site?

10        A    Yes.

11        Q    Okay.  The download feature?

10          THE WITNESS:  Yeah, I -- I don't know.  We

11    wouldn't want to look at a ton of raw data.  We would

12    want something very narrow so we have -- it would be

13    overwhelming for anyone to look at the raw data.

14    BY MR. EDMONDSON:

15          Q    Well, in that raw data set you get from IPP,

16    have you ever taken the IP address from that and sent a

17    DMCA notice to that IP address?

18          A    No.

19          Q    Why not?

20          A    That's not how our DMCA process works.  So it

21    just wouldn't be -- that's not to say that that IP

22    address never received a DMCA notice.  It's just not the

23    way that the -- like it -- it's not what -- I don't

24    know -- I guess I don't really know, like, what you're

25    asking.

                    THIS IS A ROUGH TRANSCRIPT              161
                           DO NOT CITE

1          Q    Okay.  Well, let me restate it.

2          A    You just want to know why we don't send a DMCA

3    notice to an IP address?

4          Q    No.  I -- well, what I'm saying is you get this

5    big dataset with IP addresses on it; correct?

6      A    Yes.

7      Q    And that IP address could have -- if the system

8    that from IPP, which measures something; correct?

9    Infringements?

10      A    Yes.

11      Q    Of your works; correct?

12      A    Yes.

13      Q    And so at that point, do you believe that those

14    people are infringing?

15      A    Yes.

16      Q    Okay.  Because if it goes through --

17      A    Sure.

18      Q    -- this process, the end result should be --

19      A    Yes.

20      Q    -- accurate infringements?  A set of accurate

21    data?

22      A    Yes.

23      Q    Okay.  Because you want that dataset, at the

24    end of the pipeline, to be accurate; correct?

25      A    Yes.

THIS IS A ROUGH TRANSCRIPT                      162
DO NOT CITE

1      Q    Okay.  So you're throwing away a lot of data

2    through that process; is that a fair statement?

3              MR. BANDLOW:  Objection.  Lacks foundation.

4    Misstates testimony.

5              You can answer.

6              THE WITNESS:  We don't use that data.

7    BY MR. EDMONDSON:

8         Q    You filter it out?

9         A    We filter it out.

10        Q    Okay.  But those IP addresses, in your mind,

11   have infringed; correct?

12        A    Yes.

13        Q    And so why don't you send DMCA notices to those

14   IP addresses that you filtered out?

15        A    This seems like just an argumentative question,

16   but I will say that DMCA notices don't --

17             MR. BANDLOW:  Don't go to ISP addresses.

18             THE WITNESS:  We -- I can't send an IP address

19   a DMCA notice.  That's not really how it works.

20   BY MR. EDMONDSON:

21        Q    And how does Strike 3 Holdings -- because

22   you're representing Strike 3 Holdings.  How does Strike

23   3 Holdings know you can't send a DMCA notice to an IP

24   address?

25        A    It's not like this deliverable, like, address

1    that I can just send a DMCA notice.  I would have to

2    probably go through the internet service provider and

3    send it to the internet service provider.

4         Q    But you know who the internet service provider

5    is from those IP addresses; correct?

6         A    So you're asking me why we don't send DMCA

7    notices to the internet service provider?

8         Q    That's what I'm saying, but you beat me to it.

9         A    Okay.

10        Q    So, yeah, why don't you?

11        A    Well, DMCA notices don't really seem to be

12   working very well.  And they're especially not going to

13   work for people who are serial infringers and have the

14   kind of infringements that's we're monitoring.  They're

15   not very productive.

16        Q    But you just stated that these people -- of

17   that set, only a subset of the data are the serial

18   infringers.

19        A    Yes.

20        Q    Some of them are just, you know, occasional

21   infringers?

22        A    Within the data of people we sue on?

23        Q    Yeah.  You're spending a lot of money on this

24   IPP data that you get.

25        A    Oh, I'm aware we're spending a lot of money,

                    THIS IS A ROUGH TRANSCRIPT                    164
                          DO NOT CITE

1    yes.

2         Q    Yeah.  And that information has value; right?

3    That IP address has value to you because it identifies

4    an infringer; correct?

5         A    Sure.

6         Q    Okay.  What -- I need to understand why IPP

7    does not use that IP address --

8              MR. BANDLOW:  You mean why Strike 3 does not

9    use that IP address?

10             MR. EDMONDSON:  Yeah.  I get it.

11             MR. BANDLOW:  Because we're going to get

12   confused.

13             MR. EDMONDSON:  There's three letters.

14   BY MR. EDMONDSON:

15        Q    I need to know why Strike 3 Holdings does not

16   use that IP information provided by IPP to give notice

17   to these infringers?

18        A    Because DMCA notices do not work.

19      Q    How do you know that?

20      A    With respect to BitTorrent, DMCA notices do not

21   work.

22      Q    How do you know that?

23      A    Well, I mean, just even in this case alone, you

24   know, obviously, we've spoken about the deposition of

25   the defendant and he received a DMCA notice.

```
            THIS IS A ROUGH TRANSCRIPT                   165
                    DO NOT CITE
```

1      Q    Do you know when he received the DMCA notice?

2      A    I don't when he received the DMCA notice.

3      Q    Do you know if he received the DMCA notice from

4   Strike 3 Holdings?

5      A    I know that he did not receive a DMCA notice

6   from Strike 3 Holdings.

7      Q    Because you didn't send him a DMCA notice;

8   correct?

9      A    Correct.

10      Q    So how do you know it doesn't work?

11      A    I mean, there's plenty of articles that talk

12   about the failure of Strike 3 -- I'm sorry, the six

13   strikes program and what a failure that was.  And

14   there's -- and that's all, like, public knowledge about

15   how DMCA notices and notifying pirates just doesn't

16   really work.  Even if it's going to the end user.

17        Q    Have you run a test to see if it works or

18   doesn't work?

19        A    I don't need to run a test.  It's widespread

20   knowledge that it doesn't work.

21        Q    So what articles can you state that for

22   Strike 3 data being sent to an ISP, a DMCA notice would

23   not work?

24        A    I'm sorry.  Can you say that again?

25        Q    Yeah.  I'll say it again.  What articles would

                    THIS IS A ROUGH TRANSCRIPT                    166
                         DO NOT CITE

1   say specifically that a DMCA notice being sent from

2   Strike 3 Holdings to an IP address would not work?

3        A    There's no article that says that.

4        Q    Okay.  So you don't actually know that for

5   Strike 3 Holdings it would work or not work; correct?

6        A    No, I know it would not work.

7        Q    Okay.  Then I need to know what empirical data

8   or --

9        A    Sure.

10        Q    -- scientific data that would say it would not

11    work?

12         A    So in my experience in working on BitTorrent

13    litigation cases, I have come across instances where

14    defendants have received hundred of notices.  I had a

15    defendant once that received a phone call from his

16    internet service provider.  I had a defendant who

17    received a voicemail through the Strike 3 program and we

18    still flagged it as an infringer coming up in our data

19    and someone that we sued.

20         Q    Oh, you --

21         A    So I know with certainty that this program does

22    not work.

23         Q    You know for certainty?

24         A    I know with certainty.

25         Q    But you didn't -- you didn't want to test it?

                    THIS IS A ROUGH TRANSCRIPT                167
                         DO NOT CITE

1         A    I mean, how would -- I don't know how we would

2    test it.

3         Q    Well, you just explained --

4         A    I mean, we -- I know because of my experience

5    as an attorney representing these clients and in the

6    discovery that came out in certain cases, but I'm not

7    sure how I would test that.   And I'm definitely not sure

8    how I would test it in a particular circumstance.   Like,

9    I don't --

10        Q    Have you --

11        A    Did you -- sorry.

12        Q    I'm sorry.   Go ahead.

13        A    No, go ahead.

14        Q    Did you talk to Sid about running a test of

15   this type?   He's a --

16        A    Sid would not work on this.   I mean, no, I

17   don't -- no.

18        Q    When you were at Malibu, did you send any DMCA

19   notices out to IP addresses?

20        A    Malibu would send DMCA notices.   I don't

21   believe that they would send them to the internet

22   service providers.

23        Q    Oh.   That's the --

24        A    But they may have.   But I don't think that they

25   did, if I had to...

                        THIS IS A ROUGH TRANSCRIPT                168
                            DO NOT CITE

1         Q    How effective has it been sending DMCA notices

2    to non -- to non IP addresses?

6      Q    Okay.

7      A    Not usually.

8      Q    And so you -- but at this point, can you

9   identify an individual using that computer?

10     A    I guess I'm not -- you want me to be able to

11  identify -- you're asking me who the infringer is, it

12  sounds like.

13          MR. BANDLOW:  When we have all this data, do we

14  know the specific individual?

15          THE WITNESS:  Oh, yeah, no.  There's -- you

16  know, no.

17  BY MR. EDMONDSON:

18     Q    So any person who's accessed that IP address;

19  correct?

20     A    Yeah.

21     Q    Okay.  And does IPP know that multiple people

22  can access the IP address?

23     A    I don't what IPP knows.

24     Q    Excuse me.  I mixed it up.  Does Strike 3

25  Holdings know that multiple individuals can access an IP

                    THIS IS A ROUGH TRANSCRIPT              187
                         DO NOT CITE

1   address?

2        A    Absolutely.

3        Q    Okay.   And how do you account for the fact that

4   multiple people in a household can access that

5   particular IP address?

6        A    How do I know that?

7        Q    No, how do you -- how do you account for it in

8   your determination of the worst of the worst?

9        A    Oh.   So that determination is -- it's not

10   something that we are able to really look at until after

11   we get the defendant's name.   So once we know who the

12   defendant is, we can -- and where they live, of course,

13   we can, you know, determine if they might be living with

14   someone, say a son perhaps, or a wife.   We know if they

15   live in an apartment complex.   At times later on even in

16   discovery, other information is disclosed and they may,

17   you know, be able to tell us if they had a tenant in the

18   home.   That happens sometimes during settlement

19   negotiations, a defendant will bring forth exculpatory

20   evidence that says, you know, I actually have a tenant;

21   here's the lease that proves it.   And at that point, you

22   know, we obviously abide by Rule 11 and we wouldn't

23   pursue someone that we knew was not the infringer, so

24   long as we knew that they were not the infringer.   But

25   it's hard to do that when you don't have someone's name.

20          Do you recall how much Rightscorp charged you

21   for the services during that short contract period?

22     A    Which services?

23     Q    The DMCA services?

24     A    I don't recall that number.

25     Q    Okay.  Do you know who at Strike 3 Holdings

                    THIS IS A ROUGH TRANSCRIPT                196
                         DO NOT CITE

⬆

1   would have that number?

2     A    It would be within the agreement, actually.  I

3   don't that anyone could remember off the top of their

4   head.  Maybe Emily might, but the source would be the

5   agreement.

6     Q    Okay.  And did you ask IPP to provide you with

7   the source code?

8     A    Yes, we did.

9     Q    And what did they say?

10     A    I don't believe we ever received a response.

11     Q    Did you follow up on that response?

12     A    No.

13     Q    Why was -- why is that?

14     A    I -- to my knowledge, we only made the response

15   recently, so it was -- there hasn't been enough time to,

16    like, send a follow-up.   It was within the last few days

17    is what I'm saying.

18        Q    Okay.   Do you expect a response from them?

19        A    Yeah.

20        Q    You're --

21        A    Yes.

22        Q    You're paying them a lot of money, so --

23        A    Yeah.

24        Q    -- you're a good client.

25             Who is your main contact at IPP?

                THIS IS A ROUGH TRANSCRIPT                    197
                       DO NOT CITE

1         A    Tobias Fieser.

2         Q    Okay.   And how often do you talk to Mr. Fieser?

3         A    I don't know.

4         Q    You don't know how often you talk to

5    Mr. Fieser?

6         A    No.

7         Q    How often do you e-mail Mr. Fieser?

8         A    I don't know.

9         Q    Do you have daily e-mails with Mr. Fieser?

10        A    It's possible, but I don't know.

11        Q    You don't know how often you communicate?

12      A     I don't know.

13      Q     Can you estimate?

14      A     No.

15      Q     Do you get an e-mail from Mr. Fieser every day

16   of the week?

17      A     I don't know.

18      Q     Do you get an e-mail from Mr. Fieser at least

19   once a week?

20      A     I don't know.

21      Q     Do you get an e-mail from Mr. Fieser at least

22   once a month?

23      A     I would be guessing.   I don't know.

24      Q     Well, where would we look to see if you get

25   e-mails from Mr. Fieser?

                    THIS IS A ROUGH TRANSCRIPT                198
                          DO NOT CITE

1      A     In e-mail accounts.

2      Q     And do you have an e-mail account at IPP?

3      A     I don't have an e-mail account at IPP.

4      Q     Okay.  You don't have an e-mail at --

5            MR. BANDLOW:  You keep saying IPP.

6            MR. EDMONDSON:  Let's clear up the record.

7   BY MR. EDMONDSON:

- Exhibit C -

PAGEVAULT
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Greg Lansky: Most-Pirated Man in Porn \| Inverse |
| Capture URL: | https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview |
| Captured site IP: | 151.101.249.174 |
| Page loaded at (UTC): | Thu, 03 Jan 2019 20:38:02 GMT |
| Capture timestamp (UTC): | Thu, 03 Jan 2019 20:38:54 GMT |
| Capture tool: | v6.9.0 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Chrome/62.0.3202.9 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 19 |
| Capture ID: | a18fbaf9-7cd8-47cc-9aa0-eb82569b4273 |
| User: | s3-holdings |

PDF REFERENCE #:          aUz4iApzDpz3PLhuFGg6Wk

S3H (217-cv-01731)_000427



The Most-Pirated Man in Porn Is Getting Angry

Adult film director Greg Lansky sends 50,000 takedown notices a month.

By Dylan Love on May 24, 2017                    Filed Under Art, Instagram, Money & Sex

G reg Lansky is proud to be the most-pirated man in porn, but he's also annoyed.

amazon.com

S3H (217-cv-01731)_000428

...being very protective about his business practices makes people less annoyed.



"Piracy sucks," says the CEO and creative lead behind *Blacked*, *Tushy*, and *Vixen*. "It takes money directly out of my pocket, but I continue to make money in porn because I'm doing things differently from the rest of the industry."

Lansky, a 34-year-old Frenchman living in Los Angeles, started his porn empire in 2014 and quickly differentiated himself by producing some of the best porn on the internet. His videos are shot on high-end cameras, make use of professional sound and lighting, high-end cameras, and feature top-notch talent. He's also a strong believer in porn's potential: "Adult performers, what YOU do is ART," he tweeted earlier this year.

Lansky's focus on quality and production value is working. He won the Adult Video News (AVN) Best Director award in 2016 and 2017, along with AVN awards for Best Cinematography, Best Anal Sex Scene, and a dozen more. Together, Lansky's sites get 20 million monthly uniques, and with users paying up to $30 a month to access his content, he claims his revenues are "superior to 95 percent of the adult industry."



Document title: Greg Lansky: Most-Pirated Man in Porn | Inverse
Capture URL: https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview
Capture timestamp (UTC): Thu, 03 Jan 2019 20:38:54 GMT

S3H (217-cv-01731)_000429



**MONDAY 8PM/ET**



*Greg Lansky poses with a model.*

But the biggest mark of his success is also the bit that frustrates him most: rampant piracy of his content. Lansky works with a company called xTakeDowns.com to identify when his videos are pirated and to solicit their removal from offending sites. That company "identified my work as the internet's most-pirated adult content," says Lansky.

He estimates that he sends out 50,000 DMCA takedown notices every month to the so-called "tube sites" that host free smut across the internet. Tube sites are easily understood as self-contained "YouTubes of porn." Visitors browse content by category or date, and can even search keywords to find whatever content suits

S3H (217-cv-01731)_000430

the so-called "tube sites" that host free smut across the internet. Tube sites are easily understood as self-contained "YouTubes of porn." Visitors browse content by category or date, and can even search keywords to find whatever content suits their tastes. On the surface, tube sites are propagated by a community of registered users who upload the videos that appear on each page, exactly like YouTube.

Structuring a site this way means that when copyrighted video ends up on a public server, wrongdoing is assigned to the individual uploading the content, not the site itself. The onus is on the copyright holder to notice the offense and take proper action. It's a surprisingly advantageous structure for those in the business of showing ads against adult content. In fact, Lansky identifies the relationship between tube sites and the ad networks that make them profitable as the definitive problem entrepreneurs face in the adult world.



Greg Lansky ✓
@GregLansky

Fans! RT Here's a SFW clip from the video I directed with the amazing @realnicoleaniston coming soon on @Blacked_com

♡ 547   11:53 PM · May 17, 2017

💬 228 people are talking about this

Even after successfully completing a DMCA takedown process, Lansky will still see the removed video reappear on offending sites again and again — a fact he finds not a little suspicious.



Document title: Greg Lansky: Most-Pirated Man in Porn | Inverse
Capture URL: https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview
Capture timestamp (UTC): Thu, 03 Jan 2019 20:38:54 GMT
Page 4 of 18

finds not a little suspicious.



**15 Findings in PornHub's Massive Data Dump That We're Still Processing TBH**

All it takes is just one particularly off-the-wall piece of porno trivia to get! The! Party! Going!

▶ Watch Video »

"You gotta ask yourself," he says, "what is the motivation of hundreds of people around the world to spend their internet time uploading adult content? Why would a normal human being with an internet connection and an average income spend hours and hours behind their own computer doing this? … If it's their content, their mixtape, their edit, then there are thriving communities of artists uploading self-produced work out there. But other than that, [tube sites are] a piracy machine fueled by online advertising."

Tube site giant MindGeek did not reply to a request for comment.

Porn star Kendra Sunderland's first appearance on *Blacked* is Lansky's single most-pirated video. As it's taken down from one tube site, it appears on another right away. Lansky estimates he's lost revenue "in the millions" on this single piece of content.





*Greg Lansky sits with some of his stars.*

Part of the problem, he says, is that the relevant laws are simply out of date. "The laws that supposedly exist to help me protect my intellectual property were created during the days of dial-up," he says. "They don't work for today's modern internet."



7 New Netflix Original Debuts in March 2018

And given porn's bad reputation, there's not a lot of external interest in protecting his business, though he argues his approach is as safe and respectable as the adult world gets. "I produce content that's sitting behind a pay site on a platform that requires a credit card. Customers have to be at least 18," he says. "Tube sites follow none of these regulations and make lots of money using my work."

S3H (217-cv-01731)_000433

And given porn's bad reputation, there's not a lot of external interest in protecting how the adult world gets. "I produce content that's sitting behind a pay site on a platform that requires a credit card. Customers have to be at least 18," he says. "Tube sites follow none of these regulations and make lots of money using my work."

Don't mistake Lansky for a starving artist. It may be hard to pity a porn entrepreneur who regularly posts pictures of himself chilling on yachts with an entourage of well-endowed models, but he's selling a vision of porn that goes beyond himself. If people in the adult industry are actually going to earn a respectable wage, it depends on porn consumers paying for their finished product. And Lansky has already cracked that code meaningfully.

---

🔳 INVERSE LOOT DEALS



### Air Buds 2.0
### $36.99

Their case holds an additional 10 charges so you'll never run our of battery, and Bluetooth 4.2 technology means you'll never hear a dropped note, even in highly populated areas. Moreover, these headphones come with a IPX8 waterproof rating, something owners of the AirPods have been crying out for for a long, long time.

Buy Now

---

As he wrote on Instagram last week, captioning a picture of himself with model Eva Lovia drinking champagne by a pool, "Know your worth & never settle. #fridayvibes."



Instagram

This photo or video has been removed

S3H (217-cv-01731)_000434



Photos via Greg Lansky

# How to Get the "Instagram Top 9" List of Your Most Popular Posts in 2018

### End the year with a banger #TBT post.



By Danny Paez on December 27, 2018

Filed Under Facebook, Social Networks & Video

S3H (217-cv-01731)_000435

By **Danny Paez** on December 27, 2018                    Filed Under **Facebook**, **Social Networks** & **Video**

The end of another year means that Facebook will generate a personalized slideshow for each of its more than 2 billion users who uploaded pictures to the platform, and while the social media giant has been making these year-end retrospectives since 2014, it has yet to release a similar feature for Instagram, the photo-focused app it bought in 2012.



Missing Teeth? Try This
Latest dental implant prices may leave you smiling

∨ Continue Reading

# 19 Technology Predictions for 2019

Filed Under **Transportation**, **Apple**, **Cryptocurrency**, **Smartphones**, **SpaceX** & **Virtual Reality**

*inverse* is counting down our 19 biggest predictions for 2019, from what we expect out of tech giants like Apple and SpaceX to what we're expecting from the worldwide rollout of 5G, the next generation of gaming consoles, and the mass adoption of virtual reality.

S3H (217-cv-01731)_000436

I expect out of tech giants like Apple and SpaceX to what we're expecting from the worldwide rollout of 5G, the next generation of gaming consoles, and the mass adoption of virtual reality.



What did we miss? Email your suggestions.



Elon Musk has a big plan up his sleeve.

▣ Watch Video »



The super-fast connection is almost here.

▣ Watch Video »



Intel's days may be numbered.

▣ Watch Video »



It's the big next step for spaceflight.

▣ Watch Video »

Document title: Greg Lansky: Most-Pirated Man in Porn | Inverse
Capture URL: https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview
Capture timestamp (UTC): Thu, 03 Jan 2019 20:38:54 GMT

S3H (217-cv-01731)_000437



It's the big next step for spaceflight.

▣ Watch Video »

START NOW

3 Easy Steps:
1) **Click** 'Start Now'
2) **Download** on our website!
3) **Get** access to your inbox

My Inbox Helper



Elon Musk's ship is about to take flight.

▣ Watch Video »



The market is about to get a lot more crowded.

▣ Watch Video »



The Model 3 is going abroad.

▣ Watch Video »

S3H (217-cv-01731)_000438

The Model 3 is going abroad.

▣ Watch Video »







Facebook will move the needle... slightly.

▣ Watch Video »

Samsung could be onto a winner.

▣ Watch Video »

The world's largest cryptocurrency will keep its place.

▣ Watch Video »



Elon Musk Unveils Loop, The Boring Company's First Rideable Prototype

High hopes rest in this tunnel under LA.

▣ Watch Video »





The smartphone maker is about to make the jump.

▣ Watch Video »

The sports utility vehicle may turn heads.

▣ Watch Video »



S3H (217-cv-01731)_000439



The cars are getting more experienced.
🎬 Watch Video »



It's going to be a big year for stability.
🎬 Watch Video »



Many analysts are expecting a 2020 launch.
🎬 Watch Video »



The game streaming service could stun.
🎬 Watch Video »



# Lifelike: 20 Ways Robots Are Becoming More Like Us

Filed Under Robots, A.I. & Uncanny Valley

n December 2018, *Inverse* will look back on all the eeriest ways that technologists were able to shrink the gap between man and machine with a

Document title: Greg Lansky: Most-Pirated Man in Porn | Inverse
Capture URL: https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview
Capture timestamp (UTC): Thu, 03 Jan 2019 20:38:54 GMT

S3H (217-cv-01731)_000440

I n December 2018, *Inverse* will look back on all the eeriest ways that technologists were able to shrink the gap between man and machine with a look back at the year's most memorable stories in robotics and A.I.



For robots and artificial intelligence to continue making life easier for humans, they'll have to learn how to master increasingly human-like skills, from learning how to dress oneself to how to crack jokes, create works of art, or determine whether someone seems happy or sad.

Watch this space for more additions all month long.

What did we miss? Email your suggestions.



In 2018, Google DeepMind Imbued A.I. With Human-Like Sight and Imagination
The landmark A.I. breakthrough of 2018.
▷ Watch Video »

S3H (217-cv-01731)_000441



In 2018, Google DeepMind Imbued A.I. With Human-Like Sight and Imagination

The landmark A.I. breakthrough of 2018.

▶ Watch Video »

Watch A.I. Learn the Unique Human Pain of Getting Out of Bed in the Morning

Algorithms Learned How Size Up What You Look Like — and Find Your Twin

This Leveled-Up Autopilot Knows How to Evade Your Parking Tickets

The only boot you'll need this fall.

*Thursday Boots*



S3H (217-cv-01731)_000442



Document title: Greg Lansky: Most-Pirated Man in Porn | Inverse
Capture URL: https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview
Capture timestamp (UTC): Thu, 03 Jan 2019 20:38:54 GMT

S3H (217-cv-01731)_000443



Document title: Greg Lansky: Most-Pirated Man in Porn | Inverse
Capture URL: https://www.inverse.com/article/31350-greg-lansky-tushy-blacked-vixen-interview
Capture timestamp (UTC): Thu, 03 Jan 2019 20:38:54 GMT

S3H (217-cv-01731)_000444



S3H (217-cv-01731)_000445

- Exhibit D -

23    counsel, paragraphing and other changes.

24

25

                                          2

 1                  (Witness sworn.)

 2                  SUSAN BLACKWOOD STALZER,

 3    called as a witness herein, having been first

 4    duly sworn, was examined and testified as

 5    follows:

 6                  EXAMINATION

 7    BY MR. EDMONDSON:

 8        Q.   Good morning, Miss Stalzer.  Could you

 9    state your name for the record and spell it.

10        A.   Susan Blackwood Stalzer,

11    S-t-a-l-z-e-r.

12        Q.   And, Miss Stalzer, do you know why

13    you're here today?

14        A.   I do.

15        Q.   And have you seen this deposition

16    notice?  Handing her a document we're going to

22

1    connection from that computer desktop into --

2    it's usually a box called a router?

3         A.   Yes, I have -- it is connected.

4         Q.   It does have a wired connection?

5         A.   Correct.

6         Q.   And then on your computer -- and I

7    think you stated it was Windows 10.  What

8    application are you using to watch the movies?

9         A.   We have a verification tool that was

10   designed by someone in whoever deals with the

11   technology.

12        Q.   Okay.  Well, I'm not talking about the

13   verification tool.  Do you ever look at the

14   movies in their native format?

15        A.   In the original films?

16        Q.   Yeah, I'll give you an example, MP-4.

17   Are you familiar with the extension MP-4?

18        A.   Yes, but I'm not -- your question is

19   not clear to me.

20        Q.   Okay.  Well, let's walk through it.

21             First day you got this job at --

22    for Strike 3 Holdings, how did you verify the

23    first work?

24         A.   We have a verification tool in which I

25    can play the clips.

23

1         Q.   Okay.   What is the name of that

2    verification tool?

3         A.   Verification tool.

4         Q.   Okay.   Who made the verification tool?

5         A.   I have no idea.

6         Q.   How do you know the verification tool

7    works?

8              MR. BANDLOW:   Objection.   Vague and

9         ambiguous.

10              THE WITNESS:   It works in what regard?

11         I don't understand the question.

12    BY MR. EDMONDSON:

13         Q.   How do you know it actually verifies

14    the works.

15         A.   I verify the work.

16          MR. BANDLOW:   She verifies.

17          THE WITNESS:   The application -- the

18     tool -- the site does not verify them.   I

19     verify them.   All it does is allow me to

20     play them.

21  BY MR. EDMONDSON:

22       Q.   Okay.   So what does it looks like when

23  it plays the film?   Describe that for me.

24       A.   When I -- I have a place where I can

25  click the film to play and it opens and plays,

                                                    24

1   and I see the film.

2        Q.   Is it a web application?

3        A.   I don't know the answer to that.

4        Q.   Well, how do you get access to the

5   works that you're verifying?

6        A.   They're uploaded into the verification

7   tool.

8        Q.   Who uploads them into the verification

9   tool?

10        A.   Our technology department.

11        Q.   Well, you're an independent

12   contractor, correct?

13        A.   Correct.

14        Q.   Do you have a technology department?

15        A.   Do I personally?  No.

16        Q.   Yes.  So you're speaking of

17   Strike 3 Holding's technology department?

18        A.   Yes.

19        Q.   Or IT --

20        A.   Or someone that is employed by them.

21        Q.   Okay.  When does it get uploaded?

22        A.   I have no idea.

23        Q.   How do you know you have things to

24   verify?

25        A.   I'm verified.

25

1        Q.   How do you get verified?

2        A.   An e-mail.

3        Q.   And what's in that e-mail?

4          A.   "There are films to be verified.

5     Please do so."

6          Q.   Okay.   And in that e-mail, is there,

7     for example, a hyperlink that links it to that

8     particular --

9          A.   No.

10         Q.   What do you see in that e-mail?

11         A.   The wording that I told you.

12              MR. BANDLOW:   Objection.   Asked and

13         answered.

14    BY MR. EDMONDSON:

15         Q.   What's that?

16         A.   The wording that I told you.

17         Q.   Is it just a list of films?

18         A.   No, sir.   There's nothing in the

19    e-mail other than a notification that there are

20    films in the tool for me to verify.

21         Q.   Okay.   So now then you see that e-mail

22    and you open up the verification system.

23         A.   Correct.

24         Q.   What's the first thing you see when

25    you open up the verification system?

26

1        A.    A list of hash marks.   A list of the

2   site that the film is purported to be coming

3   from, the title that is believed to be attached

4   to this film and a button where I can hit play

5   for the film to pop up for me to view it.

6        Q.    Okay.   And how is that information

7   organized?

8             MR. BANDLOW:   Objection.   Vague and

9        ambiguous.

10            THE WITNESS:   Often alphabetically by

11        title.

12   BY MR. EDMONDSON:

13        Q.    Okay.   Is it organized by case?

14        A.    No, sir.

15        Q.    Do you have any idea if you're working

16   on a particular case?

17        A.    No, sir.

18        Q.    And do you know what I'm talking about

19   when I say the word case?

20        A.    I have a reasonable understanding of

21   that, yes.

22        Q.    Is the reasonable understanding that

23    we're referring to a particular lawsuit?

24         A.   I understand that the films that I am

25    to verify are being looked at to see whether or

27

1    not they are Strike 3 property and therefore

2    whether or not someone has downloaded them

3    illegally, so, yes, I understand the purpose of

4    that is potential lawsuits.

5         Q.   So let's go back to the process of

6    verification.

7              So you get an e-mail, correct?

8         A.   Uh-hum.

9         Q.   And then you go and you look at this

10   verification system.  Has the verification

11   system ever not worked?

12        A.   No.

13        Q.   Okay.  So it's worked perfectly?

14        A.   Correct.

15        Q.   Have you ever tested the verification

16   system?

```
17              MR. BANDLOW:  Objection.  Vague and
18        ambiguous.
19              THE WITNESS:  In what regard?
20    BY MR. EDMONDSON:
21        Q.   Okay.  How do you know the
22    verification system works?
23              MR. BANDLOW:  Objection.  Vague and
24        ambiguous as to what works means.
25              THE WITNESS:  The only thing it needs
```

28

```
1         to do from my end is for the films that
2         have been uploaded to be able to play.  If
3         they do not play, then the file is corrupt
4         and that particular hash mark is marked as
5         bad.
6    BY MR. EDMONDSON:
7         Q.   Okay.  So have you ever had corrupted
8    files?
9         A.   Yes.
10        Q.   And then what do you do?
```

11          A.   They're marked bad.

12          Q.   You just mark good or bad?

13          A.   Correct.

14          Q.   And they're linked to a particular

15   hash mark, correct?

16          A.   Correct.

17          Q.   Next to the hash mark is there an URL?

18          A.   No.

19          Q.   Okay.  So if you were to -- I'll give

20   you another blank piece of paper.

21               We'll mark this as 62.

22                    (Whereupon, Exhibit

23                     No. 62 was marked for

24                     Identification, 04/16/2019.)

25

29

1   BY MR. EDMONDSON:

2          Q.   To the best of your ability, drawing a

3   box, which I'm going to represent is a computer

4   screen --

```
 5          A.    Okay.

 6          Q.    -- can you kind of draw out what each

 7    of the fields are on your computer screen that

 8    you see in this verification system?

 9          A.    So there are hash marks here, titles

10    listed here, the site that is listed here, and

11    then there is a button to click play, and then I

12    have a box for good and a box for bad.

13          Q.    And when you click play, what happens?

14          A.    The film opens and plays.

15          Q.    Which film opens and plays?

16          A.    The one that's connected to that

17    specific hash mark.  There will be a list of 500

18    films.

19                MR. BANDLOW:  Possibly infringing

20    film, not our film.

21                MR. EDMONDSON:  Well, I think she's

22    the witness today, Lincoln, and we'll --

23                MR. BANDLOW:  It's what she previously

24    testified.

25                MR. EDMONDSON:  Not with this diagram
```

30

1          in front of her at the time.

2     BY MR. EDMONDSON:

3          Q.   So looking that screen -- and I'll

4     make sure you have a copy of it and you can see

5     it.

6               Can you see this okay,

7     Miss Stalzer?

8          A.   Yes, sir.

9          Q.   So you have this hash on this column

10    here, correct?

11         A.   To clarify, it goes all the way down

12    the screen depending on how many of them have

13    uploaded and there may be multiple pages, but

14    yes.

15         Q.   Are you able to scroll up and down

16    using like a sidebar?

17         A.   Yes.

18         Q.   You have used web browsers?

19         A.   Yes.

20         Q.   Okay.  Does it looks like sort of a

21    web-based application?

22         A.   No.

23         Q.   Okay.  Did you have to install some

24     special software on your computer?

25          A.   No.

31

1          Q.   So how does it run?

2               MR. BANDLOW:   Objection.   Vague and

3     ambiguous.   Lack of foundation.

4     BY MR. EDMONDSON:

5          Q.   How do you start it?

6          A.   I have a link to the verification and

7     a secure log-in to the verification tool.   So I

8     open the page and I log in.

9          Q.   So you do log-in using some sort of

10    application, correct?

11         A.   I don't know the answer to that.   I

12    open the tool and my log-in screen appears.

13         Q.   Okay.   Maybe I can -- we can clarify

14    with another exhibit.

15              MR. EDMONDSON:   We'll mark this as 63.

16                   (Whereupon, Exhibit

17                   No. 63 was marked for

18                          Identification, 04/16/2019.)

19   BY MR. EDMONDSON:

20        Q.    You testified you have a HP computer.

21        A.    Yes.

22        Q.    I'm going to draw a box here which is

23   going to represent your screen.

24                    Can you sketch out what your

25   screen looks like and what you click to start

                                                      32

1    the verification tool?

2              MR. BANDLOW:   This is her home

3    page screen is what you're talking about?

4              MR. EDMONDSON:   Yeah.   I mean, I'll

5    still a little unclear the process of

6    starting the application.

7              THE WITNESS:   I have a link saved to

8    the page.   I open Google.   I click on my

9    saved link to the verification page.

10   BY MR. EDMONDSON:

11        Q.    Okay.   And what -- you open Google and

12   something comes up on that link, correct?

13        A.   No, sir.   When I open Google, I have a

14   saved tab --

15        Q.   Yes.

16        A.   -- for the tool, the verification

17   tool.

18        Q.   Right.   So you open --

19        A.   So I click that, and the tool opens

20   with a log-in screen --

21        Q.   Okay.

22        A.   -- for my user name and password.

23        Q.   Are you within the Google browser?

24   You said you opened Google.

25        A.   Am I using Google?   Yes.

33

1        Q.   Okay.   And click on that link.   And

2   does it insert a hyperlink into the Google

3   browser?

4        A.   Okay.

5             MR. BANDLOW:   It's a separate

6       favorite, a tab that's a favorite.  Her

7       home page is Google and she has a tab, she

8       clicks it and it's in there.

9            MR. EDMONDSON:  Could we go off the

10      record for a moment, please?

11                     (A short break was taken.)

12                     (Whereupon, Exhibit

13                      No. 64 was marked for

14                      Identification, 04/16/2019.)

15           MR. EDMONDSON:  Let's go back on the

16      record.

17   BY MR. EDMONDSON:

18      Q.    So we went on break.  Did you talk to

19   anybody during the break aside from the court

20   reporter?

21      A.    No -- that's not true.  I mentioned to

22   the -- I couldn't find the bathroom, so I asked

23   the lady at the front.

24      Q.    And did you talk to anybody about this

25   case?

34

1        A.    No.

2        Q.    Now, I have handed you a Document 63,

3   which is your sketch of your desktop.   If I

4   understand your testimony correctly, there is a

5   link on your desktop.   What's the title of that

6   link?

7        A.    Verification tool.

8        Q.    Verification tool.   Who provided with

9   you that link?

10       A.    Strike 3.

11       Q.    Okay.   And who at Strike 3 provided

12   you with that link?

13       A.    Sud.   Please do not ask me his last

14   name because can I not spell it, nor pronounce

15   it.

16       Q.    Well, can you say it?

17       A.    No, sir, I cannot pronounce it, and I

18   wouldn't guess at the spelling.

19       Q.    Do you get e-mails directly from Sud?

20       A.    I do.

21       Q.    Well, how many e-mails have you gotten

22   from Sud since your engagement with Strike 3

23   started?

24       A.    I don't know.

```
 8    I'm verifying are tied to any specific case.  I

 9    have no knowledge of that, and I have no way of

10    knowing that, and I have no way of knowing if

11    the 200 files I'm given in the verification tool

12    all relate to one case or to 20 cases.  I have

13    no knowledge of that.

14         Q.   So let's just turn to Exhibit A of

15    this complaint.

16         A.   Yes.

17              MR. BANDLOW:  Which one are we

18    looking at?

19              MR. EDMONDSON:  Exhibit A of 45.

20              MR. BANDLOW:  45.

21              MR. EDMONDSON:  Yes.  Back to the

22    80 works infringed.

23    BY MR. EDMONDSON:

24         Q.   So on Work No. 1 can you tell me when

25    you verified Work No. 1?
```

```
 1         A.   No.
```

2          Q.   And can you tell me when you verified

3   Work No. 2?

4          A.   I won't be able to tell you the

5   specific date I verified any of these by this.

6   I don't have -- I do not keep in my memory what

7   day I verify what hash, and I don't know how

8   they relate to any specific case, so...

9          Q.   Okay.  So if I were to go 3 through 80

10  and ask you the same question, I would get the

11  same answer?

12         A.   Correct.

13         Q.   Okay.  And going back to Exhibit 64 --

14              MR. BANDLOW:  The same answer, right?

15              THE WITNESS:  Correct.

16              MR. EDMONDSON:  Let me ask the

17         question, Lincoln.

18  BY MR. EDMONDSON:

19         Q.   You see there Work No. 1?

20         A.   I do.

21         Q.   And do you recall when you verified

22  Work No. 1 on Exhibit 64?

23         A.   I cannot tell you that.

24         Q.   Okay.  How about 2?

25         A.   I cannot tell you that.

68

1        Q.    The same answer, 3 through 87?

2        A.    Yes, sir.

3        Q.    Do you see the date at the top,

4   7/3/18, July 3rd, 2018?

5              MR. BANDLOW:   Up here.

6              THE WITNESS:   Yes.

7   BY MR. EDMONDSON:

8        Q.    Were you ever contacted by somebody at

9   Strike 3 Holdings to review this document prior

10  to July 3rd, 2018?

11       A.    No.

12       Q.    Were you ever contacted by somebody at

13  Fox Rothschild to review this document?

14       A.    No.

15       Q.    And the same going back to 45?

16       A.    Correct.

17       Q.    Prior to November 16th were you ever

18  asked to verify this information?

19       A.    No.

20       Q.    Have you ever been asked to verify any

21     exhibit on any complaint --

22          A.    No.

23          Q.    -- filed by Strike 3 Holdings?

24          A.    No.

25          Q.    Miss Stalzer, I'm going to hand you a

69

1     document we previously marked as 43.  Just for

2     the record, this is plaintiff's motion for leave

3     to serve a third-party subpoena prior to the

4     Rule 26 conference.

5               Miss Stalzer, have you ever seen

6     this document before?

7          A.    No.

8          Q.    I'm going to give you an opportunity

9     to read it.  It might take a few minutes.  Just

10    tell me when you're done.

11              MR. BANDLOW:  You want her to read

12         the entire 11-page document.

13              MR. EDMONDSON:  Yeah.  Well, she's

14         said she's never seen it before, so...

23          answered at this point.

24                THE WITNESS:  No, sir.

25                MR. EDMONDSON:  All right.  I'll ask.


                                                    102

1                 MR. BANDLOW:  She stated very clearly

2           she didn't draft a single thing in this

3           declaration.

4                      For you to go paragraph by

5           paragraph, you're not going to get anywhere

6           further than her statement she didn't draft

7           a single thing in this declaration.  Asked

8           and answered.

9     BY MR. EDMONDSON:

10          Q.   Okay.  So see where it says IPP

11    provided me with the infringing motion picture

12    file?

13          A.   Yes, I see that.

14          Q.   Did IPP provide you with the

15    infringing motion picture file?

16          A.   To the best of my knowledge, yes.

17          Q.    How do you know that?

18          A.    Because it has been told to me that

19   that is where the films come from that get voted

20   into the verification center.

21          Q.    Miss Stalzer, I see up here you hold a

22   Bachelor's degree and a Master's degree from

23   English?

24                MR. BANDLOW:   In English.

25                THE WITNESS:   In English.

                                                    103

1    BY MR. EDMONDSON:

2           Q.    In English.  Is that true?

3           A.    Yes.

4           Q.    From Oakland University?

5           A.    Yes.

6           Q.    Would you say your command of the

7    English language is probably better than the

8    average person's?

9                 MR. BANDLOW:  Objection.  Calls for

10                speculation.  Vague and ambiguous.

8    associated with this particular exhibit,

9    correct?

10        A.   They have been previously verified.

11        Q.   I just want to be clear.

12        A.   I understand.  I'm trying to clarify

13   as well.

14        Q.   Well, you're -- so I asked you a

15   question.  When you're signing this declaration

16   for this particular case, or for any case, and

17   you have this exhibit open, do you go back and

18   verify the hashes, or do you even do it for the

19   first time, verify these hashes associated with

20   Exhibit A?

21        A.   They are not sent to me by case.  No,

22   I do not go back and verify a second time.

23        Q.   So when you sign this declaration and

24   you have this Exhibit A, you don't verify

25   against this Exhibit A, correct?

117

1         A.   No, I do not go back and verify a

2    second time.

3         Q.   Is there anywhere on this declaration

4    where you talk about the verification system?

5              MR. BANDLOW:  Objection.  The

6         document speaks for itself.

7              MR. EDMONDSON:  Well, I think

8         Miss Stalzer can say if there is or isn't.

9              MR. BANDLOW:  Anybody with a set of

10        eyes and a reading ability can say whether

11        something is or isn't on a document.

12                   But go ahead.  Why don't you do it

13        for him?

14             THE WITNESS:  There is no mention of

15        the specific method of verification or the

16        tool?

17   BY MR. EDMONDSON:

18        Q.   Why isn't that information on this

19   declaration?

20        A.   I cannot answer why there's not

21   information in a declaration that I did not

22   write.  I assume the attorneys know the best way

23   to draft the declarations.

24        Q.   Did you ever ask anybody at

25   Strike 3 Holdings why the verification system is

- Exhibit E -

1   (INSERT CAPTION/APPEARANCES/INDEX/SWORN)

2   STARTTIME9:40AM 4/17/19

3   (EXHIBIT MARKED/70)

4        Q      Good morning, Mr. Pasquale.

5        A      Good morning.

6        Q      Could you please state and spell

7   your name for the record?

8        A      John Pasquale, J-o-h-n,

9   P-a-s-q-u-a-l-e.

10       Q      Do you have a middle name?

11       A      Yes, Santo, S-a-n-t-o.

12       Q      Excellent.  Mr. Pasquale, have you

13   ever been deposed before?

14       A      No, I have not.

15       Q      Some of the grounds rules for a

16   deposition is the Court Reporter is taking down

17   our words, so if you can answer verbally, that

18   would be appreciated.  She can't record gestures.

19       A      Understood.

20       Q      If you nod yes or shake no, she

21   can't take that down.

22       A      Understood.

23       Q      Do everything verbally.  The other

24   thing, too, is that I might ask you to either to

8        Q      And Paragraph 2, did you type up or

9  draft this statement?

10       A     No.

11       Q     The same with Paragraph 3?

12       A     No.

13       Q     How about Paragraph 4?

14       A     No.

15       Q     And Paragraph 5?

16       A     No.

17       Q     What about Paragraph 6?

18       A     No.

19       Q     Paragraph 7, it has a date and time

20  and an IP address.   Did you draft this statement?

21       A     No, I did not.

22       Q     Do you recall when you received

23  that PCAP from IPP?

24       A     I really couldn't tell you.

25       Q     Do you know who IPP is?

                                                                       19

1       A     The IPP for this transaction is

2  listed --

3       Q     It says "company" there.

4       A     I know of them, but do I know them?

5  No.   Have I had a conversation with them?   No.

6       Q     Do you use email communications

7    with anybody at IPP?

8         A    No.

9         Q    Who sends the you the PCAP?

10        A    Paul does.

11        Q    Your nephew?

12        A    My son.  Philip is my nephew.

13   Write it down.

14        Q    Your son is also involved in the

15   business?

16        A    There's a lot of P's.  My son owns

17   7 Rivers Systems.

18        Q    So we've got Paul your son owns 7

19   Rivers Systems.  Is he a computer guy?

20        A    I would say so.

21        Q    Do you know if he studied

22   electrical engineering or computer science?

23        A    He has a electrical engineering

24   degree from Cooper Union, and he also has a

25   security degree from Carnegie Mellon as a

                                              20

1    master's.

2         Q    He has a master's from Carnegie

3    Mellon in Pittsburgh.  Cooper Union, is that New

4    Jersey?

5         A    No, new York City.