THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>          Plaintiff,<br><br>vs.<br><br>JOHN DOE, subscriber assigned IP address 73.225.38.130,<br><br>          Defendant. | NO. 2:17-cv-01731-TSZ<br><br>**DECLARATION OF J. CURTIS EDMONDSON IN SUPPORT OF RESPONSE TO MOTION TO EXTEND DEADLINES** |
| JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>          Counterclaimant,<br><br>vs.<br><br>STRIKE 3 HOLDINGS, LLC,<br><br>          Counterdefendant. | |

I, J. Curtis Edmondson, hereby declare under the penalty of perjury under the laws of the United States of America, the following:

1.    I am counsel of record in this case. I am a member of the bar of this Court and a member of the Patent Bar. I have personal knowledge of the facts set forth in this declaration

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    and could testify competently to them if called upon to do so.

2           2.      Attached as Exhibit 1 is a true and correct copy of the proposed protocol I emailed

3    to Strike 3's counsel on March 22, 2019 regarding inspection of Doe's hard drives.

4           3.      A week later on Friday, March 29, 2019, I conferred telephonically with Strike

5    3's counsel regarding the proposed protocol, along with co-counsel, Adrienne McEntee. Strike

6    3's counsel agreed during the call to consider our proposal and get back with us the following

7    Monday.

8           4.      Attached as Exhibit 2 is a true and correct copy of the email Ms. McEntee sent to

9    Strike 3's counsel following our March 29, 2019 telephone call.

10          5.      Strike 3's counsel did not respond the following Monday regarding the proposed

11   protocol and has not initiated a conversation regarding the analysis of Doe's computers with me

12   (or Ms. McEntee) since March 29th.

13          6.      Attached as Exhibit 3 is a true and correct copy of excerpts from John Doe's

14   deposition. The portions of the transcript that reference names, addresses, and emails have been

15   redacted to protect the identity of Doe and his family, friends, and neighbors.

16          7.      Doe anticipates serving additional discovery requests to Strike 3 this week

17   following Strike 3's recent deposition testimony. Because of Strike 3's history of declining to

18   produce data and documents in response to requests for production, Doe joins in Strike 3's

19   request to extend the deadline to bring discovery motions.

20          I declare under penalty of perjury under the laws of the United States that the foregoing

21   is true and correct.

22          EXECUTED this 24th day of April, 2019, at Hillsboro, Oregon.

23

24                                      /s/ J. Curtis Edmondson, WSBA #43795
                                        J. Curtis Edmondson, WSBA #43795

25

26

27

DECLARATION OF J. CURTIS EDMONDSON IN
SUPPORT OF RESPONSE TO MOTION TO EXTEND
DEADLINES - 2
CASE NO. 2:17-CV-01731-TSZ

CERTIFICATE OF SERVICE

I, Adrienne D. McEntee, hereby certify that on April 24, 2019, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

Bryan J. Case, WSBA #41781
Email: bcase@foxrothschild.com
FOX ROTHSCHILD LLP
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154
Telephone: (206) 624-3600
Facsimile: (206) 389-1708

Lincoln D. Bandlow, *Admitted Pro Hac Vice*
Email: lbandlow@foxrothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Blvd., Suite 900
Los Angeles California 90067
Telephone: (310) 598-4150
Facsimile: (310) 556-9828

John C. Atkin, *Admitted Pro Hac Vice*
Email: jatkin@atkinfirm.com
THE ATKIN FIRM, LLC
55 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Telephone: (973) 285-3239

*Attorneys for Plaintiff*

Joshua L. Turnham, WSBA #49926
E-mail: joshua@turnhamlaw.com
THE LAW OFFICE OF JOSHUA L. TURNHAM PLLC
1001 4th Avenue, Suite 3200
Seattle, Washington 98154
Telephone: (206) 395-9267
Facsimile: (206) 905-2996

*Attorneys for Non-Party Donald Isaksen, Jr.*

DECLARATION OF J. CURTIS EDMONDSON IN
SUPPORT OF RESPONSE TO MOTION TO EXTEND
DEADLINES - 3
CASE NO. 2:17-CV-01731-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    DATED this 24th day of April, 2019.

2                           TERRELL MARSHALL LAW GROUP PLLC

3

4                           By:   /s/ Adrienne D. McEntee, WSBA #34061
                                Adrienne D. McEntee, WSBA 34061
5                               Email:  amcentee@terrellmarshall.com
                                936 North 34th Street, Suite 300
6                               Seattle, Washington 98103-8869
                                Telephone: (206) 816-6603
7                               Facsimile: (206) 319-5450

8                           *Attorneys for Defendant*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF J. CURTIS EDMONDSON IN
SUPPORT OF RESPONSE TO MOTION TO EXTEND
DEADLINES - 4
CASE NO. 2:17-CV-01731-TSZ

# — EXHIBIT 1 —

THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>                                Plaintiff,<br><br>        vs.<br><br>JOHN DOE, subscriber assigned IP address 73.225.38.130,<br><br>                                Defendant.<br><br>---<br><br>JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>                                Counterclaimant,<br><br>        vs.<br><br>STRIKE 3 HOLDINGS, LLC,<br><br>                                Counterdefendant. | NO. 2:17-cv-01731-TSZ<br><br>**[PROPOSED[ DEFENDANT'S ESI PROTECTIVE ORDER ON COMPUTERS AND HARD DRIVES** |

The parties hereby stipulate to the following provisions regarding the discovery of electronically stored information ("ESI") for the Defendant in this matter:

**A.     General Principles**

1.   An attorney's zealous representation of a client is not compromised by conducting discovery in a cooperative manner. The failure of counsel or the parties to litigation to cooperate in facilitating and reasonably limiting discovery requests and responses raises litigation costs and contributes to the risk of sanctions.

2.   The proportionality standard set forth in Fed. R. Civ. P. 26(b)(1) must be applied in each case when formulating a discovery plan. To further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as possible.

**B.     ESI Disclosures**

Within 30 days after the Rule 26(f) conference, or at a later time if agreed to by the parties, each party shall disclose:

1.   <u>Custodians.</u> The five custodians most likely to have discoverable ESI in their possession, custody or control. The custodians shall be identified by name, title, connection to the instant litigation, and the type of the information under his/her control.

2.   <u>Non-custodial Data Sources.</u> A list of non-custodial data sources (e.g. shared drives, servers, etc.), if any, likely to contain discoverable ESI.

3.   <u>Third-Party Data Sources.</u> A list of third-party data sources, if any, likely to contain discoverable ESI (e.g. third-party email and/or mobile device providers, "cloud" storage, etc.) and, for each such source, the extent to which a party is (or is not) able to preserve information stored in the third-party data source.

4.   <u>Inaccessible Data.</u> A list of data sources, if any, likely to contain discoverable ESI (by type, date, custodian, electronic system or other criteria sufficient to specifically identify the data source) that a party asserts is not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(B). [*Section (C)(3)(a)(i) below sets forth data sources and ESI*

1  *which  are  not required to be preserved by the parties. Those data sources and ESI do*

2  *not need to be included on this list.*]

3  DEFENDANT'S DESIGNATION PURSUANT TO SECTION B.

4  Plaintiff made a document request for all computers and electronic media in possession

5  and control of Defendant.

6  1.      Defendant John Doe is a retired cop who in his retirement purchased computers

7  and fixed them up with the idea of providing them to non-profits as a hobby.  Defendant John

8  Doe has collected all electronic media and computers requested by the Plaintiff during the

9  period of infringement and has turned them over to counsel for inspection.  The number of

10  computers and hard drives are approximately 100 and are in various states of operation.

11  Defendant John Doe is the sole custodian. Defendant counsel is in possession of the hard drives

12  and other media.

13  2.      Defendant does not believe there is any non-custodial data sources.

14  3.      Third Party data sources – This may include email servers for two email

15  accounts. Defendant has searched those email accounts for requested documents.

16  4.      Inaccessible Data – Some of the computers and hard drives may have failed or

17  were purchased in a failed condition.

18

19  **C.      Preservation of ESI**

20  The parties acknowledge that they have a common law obligation to take reasonable

21  and proportional steps to preserve discoverable information in the party's possession, custody

22  or control. With respect to preservation of ESI, Defendant has:

23  1.      Gathered all computers and hard drives in possession during the period of infringement.

24  As noted, this is approximately 100 items.

25  2.      Identified the majority of the computers by model and S/N, and the same with

26  the hard drives.

27

3.     These categories of Defendant's ESI need not be preserved:

    a.     Deleted, slack, fragmented, or other data only accessible by forensics.

    b.     Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

    c.     On-line access data such as temporary internet files, history, cache, cookies, and the like.

    d.     Data in metadata fields that are frequently updated automatically, such as last-opened dates (see also Section (E)(5)).

    e.     Back-up data that are substantially duplicative of data that are more accessible elsewhere.

    f.     f. Server, system or network logs.

    g.      Data remaining from systems no longer in use that is unintelligible on the systems in use.

    h.     The computers and hard drives located at Counsel's office in Hillsboro, Oregon, stored in numerous plastic containers.

DEFENDANT'S DESIGNATION PURSUANT TO SECTION C

4.     Defendant has collected all requested computers and media and has stored them at counsel's office.

5.     Defendant will keep the computers and media in native format as the cost for a complete forensic image of each drive and a string search of each drive is disproportionately large (est $ 50,000.00).

**D.     Privilege**

1.  With respect to privileged or work-product information generated after the filing of the

complaint, parties are not required to include any such information in privilege logs.

2.      Subject to STEP "E", Defendant will identify those computers that may have been used to communicate with this attorneys.   Steps will be taken to identify those communications that are privileged.

**E.    ESI Discovery Procedures**

Plaintiff contends that their IPP software  has recorded  "File Hashes" that uniquely identiffy an infringed movie that are approximately 20-40 minutes in length.

Plaintiff has provided, in response to Defendant's discovery requests, data that their German monitoring system that is used to purportedly identify infringers.  This data provided by the Plaintiff's monitoring software is:

| Work | Hash | Site |
|------|------|------|
| 1 | 1BC8C1ADCAA75C3EC9408C8CCBF5147863205E6C | Tushy |
| 2 | 0326E8923C58852725F5A7857833A4CD3E715289 | Tushy |
| 3 | 039F4779148D3E374D990283A83AC46A0219DAE9 | Vixen |
| 4 | 0CAB7415EAE003A2C3835DE5FC716759A49040B9 | Tushy |
| 5 | 0CDEB18021838E8E2A694A7D16D9A45366CFABB6 | Blacked |
| 6 | 1278F4C4BF0B45678418F6CC8F8844DE4AB68C83 | Tushy |
| 7 | 1487A26EAAAD70318258AB9F506506A8F293533A | Blacked |
| 8 | 18A6F7D0E24D4FA3CC1589DE496D1AD9433CF09B | Blacked |
| 9 | 1A032CB38BB2AF87DAF2B239A1A17B6C713EBC26 | Blacked |
| 10 | 1C2C06D480942F4FE7FDCED4759E93805E02B54B | Tushy |
| 11 | 1D1B18BB0C921D6E1A6D148E4542257B42A2469F | Tushy |
| 12 | 1D63168E762F9CB41AE4DBD6646599AD0EFF3911 | Blacked |
| 13 | 1D7E521CD7368013A7F1B28494A2AC43D8F99F0E | Vixen |
| 14 | 1D7E721AC3B8D955BBCAD8D62F57AF030BD1F315 | Vixen |
| 15 | 22883186DAB5FCA92C8513AD939652BCB867FD5C | Tushy |
| 16 | 22C377CC65B1695E6470BFAF967C4C825391EF90 | Blacked |
| 17 | 24D6E127081B069994E81CA544B8FF3E3A0A33D3 | Tushy |
| 18 | 258961E123E520633A96CDF11E8E6F60E233C816 | Vixen |
| 19 | 289FE7D65DFCFACB416832D12862105A2762841A | Blacked |
| 20 | 31577E16E1B68BF13F30BE538E1BAF66E224726A | Tushy |

| 21 | 322F6ABAB019761A6FF3C1211AF75B28137F013F | Vixen |
|----|------------------------------------------|---------|
| 22 | 34452073A3328CE2AF5FC73A5A8DDD4141E85B4A | Vixen |
| 23 | 374A3B65D604113BB3880FDACE83FD1EFED3CA7C | Tushy |
| 24 | 3945FEF635D609C3FB77DD4762FC2570E7E12D7C | Blacked |
| 25 | 3F3D4931127C380DD0AA05C298E26438267560BB | Vixen |
| 26 | 408577469D1675504E89F205C619738007D08DD9 | Blacked |
| 27 | 4125860EC76C1E0880F652DA94EB84D375A64436 | Tushy |
| 28 | 464AB452DA8258FA23BA74830F0D57EE7CA518C5 | Tushy |
| 29 | 48F5E3FE474EA76DE23D7D0A8F27ADA15F5C98D7 | Blacked |
| 30 | 4B86BC16D0E5A0983C578B61ED87BC62C55B116A | Vixen |
| 31 | 4F0D3D0FD3F88791F4933080453A052BE6924F22 | Tushy |
| 32 | 4FAE423CFA8C54409A4658429D7CB2B3E0F2E8B1 | Vixen |
| 33 | 4FF62836FC3C509617EE5DE7658EAABE045C0BA1 | Tushy |
| 34 | 5003D85013A07470D85A3250EF4B3393B6E2CB04 | Tushy |
| 35 | 5176733783D1199D43060681D7AE2D4E3B5C9AF9 | Blacked |
| 36 | 53FF1B4BD8FB69630FE0A67611FE747F902F6874 | Vixen |
| 37 | 5A06B4EA4DB48984499F2E9EA7213220E835089D | Blacked |
| 38 | 5AA7FC6E46AEF9EC1227A939EADB3351AD495F12 | Vixen |
| 39 | 5C208E2ABF6083135CA52776A02D87442F215D60 | Tushy |
| 40 | 5F25F5C8970A1123950D8543F0C954308ECC9D12 | Tushy |
| 41 | 6503CB2EAECE7FA2F1D71B98E41D6D845BF7B794 | Vixen |
| 42 | 6960957E412263AA671D4F7A15737527D71A7C08 | Tushy |
| 43 | 69AC2D8751ABF0FED5C443A1CE77A7C7529B7AC9 | Vixen |
| 44 | 6A53ECB874B094837053EB7B7142560F0A85A9C2 | Vixen |
| 45 | 6B9175E9708A1BE765BBDC6582A68A12E44A33E3 | Vixen |
| 46 | 72F519FE9EED3C466979E55CFEBF253309A8106C | Vixen |
| 47 | 74C66B184CB3F25F69326EF0C5529CDB680A8C47 | Vixen |
| 48 | 792198F0F41E1FFA44A67E62F451EC11B9B692EF | Vixen |
| 49 | 7E4981D21DDD4B8D9EB5905B1B8A95461915A160 | Blacked |
| 50 | 82EC6E9F2A9287FD59C2B571FDC0CDED7EDDBB81 | Blacked |
| 51 | 8519F3BB18D38EB8472CD07987B1BC2224E7EC22 | Vixen |
| 52 | 88D30B83D9E749F514380A5F2E9C3E876CF55431 | Tushy |
| 53 | 8D906EA439B8BF052A8D68240F71C6D9ACE1E17A | Vixen |
| 54 | 8F55C47AC0C8FED6F30E2C094965B3CF4749FA41 | Vixen |
| 55 | 921AED6337A58B159CFAF9DADDFE2D91CDFF8AB3 | Tushy |
| 56 | 94E00EDACF46F8763B4B28A29BEB83473AC2BA8E | Blacked |
| 57 | 9B5E94F7A0C627798E8020DFAA9A28609D1AB82A | Tushy |
| 58 | 9C80B087C925D30BA01F72FC0EAABD8EAADF588A | Blacked |
| 59 | 9D5513F0563852D9FB73EDC7D6318A6BB04334D9 | Tushy |
| 60 | 9E77DF7FCCB30D04DC6500C39CC3EF0AA2B48257 | Blacked |
| 61 | ABC004062B9F9CF37E9A3A57F4BEA161154EECAE | Vixen |

| 62 | ABDFB02F5D20E29C32ABCE90A8478787DDA3C11D | Tushy |
|----|------------------------------------------|-------|
| 63 | AE6A89DD0FB4978EAC561028F9FB06AA0A8D7E6A | Tushy |
| 64 | AFA4C44023577E2A90E1CFA8DB69A6F5D035B1D2 | Blacked |
| 65 | B2EC2056C7699F25A118F23E36BB74FC7D3B7131 | Vixen |
| 66 | B80F62F292E7B77184DC0BCF80ECE23CF7B23D15 | Tushy |
| 67 | BA56E328AE2DBA8A20B327451656293E37FDAE35 | Blacked |
| 68 | C496C2BFE4C6D994F43DC665F2CBEE16FE85777A | Tushy |
| 69 | C59734C1DC4D87F563ABE2D6E371C12FD12FC7D9 | Blacked |
| 70 | C6965A70345AC1C86DD34737BF381734CA301655 | Vixen |
| 71 | D2B9C8834073E3BF4B55F7BF45C7EA7BE5903569 | Blacked |
| 72 | DB6040CB19308F376554AC18F5C883139311322D | Blacked |
| 73 | DCE0631B0833B899B8A4C577203A87AD00BD2B8B | Blacked |
| 74 | DCE1E033042DA8E7CFC7CEC42B7D21201BEDFD57 | Tushy |
| 75 | E132114F31A37161B83D12BCE6320B65DE025C9B | Vixen |
| 76 | E1C14843DC58F3CB2CCB7383B242E4EE8D32363B | Tushy |
| 77 | E272AF63D15A4277BF857E93B225717C76F3DA9D | Tushy |
| 78 | E4BB4B0185636612E25A2955F474B4494789F63C | Blacked |
| 79 | E69BB37CE99BE570CC9EB659F45DDEF6E740E3BE | Blacked |
| 80 | E8910563DE2084C48C6A8C5801457339745A09FA | Vixen |
| 81 | EC31FAD9EF2492EACCD767B4A6E207BBF2765F0E | Blacked |
| 82 | F1132ADEB75DD2EA99B249DD70902C74E9DA7884 | Tushy |
| 83 | F28E401CBB99CFB32E0808B7662BC50A9C5F64AD | Blacked |
| 84 | F8A92532C263D3E3497FF27A3FE569FF7BF15E37 | Blacked |
| 85 | F8FEB2EE6C17B37610C5B2AE85F0266CB0C5C5BD | Blacked |
| 86 | FF7A5EE06C927438A3CAABC69D774D9CEACA8B9F | Tushy |
| 87 | FFD7D4C0A301487B3A11CBF1B3FC16410D42AEA0 | Vixen |

PCAP – Packet Capture Data (raw data files from the film). Within each movie is at least 16 KB of raw movie data stored in a PCAP. Each raw movie data file has an associated ".torrent" file that is unique to each hash.

    i)      .torrent files – A relatively small file that linked to a "torrent site".

    ii)    Movie Name – The title of the movie as recorded at the Copyright Office

    iii)    Infringed File Name.  – The file name

    iv)    Actual Movie Title

    v)    The terms "Backed", "Tushy", "Vixen"

1

2

3      1.      On-site inspection of electronic media.

4      Computers will be first inspected by the Defendant's technician according to the

5   PHASE 1 review below.  To minimize cost, inspection will be done by a computer technician.

6      2.      Search methodology.

7      The computers and other media will be searched according to Defendant's PHASE I

8   and PHASE II procedures below.

9      3.      Format.

10     The format produced will be a native file format  that will probably then be reproduced

11  in a PDF format in readable form.  Evidence will be kept in native and

12     4.      De-duplication.   The parties may de-duplicate their ESI production across

13  custodial and non-custodial data sources after disclosure to the requesting party.

14     5.      Metadata fields. If the requesting party seeks metadata, the parties agree that

15  only the following metadata fields need be produced: document type; custodian and duplicate

16  custodians; author/from; recipient/to, cc and bcc; title/subject; file name and size; original file

17  path; date and time created, sent, modified and/or received; and hash value.

18

19

20  DEFENDANT'S PHASE 1 REVIEW – COMPUTER AND MEDA CULLING

21     6.      For computers that have a hard drive, the computers will be "booted" and the

22  Defendant's technician will use an accepted forensic tool, such as X-RAYS "WinHex" to inspect

23  the drives. (Cost approx. $ 500.00)  A computer technician (est cost $ 40.00 per hour) will do a

24  pattern match on each of the five (5) search strings provided by the Plaintiff for the computer

25  hard drive(s.) to Defendant's technician.  The date and time of the analysis will be recorded. If a

26

27

match is found, then Defendant technician will identify the match and isolate that computer for PHASE 2 REVIEW.

7.      If there is an external hard drive or other media, then the hard drive will be installed so that it can be read by the forensic tool.

8.      To limit burden and costs, this PHASE 1 REVIEW will be performed by someone with the skill of a computer technician hired by the Defendant.

9.      It is estimated that PHASE I will take 40 hours (approx. 20-30 minutes per computer).

10.     If a computer is inoperable or a hard drive does not work, then this will be noted.


DEFENDANT'S PHASE 2 REVIEW – LIKELY COMPUTER SOURCES

11.     The isolated drives identified in the PHASE 1 REVIEW will be available for a Plaintiff's computer expert who will do a further review according to the following protocol at Defendant's counsel's office in Hillsboro, Oregon or in Seattle, Washington.  The further review will allow the expert to search for an additional ten (10) "Search Strings" that are from the following data sources:

          a.      Hash Hex Identifier Listed Above;

          b.      16 KB Raw Data Block from a PCAP;

          c.      Infringed Movie Title; and/or

          d.      Actual Movie Title.

          e.      Identification of the particular torrent client  identified by Plaintiff's IPP monitoring software.

1

2      **F.      Discovery Disputes**

3              In the event there are discovery disputes, counsel will meet informally in good faith

4      basis to try and stipulate to issues.  Absent resolution, the parties will ask for an informal

5      conference with a discovery magistrate to resolve any issues.

6

7              DATED: _____

8              Plaintiff's Counsel                          Defendant's Counsel

9

10             By _____          By _____

11     **ORDER**

12

13             Based on the foregoing, IT IS SO ORDERED.

14             DATED: _____

15

16     _____

17     The Honorable _____

18     UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

# — EXHIBIT  2 —

## Adrienne McEntee

**From:** Adrienne McEntee
**Sent:** Friday, March 29, 2019 4:45 PM
**To:** 'Bandlow, Lincoln D.'; Case, Bryan J.; J. Curtis Edmondson
**Subject:** RE: Strike 3 v. Doe - Model ESI Agreement

Lincoln,

Thank you for the call today. We understand that you are going to think about the ESI protocol a bit more and get back with us on Monday.

Also, we would like to schedule all expert depositions the week of April 22nd. We believe we can meet the court's deadlines if we conduct the depositions via Skype.

Finally, this email confirms that you will identify the Rule 30(b)(6) witness(es) next week as well. Please also provide any objections to the notice by April 5th.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Sent:** Tuesday, March 26, 2019 7:50 PM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; Case, Bryan J. <bcase@foxrothschild.com>; J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** RE: Strike 3 v. Doe - Model ESI Agreement


Bryan is unavailable but I can do the call.  I have a deposition the first half of the day, so Friday at 4:00 p.m.?

**Lincoln Bandlow**
Partner
**Fox Rothschild LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
(310) 228-2913 - direct
(310) 556-9828- fax
lbandlow@foxrothschild.com
www.foxrothschild.com


**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Tuesday, March 26, 2019 3:11 PM
**To:** Case, Bryan J. <bcase@foxrothschild.com>; J. Curtis Edmondson <jcedmondson@edmolaw.com>

**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Subject:** [EXT] RE: Strike 3 v. Doe - Model ESI Agreement

Bryan, Curt and I would like to meet and confer with you regarding the revisions to our proposed ESI order. Are you available on Friday?

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

---

**From:** Case, Bryan J. <bcase@foxrothschild.com>
**Sent:** Monday, March 25, 2019 4:27 PM
**To:** J. Curtis Edmondson <jcedmondson@edmolaw.com>; Case, Bryan J. <bcase@foxrothschild.com>; Adrienne McEntee <amcentee@terrellmarshall.com>
**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Subject:** RE: Strike 3 v. Doe - Model ESI Agreement


Curt,

In an effort to work cooperatively, attached are Strike 3's edits to the ESI agreement you sent on Friday.    Please let us know if you have any changes or disagreements with the attached.   If so, counsel should schedule a discovery conference to discuss.

Regards,

Bryan

**Bryan Case**
Partner
**Fox Rothschild LLP**
Direct: (206) 389-1643
Cell: (425) 890-5112

---

**From:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Sent:** Friday, March 22, 2019 5:53 AM
**To:** Case, Bryan J. <bcase@foxrothschild.com>; Adrienne McEntee <amcentee@terrellmarshall.com>
**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>; jcedmondson@edmolaw.com
**Subject:** [EXT] Re: Strike 3 v. Doe - Model ESI Agreement
**Importance:** High


Bryan and Lincoln,

Attached is our proposed ESI protective order. When this case started, I proposed that we discuss ESI and there was not much of a response from your side.  Now that we are down to the wire, I have put together a reasonable protocol in view of your remaining claims (of which there are none) and your affirmative defenses (of which there are a few). I have already spent a significant amount of time collecting and organizing these computers.

The number of computers being produced is a result of your overly broad discovery requests, which are cut/paste from the discovery requests that Malibu Media would send out from the Lipscomb law firm.  These discovery requests were designed by the Lipscomb firm to increase the litigation costs  to the defendant and force a settlement.

I have crafted a cost effective ESI order where Defendant will bear the initial cost of inspecting computers.  The majority of these computers were bought from Goodwill and eBay and may still have the prior owners data on them.

Please let me know if my ESI order is acceptable.  Your ESI order will not work as it is overly broad, imposes large unnecessary costs, and is disproportionate to what is needed to prove your affirmative defenses.

B. Regards,

J. Curtis Edmondson, Patent Attorney | Edmondson IP Law
USPTO 57027 | CA SBN 236105 | WA SBN 43795 | DC BAR NO 998407 | CA PE 13377| WA PE 43728
Venture Commerce Center, 3699 NE John Olsen Ave, Hillsboro OR 97124
ph: (503) 336-3749 | fax: (503) 482-7418
jcedmondson@edmolaw.com | www.edmolaw.com

Edmondson IP Law

On March 22, 2019 at 12:28 AM "J. Curtis Edmondson" <jcedmondson@edmolaw.com> wrote:

Bryan,

I am reviewing your proposed edits model ESI agreement.  I have taken the model ESI agreement and tailored it to this computer/ hard drive issue.  I should have our draftt to you by tomorrow.

In Best Regards,

J. Curtis Edmondson, Patent Attorney | Edmondson IP Law
USPTO 57027 | CA SBN 236105 | WA SBN 43795 | DC BAR NO 998407 | CA PE 13377| WA PE 43728
Venture Commerce Center, 3699 NE John Olsen Ave, Hillsboro OR 97124
ph: (503) 336-3749 | fax: (503) 482-7418
jcedmondson@edmolaw.com | www.edmolaw.com

Edmondson IP Law

On March 21, 2019 at 8:40 PM "Case, Bryan J." <bcase@foxrothschild.com> wrote:


Adrienne and Curt,


Attached please find our edits to the model ESI agreement.   Please let us know if you have any changes ASAP so we can move forward with discovery without further delay, in particular inspection of Defendant's computer devices you've disclosed.

Bryan

**Bryan Case**
Partner
**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
Direct: (206) 389-1643
Cell: (425) 890-5112

Fax: (206) 389-1708
bcase@foxrothschild.com
www.foxrothschild.com

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

— **EXHIBIT 3** —

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


STRIKE 3 HOLDINGS, LLC, a Delaware )
corporation,                       )
                                   )
            Plaintiff,             )
                                   ) Case No.
       vs.                         ) 2:17-cv-01731-TSZ
                                   )
JOHN DOE, subscriber assigned IP   )
address 73.225.38.130,             )
                                   )
            Defendant.             )


VIDEOTAPED DEPOSITION OF ███████████

April 9, 2019

10:01 a.m.

Seattle, Washington


Reported by:
Mark Hovila, CCR, CM
CCR No. 2599
Job No. 790669

April 09, 2019

```
 1                        EXAMINATION

 2    BY MR. BANDLOW:

 3        Q.   _____, what is your middle name?

 4        A.   _____

 5        Q.   It is not _____?

 6        A.   No.

 7        Q.   Is your son's middle name _____?

 8        A.   No.

 9        Q.   Your middle name is not _____?

10        A.   No.

11        Q.   Is your son's middle name _____?

12        A.   No.

13        Q.   What is your son's middle name?

14        A.   _____

15        Q.   His middle name is ____?

16        A.   Yes.

17        Q.   Have you ever had your deposition taken

18    before?

19        A.   No.

20        Q.   Have you ever given testimony in a court of

21    law before?

22        A.   Yes.

23        Q.   Is that in your capacity in law enforcement?

24        A.   Yes.

25        Q.   Have you ever given testimony about Internet
```

April 09, 2019

1        A.    Losartin, potassium, hydrochlorothiazide,

2    verapamil, and paroxetine HCL.

3        Q.    How is it you think that might affect your

4    ability to give your best testimony today?

5        A.    I'm just taking those medications.

6        Q.    Okay.  If you feel any reason you need to

7    take a break or gather yourself, that's fine, just let

8    me know.  What is your date of birth?

9        A.    ██████████████ 1944.

10       Q.    What's your current home address?

11       A.    ████████████████████████████████████

12   ██████████████████.

13       Q.    How long have you lived at that address?

14       A.    Since 1977.

15       Q.    And you've actually lived at that one

16   address from '77 to the present?

17       A.    Built the house and have lived in it ever

18   since.

19       Q.    Have you or your son -- well, strike that.

20   Has your son ever lived at ████████████████████████████

21   ████████████?

22       A.    No.

23       Q.    Has your son ever lived at ████████████████

24   ████████████████████?

25       A.    I don't know.

April 09, 2019

1      Q.   Has your son ever lived in Portland?

2      A.   No.

3      Q.   Okay.  Has your son ever lived at ██████

██████████████████████████?

5      A.   Yes.

6      Q.   When did he live at that address?

7      A.   I don't know the address, I know -- well,

8   I'm not sure.

9      Q.   Does your son live with you now?

10     A.   On and off, yes.

11     Q.   Is there any other address you know your son

12   to live in now?  Because you said on and off.

13     A.   When he leaves home, I don't know.  Can I --

14          MS. McENTEE:  Did you have more to add to

15   that answer?

16     A.   Well, I know that he's stayed at my

17   daughter's.

18   BY MR. BANDLOW:

19     Q.   He also sometimes stays at your daughter's

20   house?

21     A.   Yes.

22     Q.   And you own your present home, correct?

23     A.   Yes.

24     Q.   From August of 2016 through December of

25   2017, who lived in your home?

April 09, 2019

1      A.   My wife and I, my son off and on.

2      Q.   No one else?

3      A.   Yes.  My brother-in-law.

4      Q.   Anybody else?

5      A.   Not -- not lived, no.

6      Q.   Okay.  Obviously you've had visitors at your

7   house.

8      A.   Lots of visitors, yes.

9      Q.   And just for reference, what is your wife's

10   first name?

11      A.   ███████.

12      Q.   ███████.  Okay.  And your daughter's first

13   name?

14      A.   ████████

15      Q.   ████████   And the brother-in-law's first

16   name?

17      A.   ██████

18      Q.   █████.  Okay.  Do you currently have an email

19   address?

20      A.   Yes, I do.

21      Q.   What is that email address?

22      A.   ████████████████████

23      Q.   Is that the only email address you currently

24   have?

25      A.   No.

April 09, 2019

1    Q.   What others do you have?

2    A.   ██████████████████████████████████████

███████████████████.  And you want the --

4    Q.   Is there any others?

5    A.   Yes.

6    Q.   What else?

7    A.   It's ████████████████████

8    Q.   Okay.  Any others?

9    A.   No.

10   Q.   How long have you had the

11   ████████████████████ email address?

12   A.   Since Comcast bought the previous AT&T out.

13   Q.   Do you know when that was?

14   A.   No.

15   Q.   Okay.

16   A.   Long time ago.

17   Q.   How long have you had the ██████████ address?

18   A.   I would guess 15 years.

19   Q.   And how long have you the Gmail address?

20   A.   Within -- less than a year.

21   Q.   Was there a reason you set up the additional

22   ████████████████ email?

23   A.   Yes it's an email that I use on my cell

24   phone.

25   Q.   Was there a particular reason you set up the

April 09, 2019

1    ████████ email address?

2        A.    Yes.  I used to run an online ███ site.

3        Q.    ███, the fish?

4        A.    Fish, yes.

5        Q.    What do you mean by run a site?

6        A.    Well, I guess managed the --

7        Q.    Is it a website dedicated to people

8    interested in ███ fish?

9        A.    I don't even know if it was in -- yes.  Yes.

10            MS. McENTEE:  And Lincoln, I don't want to

11   interrupt your flow, but one thing, I'm noticing some

12   of the exchange here that I think ███ is having some

13   trouble hearing you.  He does have hearing problems,

14   so --

15            MR. BANDLOW:  Okay.

16            MS. McENTEE:  I just want you to be aware of

17   that.

18            MR. BANDLOW:  I'll try to speak up.

19       A.    My one hearing aid battery went dead.

20       Q.    Okay.

21       A.    This one, if it goes dead I don't hear

22   anything.

23       Q.    I'll try to keep my volume up for you.  And

24   let me know if you don't hear anything I say.

25       A.    Thank you.

April 09, 2019

1    Q.   Have you ever had an email address

2    ██████████████████?

3    A.   Not -- no.

4    Q.   Do you know if your son ever had that?

5    A.   No, I don't.

6    Q.   Have you ever had an email address

7    ███████████████████?

8    A.   No.

9    Q.   Do you ever know if your son has had that

10   one?

11   A.   No.

12   Q.   Now, have you ever had an email address

13   ██████████████?

14   A.   Not to my recollection.

15   Q.   Okay.  Do you know if your son has ever had

16   that email address?

17   A.   No.

18   Q.   And have you ever had an email address

19   █████████████████████?

20   A.   No.

21   Q.   Do you know if your son's ever had that

22   email address?

23   A.   No.

24   Q.   Do you know your son's email address?

25   A.   I don't.

April 09, 2019

1          Q.    Okay.  Do you know anybody with first

2     initial █ last name ████████?

3          A.    He was -- yes.

4          Q.    Is that a neighbor of yours?

5          A.    Yes.

6          Q.    Is he still with us?

7          A.    No.

8          Q.    No?  Okay.  Do you know someone named ██████

9     ██████?

10         A.    Yes.

11         Q.    Is that a neighbor of yours?

12         A.    Yes.

13         Q.    Okay.  Is she still -- is she down the

14    street or --

15         A.    Yes.

16         Q.    Okay.  Do you have a neighbor named ████████

17    █████?

18         A.    I don't know.

19         Q.    Okay.  What about a neighbor named ████████

20    ████████?

21         A.    I don't.

22         Q.    ███████████████?

23         A.    No.  Don't know.

24         Q.    ███████████████?

25         A.    Don't know.

April 09, 2019

1    Q.  _____?

2    A.  I don't know.

3    Q.  Okay.  _____?

4    A.  I don't know.

5    Q.  All right.  So I'm sorry, your son's middle

6    name is ___, correct?

7    A.  Yes.

8    Q.  Okay.  In July of 1999 was your son charged

9    with driving with a suspended license?

10   A.  No.

11   Q.  In June of 2002 was he charged with driving

12   with a suspended license?

13   A.  No.

14   Q.  Has he ever been charged with driving with a

15   suspended license that you're aware of?

16   A.  No.

17   Q.  I want to -- let me see if -- I didn't bring

18   my pen.  Can I borrow your pen for one moment?  I want

19   to ask you, if you could, to draw a diagram of your

20   house, the rooms in your house.  It's a one-story

21   house?

22   A.  Yes.

23   Q.  Okay.  How many bedrooms?

24   A.  Three.

25   Q.  Okay.  Can you, the best you can, it doesn't

April 09, 2019

1    have to be a Picasso work of art, but just give me a

2    sense of where the rooms are in your house?

3         A.   It's going to be very scratchy.

4         Q.   That's okay.

5         A.   I have tremors.

6         Q.   Okay.  Thank you.  And I appreciate it.

7    I'll give that back to you.  Okay.  So I'm looking at

8    this and I'm going to, I've got some pre-marked

9    exhibits, so I'm going to mark this one as Exhibit 30

10   so I don't -- so I don't -- I'm writing on here

11   Exhibit 30 so I don't mark it, get two duplicates.  So

12   I do see how you've kind of scratched this out here.

13        (Exhibit 30 marked)

14        Q.   On the top left corner, what is that?

15        A.   That's --

16        Q.   Living room?

17        A.   Living room, yeah.

18        Q.   Okay.  Where is the front door in this?

19        A.   That's -- it's FD.

20        Q.   FD is here.  Okay.

21        A.   Yes.

22        Q.   The front door is there?

23        A.   I need to correct that.

24        Q.   Sure.

25        A.   Because I -- this is -- this actually goes

April 09, 2019

1    this way.  And that is -- I don't think that that's

2    going to be --

3        Q.   Okay.

4        A.   This line is out.

5        Q.   Is the door?

6        A.   The door.  No, the door is where it's

7    located.

8        Q.   Where it says FD?

9        A.   That's the entry.

10       Q.   And you go in this front door and there's a

11   front room there?

12       A.   Yes.  There is a half wall and then a step

13   down.

14       Q.   Okay.  And then this thing to the left, is

15   that the garage?

16       A.   The garage.

17       Q.   I'm going to write the word garage just a

18   little more clearly.  Okay.  So that's your garage.

19   This is front --

20       A.   Room.

21       Q.   Room.  And then top left.  That is the

22   living room.  I'm marking that living room.  And

23   then --

24       A.   Kitchen.

25       Q.   That's -- okay, that is the kitchen.

April 09, 2019

1      A.   Actually, I forgot --

2      Q.   That's okay.

3      A.   This -- right there.

4      Q.   That's the kitchen?

5      A.   Yeah.  Like that.

6      Q.   Oh, a little hallway into it?  I see.

7      A.   This is the dining room.

8      Q.   Oh, dining room.  Sorry.  No, no, thank you.

9   So to the right of the living room is the kitchen?

10     A.   Yes.

11     Q.   Then there's a dining room?

12     A.   Yes.

13     Q.   And then you've got two rooms on the top

14   right.  What are those?

15     A.   Bedrooms.

16     Q.   Those are both bedrooms?

17     A.   Yes.

18     Q.   Bedroom and bedroom.

19     A.   Yes.

20     Q.   And down below is that a bigger bedroom?

21     A.   That's the master.

22     Q.   That's the master bedroom.  Master bedroom.

23   You've got -- what is this over kind of to the --

24     A.   That's --

25     Q.   -- right?

April 09, 2019

1          A.    That's the brown bathroom.

2          Q.    Oh, that's -- okay, that's a bathroom.

3    Gotcha.

4          A.    That's what we call it.

5          Q.    Master bathroom, probably?

6          A.    Yeah.   There are other bathrooms.

7          Q.    And that's the basic layout of this house.

8    Thank you.   And when your son is staying with you

9    where does he stay?

10         A.    In the -- it would be the southwest most

11   bedroom.

12         Q.    Okay.   So if we go left to right can we call

13   this bedroom 1 and bedroom 2?

14         A.    Bedroom 2.

15         Q.    Okay.   So bedroom 1, and he would be in

16   bedroom 2.

17         A.    Yes.

18         Q.    Is there anybody that stays in bedroom 1, or

19   is that just a guest room?

20         A.    It's a guest room.

21         Q.    Okay.   And your wife and you stay in the

22   master bedroom?

23         A.    Yes.

24         Q.    Okay.   Do you know, about how far away are

25   each of your neighbors' houses?

April 09, 2019

1    A.   The ████████ house, it's not the ████████
2    anymore, but it's straight across the street.   And the
3    ████████ home are the property -- it's a double property
4    next to the east, across the street and to the east.
5    Q.   Are there houses on the side of your house?
6    A.   No.
7    Q.   There's not a house on either side of your
8    house?
9    A.   Yes, there is.   There's -- we call it the
10   ████████ house.   It's on the west side.   And frankly, I
11   don't know the last name of the people that moved into
12   the house on the east side of our house.
13   Q.   Do you know how far away that house to the
14   side of you is?
15   A.   They're both, I'd say, 30, 40 foot, you
16   know, whatever the property line.
17   Q.   What is the material your house is made of?
18   Wood, brick, cement?
19   A.   Wood.
20   Q.   Wood.   Okay.   Where do you keep your
21   computers in this house?
22   A.   In the living -- front room.   In the front
23   room.
24   Q.   Aside from your attorneys, has anyone else
25   helped you with dealing with this lawsuit?

April 09, 2019

1          Q.    Okay.  So your last job prior to retiring

2     you were -- what was your job prior to retiring?

3          A.    Deputy sheriff.  Sheriff's deputy, I should

4     say.

5          Q.    How long were you a sheriff's deputy?

6          A.    Oh, ten years, maybe.

7          Q.    Where were you a sheriff's deputy?

8          A.    ████   County.

9          Q.    Prior to being a sheriff's deputy what was

10    your employment?

11         A.    I was NC maintenance mechanic for Boeing.

12         Q.    Do you have any kind of employment now?

13         A.    No.

14         Q.    You don't do any form of work from home?

15         A.    No.

16         Q.    Do you currently repair computers?

17         A.    Occasionally.

18         Q.    When did you start doing that?

19         A.    Probably 1998, maybe.

20         Q.    Why did you get into doing that?

21         A.    It was something to bide my time.  I was

22    interested in.

23         Q.    Do you have any business that repairs

24    computers?

25         A.    No.

April 09, 2019

```
 1          Q.   Just a hobby of yours?

 2          A.   Hobby.

 3          Q.   Have you ever been employed by any computer

 4    companies?

 5          A.   No.

 6          Q.   And so from -- so you -- how long ago was it

 7    that you worked on a day-to-day basis?  Let me scratch

 8    that.  When did you retire?

 9          A.   I believe it was 1982 or '3.  I can't

10    remember the exact date.

11          Q.   1982 or 1983?

12          A.   Yeah.

13          Q.   And in the last couple of years you've not

14    had any sort of full-time employment of any kind,

15    correct?

16          A.   No.

17          Q.   All right.  Are you generally around the

18    house, or what are you doing with your day to days,

19    typically?

20          A.   I guess generally around the house.

21          Q.   Okay.

22          A.   I work on a computer every once in a while.

23          Q.   What is -- well, you graduated from high

24    school?

25          A.   Yes.
```

April 09, 2019

1       Q.   What years?

2       A.   I went into the Army.

3       Q.   Oh, okay.  How many years were you in the

4   Army?

5       A.   Three years.

6       Q.   And then after that you started working for

7   Boeing?

8       A.   Yes.

9       Q.   Okay.  And then when did you make a

10  transition from Boeing to being a deputy sheriff?

11      A.   1972.

12      Q.   So were you a sheriff from '72 until '83 or

13  so when you retired?

14      A.   Yes.

15      Q.   As a sheriff did you ever have occasion to

16  work on any kind of cyber crimes or anything of that

17  nature?

18      A.   No.

19      Q.   This is before the Internet when you

20  retired, correct?

21      A.   Yes.

22      Q.   Do you speak any other languages?

23      A.   No.

24      Q.   When did you first begin repairing

25  computers?

April 09, 2019

1        A.    1998 or '99, in that frame.

2        Q.    Was there a reason for you --

3        A.    Just to fix them up and resell them.

4        Q.    And that's something you to this day

5   continue to do?

6        A.    I'm -- well, within the last year or so I

7   just started working on a couple of computers for my

8   niece, to repair them.

9        Q.    This is your niece -- your niece is -- how

10  is your niece related to you?  Is that your sons's --

11  wait, I'm terrible with --

12       A.    My brother's daughter.

13       Q.    Your brother's daughter, okay.  How old is

14  she?

15       A.    Probably 46, 47.

16       Q.    Oh.  Are there any young children in your

17  house in the last few years?

18       A.    By young --

19       Q.    You know, 10 or below, or any children of

20  that age?

21       A.    No.

22       Q.    Any early teen kids in the house in the last

23  few years?

24       A.    Well, they've visited, yes.  The younger and

25  the teens have visited.  My grandson has stayed at the

April 09, 2019

1    home on several days.

2         Q.    Okay.  So let me back up.  So you have a

3    daughter and a son?

4         A.    Yes.

5         Q.    Okay.  Your son ███, does he have any

6    children?

7         A.    No.

8         Q.    Okay.  And your daughter, you were kind of

9    enough to give her name, so let me see.  ███████ has

10   children?

11        A.    Yes.

12        Q.    How old are her children?

13        A.    18 and 20.

14        Q.    Okay, 18 and 20.  All right.  And one of

15   those is the grandson you just mentioned?

16        A.    Yes.

17        Q.    Okay.  So is the grandson the 18-year-old?

18        A.    Yes.

19        Q.    Okay.  And the 20-year-old, is that a

20   granddaughter?

21        A.    Yes.

22        Q.    Okay.  And in the last couple years they've

23   occasionally stayed over at the home?

24        A.    Yes.

25        Q.    All right.  Do you know if they've watched

April 09, 2019

1    movies while they were at the home?

2          A.   No, I don't.

3          Q.   So did you get any kind of training to help

4    you with this processes of refurbishing computers?

5          A.   Not -- not really, no.  No.

6          Q.   How did you go about learning how to do

7    that?

8          A.   Same way I learned how to take apart a car

9    motor and put it back together.  Just --

10         Q.   Tinkering with it?

11         A.   Tinkering.

12         Q.   Do you have a preference for Apple or PC?

13         A.   PC.

14         Q.   PC.  Do you take apart and refurbish Apple

15   computers?

16         A.   I don't take -- well, can -- I had -- the

17   only Apple computers that I've worked on, many years

18   ago I bought six iMacs from Everett Junior College.

19   And those computers had no operating system.  I

20   installed operating systems on them, gave one away and

21   sold the rest.  I'm currently working on a MacBook Pro

22   for my niece and her husband.  And about two, two and

23   a half weeks ago I fixed another one of their MacBook

24   Pros to just get it up and running.

25         Q.   Okay.  Have you purchased any software

April 09, 2019

1    licenses in the past year or two?

2         A.   Yes.

3         Q.   What software licenses have you purchased

4    that you can recall as you sit here today?

5         A.   Windows 7, Windows 8, Windows 10, Avast

6    Antivirus.  Bought that for one year.  And I think it

7    was either Malwarebytes or SUPERAntiSpyware.

8         Q.   In the past year how many computers have you

9    purchased?

10        A.   In the past year?  I don't know, I'd say 20

11   to 30.  I haven't really kept a record of it.

12        Q.   In the past year how many computers have you

13   sold?

14        A.   Probably eight or 10.

15        Q.   How many have you given away?  You mentioned

16   earlier you gave some away.

17        A.   I've given away probably 120.

18        Q.   Over the lifetime of your doing computers?

19        A.   Yes.

20        Q.   In the past year do you know how many you've

21   given away?

22        A.   Four, I believe.

23        Q.   Is there a particular time of day you're

24   more likely to work on repairing computers?

25        A.   Evening.

April 09, 2019

```
 1    the bills?  Does it say ████?  What does it say?
 2         A.   I don't know.
 3         Q.   But it's in your name.  Are you the one who
 4    pays for the Comcast bill?
 5         A.   Yes.
 6         Q.   Okay.  Do you separately pay for cable
 7    television?
 8         A.   No.  It's a single package.
 9         Q.   Okay.  So Comcast provides your cable and
10    your Internet?
11         A.   And phone.
12         Q.   And are you still with Comcast?
13         A.   Yes.
14         Q.   Okay.  So between August of 2016 and
15    December of 2017, during periods of that time your son
16    lived at the house, correct?
17         A.   Yes.
18         Q.   Did anybody else in that period of time live
19    at the house?  Obviously besides you and your wife.
20         A.   Yes.  I'm trying to -- I can't remember when
21    he moved in, but my brother-in-law ██, he lived with
22    us for about three and a half years.
23         Q.   You have a sister --
24         A.   Wife's --
25         Q.   Oh, your wife's --
```

April 09, 2019

1          A.    Brother.

2          Q.    Brother.   Okay.   So give me the time frame

3    of when he lived in the house.

4          A.    They moved -- from, I believe it was maybe

5    November of last year for about three and a half years

6    before that.

7          Q.    Oh, okay.   So 2014 or '15 he may have moved

8    in and lived all the way through November of 2018?

9          A.    Yeah, maybe.

10         Q.    Okay.

11         A.    Latter part of maybe '14, I guess.   Or '15.

12         Q.    When he moved in where did he live?   What

13   room did he live in?

14         A.    The guest bedroom.

15         Q.    So bedroom number 1 on your chart?

16         A.    Yes.

17         Q.    And then during that time bedroom number 2

18   your son was in?

19         A.    Yes, when he was here.

20         Q.    Okay.   And his name, you said, was ███

21   ████████?

22         A.    Yes.

23         Q.    Do you know where he works?

24         A.    No, he -- he's a commercial plumber.

25   Seattle, I think.

April 09, 2019

1     Q.   Do you know what company he works for?

2     A.   Whoever they -- the union assigns him to

3 work with.  I have no idea who that might be.

4     Q.   How old is ███████?

5     A.   Sixty -- I'd say 63 or '4.

6     Q.   Have you ever talked to him about this

7 lawsuit?

8     A.   No.

9     Q.   And other than Federal Way, do you have any

10 other address information for him?

11     A.   No.  I don't know it.

12     Q.   Does he have a middle name?

13     A.   I don't know.  I'm sure -- I don't know.

14     Q.   Did he have -- during the time he lived in

15 the house did he have a computer in his room?

16     A.   No.

17     Q.   Did he have a laptop or any kind of

18 computer?

19     A.   Let me expand -- he had a netbook that his

20 son gave him for about the last six months that he

21 lived in there.  And that computer, or that laptop, or

22 netbook, was never -- was not operable.

23     Q.   How do you know it was not operable?

24     A.   I looked at it I wound up fixing it up when

25 he left.

April 09, 2019

1      Q.   Did ████████ have access to other

2  computers that were in the home?

3      A.   Yes.

4      Q.   Okay.  What computers did he have access to?

5      A.   My desktop.

6      Q.   Where was your desktop located?

7      A.   In the front room.

8      Q.   Okay.  So was there a desk and sort of a

9  computer setup in the front room?

10     A.   Yes.

11     Q.   And that desktop computer could search the

12  Internet, could get access to the Internet?

13     A.   Yes.

14     Q.   Okay.  What is the -- is there an

15  identifying number for that computer?

16     A.   Not that I'm aware of.

17     Q.   Do you know if that computer's been produced

18  in connection with this case?  Was that given to your

19  attorneys for production in this case?

20     A.   Yes.

21     Q.   It was.  Were there any other computers that

22  ██████████ had access to while he was staying there?

23     A.   No.

24     Q.   Your son, does he have a computer in his

25  room?

April 09, 2019

1        A.    Yes.

2        Q.    What kind of computer is that?

3        A.    A generic.

4        Q.    Is it a PC?

5        A.    Yeah, it's a PC.

6        Q.    Does it have access to the Internet?

7        A.    Yes.

8        Q.    Does he still have that in his room?

9        A.    No.

10       Q.    When --

11       A.    We'll, he has a different computer,

12  basically.

13       Q.    Okay.  So let me back up.

14       A.    Okay.

15       Q.    From the period of August 2016 through

16  December 2017, did your son have a computer in his

17  room?

18       A.    There was a computer in his room, yes.

19       Q.    And was that a desktop?

20       A.    Yes.

21       Q.    And it was a PC?

22       A.    A PC.

23       Q.    And it had access to the Internet?

24       A.    Yes.

25       Q.    Okay.  And does that computer still exist?

April 09, 2019

```
1        Q.   So he plays World of Warcraft, right?

2        A.   Yes.

3        Q.   Are there any other games that you know that

4   he plays?

5        A.   I don't know the names of them.  But he

6   plays other ones, and I don't know the names of them.

7   There are -- well, I don't know if it will name them,

8   but he will have -- I mean, there will be records of

9   when they purchased.  Go online to Steam or something

10  like that and every once in a while they'll have a

11  special on different games and --

12       Q.   How do you know about Steam?

13       A.   He has -- I have -- he only has basically

14  two friends in the world.  One of them lives here in

15  West Seattle and the other one lives in Minnesota,

16  moved to Minnesota.  The main time that he is able to

17  play games with them is in the late evening through

18  the morning hours.  And when they play games, you

19  know, if --  ███  is the gentleman from Minnesota.

20  They talk and they'll say, hey, there's a cool game or

21  something that's cheap, and he'll want to buy that

22  game so they can play.

23       Q.   So you've helped him buy games on Steam

24  sometimes?

25       A.   Well, I -- yes, I have --
```

April 09, 2019

1       Q.   Do you know ███ last name, the friend in

2    Minnesota, by any chance?

3       A.   I know it.  And I can see it, but I can't

4    say it.

5       Q.   What about -- you said he had another friend

6    in West Seattle.  Do you know that person's name?

7       A.   ████████.

8       Q.   ████████.

9       A.   Yes.

10       Q.   Do you have any other contact information

11    for ████████?

12       A.   No.

13       Q.   How do you know he's in West Seattle?

14       A.   That's where he bought a home.

15       Q.   How do you know he bought a home there?

16       A.   I took my son to the home for visits

17    every -- occasionally.

18       Q.   Do you know the address?

19       A.   No.  I don't know.  The farther away from

20    Seattle I am, the better.

21       Q.   Okay.

22       A.   My son hears from ████████ maybe once

23    every month and a half or two.

24       Q.   Does your son watch movies on his computer?

25    Ever see him watching movies?

April 09, 2019

```
 1   issue with it and that he should start turning it off

 2   at night.

 3        Q.   Okay.  Have you ever received a copyright

 4   alert notice from comcast?

 5        A.   Not that -- other than that one time many

 6   years ago that, I guess that alert notice, I don't

 7   recall having received one.

 8        Q.   Where am I at here?  Let's look at Exhibit 5

 9   for right now.  We'll go back to 4 in a second.

10             (Exhibit 5 marked)

11        Q.   Exhibit 5, some kind of email from Shop

12   Goodwill.  And that's to you, to ████████, correct?

13        A.   Yes.

14        Q.   And it's April 29th, 2016, correct?

15        A.   Yes.

16        Q.   And it looks like you were successful bidder

17   on a computer, correct?

18        A.   Yes.  Yes.

19        Q.   This HP Pavilion Slimline?

20        A.   Mm-hmm.

21        Q.   All right.  So you purchased that off of --

22   from Shop Goodwill?

23        A.   Yes.

24        Q.   Do you know what happened to that computer?

25        A.   That Slimline?  It was -- it could be one of
```

1        the ones that I have not sold.  Or got rid of.

2            Q.   Do you think it's one you still have in your

3        possession?

4            A.   I don't know, without -- I have a lot of

5        computers in my possession.

6            Q.   Okay.

7            A.   A lot of computers that were bought from

8        Shop Goodwill.

9            Q.   All right.  Let me mark this one next in

10       order.  Or actually, Exhibit 4, since I didn't mark

11       one yet.

12               (Exhibit 4 marked)

13           Q.   Exhibit 4 is a document that was prepared, I

14       believe, by your counsel talking about the production

15       of various computers and with devices, et cetera, in

16       this matter.  And if you look at the second page of

17       that, it lists, it begins to list a number of

18       computers, laptops, various other things.

19           A.   Okay.

20           Q.   Do you see on this list a computer that you

21       would believe is this computer identified in Exhibit

22       5?

23           A.   I don't -- I don't know without -- S5-1204?

24       I don't see it on here.

25           Q.   Okay.  Does that help refresh your

April 09, 2019

```
 1        Q.   Okay.  And I appreciate your trying to

 2   clarify, but I just now I need to kind of backtrack.

 3        A.   Okay.

 4        Q.   So from August 12th, 2016, through December

 5   9th, 2017 --

 6        A.   Okay.

 7        Q.   -- in that period of time, was there a

 8   computer that you used?

 9        A.   Yes.

10        Q.   Which computer was that?

11        A.   That was an ASUS computer.  If it's on the

12   list here, I think, where is --

13             MS. McENTEE:  You're looking for Exhibit 4.

14   BY MR. BANDLOW:

15        Q.   If you look at 4, it looks like --

16        A.   4.

17        Q.   Are you referring to Bates number 10029 of

18   that?  It's the first page of that.  No, no, no.  I'm

19   talking about -- look at the second page of that

20   document.

21        A.   Okay.

22        Q.   And then these computers starting on left,

23   they're numbered.  And there's one that says 10029

24   towards the bottom.  That says ASUS.  Is it that one?

25   Is that the one you're talking about?
```

April 09, 2019

1    exhibit consists of.  And I want to ask you some

2    questions about some of the documents that are in

3    there.  We can kind of go through it page by page.

4    This first page on there, it says to Comcast or the

5    U.S. District Court of the Western District of

6    Washington.  Can you tell me what this was?

7        A.   This appears to be a letter that I had --

8    that I drafted in -- when I was considering trying to

9    defend myself.

10       Q.   Okay.  Do you know if you ever actually sent

11   this to Comcast or the District Court?

12       A.   I wouldn't -- I can't remember whether I did

13   or not.

14       Q.   Okay.  In point number 4 on that page you

15   say:  "We have had six people living/staying at our

16   home over the past year who have had access to the

17   Internet by using our PC or their own laptops."  Who

18   are the six people in your mind when you wrote there?

19       A.   My granddaughter, my grandson, ████████,

20   my brother and his wife,

21       Q.   Is that ██ and ████████████?

22       A.   ██ and █████.  And my brother-in-law and

23   his wife, that was █████████ and -- ███ and █████

24   █████.  ████ is deceased.  He just passed away just

25   recently.

April 09, 2019

1        Q.   Okay.  Okay.  And that's the exhausting of
2    the six people had you in mind when you wrote this?
3        A.   Yes.  That's -- now, I'm just saying that
4    there have been other people, though they've been the
5    only ones that have spent any, you know, more than a
6    day or two.
7        Q.   All right.  And then on point 8 you say:  "I
8    recent contacted Comcast for problem with our Internet
9    connection and found that they had a computer listed
10   as being connected to our modem that did not exist in
11   our home."  What is the basis for your saying that?
12       A.   I was just looking at -- went to my account,
13   online account, and they had a computer hooked up on
14   the line that I could not account for.
15       Q.   What was the name of that computer?
16       A.   I have no idea right now.  I should have
17   listed it, I imagine, but I don't remember.
18       Q.   Did you take a photograph or have any
19   documents that would support this contention in number
20   8?
21       A.   No, I don't.
22       Q.   All right.  Then turning to the next page,
23   "Letter to who it may concern," did you write this as
24   well?
25       A.   Yes.

April 09, 2019

```
 1          Q.   So that's all of those.  Have you ever
 2   watched X-rated adult or pornographic movies or live
 3   feeds?
 4          A.   No.
 5          Q.   Have you ever been made aware that your son
 6   watches them?
 7          A.   No.
 8          Q.   And you had never heard of Strike 3 prior to
 9   this lawsuit?
10          A.   Never, no.
11          Q.   Have you ever downloaded any movies or
12   television shows?
13          A.   Not myself, no, I don't.  I've never.
14          Q.   Do you know of anybody in the household
15   that's done it?
16          A.   No.
17          Q.   Since you were made aware of this lawsuit,
18   have you -- I'm going to break this down.  Have you
19   given away computers that were in your possession at
20   the time you were made aware of this?
21          A.   Yes.
22          Q.   How many have you given away?
23          A.   Five or six.
24          Q.   Have you sold some?
25          A.   Yes.
```

April 09, 2019

1    law enforcement denied wrongdoing, didn't they?

2         A.   Oh, yes.

3         Q.   And you always looked for information to

4    verify their denial of that wrongdoing, didn't you?

5         A.   Yes.

6         Q.   Okay.  Now, as part of the discovery you

7    produced over 100 computer devices, routers or hard

8    drives, right?  Is that correct?

9         A.   Yeah, devices, yes.

10        Q.   Okay.  And I guess your counsel said earlier

11   you've found some additional ones, so that document

12   needs to be updated, right?

13        A.   Yes.  Yes.

14        Q.   All right.  But the computer you used in

15   your day to day was the one in the front room.

16   Correct?

17        A.   Yes, it was.

18        Q.   Okay.

19        A.   That I provided to my attorney.

20        Q.   And that computer is on this list?

21        A.   I believe so, yes.

22        Q.   Can you find 4 in there for me, if you

23   would?

24             MS. McENTEE:  We've already had this

25   testimony, but we can revisit it if you like.

April 09, 2019

```
 1   UNITED STATES DISTRICT COURT              )
                                               )
 2   FOR THE WESTERN DISTRICT OF WASHINGTON    )

 3            I, Mark Hovila, CCR No. 2599, Certified

 4   Court Reporter, certify:

 5            That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8            That the testimony of the witness, the

 9   questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13            That a review of the transcript by the

14   deponent was requested;

15            That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17            I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20            I declare under penalty of perjury under the

21   laws of Washington that the foregoing is true and

22   correct.

23            Dated this 19th day of April 2019.

24

25            _____
              Mark Hovila, CCR No. 2599, CM
```