# EXHIBIT "A"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>                    Defendant. | Case No.: 2:17-cv-01731-TSZ<br><br>**[PROPOSED] ESI PROTOCOL FOR PRODUCTION OF DEFENDANT'S COMPUTER HARD DRIVES** |

16
17
18
19
20
21
22
23
24
25
26
27
28

        1.      Plaintiff, Strike 3 Holdings, LLC ("Plaintiff"), has requested that Defendant produce for inspection all of Defendant's computer device hard drives[1] in his possession, custody, or control which were at his residence during the time of infringement.  Defendant will produce forensically sound images of the following hard drives ("Hard Drives") to Plaintiff for inspection subject to the entry of this stipulated protective order.

        a.      Seagate Model Number ST3750528AS; serial number 9VP05TWX; and

---

[1] For the avoidance of doubt, "Hard Drives" means any computer device, including any computer laptop or desktop, mobile phone, external hard drive, portable hard drive, server, NAS (Network-Attached Storage), USB (thumb) drive, internal hard drives which may have been removed from their original device, solid state hard drives, contents of a cloud based storage account, or any other electronic device capable of connecting to the internet, downloading media files, or storing electronic data, used by, or within Defendant's possession, custody or control at his Residence during the period of infringement.

PLAINTIFF'S PROPOSED ESI PROTOCOL
FOR PRODUCTION OF DEFENDANT'S
COMPUTER HARD DRIVES
(Case No.: 2:17-cv-01731-TSZ)

b.   Asus Model Number CG5270-BP003; Serial Number PF1G95B15000014 or 95PDAG039530.

2.      In conducting an examination of Defendant's Hard Drives, Plaintiff may only search for evidence of: (1) Plaintiff's copyrighted Works identified on Plaintiff's Amended Complaint in this case; (2) BitTorrent and Peer-to-Peer file sharing; and (3) sophisticated wiping efforts, spoliation, and the suppression of evidence.  The foregoing parameters are explained in detail in Paragraph 7 of this Protective Order.

3.      Plaintiff, Defendant, and their respective counsel are automatically bound by this Protective Order.  Prior to receiving any of Defendant's Hard Drives, or forensically-sound images of same, each qualified person defined in sections (a) - (d) below shall be provided with a copy of this Order and shall execute and be bound by this Order by signing the agreement attached hereto as Exhibit A, an original of which shall be maintained by Plaintiff's counsel.  As soon as signed, the signed copy will be provided to Defendant's counsel.  "Qualified persons" are defined as:

a.   experts or consultants (together with their clerical staff) retained by such counsel to assist in the prosecution, defense, or settlement of this action;

b.   employees of attorney services or professional copy services retained by a counsel of one of the parties;

c.   court reporter(s) employed in this action; and

d.   any other person as to whom the parties in writing agree.

4.      Plaintiff will engage the services of a local computer professional ("Computer Professional") to create a forensically sound images of Defendant's Hard Drives.  Plaintiff will be solely responsible for the cost and fee associated with retention of this Computer Professional.

5.      The Computer Professional will produce a forensically sound image of each Hard Drive using industry-standard software and procedures.  After completion of the imaging,

PLAINTIFF'S PROPOSED ESI PROTOCOL
FOR PRODUCTION OF DEFENDANT'S
COMPUTER HARD DRIVES
(Case No.: 2:17-cv-01731-TSZ)

the Computer Professional will send the Defendant's hard drive images to Plaintiff's computer forensic expert.

6.     Prior to receiving any of Defendant's Hard Drives, Plaintiff's computer forensic expert shall be provided with a copy of this Order and shall execute and be bound by this Order by signing the agreement attached hereto as Exhibit A.

7.     Plaintiff's forensic expert is permitted to search the imaged hard drives for evidence of: (1) Plaintiff's Copyrighted Works identified on Plaintiff's Amended Complaint in this case; (2) BitTorrent clients and Peer-to-Peer file sharing software; and (3) wiping efforts, spoliation, and the suppression of evidence.  Plaintiff's forensic expert is only permitted to search Defendant's imaged Hard Drives for these three categories, as specified in paragraphs (a) – (c) below.

   a.   Plaintiff's Works: Plaintiff's computer forensic expert is permitted to search for: (1) the title, and any variation thereof, of Plaintiff's Works identified on Plaintiff's Amended Complaint in this case; (2) the term "Tushy;" (3) the term "Blacked;" (4) the term "Vixen;" and (3) the term "Blacked Raw."

   b.   BitTorrent or Peer-to-Peer File Sharing Use: Plaintiff's forensic expert is permitted to search for: (1) the term "torrent"; and (2) the presence or prior existence of a BitTorrent Client or Peer-to-Peer file sharing software (i.e., torrent clients, torrent trackers, torrent bookmarks, torrent files, torrent file fragments, torrent related web history, and evidence of other peer-to-peer software).

   c.   Spoliation and Suppression of Evidence: Plaintiff's forensic expert is permitted to search for evidence of: (1) wiping efforts such as the reformatting or wiping of a Hard Drive; (2) deletions; (3) significant alterations; and (4) the suppression of evidence.  This involves the examination of or search for: (1) information about how and when the image was created; (2) the timeline of Hard Drive usage; (3) the operating system installation information; (4) devices that have been plugged

PLAINTIFF'S PROPOSED ESI PROTOCOL
FOR PRODUCTION OF DEFENDANT'S
COMPUTER HARD DRIVES
(Case No.: 2:17-cv-01731-TSZ)

into the Hard Drive; (5) anti-computer forensic software (software specifically designed to wipe or delete user activity on a Hard Drive) including by not limited to Evidence Eliminator, BC Wipe, Window Washer, and other wiping software programs installed on the Hard Drive; and (6) the contents within the unallocated space and recycling bin of the Hard Drive; and modifications on the Hard Drive registry.

8.      If the above listed parameters yield relevant results, Plaintiff's forensic expert will reproduce the information or data to Plaintiff.

9.      If Plaintiff's forensic expert's examination reveals relevant information matching the above search criteria, provided the information is not information listed in paragraphs 10 or 11 of this Protective Order, he shall be allowed to disclose the relevant information, the stored location of the information, and/or the allocation format of the data to Plaintiff.  Plaintiff will then provide its expert report consistent with Fed. R. Civ. P. 26(a)(2) by this Court's deadline. Determination as to the form, foundation, and admissibility of the location and/or allocation format of the information will be made by the Court prior to trial.

10.     Plaintiff's forensic expert shall not disclose to Plaintiff's counsel any relevant information which includes Defendant's IRS filings, banking information, and personal information regarding Defendant's family members.  If Plaintiff's forensic expert discovers relevant information which include this sensitive information therein, Plaintiff's forensic expert will, without disclosing the contents, notify both Plaintiff's counsel and defense counsel of this discovery.  Defendant will determine whether Defendant wishes to prevent disclosure of any such confidential information.  Plaintiff reserves the right to move the Court for an *in camera*.

11.     Plaintiff's forensic expert shall not disclose to Plaintiff's counsel any relevant privileged information. If Plaintiff's forensic expert discovers relevant privileged information, Plaintiff's forensic expert will, without disclosing the contents, notify both Plaintiff's counsel and defense counsel of this discovery.  Defendant will determine whether Defendant wishes to

assert a claim of privilege to the information.  Plaintiff reserves the right to move the Court for an *in camera*. Neither Plaintiff's forensic expert nor any other person's review of privileged information, nor any inadvertent disclosure thereof, will constitute a waiver of any privilege by Defendant.

12.     Plaintiff's forensic expert initial analysis shall be limited as set forth in this Order, plus an analysis of the location of files discovered.  No further analysis shall be performed without the agreement of the parties or Court Order.

13.     The search of all Defendant's imaged hard drives shall be limited to the manner described above and there shall be no modification or deviation of the methods of data extraction without prior written agreement of the parties or order of the Court.


IT IS SO ORDERED

Date:


_____

UNITED STATES DISTRICT JUDGE


PLAINTIFF'S PROPOSED ESI PROTOCOL
FOR PRODUCTION OF DEFENDANT'S
COMPUTER HARD DRIVES
(Case No.: 2:17-cv-01731-TSZ)

Exhibit "A" to Plaintiff's Motion to Compel Production of Defendant's Hard Drives

## EXHIBIT A TO PROTECTIVE ORDER FOR PRODUCTION

## OF DEFENDANT'S COMPUTER HARD DRIVES

I, _____, located at _____,

have read the foregoing Stipulated Protective Order and agree to be bound by the terms thereof,

and I further stipulate and agree that the United States District Court for the Western District of

Washington shall have personal jurisdiction over me for purposes of enforcing the terms of the

Stipulated Protective Order.

By:_____

Printed:_____

Date:_____

PLAINTIFF'S PROPOSED ESI PROTOCOL
FOR PRODUCTION OF DEFENDANT'S
COMPUTER HARD DRIVES
(Case No.: 2:17-cv-01731-TSZ)

# EXHIBIT "B"

Exhibit "B" to Plaintiff's Motion to Compel Production of Defendant's Hard Drives

THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>JOHN DOE, subscriber assigned IP address 73.225.38.130,<br><br>        Defendant. | NO. 2:17-cv-01731-TSZ<br><br>**DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION** |
| JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>        Counterclaimant,<br><br>    vs.<br><br>STRIKE 3 HOLDINGS, LLC,<br><br>        Counterdefendant. | |

## REQUEST FOR PRODUCTION NO. 1:

A forensically sound copy (*i.e.*, a clone) of the hard drive for each of the COMPUTER DEVICES USED in YOUR house, apartment or dwelling from August 12, 2016 to present day.

## OBJECTION:

Defendant objects to this request as unduly burdensome and improper, to the extent Plaintiff asks Defendant to "clone" any computer devices. Defendant is not required to "clone"

or do anything to the computers in his possession and control. Defendant further objects that this request seeks documents and ESI protected by the attorney-client privilege, including communications to and from counsel.

**RESPONSE:**

Without waiving any objections, Defendant responds: Subject to entry of an agreement to protect private and sensitive information in a form identical or substantially similar to the model ESI protocol in this district, Defendant will produce computing devices for inspection.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS that constitute, mention, or otherwise RELATE to the Internet browser activity on each of YOUR COMPUTER DEVICES from August 12, 2016 to present day.

**OBJECTION:**

Defendant objects to this request as irrelevant, overbroad and intrusive, to the extent that it seeks information regarding browser activities unrelated to this litigation. Defendant further objects that this request seeks information that is protected by the attorney-client privilege. Moreover, the request is overly broad as to time in that it relates to dates before the first date of infringement. Finally, the request is unduly burdensome as it requests the inspection of over 70 devices.

**RESPONSE:**

Without waiving any objections, Defendant responds: Subject to entry of an agreement to protect private and sensitive information in a form identical or substantially similar to the model ESI protocol in this district, Defendant will produce computing devices for inspection.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS that constitute, mention, or otherwise RELATE to the purchase of a COMPUTER DEVICE USED in YOUR house, apartment, or dwelling from August 12, 2016 to present day.

**OBJECTION:**

Defendant objects to this request as overly broad as to time in that it relates to dates before the first date of infringement. Defendant further objects that this request is unduly burdensome as it requests the inspection of over 70 devices, many of which were purchased used at such places as ebay and goodwill, and for which Defendant has not retained records.

**RESPONSE:**

Subject to and without waiving these objections, Defendant will produce relevant documents in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 4:**

All DOCUMENTS that constitute, mention, or otherwise RELATE to the purchase of any electronic equipment used to operate a COMPUTER DEVICE in YOUR house, apartment, or dwelling from August 12, 2016 to present day.

**OBJECTION:**

*See* Objection to Request for Production No. 3.

**RESPONSE:**

*See* Response to Request for Production No. 3.

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS that constitute, mention, or otherwise RELATE to the setup, use, and control of any modem and wireless router which was USED in YOUR house, apartment, or dwelling during the PERIOD OF RECORDED INFRINGEMENT.

1  **OBJECTION:**

2  No objection.

3  **RESPONSE:**

4  Defendant will produce documents in his possession, custody, or control.

5

6  **REQUEST FOR PRODUCTION NO. 6:**

7  All DOCUMENTS that constitute, mention, or otherwise RELATE to records of any

8  computer programs downloaded, uploaded, or installed on any COMPUTER DEVICE USED in

9  YOUR house, apartment or dwelling from August 12, 2016 to present day.

10  **OBJECTION:**

11  *See* Objection to Request for Production No. 2

12  **RESPONSE:**

13  *See* Response to Request for Production No. 2.

14

15  **REQUEST FOR PRODUCTION NO. 7:**

16  All DOCUMENTS and COMMUNICATIONS between YOU and YOUR ISP that

17  constitute, mention, or otherwise RELATE to contracts, agreements, usage statements, bills,

18  payments, Digital Millennium Copyright Act notices, and any notice regarding copyright

19  infringement.

20  **OBJECTION:**

21  Defendant objects to this request as irrelevant and overbroad, to the extent it seeks

22  information that would intrude on activities unrelated to this litigation. Defendant further

23  objects that the time period is overly broad in that it relates to dates before the first date of

24  infringement.

25  **RESPONSE:**

26  Subject to and without waiving any objections, Defendant will produce documents in his

possession, custody, and control.

DEFENDANT'S RESPONSES AND OBJECTIONS
TO PLAINTIFF'S FIRST REQUESTS FOR
PRODUCTION - 4

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS, including credit card statements, receipts, or other statements that RELATE to the purchase and installation of anti-virus software between August 12, 2016 to present day for use on a COMPUTER DEVICE in YOUR house, apartment or dwelling.

**OBJECTION:**

Defendant objects to this request as irrelevant and overbroad, to the extent it seeks information that would intrude on activities unrelated to this litigation. Defendant further objects that the time period is overly broad in that it relates to dates before the first date of infringement. Further, the purchase of anti-virus software is irrelevant to a claim of infringement.

**RESPONSE:**

Subject to and without waiving any objections, Defendant will produce documents in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 9:**

All FILES, DOCUMENTS, and COMMUNICATIONS transmitted by YOU through PEER-TO-PEER SOFTWARE, which includes the BITORRENT network, that constitutes, mentions, or otherwise RELATES to PLAINTIFF'S copyrighted WORKS or portions of those WORKS.

**OBJECTION:**

Defendant objects to this request as irrelevant, overbroad and intrusive, to the extent that it seeks information unrelated to this litigation. Defendant further objects that the request is overly broad as to time in that it relates to dates before the first date of infringement. Further, the request is unduly burdensome as requires keeping a log of all files transferred whether or not they are related to copyrighted works. Further the request requests irrelevant documents untethered to this litigation.

DEFENDANT'S RESPONSES AND OBJECTIONS
TO PLAINTIFF'S FIRST REQUESTS FOR
PRODUCTION - 5

**RESPONSE:**

Without waiving any objections, Defendant responds: Subject to entry of an agreement to protect private and sensitive information in a form identical or substantially similar to the model ESI protocol in this district, Defendant will produce computing devices for inspection.

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS that RELATE to the purchase and/or installation of any PEER-TO-PEER SOFTWARE on any COMPUTER DEVICE USED in YOUR house, apartment, or dwelling from August 12, 2016 to present day.

**OBJECTION:**

Defendant objects to this request as irrelevant, overbroad and intrusive, to the extent that it seeks information regarding computer activities unrelated to this litigation. Defendant further objects that the request is overly broad as to time in that it relates to dates before the first date of infringement.

**RESPONSE:**

Subject to and without waiving any objections, Defendant will produce documents in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 11:**

A complete copy of all of the FILES contained within any CLOUD BASED STORAGE SYSTEM to which YOU or anyone in YOUR house, apartment or dwelling, have used between the first date of recorded infringement (*i.e.*, from August 12, 2016) through present day, including but not limited to all DOCUMENTS that RELATE to any such CLOUD BASED STORAGE SYSTEM, including the contract, and all statements of account and usage.

**OBJECTION:**

Defendant objects to this request as irrelevant, overbroad and intrusive, to the extent that it seeks information regarding computer activities unrelated to this litigation. Defendant further

objects that the request is overly broad as to time in that it relates to dates before the first date of infringement.

**RESPONSE:**

Subject to and without waiving any objections: Defendant has no documents to produce.

**REQUEST FOR PRODUCTION NO. 12:**

A complete copy of any FILES stored on any video game consoles which were used in YOUR house, apartment or dwelling from August 12, 2016 to present day.

**OBJECTION:**

*See* Objection to Request for Production No. 1.

**RESPONSE:**

*See* Response to Request for Production No. 1.

**REQUEST FOR PRODUCTION NO. 13:**

Any DOCUMENTS that constitute, mention, or otherwise RELATE to any legal notice of tenants or residents authorized to live at YOUR house, apartment, or dwelling at any time during the PERIOD OF RECORDED INFRINGEMENT, including but not limited to any existing lease, rental agreements, and/or sublet agreements.

**OBJECTION:**

Defendant objects to the term "legal notice" as vague and ambiguous. Further, the request is irrelevant to the Plaintiff's prior cause of action or defenses to Defendant's counterclaims.

**RESPONSE:**

Subject to and without waiving these objections, Defendant will produce any and all agreements in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 14:**

All COMMUNICATIONS between YOU and a third party that mentions or RELATES to PLAINTIFF or any of PLAINTIFF'S Copyrighted Works, including but not limited to emails, instant messages, social network postings, chat room comments, and any and all other forms of electronic communication.

**OBJECTION:**

Defendant objects to this request as overly broad in that "RELATES" to "PLAINTIFF'S Copyrighted Works" could be construed to include to encompass the entire pornography industry. Defendant further objects to this request to the extent that it seeks communications that are protected by the attorney-client privilege.

**RESPONSE:**

Subject to these objections, and to the entry of an agreement to protect private and sensitive information in a form identical or substantially similar to the model ESI protocol in this district, Defendant will produce any and all agreements in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 15:**

Any and all DOCUMENTS and COMMUNICATIONS which indicate that YOU were not at the residence assigned to subscriber IP address 73.225.38.130 or within the CONTROL of IP address 73.225.38.130 during the PERIOD OF RECORDED INFRINGEMENT.

**OBJECTION:**

Defendant objects to this request as overbroad and harassing, as it seeks to intrude on personal activities unrelated to this litigation, and encompasses deeply private documents, including but not limited to medical records. Defendant further objects that this request is for information that is protected by the attorney-client privilege. Defendant further objects that this request is irrelevant as Plaintiff has no pending infringement claims against Defendant.

**RESPONSE:**

Subject to and without waiving any objections: Defendant has no such documents currently in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 16:**

Any and all DOCUMENTS and COMMUNICATIONS that support, evidence, or otherwise RELATE to YOUR CONTENTION that YOU are not the individual who infringed PLAINTIFF'S copyrighted WORKS as alleged in PLAINTIFF'S initial Complaint.

**OBJECTION:**

Defendant objects to this request, which seeks documents in order to prove a negative, and regarding issues for which Defendant does not bear the burden of proof.

**RESPONSE:**

*See* Response to Request for Production No. 2.

**REQUEST FOR PRODUCTION NO. 17:**

Any and all DOCUMENTS and COMMUNICATIONS that indicate or demonstrate that another individual infringed PLAINTIFF'S copyrighted WORKS as alleged in PLAINTIFF'S initial Complaint.

**OBJECTION:**

*See* Objection to Request for Production No. 16.

**RESPONSE:**

*See* Response to Request for Production No. 16.

**REQUEST FOR PRODUCTION NO. 18:**

Any and all DOCUMENTS and COMMUNICATIONS from YOUR Internet Service Provider, Comcast Cable Communications, LLC, which notified YOU of PLAINTIFF'S initial Complaint against YOU.

**OBJECTION:**

Defendant objects to this request as irrelevant as Plaintiff has no pending infringement claims against Defendant. Defendant further objects that the information requested is equally available to Plaintiff through Comcast.

**RESPONSE:**

Subject to and without waiving these objections, Defendant will produce all non-privileged responsive documents in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 19:**

Any and all DOCUMENTS which evidence that PLAINTIFF has an ulterior motive in the use of any legal process in this case.

**OBJECTION:**

Defendant objects that substantial discovery remains to be conducted, and that this request seeks documents that are already in Plaintiff's possession, custody, or control, or otherwise more readily available to Plaintiff than to Defendant.

**RESPONSE:**

Subject to and without waiving any objections: *See* Dkt. Nos. 4, 4-1, 4-2, 4-3, 4-4; *see also* documents in Plaintiff's possession related to Plaintiff's attempt to depose Defendant's son.

**REQUEST FOR PRODUCTION NO. 20:**

Any and all DOCUMENTS which evidence that the use of any legal process in this case by PLAINTIFF was not proper in the regular prosecution of such process.

**OBJECTION**:

*See* Objection to Request for Production No. 19.

**RESPONSE:**

*See* Response to Request for Production No. 19.


**REQUEST FOR PRODUCTION NO. 21:**

A copy of any current government issued photo identification for YOU.

**OBJECTION**:

Defendant objects to this request as irrelevant to any claims or defenses.

**RESPONSE:**

Defendant declines to produce documents in response to this request.


**REQUEST FOR PRODUCTION NO. 22:**

Any and all DOCUMENTS which evidence the "actual damages," (as listed in paragraph 54 of YOUR First Amended Counterclaims, Dk. 32) YOU have suffered.

**OBJECTION**:

Defendant objects that discovery is ongoing and Defendant's damages are not complete.

**RESPONSE:**

Defendant has incurred substantial attorneys' fees and will continue to incur attorneys' fees due to Plaintiff's actions. Defendant has also suffered from insomnia.


**REQUEST FOR PRODUCTION NO. 23:**

Any and all DOCUMENTS which evidence the "actual damages," (as listed in paragraph 57 of YOUR First Amended Counterclaim, Dk. 32) YOU have suffered.

**OBJECTION:**

Defendant objects to this request, which seeks documents containing private, medical information, and documents protected by the attorney-client privilege.

DEFENDANT'S RESPONSES AND OBJECTIONS
TO PLAINTIFF'S FIRST REQUESTS FOR
PRODUCTION - 11

**RESPONSE:**

Subject to these objections, and to the entry of an agreement to protect private and sensitive information in a form identical or substantially similar to the model ESI protocol in this district, Defendant will produce redacted responsive non-privileged documents in his possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 24:**

Any and all DOCUMENTS which evidences that PLAINTIFF had "no intention of litigating" the instant case.

**OBJECTION:**

Defendant objects that substantial discovery remains to be conducted, and that this request seeks documents that are already in Plaintiff's possession, custody, or control, or otherwise more readily available to Plaintiff than to Defendant.

**RESPONSE:**

Subject to and without waiving any objections:  *See* Dkt. No. 53, Plaintiff's Notice of Voluntary Dismissal without Prejudice.

**REQUEST FOR PRODUCTION NO. 25:**

Any and all DOCUMENTS which evidences that PLAINTIFF failed to "disclose the actual parties in interest" in this case.

**OBJECTION:**

Defendant objects that substantial discovery remains to be conducted, and that this request seeks documents that are already in Plaintiff's possession, custody, or control, or otherwise more readily available to Plaintiff than to Defendant.

**RESPONSE:**

Subject to and without waiving any objections: Discovery is ongoing. Defendant will supplement this response if and when necessary.

**REQUEST FOR PRODUCTION NO. 26:**

Any and all DOCUMENTS which evidence the "actual damages," (as listed in paragraph 66 of YOUR First Amended Counterclaim, Dk. 32) YOU have suffered.

**OBJECTION:**

*See* Objection to Request for Production No. 23.

**RESPONSE:**

*See* Response to Request for Production No. 23.


**REQUEST FOR PRODUCTION NO. 27:**

Any and all DOCUMENTS which evidence the "actual damages," (as listed in paragraph 69 of YOUR First Amended Counterclaim, Dk. 32) YOU have suffered.

**OBJECTION:**

*See* Objection to Request for Production No. 23.

**RESPONSE:**

*See* Response to Request for Production No. 23.


**REQUEST FOR PRODUCTION NO. 28:**

Any and all "demand letters threatening exaggerated and unsupportable damages" (as listed in paragraphs 70-72 of YOUR First Amended Counterclaim, Dk. 32) which PLAINTIFF sent to YOU.

**OBJECTION:**

Defendant objects that substantial discovery remains to be conducted, and that this request seeks documents that are already in Plaintiff's possession, custody, or control, or otherwise more readily available to Plaintiff than to Defendant.

**RESPONSE:**

Subject to and without waiving any objections: Defendant will produce any responsive non-privileged documents in this possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 29:**

Any and all documents evidencing that YOU posted comments regarding BitTorrent or torrents generally on any online board, website, or forum.

**OBJECTION:**

Defendant objects that substantial discovery remains to be conducted, and that this request seeks documents that are already in Plaintiff's possession, custody, or control, or otherwise more readily available to Plaintiff than to Defendant.

**RESPONSE:**

Subject to and without waiving any objections: Defendant will produce any responsive non-privileged documents in this possession, custody, or control.

**As to Answers Only:**

By: /s/ *John Doe*
*Defendant*

**As to Objections Only:**

Respectfully submitted on March 18, 2019

By: /s/ *J. Curtis Edmondson*
J. Curtis Edmondson, WSBA #43795
3699 NE John Olsen Avenue
Hillsboro, Oregon 97124
Telephone: (503) 336-3749
Email: jcedmondson@edmolaw.com

*Attorney for Defendant*

## CERTIFICATION OF ATTORNEY

I am one of the attorneys for Defendant ████████████ in this matter.  I hereby certify that I have read the foregoing Defendant's Answers and Objections to Plaintiff's First Set of Requests for Production, and believe that the same are in compliance with Federal Rule of Civil Procedure 26(g).

DATED this 18th day of March, 2019.

By:  /s/ *J. Curtis Edmondson*
J. Curtis Edmondson, WSBA #43795
3699 NE John Olsen Avenue
Hillsboro, Oregon 97124
Telephone: (503) 336-3749
Email: jcedmondson@edmolaw.com
*Attorney for Defendant*

DEFENDANT'S RESPONSES AND OBJECTIONS
TO PLAINTIFF'S FIRST REQUESTS FOR
PRODUCTION - 15

<u>CERTIFICATE OF SERVICE</u>

I, J. Curtis Edmondson, hereby certify that on March 18, 2019, I electronically transmitted the foregoing to the following:

> Bryan J. Case, WSBA #41781
> Email: bcase@foxrothschild.com
> FOX ROTHSCHILD LLP (SEATTLE)
> 1001 Fourth Avenue, suite 4500
> Seattle, Washington 98154
> Telephone: (206) 624-3600
>
> Lincoln D. Bandlow, *Admitted Pro Hac Vice*
> Email: lbandlow@foxrothschild.com
> FOX ROTHSCHILD LLP (LOS ANGELES)
> 10250 Constellation Blvd., Suite 900
> Los Angeles, California 90067
> Telephone: (310) 598-4150
>
> *Attorneys for Plaintiff Strike 3 Holdings LLC*

DATED this 18th day of March, 2019.

> By:  */s/ J. Curtis Edmondson*
> J. Curtis Edmondson, WSBA #43795
> 3699 NE John Olsen Avenue
> Hillsboro, Oregon 97124
> Telephone: (503) 336-3749
> Email: jcedmondson@edmolaw.com
> *Attorney for Defendant*

# EXHIBIT "C"

THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation,<br><br>                     Plaintiff,<br><br>     vs.<br><br>JOHN DOE, subscriber assigned IP address 73.225.38.130,<br><br>                     Defendant. | NO. 2:17-cv-01731-TSZ<br><br>**[PROPOSED[ DEFENDANT'S ESI PROTECTIVE ORDER ON COMPUTERS AND HARD DRIVES** |
| JOHN DOE subscriber assigned IP address 73.225.38.130,<br><br>                     Counterclaimant,<br><br>     vs.<br><br>STRIKE 3 HOLDINGS, LLC,<br><br>                     Counterdefendant. | |

        The parties hereby stipulate to the following provisions regarding the discovery of electronically stored information ("ESI")  for the Defendant in this matter:

**A.     General Principles**

1.   An attorney's zealous representation of a client is not compromised by conducting discovery in a cooperative manner. The failure of counsel or the parties to litigation to cooperate in facilitating and reasonably limiting discovery requests and responses raises litigation costs and contributes to the risk of sanctions.

2.   The proportionality standard set forth in Fed. R. Civ. P. 26(b)(1) must be applied in each case when formulating a discovery plan. To further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as possible.

**B.     ESI Disclosures**

Within 30 days after the Rule 26(f) conference, or at a later time if agreed to by the parties, each party shall disclose:

1.   <u>Custodians.</u> The five custodians most likely to have discoverable ESI in their possession, custody or control. The custodians shall be identified by name, title, connection to the instant litigation, and the type of the information under his/her control.

2.   <u>Non-custodial Data Sources.</u> A list of non-custodial data sources (e.g. shared drives, servers, etc.), if any, likely to contain discoverable ESI.

3.   <u>Third-Party Data Sources.</u> A list of third-party data sources, if any, likely to contain discoverable ESI (e.g. third-party email and/or mobile device providers, "cloud" storage, etc.) and, for each such source, the extent to which a party is (or is not) able to preserve information stored in the third-party data source.

4.   <u>Inaccessible Data.</u> A list of data sources, if any, likely to contain discoverable ESI (by type, date, custodian, electronic system or other criteria sufficient to specifically identify the data source) that a party asserts is not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(B). [*Section (C)(3)(a)(i) below sets forth data sources and ESI*

1    *which  are  not required to be preserved by the parties. Those data sources and ESI do*

2    *not need to be included on this list.*]

3        DEFENDANT'S DESIGNATION PURSUANT TO SECTION B.

4        Plaintiff made a document request for all computers and electronic media in possession

5    and control of Defendant.

6        1.    Defendant John Doe is a retired cop who in his retirement purchased computers

7    and fixed them up with the idea of providing them to non-profits as a hobby.  Defendant John

8    Doe has collected all electronic media and computers requested by the Plaintiff during the

9    period of infringement and has turned them over to counsel for inspection.  The number of

10   computers and hard drives are approximately 100 and are in various states of operation.

11   Defendant John Doe is the sole custodian. Defendant counsel is in possession of the hard drives

12   and other media.

13       2.    Defendant does not believe there is any non-custodial data sources.

14       3.    Third Party data sources – This may include email servers for two email

15   accounts. Defendant has searched those email accounts for requested documents.

16       4.    Inaccessible Data – Some of the computers and hard drives may have failed or

17   were purchased in a failed condition.

18

19   **C.    Preservation of ESI**

20       The parties acknowledge that they have a common law obligation to take reasonable

21   and proportional steps to preserve discoverable information in the party's possession, custody

22   or control. With respect to preservation of ESI, Defendant has:

23   1.    Gathered all computers and hard drives in possession during the period of infringement.

24   As noted, this is approximately 100 items.

25       2.    Identified the majority of the computers by model and S/N, and the same with

26   the hard drives.

27

3.    These categories of Defendant's ESI need not be preserved:

    a.    Deleted, slack, fragmented, or other data only accessible by forensics.

    b.    Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

    c.    On-line access data such as temporary internet files, history, cache, cookies, and the like.

    d.    Data in metadata fields that are frequently updated automatically, such as last-opened dates (see also Section (E)(5)).

    e.    Back-up data that are substantially duplicative of data that are more accessible elsewhere.

    f.    f. Server, system or network logs.

    g.     Data remaining from systems no longer in use that is unintelligible on the systems in use.

    h.    The computers and hard drives located at Counsel's office in Hillsboro, Oregon, stored in numerous plastic containers.

<u>DEFENDANT'S DESIGNATION PURSUANT TO SECTION C</u>

4.    Defendant has collected all requested computers and media and has stored them at counsel's office.

5.    Defendant will keep the computers and media in native format as the cost for a complete forensic image of  each drive and a string search of  each drive is disproportionately large (est $ 50,000.00).

**D.    Privilege**

1.  With respect to privileged or work-product information generated after the filing of the

1  complaint, parties are not required to include any such information in privilege logs.

2

3  2.     Subject to STEP "E", Defendant will identify those computers that may have

4  been used to communicate with this attorneys.   Steps will be taken to identify those

5  communications that are privileged.

6

7  **E.     ESI Discovery Procedures**

8  Plaintiff contends that their IPP software  has recorded  "File Hashes" that uniquely

9  identiffy an infringed movie that are approximately 20-40 minutes in length.

10  Plaintiff has provided, in response to Defendant's discovery requests, data that their

11  German monitoring system that is used to purportedly identify infringers.  This data provided

12  by the Plaintiff's monitoring software is:

13

| Work | Hash | Site |
|------|------|------|
| 1 | 1BC8C1ADCAA75C3EC9408C8CCBF5147863205E6C | Tushy |
| 2 | 0326E8923C58852725F5A7857833A4CD3E715289 | Tushy |
| 3 | 039F4779148D3E374D990283A83AC46A0219DAE9 | Vixen |
| 4 | 0CAB7415EAE003A2C3835DE5FC716759A49040B9 | Tushy |
| 5 | 0CDEB18021838E8E2A694A7D16D9A45366CFABB6 | Blacked |
| 6 | 1278F4C4BF0B45678418F6CC8F8844DE4AB68C83 | Tushy |
| 7 | 1487A26EAAAD70318258AB9F506506A8F293533A | Blacked |
| 8 | 18A6F7D0E24D4FA3CC1589DE496D1AD9433CF09B | Blacked |
| 9 | 1A032CB38BB2AF87DAF2B239A1A17B6C713EBC26 | Blacked |
| 10 | 1C2C06D480942F4FE7FDCED4759E93805E02B54B | Tushy |
| 11 | 1D1B18BB0C921D6E1A6D148E4542257B42A2469F | Tushy |
| 12 | 1D63168E762F9CB41AE4DBD6646599AD0EFF3911 | Blacked |
| 13 | 1D7E521CD7368013A7F1B28494A2AC43D8F99F0E | Vixen |
| 14 | 1D7E721AC3B8D955BBCAD8D62F57AF030BD1F315 | Vixen |
| 15 | 22883186DAB5FCA92C8513AD939652BCB867FD5C | Tushy |
| 16 | 22C377CC65B1695E6470BFAF967C4C825391EF90 | Blacked |
| 17 | 24D6E127081B069994E81CA544B8FF3E3A0A33D3 | Tushy |
| 18 | 258961E123E520633A96CDF11E8E6F60E233C816 | Vixen |
| 19 | 289FE7D65DFCFACB416832D12862105A2762841A | Blacked |
| 20 | 31577E16E1B68BF13F30BE538E1BAF66E224726A | Tushy |

| 21 | 322F6ABAB019761A6FF3C1211AF75B28137F013F | Vixen |
| 22 | 34452073A3328CE2AF5FC73A5A8DDD4141E85B4A | Vixen |
| 23 | 374A3B65D604113BB3880FDACE83FD1EFED3CA7C | Tushy |
| 24 | 3945FEF635D609C3FB77DD4762FC2570E7E12D7C | Blacked |
| 25 | 3F3D4931127C380DD0AA05C298E26438267560BB | Vixen |
| 26 | 408577469D1675504E89F205C619738007D08DD9 | Blacked |
| 27 | 4125860EC76C1E0880F652DA94EB84D375A64436 | Tushy |
| 28 | 464AB452DA8258FA23BA74830F0D57EE7CA518C5 | Tushy |
| 29 | 48F5E3FE474EA76DE23D7D0A8F27ADA15F5C98D7 | Blacked |
| 30 | 4B86BC16D0E5A0983C578B61ED87BC62C55B116A | Vixen |
| 31 | 4F0D3D0FD3F88791F4933080453A052BE6924F22 | Tushy |
| 32 | 4FAE423CFA8C54409A4658429D7CB2B3E0F2E8B1 | Vixen |
| 33 | 4FF62836FC3C509617EE5DE7658EAABE045C0BA1 | Tushy |
| 34 | 5003D85013A07470D85A3250EF4B3393B6E2CB04 | Tushy |
| 35 | 5176733783D1199D43060681D7AE2D4E3B5C9AF9 | Blacked |
| 36 | 53FF1B4BD8FB69630FE0A67611FE747F902F6874 | Vixen |
| 37 | 5A06B4EA4DB48984499F2E9EA7213220E835089D | Blacked |
| 38 | 5AA7FC6E46AEF9EC1227A939EADB3351AD495F12 | Vixen |
| 39 | 5C208E2ABF6083135CA52776A02D87442F215D60 | Tushy |
| 40 | 5F25F5C8970A1123950D8543F0C954308ECC9D12 | Tushy |
| 41 | 6503CB2EAECE7FA2F1D71B98E41D6D845BF7B794 | Vixen |
| 42 | 6960957E412263AA671D4F7A15737527D71A7C08 | Tushy |
| 43 | 69AC2D8751ABF0FED5C443A1CE77A7C7529B7AC9 | Vixen |
| 44 | 6A53ECB874B094837053EB7B7142560F0A85A9C2 | Vixen |
| 45 | 6B9175E9708A1BE765BBDC6582A68A12E44A33E3 | Vixen |
| 46 | 72F519FE9EED3C466979E55CFEBF253309A8106C | Vixen |
| 47 | 74C66B184CB3F25F69326EF0C5529CDB680A8C47 | Vixen |
| 48 | 792198F0F41E1FFA44A67E62F451EC11B9B692EF | Vixen |
| 49 | 7E4981D21DDD4B8D9EB5905B1B8A95461915A160 | Blacked |
| 50 | 82EC6E9F2A9287FD59C2B571FDC0CDED7EDDBB81 | Blacked |
| 51 | 8519F3BB18D38EB8472CD07987B1BC2224E7EC22 | Vixen |
| 52 | 88D30B83D9E749F514380A5F2E9C3E876CF55431 | Tushy |
| 53 | 8D906EA439B8BF052A8D68240F71C6D9ACE1E17A | Vixen |
| 54 | 8F55C47AC0C8FED6F30E2C094965B3CF4749FA41 | Vixen |
| 55 | 921AED6337A58B159CFAF9DADDFE2D91CDFF8AB3 | Tushy |
| 56 | 94E00EDACF46F8763B4B28A29BEB83473AC2BA8E | Blacked |
| 57 | 9B5E94F7A0C627798E8020DFAA9A28609D1AB82A | Tushy |
| 58 | 9C80B087C925D30BA01F72FC0EAABD8EAADF588A | Blacked |
| 59 | 9D5513F0563852D9FB73EDC7D6318A6BB04334D9 | Tushy |
| 60 | 9E77DF7FCCB30D04DC6500C39CC3EF0AA2B48257 | Blacked |
| 61 | ABC004062B9F9CF37E9A3A57F4BEA161154EECAE | Vixen |

| 62 | ABDFB02F5D20E29C32ABCE90A8478787DDA3C11D | Tushy |
| 63 | AE6A89DD0FB4978EAC561028F9FB06AA0A8D7E6A | Tushy |
| 64 | AFA4C44023577E2A90E1CFA8DB69A6F5D035B1D2 | Blacked |
| 65 | B2EC2056C7699F25A118F23E36BB74FC7D3B7131 | Vixen |
| 66 | B80F62F292E7B77184DC0BCF80ECE23CF7B23D15 | Tushy |
| 67 | BA56E328AE2DBA8A20B327451656293E37FDAE35 | Blacked |
| 68 | C496C2BFE4C6D994F43DC665F2CBEE16FE85777A | Tushy |
| 69 | C59734C1DC4D87F563ABE2D6E371C12FD12FC7D9 | Blacked |
| 70 | C6965A70345AC1C86DD34737BF381734CA301655 | Vixen |
| 71 | D2B9C8834073E3BF4B55F7BF45C7EA7BE5903569 | Blacked |
| 72 | DB6040CB19308F376554AC18F5C883139311322D | Blacked |
| 73 | DCE0631B0833B899B8A4C577203A87AD00BD2B8B | Blacked |
| 74 | DCE1E033042DA8E7CFC7CEC42B7D21201BEDFD57 | Tushy |
| 75 | E132114F31A37161B83D12BCE6320B65DE025C9B | Vixen |
| 76 | E1C14843DC58F3CB2CCB7383B242E4EE8D32363B | Tushy |
| 77 | E272AF63D15A4277BF857E93B225717C76F3DA9D | Tushy |
| 78 | E4BB4B0185636612E25A2955F474B4494789F63C | Blacked |
| 79 | E69BB37CE99BE570CC9EB659F45DDEF6E740E3BE | Blacked |
| 80 | E8910563DE2084C48C6A8C5801457339745A09FA | Vixen |
| 81 | EC31FAD9EF2492EACCD767B4A6E207BBF2765F0E | Blacked |
| 82 | F1132ADEB75DD2EA99B249DD70902C74E9DA7884 | Tushy |
| 83 | F28E401CBB99CFB32E0808B7662BC50A9C5F64AD | Blacked |
| 84 | F8A92532C263D3E3497FF27A3FE569FF7BF15E37 | Blacked |
| 85 | F8FEB2EE6C17B37610C5B2AE85F0266CB0C5C5BD | Blacked |
| 86 | FF7A5EE06C927438A3CAABC69D774D9CEACA8B9F | Tushy |
| 87 | FFD7D4C0A301487B3A11CBF1B3FC16410D42AEA0 | Vixen |

PCAP – Packet Capture Data (raw data files from the film). Within each movie is at least 16 KB of raw movie data stored in a PCAP. Each raw movie data file has an associated ".torrent" file that is unique to each hash.

i)      .torrent files – A relatively small file that linked to a "torrent site".

ii)      Movie Name – The title of the movie as recorded at the Copyright Office

iii)      Infringed File Name. – The file name

iv)      Actual Movie Title

v)      The terms "Backed", "Tushy", "Vixen"

1

2

3        1.      On-site inspection of electronic media.

4        Computers will be first inspected by the Defendant's technician according to the

5    PHASE 1 review below.  To minimize cost, inspection will be done by a computer technician.

6        2.      Search methodology.

7        The computers and other media will be searched according to Defendant's PHASE I

8    and PHASE II procedures below.

9        3.      Format.

10       The format produced will be a native file format  that will probably then be reproduced

11   in a PDF format in readable form.  Evidence will be kept in native and

12       4.      De-duplication.   The parties may de-duplicate their ESI production across

13   custodial and non-custodial data sources after disclosure to the requesting party.

14       5.      Metadata fields. If the requesting party seeks metadata, the parties agree that

15   only the following metadata fields need be produced: document type; custodian and duplicate

16   custodians; author/from; recipient/to, cc and bcc; title/subject; file name and size; original file

17   path; date and time created, sent, modified and/or received; and hash value.

18

19

20   DEFENDANT'S PHASE 1 REVIEW – COMPUTER AND MEDA CULLING

21       6.      For computers that have a hard drive, the computers will be "booted" and the

22   Defendant's technician will use an accepted forensic tool, such as X-RAYS "WinHex" to inspect

23   the drives. (Cost approx. $ 500.00)  A computer technician (est cost $ 40.00 per hour) will do a

24   pattern match on each of the five (5) search strings provided by the Plaintiff for the computer

25   hard drive(s) to Defendant's technician.  The date and time of the analysis will be recorded. If a

26

27

match is found, then Defendant technician will identify the match and isolate that computer for PHASE 2 REVIEW.

7.      If there is an external hard drive or other media, then the hard drive will be installed so that it can be read by the forensic tool.

8.      To limit burden and costs, this PHASE 1 REVIEW will be performed by someone with the skill of a computer technician hired by the Defendant.

9.      It is estimated that PHASE I will take 40 hours (approx. 20-30 minutes per computer).

10.     If a computer is inoperable or a hard drive does not work, then this will be noted.

DEFENDANT'S PHASE 2 REVIEW – LIKELY COMPUTER SOURCES

11.     The isolated drives identified in the PHASE 1 REVIEW will be available for a Plaintiff's computer expert who will do a further review according to the following protocol at Defendant's counsel's office in Hillsboro, Oregon or in Seattle, Washington.  The further review will allow the expert to search for an additional ten (10) "Search Strings" that are from the following data sources:

a.      Hash Hex Identifier Listed Above;

b.      16 KB Raw Data Block from a PCAP;

c.      Infringed Movie Title; and/or

d.      Actual Movie Title.

e.      Identification of the particular torrent client  identified by Plaintiff's IPP monitoring software.

**F.     Discovery Disputes**

In the event there are discovery disputes, counsel will meet informally in good faith basis to try and stipulate to issues.  Absent resolution, the parties will ask for an informal conference with a discovery magistrate to resolve any issues.


DATED: _____

Plaintiff's Counsel                                    Defendant's Counsel

By _____          By _____


**ORDER**


Based on the foregoing, IT IS SO ORDERED.

DATED: _____


_____

The Honorable _____

UNITED STATES DISTRICT JUDGE

# EXHIBIT "D"

THE HONORABLE THOMAS S. ZILLY

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware corporation, <br><br>            Plaintiff, <br><br>       vs. <br><br> JOHN DOE, subscriber assigned IP address 73.225.38.130, <br><br>            Defendant. | NO. 2:17-cv-01731-TSZ <br><br> **DEFENDANT'S BATES INDEX AND SERVICE OF DOCUMENTS** |
| JOHN DOE subscriber assigned IP address 73.225.38.130, <br><br>            Counterclaimant, <br><br>       vs. <br><br> STRIKE 3 HOLDINGS, LLC, <br><br>            Counterdefendant. | |

Defendant hereby serves the following BATES index in response to Plaintiff's request for production of documents.  This index is a provided as a reference and is not substantive part of the production response.  Bates 10001-10199 are computer equipment, devices, etc. that may be inspected and copied at counsel's office subject to the objections and protective order.

- 1

Originals documents served on a USB (Bates 10200-10301) drive via mail.   PDF Document Bates 10270-10282, 10301 is designated Attorney Eyes Only.

Several documents are graphic in nature.

| BATES | Description | Brand/Model | Model | | S/N |
|-------|-------------|-------------|-------|---|-----|
| 10001 | Computer | Optiplex | GX270 | | HZHKF1 |
| 10002 | Computer | Optiplex | GX270 | | BFJ5441 |
| 10003 | Computer | Dell | DCNE | | D1L0PD1 |
| 10004 | Computer | Studio | XPS 8000 | | 3MJNHK1 |
| 10005 | Computer | HP Envy | 810 PC series | | MXX4320SDM |
| 10006 | Computer | HP Pavilion Elite | (HPE-240f) | | 4CE0221KSF |
| 10007 | Computer | OPTIPLEX 790 | | 790 | 4TZWXV1 |
| 10008 | Computer | OPTIPLEX 745 | | 745 | HZRQPC1 |
| 10009 | Computer | OPTIPLEX | | 745 | 4F1YZC1 |
| 10010 | Computer | OPTIPLEX 9020 | | 9020 | GMWFX12 |
| 10011 | Computer | OPTIPLEX 9010 | | 9010 | 20N39W1 |
| 10012 | Computer | GATEWAY | 831-GM | | GA5561007728 |
| 10013 | Computer | OPTIPLEX | | 960 | JNLXTL1 |
| 10014 | Computer | HP P6000 | P6000 | | CNX92402sc |
| 10015 | Computer | Custom Built PC | | | none |
| 10016 | Computer | Gateway | DX4850-27E | | PTGBL020010480!0286300 |
| 10017 | Computer | Aspire | M5630 | | PSSA50X045744008Cf2 |
| 10018 | Computer | HP | ELITE 8300 | | MXL2470D56 |
| 10019 | Computer | HP | DX 2250 | | MXL73608d1 |
| 10020 | Computer | Custom Built PC | | |  none |
| 10021 | Computer | Dell | Dimension E31 | | CKHBW91 |
| 10022 | Computer | Hard Drives NW | | | 122545 |
| 10023 | Computer | Shuttle | S113G | | SG31G2SO-S00-13 |
| 10024 | Computer | Dell | Inspiron 570 | | 90G2SL1 |
| 10025 | Computer | Lenovo | A1U | | M5RGK73 |
| 10026 | Computer | Dell | Inspiron DCMF | | 4GM2HH1 |
| 10027 | Computer | Dell | T5500 | | 32SB3L1 |
| 10028 | Computer | Dell | Inspiron 660 | | DKDBNy1 |
| 10029 | Computer | ASUS | CG Series | | PRF 105090 |
| 10030 | Computer | Dell | PP07S | | 44HS981 |
| 10031 | Laptop | Dell | PP18L | | 0T17570 |
| 10032 | Laptop | Dell | Latitude E6520 | | 6XSBR1 |
| 10033 | Laptop | Dell | Latitude E6520 | | 9M2C6R1 |
| 10034 | Laptop | Dell | Latitude PP04X | | 669NJF1 |
| 10035 | Laptop | Dell | Latitude E6520 | | 5H2C6R1 |
| 10036 | Laptop | Dell | Latitude E6520 | | 1H2C6R1 |
| 10037 | Laptop | Dell | Latitude E6420 | | 7CZZ6R1 |
| 10038 | Laptop | Dell | PP31L | | 8039 |

| | | | | |
|---|---|---|---|---|
| 10039 | Laptop | Dell | PP29L | 7146 |
| 10040 | Laptop | Dell | P02EE002 | GKWWQM1 |
| 10041 | Laptop | Dell | P07E | 9LCYKL1 |
| 10042 | Laptop | Dell | P02E | 9JR0RK1 |
| 10043 | Laptop | Sony | PCG-8C3L | 283626303717017 |
| 10044 | Laptop | ASUS G72G | G27GX | 9AN0AS86977944A |
| 10045 | Laptop | Lenovo 4151 | R39Y39C25615 | EB16835152 |
| 10046 | Laptop | Acer E5-511 | E5-511 | NXMPKAA005434104423400 |
| 10047 | Laptop | Fujitsu Lifebook | N6410 | R6204104 |
| 10048 | Laptop | Gateway | MS2370 | NXY2ZAA019412080096600 |
| 10049 | Laptop | Satelite | C655-S5212 | 5B426377Q |
| 10050 | Console | XBOX | Xbox 360 Conole | 913756473305 |
| 10051 | Laptop | Gateway | NAV50 | LUWH20D0060035342C1601 |
| 10052 | Router | VIZIO | XWR100 | WGKOIEAL4302262 |
| 10053 | Router | Linksys | RT31P2-VD | CH500E3H9553 |
| 10054 | Hard Drive | WD | WD600 | WMA9S1536850 |
| 10055 | Hard Drive | Seagate | ST315005N1A1AS-RK | 9VS1M9Z3 |
| 10056 | Hard Drive | Maxtor | D740X-6L | 11S24P3662ZJ1JN23SSSZE |
| 10057 | Hard Drive | WD | WD1200 | WMA8C2473896 |
| 10058 | Hard Drive | Seagate | ST3200822A | 4LJ0H0MV |
| 10059 | Hard Drive | WD | WD1000 | WMA8C1145815 |
| 10060 | Hard Drive | Hitachi | HTS548080M9AT00 | MRL455L4K558DB |
| 10061 | Hard Drive | Seagate | Momentus 5400.2 | 3PJ13XQ2 |
| 10062 | Hard Drive | Seagate | Momentus 5400.5 | 5SV6CHA7 |
| 10063 | Hard Drive | Seagate | Momentus 5400.5 | 5SX09BHB |
| 10064 | Hard Drive | WD | WD800 | WCAM9D729123 |
| 10065 | Hard Drive | WD | WD800 | WMAM9ADZ1831 |
| 10066 | Hard Drive | WD | WD1200 | WMAEL1694798 |
| 10067 | Hard Drive | WD | WD1200 | WMA8C2865416 |
| 10068 | Hard Drive | Seagate | Barracuda 7200.9 | 5PS2VQ5X |
| 10069 | Hard Drive | Fujitsu | MHZ2080BJ | K83AT8826CED |
| 10070 | Hard Drive | Seagate | Barracuda 7200.9 | 9LR0L87G |
| 10071 | Hard Drive | Hitachi | HDS721616PLA380 | PVB330Z2S02MBH |
| 10072 | Hard Drive | Seagate | Momentus 7200.4 | 5VJ12E0L |
| 10073 | Hard Drive | Seagate | Momentus Thin 250GB | W041YEMR |
| 10074 | Hard Drive | WD | WD1600 | WCAL81049956 |
| 10075 | Hard Drive | Seagate | Barracuda 7200.9 | 6PT1SH3 |
| 10076 | Hard Drive | Seagate | Barracuda 7200.9 | 5ND3P6QH |
| 10077 | Hard Drive | Seagate | Barracuda 7200.10 | 9QG73DQS |
| 10078 | Hard Drive | Seagate | ST310211A | 6DB0DQMB |
| 10079 | Hard Drive | WD | WD1600 | WCAL92547435 |
| 10080 | Hard Drive | Hitachi | HDS721050CLA362 | HN1A4SPA |
| 10081 | Hard Drive | Seagate | ST2000DM001 | Z1F01GVY |

| | | | | |
|---|---|---|---|---|
| 10082 | Hard Drive | WD | WD800JD | WMAM9UK73521 |
| 10083 | Hard Drive | WD | WD10EADS | WCAV54551878 |
| 10084 A/B | Hard Drive | WD | TBD | TBD |
| 10085 | Laptop #1 | Unknown | Unknown | Unknown |
| 10086 | Laptop #2 | Unknown | Unknown | Unknown |
| 10087 | Laptop #3 | Unknown | Unknown | Unknown |
| 10088 | Laptop #4 | Unknown | Unknown | Unknown |
| 10089 | Laptop #5 | Unknown | Unknown | Unknown |
| 10090 | Laptop #6 | Unknown | Unknown | Unknown |
| 10091 | Laptop #7 | Unknown | Unknown | Unknown |
| 10092 | Laptop #8 | Unknown | Unknown | Unknown |
| 10093 | Laptop #9 | Unknown | Unknown | Unknown |
| 10094 | Laptop #10 | Unknown | Unknown | Unknown |
| 10095 | Laptop #11 | Unknown | Unknown | Unknown |
| 10096 | Laptop #12 | Unknown | Unknown | Unknown |
| 10097 | USB Drive #1 | Unknown | Unknown | Unknown |
| 10098 | USB Drive #2 | Unknown | Unknown | Unknown |
| | | | | |
| 10200 | Document | PDF | | |
| 10201 | Document | PDF | | |
| 10202 | Document | PDF | | |
| 10203 | Document | PDF | | |
| 10204 | Document | PDF | | |
| 10205 | Document | PDF | | |
| 10206 | Document | PDF | | |
| 10207 | Document | PDF | | |
| 10208 | Document | PDF | | |
| 10209 | Document | PDF | | |
| 10210 | Document | PDF | | |
| 10211 | Document | PDF | | |
| 10212 | Document | PDF | | |
| 10213 | Document | PDF | | |
| 10214 | Document | PDF | | |
| 10215 | Document | PDF | | |
| 10216 | Document | PDF | | |
| 10217 | Document | PDF | | |
| 10218 | Document | PDF | | |
| 10219 | Document | PDF | | |
| 10220 | Document | PDF | | |
| 10221 | Document | PDF | | |
| 10222 | Document | PDF | | |
| 10223 | Document | PDF | | |
| 10224 | Document | PDF | | |
| 10225 | Document | PDF | | |

| | | |
|---|---|---|
| 10226 | Document | PDF |
| 10227 | Video | |
| 10228 | Document | PDF |
| 10229 | Document | PDF |
| 10230 | Excel | CSV |
| 10231 | Document | PDF |
| 10232 | Document | PDF |
| 10233 | Document | PDF |
| 10234 | Document | PDF |
| 10235 | Document | PDF |
| 10236 | Document | PDF |
| 10237 | Document | PDF |
| 10238 | Document | PDF |
| 10239 | Document | PDF |
| 10240 | Document | PDF |
| 10241 | Document | PDF |
| 10242 | Document | PDF |
| 10243 | Document | PDF |
| 10244 | Document | PDF |
| 10245 | Document | PDF |
| 10246 | Document | PDF |
| 10247 | Document | PDF |
| 10248 | Document | PDF |
| 10249 | Document | PDF |
| 10250 | Document | PDF |
| 10251 | Document | PDF |
| 10252 | Document | PDF |
| 10253 | Document | PDF |
| 10254 | Document | PDF |
| 10255 | Document | PDF |
| 10256 | Document | PDF |
| 10257 | Document | PDF |
| 10258 | Document | PDF |
| 10259 | VIDEO | MP4 |
| 10260 | Document | PDF |
| 10261 | Document | PDF |
| 10262 | Document | PDF |
| 10263 | Document | PDF |
| 10264 | Document | PDF |
| 10265 | Document | PDF |
| 10266 | Document | PDF |
| 10267 | Video | MP4 |
| 10268 | Video | MP4 |
| 10269 | Document | PDF |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

| | | |
|---|---|---|
| **10270** | **Document** | **PDF** |
| **10271** | **Document** | **PDF** |
| **10272** | **Document** | **PDF** |
| **10273** | **Document** | **PDF** |
| **10274** | **Document** | **PDF** |
| **10275** | **Document** | **PDF** |
| **10276** | **Document** | **PDF** |
| **10277** | **Document** | **PDF** |
| **10278** | **Document** | **PDF** |
| **10279** | **Document** | **PDF** |
| **10280** | **Document** | **PDF** |
| **10281** | **Document** | **PDF** |
| **10282** | **Document** | **PDF** |
| 10283 | Document | PDF |
| 10284 | Document | PDF |
| 10285 | Document | PDF |
| 10286 | Document | PDF |
| 10287 | Document | PDF |
| 10288 | Document | PDF |
| 10289 | Document | PDF |
| 10290 | Document | PDF |
| 10291 | Document | PDF |
| 10300 | Document | PDF |
| **10301** | **Document** | **PDF** |
| 10302 | Document | PDF |

Respectfully submitted on March 18, 2019

By:  /s/ *J. Curtis Edmondson*
J. Curtis Edmondson, WSBA #43795
3699 NE John Olsen Avenue
Hillsboro, Oregon 97124
Telephone: (503) 336-3749
Email: jcedmondson@edmolaw.com

*Attorney for Defendant*

- 6

CERTIFICATE OF SERVICE

I, J. Curtis Edmondson, hereby certify that on March 18, 2019, I mailed this document and the referenced documents on USB (bates 10200-10302)  the foregoing to the following:

Bryan J. Case, WSBA #41781
Email: bcase@foxrothschild.com
FOX ROTHSCHILD LLP (SEATTLE)
1001 Fourth Avenue, suite 4500
Seattle, Washington 98154
Telephone: (206) 624-3600

Lincoln D. Bandlow, *Admitted Pro Hac Vice*
Email: lbandlow@foxrothschild.com
FOX ROTHSCHILD LLP (LOS ANGELES)
10250 Constellation Blvd., Suite 900
Los Angeles, California 90067
Telephone: (310) 598-4150

*Attorneys for Plaintiff Strike 3 Holdings LLC*

By:  __/s/__   J. Curtis Edmondson
          J. Curtis Edmondson

- 7

# EXHIBIT "E"

Exhibit "E" to Declaration of Michael Yasumoto in Support of Defendant's Motion for Attorneys' Fees



# AMENDED DIGITAL FORENSICS EXAMINATION REPORT

Regarding:
Strike 3 Holdings, LLC v. John Doe
Case Number: 2:17-CV-01731-TSZ

Prepared for:
Curtis Edmondson
Edmondson IP Law
3699 NW John Olsen Place
Hillsboro, OR 97124

Prepared by:
Michael Yasumoto
Deadbolt Forensics® LLC
1500 NW Bethany Blvd, #200
Beaverton, OR 97006

Amended Report: April 15, 2019
Original Report: March 15, 2019

## I. Assignment

My name is Michael Yasumoto.  I was retained on March 6, 2018 by Curtis Edmondson of Edmondson IP Law which represents John Doe.  I have been retained to conduct a forensic examination of the defendant's hard drive in this case.  Specifically, I have been asked to determine the following.

1) Are any of the movies listed in Plaintiff's complaint located on the Defendant's hard drive?

2) Document the computer the hard drive originally came from on March 6, 2018.

## II. Qualifications

I hold an MS in Computer Science from the George Washington University (GWU).  I am certified in Computer Security by GWU as well as certified in Computer Forensics by Edmonds Community College.  My curriculum vitae is attached to this report as Exhibit 1.

## III. Compensation

I am being compensated at a rate of $250 per hour for my time in this matter.  My fees are not contingent upon the outcome of this litigation.

## IV. Evidence Collection and Analysis

I have reviewed the following documents:

    A.  Exhibit A to the Complaint, 6 pages, 07/03/18 Document 43-1.

    B.  "PCAP analysis (Case 17-cv-01731-TSZ) v3.xlsx", 1 Worksheet.

### Imaging

I created a forensically sound image of the hard drive listed in Table 1 using a CRU Forensic UltraDock v5.5 write blocker on 3/7/2018.  The hard drive was imaged using X-Ways Forensics (XWF) to create an image in EWF/.E01 format.  The hard drive with serial# 9VP05TWX was picked up from Curtis Edmondson's office on 3/6/2018 and returned on 3/9/2018.

Four copies of the forensic image were created.  One is stored at Deadbolt Forensics for examination.  Another copy is stored at Curtis Edmondson's office.  Copies three and four were

1   provided to Curtis Edmondson's office and are identified by bates numbers 10084A and

2   10084B.

| Make | Model | Serial# | Hash (SHA1) |
|------|-------|---------|-------------|
| Seagate | ST3750528AS | 9VP05TWX | C030EFD65D37609FA736FAA2924D6636F96BF4CB |

3   Table 1: Defendant's Hard Drive

4

5   On 4/10/2019, I examined the computer containing the hard drive with serial# 9VP05TWX at

6   Curtis Edmondson's office.  The computer's make and model are listed in Table 2 however the

7   manufacturer did not explicitly identify any serial numbers on the computer's case.  Two

8   potential serial numbers printed on the case are listed in Table 2.

| Make | Model | Serial# |
|------|-------|---------|
| Asus | CG5270-BP003 | PF1G95B15000014 or 95PDAG039530 |

9   Table 2: Defendant's Computer

10

11   Analysis

12   I used XWF version 19.8 SR3 to examine the forensic image. Using XWF, I searched for all video

13   files including deleted files recovered from unallocated space. I conducted file carving, which

14   looks for signatures of certain file types to detect data that may be hidden inside another file or

15   located in unallocated space such as deleted files.  The smallest video file referenced in Exhibit

16   A of the complaint is approximately 187 MBs in size.  Based on a review or plaintiff's videos,

17   they appear to have an introduction and concluding animation featuring the name of either

18   Tushy, Vixen, or Blacked.  I reviewed all recovered and existing video files over 100 MBs in size

19   to determine if any of the video files were Plaintiff's copyrighted works.  None of the videos

20   examined appear to be Plaintiff's work based on content and the lack of any Tushy, Vixen, or

21   Blacked animated titles.  I also compared the SHA1 hash, which acts as a fingerprint for

22   computer files, and none of the videos examined on defendant's computer were a hash match

23   for the videos listed in Exhibit 3.

24

1   V.  Conclusions

2   Plaintiff's Videos Not Found

3   It is my opinion, based on a reasonable degree of scientific certainty, that the movies listed in

4   Exhibit 3 are not located on the storage devices that I examined in Table 1.

5   Basis:

6   • None of the video files reviewed from the Defendant's hard drive are the Plaintiff's

7       movies based on video subject matter or SHA1 hash.

8   Defendant's Hard Drive

9   It is my practice, working with Curt Edmondson, to preserve and examine the hard drive of the

10   computer at issue in the case.  It is my understanding that the hard drive that I preserved and

11   examined on 3/6/2018 was the only hard drive from the client's working desktop.

12

13   My opinion is based upon the information available at the time of the writing of this report.  I

14   reserve the right to expand, amend, or change my opinions upon receipt of additional pertinent

15   information, should it be presented to me for review.

16

17

18   I declare under penalty of perjury that the foregoing is true and correct.

19

20

21                                                        *Michael Yasumoto*  4/15/2019

22                                                        Michael Yasumoto          Date

23

24   Appendix: Exhibit List

25   Exhibit 1:

26   Curriculum Vitae for Michael Yasumoto

1    Exhibit 2:

2    FRCP 26(a)(2)(B) Testimony Disclosure for Michael Yasumoto

3    Exhibit 3:

4    Exhibit A to the Complaint, 6 pages, 07/03/18 Document 43-1.

# EXHIBIT "F"

**From:** J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Sent:** Saturday, February 2, 2019 8:13 AM
**To:** Case, Bryan J. <bcase@foxrothschild.com>
**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Subject:** [EXT] Meet and Confer re: stip to ESI Protective Order / WDWA Model ESI Agreement ( our file: DIS 1.002)
**Importance:** High


Lincoln and Bryan,

Your client has asked for the production of ESI in your first discovery request.  It is our position that the production of computer hard drives is not a proportionate discovery request under the amended Rule 26 and will allow your client access to data that is irrelevant to this case,  personal to my client, and may result in your inspection of attorney-client correspondence.

To avoid our motion for a protective order, will you stip to the WDWA model ESI agreement in the form of a stipulated protective order for both parties?  In particular, I would propose that you present "search strings" that would indicate the presence of the movies or other data that believe are pertinent to this case.

If your not amenable to this approach, then I would like to meet and confer on this topic.

In Best Regards,

J. Curtis Edmondson, Patent Attorney | Edmondson IP Law
USPTO 57027 | CA SBN 236105 | WA SBN 43795 | DC BAR NO 998407 | CA PE 13377| WA PE 43728
Venture Commerce Center, 3699 NE John Olsen Ave, Hillsboro OR 97124
ph: (503) 336-3749 | fax: (503) 482-7418
jcedmondson@edmolaw.com | www.edmolaw.com


**From:** Case, Bryan J. <bcase@foxrothschild.com>
**Sent:** Thursday, March 21, 2019 5:41 PM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; J. Curtis Edmondson
<jcedmondson@edmolaw.com>
**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Subject:** Strike 3 v. Doe - Model ESI Agreement

Adrienne and Curt,

Attached please find our edits to the model ESI agreement.   Please let us know if you have any changes ASAP so we can move forward with discovery without further delay, in particular inspection of Defendant's computer devices you've disclosed.

Bryan

**Bryan Case**
Partner
**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
Direct: (206) 389-1643
Cell: (425) 890-5112
Fax: (206) 389-1708
bcase@foxrothschild.com
www.foxrothschild.com

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

**From:** "J. Curtis Edmondson" <jcedmondson@edmolaw.com>
**Date:** March 22, 2019 at 5:52:42 AM PDT
**To:** "Case, Bryan J." <bcase@foxrothschild.com>, Adrienne McEntee <amcentee@terrellmarshall.com>
**Cc:** "Bandlow, Lincoln D." <lbandlow@foxrothschild.com>, <jcedmondson@edmolaw.com>
**Subject: [EXT] Re: Strike 3 v. Doe - Model ESI Agreement**

Bryan and Lincoln,

Attached is our proposed ESI protective order. When this case started, I proposed that we discuss ESI and there was not much of a response from your side.  Now that we are down to the wire, I have put together a reasonable protocol in view of your remaining claims (of which there are none) and your affirmative defenses (of which there are a few). I have already spent a significant amount of time collecting and organizing these computers.

The number of computers being produced is a result of your overly broad discovery requests, which are cut/paste from the discovery requests that Malibu Media would send out from the Lipscomb law firm.  These discovery requests were designed by the Lipscomb firm to increase the litigation costs  to the defendant and force a settlement.

I have crafted a cost effective ESI order where Defendant will bear the initial cost of inspecting computers.  The majority of these computers were bought from Goodwill and eBay and may still have the prior owners data on them.

Please let me know if my ESI order is acceptable.  Your ESI order will not work as it is overly broad, imposes large unnecessary costs, and is disproportionate to what is needed to prove your affirmative defenses.

B. Regards,

J. Curtis Edmondson, Patent Attorney | Edmondson IP Law
USPTO 57027 | CA SBN 236105 | WA SBN 43795 | DC BAR NO 998407 | CA PE 13377| WA PE 43728
Venture Commerce Center, 3699 NE John Olsen Ave, Hillsboro OR 97124
ph: (503) 336-3749 | fax: (503) 482-7418
jcedmondson@edmolaw.com | www.edmolaw.com

**From:** Case, Bryan J. <bcase@foxrothschild.com>
**Sent:** Monday, March 25, 2019 4:27 PM
**To:** J. Curtis Edmondson <jcedmondson@edmolaw.com>; Case, Bryan J. <bcase@foxrothschild.com>;

Adrienne McEntee <amcentee@terrellmarshall.com>
**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Subject:** RE: Strike 3 v. Doe - Model ESI Agreement

Curt,

In an effort to work cooperatively, attached are Strike 3's edits to the ESI agreement you sent on
Friday.   Please let us know if you have any changes or disagreements with the attached.   If so, counsel
should schedule a discovery conference to discuss.

Regards,

Bryan

**Bryan Case**
Partner
**Fox Rothschild LLP**
Direct: (206) 389-1643
Cell: (425) 890-5112

**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Tuesday, March 26, 2019 3:11 PM
**To:** Case, Bryan J. <bcase@foxrothschild.com>; J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Cc:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Subject:** [EXT] RE: Strike 3 v. Doe - Model ESI Agreement

Bryan, Curt and I would like to meet and confer with you regarding the revisions to our proposed ESI
order. Are you available on Friday?

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

**From:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>
**Sent:** Tuesday, March 26, 2019 7:50 PM
**To:** Adrienne McEntee <amcentee@terrellmarshall.com>; Case, Bryan J. <bcase@foxrothschild.com>; J.
Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** RE: Strike 3 v. Doe - Model ESI Agreement

Bryan is unavailable but I can do the call.  I have a deposition the first half of the day, so Friday at 4:00
p.m.?

**Lincoln Bandlow**
Partner

**Fox Rothschild LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
(310) 228-2913 - direct
(310) 556-9828- fax
lbandlow@foxrothschild.com
www.foxrothschild.com

**From:** Adrienne McEntee <amcentee@terrellmarshall.com>
**Sent:** Wednesday, March 27, 2019 8:59 AM
**To:** Bandlow, Lincoln D. <lbandlow@foxrothschild.com>; Case, Bryan J. <bcase@foxrothschild.com>; J. Curtis Edmondson <jcedmondson@edmolaw.com>
**Subject:** [EXT] RE: Strike 3 v. Doe - Model ESI Agreement

Friday at 4pm works fine. My office will circulate a conference line.

Adrienne D. McEntee
**Terrell | Marshall Law Group PLLC**
936 N 34th Street, Suite 300 | Seattle, WA 98103
T 206.816.6603 | F 206.319.5450

# EXHIBIT "G"

Exhibit "G" to Plaintiff's Motion to Compel Production of Defendant's Hard Drives

AMENDED EXPERT REPORT OF ERIC FRUITS, PH.D.
IN THE MATTER OF

STRIKE 3 HOLDINGS, LLC

V.

JOHN DOE, SUBSCRIBER
ASSIGNED IP ADDRESS 73.225.38.130

CASE NO. 2:17-CV-01731-TSZ
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

**Economics International Corp.**

503-928-6635
www.econinternational.com
info@econinternational.com

April 15, 2019

# Contents

Summary of conclusions...................................................................................2

1  Qualifications.............................................................................................3

2  Assignment and background ....................................................................4

3  Litigation is not the only effective way to stop infringement.............................5

4  DMCA notices as a method to discourage infringement.....................................7

5  Actual and statutory damages ................................................................9

6  Nuisance lawsuits and sue-then-settle strategies ...............................................11

7  Plaintiff's revenues from settling litigation........................................................17

8  Damages......................................................................................................19

9  Conclusion .................................................................................................20

## Exhibits

1  Curriculum vitae

# Summary of conclusions

I have been retained by counsel for Defendant in this matter to provide an economic opinion regarding damages in this matter.

Plaintiff's amended complaint alleges that, using BitTorrent, Defendant copied and distributed 87 works in which Plaintiff is the owner of the copyrights-in-suit and thereby willfully infringed on Plaintiff's copyrights. Plaintiff is seeking, inter alia, statutory damages. The following are my conclusions.

- Litigation is not the only way for Plaintiff to stop infringement. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

- DMCA notices are one method to discourage infringement. At the time of the downloading activity alleged by Plaintiff, Defendant's Internet service provider, Comcast, indicates it had policies to comply with the DMCA, including, "a policy to terminate the Service, in appropriate circumstances, provided to any customer or user who is a repeat infringer of third party copyright rights."

- Plaintiff's actions in this suit, and others, are consistent with a theory that plaintiff is pursuing nuisance value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-of-prevailing claims. Strike 3's strategy in BitTorrent litigation appears to satisfy a three-part test for nuisance value litigation.

- Additional information from Plaintiff would be useful to more comprehensively evaluate Plaintiff's income from pursuing and settling litigation.

The remainder of the report provides the bases for the conclusions summarized above. ∎

# STRIKE 3 HOLDINGS, LLC v.
# JOHN DOE, SUBSCRIBER
# ASSIGNED IP ADDRESS 73.225.38.130

Eric Fruits, Ph.D.

## 1  Qualifications

I am president and chief economist at Economics International Corp., a consulting firm that specializes in providing economics services to private and public sector clients. I am also an adjunct professor at Portland State University, where I teach courses in economics and real estate. I have a masters' and a doctorate degree in economics and a bachelors' degree in business economics and public policy. Exhibit 1 is a current curriculum vitae including testimony and publications.

My graduate-level training included the study of statistics and econometrics (the application of statistical methods to economics issues). I have taught graduate-level courses in economics, econometrics, finance, and the economics of regulation and antitrust. I have published several peer-reviewed papers, each of which have included statistical and econometric analysis.

I have been engaged in many projects involving financial analysis and business valuation. I have testified in federal and state courts on business and technology valuation and financial markets. As an economic damages expert, I have provided expert testimony regarding business valuation, lost profits, and foregone income. I have consulted and testified in several matters involving the

3

valuation of intellectual property, including the valuation of technology, trade marks, and trade dress. I have provided expert opinions involving statistics, economics, and finance to United States of America federal and state courts and to an international criminal tribunal.

I am familiar with BitTorrent litigation. I served as an economics expert in the case of *Malibu Media, LLC v. Doe subscriber assigned IP address 76.126.99.126* in the Northern District of California. I served as an economics expert in the case of *Clear Skies v. Hancock* in the Northern District of Illinois. I served as an economics expert in the case of *QOTD v. Wilson* in the Western District of Washington.

Economics International Corp. is compensated at an hourly rate of $350 for my work on this matter. No part of the compensation is dependent on the outcome of the matter.

## 2   Assignment and background

I have been retained by counsel for Defendant in this matter to provide an economic opinion regarding damages in this matter.

Plaintiff's amended complaint alleges that, using BitTorrent, Defendant copied and distributed 87 works in which Plaintiff is the owner of the copyrights-in-suit and thereby willfully infringed on Plaintiff's copyrights. Plaintiff is seeking, inter alia, statutory damages.

Greg Lansky made a declaration under a penalty of perjury at Docket 4-3. Greg Lansky states he has "…personal knowledge of all matters contained in this declaration…". I note that at Docket 70, made a different declaration about his knowledge. For this purposes of this motion, I will assume Docket 4-2 is accurate and not contradicted by Docket 70.

Relevant parts of the Lansky Declaration (4-2) state:

1. "Unfortunately, piracy is a major threat to our company. We can compete in the industry, but we cannot compete when our content is stolen." (¶22)

2. "We have discovered that when we put videos online for paid members to view, it takes as little as four minutes to be downloaded on to torrent

> websites. We have attempted to identify the initial seeder but have
> found it impossible with the large volume of our subscriber base." (¶23)

3. "We send on average 50,000 DMCA notices a month but it does
   virtually nothing to stop the rampant copyright infringement." (¶26)

4. "The only effective way to stop piracy of our movies on BitTorrent is to
   file lawsuits like this one." (¶27).

I am not offering any analysis, conclusions, or expert opinions regarding the law.
To the extent this report refers to laws, court decisions, and/or legal opinions, my
analysis is based on an economic evaluation of the information presented.

I have no opinions regarding liability in this matter.

In preparing this report, I have relied on my general expertise and knowledge
regarding economics, finance, and statistics as well as publicly available
information and information provided by Defendant and/or Defendant's
counsel. The materials relied upon are cited in the text and footnotes to this
report. Any of the information referred to in this report and its exhibits, as well
as summaries or exhibits based on this information, may be used at trial.

I understand that discovery is not complete. I reserve the right to supplement or
modify my report and opinions as new or additional information is presented,
obtained, or reviewed or new or additional analyses are completed, including
analyses provided by Plaintiff or its experts.

This amended report incorporates by reference my declaration in this matter
dated February 25, 2019 (Dckt. 81).

# 3   Litigation is not the only effective way to stop infringement

The Lansky Declaration claims filing lawsuits against individual alleged
downloaders is "the only effective way to stop" infringing downloading of its
copyrighted material.

Strike 3 has filed more than 2,700 complaints in federal court alleging copyright
infringement. Filing fees alone amount to more than $1.1 million.

Since the date of the Lansky Declaration, Strike 3 has filed more than 2,600 complaints alleging copyright infringement. In the first two months of 2019, Strike 3 had filed more than 360 complaints. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

The Lansky Declaration claims Strike 3 was formed in 2015. Prior to the formation of Strike 3, Malibu Media, LLC filed nearly 3,300 complaints alleging copyright infringement similar to the claims Strike 3 is making in this case. Mr. Lansky claims he was involved in the industry for approximately nine years before forming Strike 3. His declaration indicates that he was sufficiently familiar with the industry to conclude, "the industry and I were not offering the best quality and experience possible." As someone with nearly a decade of experience in the industry, it would be reasonable to conclude that Mr. Lanksy was aware of the highly publicized Malibu Media cases and had an understanding of the pervasiveness of alleged copyright infringement of pornographic works. It defies economic reasoning and common sense that Mr. Lansky would form his business and—as he says in his declaration—"risk everything" without a strategy to mitigate the costs of anticipated efforts to infringe on Strike 3's works.

Forensic watermarking of content is a well-known and widely used technique to identify individuals distributing infringing content and has been available prior to the formation of Strike 3.[1] Trade publication Streaming Media notes: "Forensic watermarking allows content owners and rights holders to identify pirated content online, then alert internet service providers, who can then issue a warning to the infringing user or even shut off the user's subscription."[2] Using such a service, Strike 3 can identify which of its subscribers is uploading infringing content and take immediate action, such as cancelling the uploaders' subscriptions to Strike 3's services.

---

[1] See, for example: Trabelsi, W. and M. H. Selmi. Multi-signature robust video watermarking. *2014 1st International Conference on Advanced Technologies for Signal and Image Processing (ATSIP)*, pp. 158-163. 2014.

[2] Krefetz, N. Protecting your assets: How studios secure their premium video. *Streaming Media Magazine*. September 28, 2018. https://www.streamingmedia.com/Articles/Editorial/Featured-Articles/Protecting-Your-Assets-How-Studios-Secure-Their-Premium-Video--127701.aspx, retrieved February 22, 2019.

Custos Media Technologies (RF) (Pty) Ltd. provides a service named "Screener Copy." The service adds a unique watermark and embeds a Bitcoin bounty to each video file distributed to users. The watermark and bounty make each copy identifiable and traceable. "Bounty hunters" on the Internet scan video files for the hidden Bitcoin bounties and, once found, claim it as a reward. Once the bounty is claimed, the copyright owner is notified of the leaked copy. Because the bounty is unique to each copy, the copyright owner can identify the source of the leak.[3] Custos indicates it was designed to serve "smaller movie producers" and claims of 130,000 copies of material it has distributed, the service has "not had a single leak."[4] Based on information available at the time of this report, it is likely that Custos' service or similar services would more effective and less costly than Strike 3's litigation strategy.

# 4   DMCA notices as a method to discourage infringement

The Lansky Declaration states Strike 3 sends an average of 50,000 DMCA notices a month, but that the notices do "virtually nothing" to stop infringement of its copyrights.

Citing *In re Charter Commc'ns, Subpoena Enforcement Matter*, 393 F.3d at 773 (8th Cir. 2005), the court in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.* (E.D. Va., 2016) notes:

> Congress enacted the Digital Millennium Copyright Act ("DMCA"), which sought to strike a balance "between the interests of ISPs in avoiding liability for infringing use of their services and the interest of copyright owners in protecting their intellectual property and minimizing online piracy." In return for a certain

---

[3] Custos Media Technologies (RF) (Pty) Ltd. Custos Video: A simple one-click solution for filmmakers and videographers. 2017. https://custostech.com/custos-video/, retrieved February 22, 2019.

[4] Lourie, G. This SA startup is fighting global problem of online piracy using Bitcoin blockchain. *TechFinancials*. June 21, 2018. https://techfinancials.co.za/2018/06/21/this-sa-startup-is-fighting-global-problem-of-online-piracy-using-bitcoin-blockchain/, retrieved February 22, 2019.

> amount of cooperation, ISPs would enjoy the protection of four
> liability-limiting safe harbors. To be eligible, an ISP must, for
> example, "adopt[] and reasonably implement[], and inform[]
> subscribers and account holders of the service provider's system or
> network of, a policy that provides for the termination in
> appropriate circumstances of subscribers and account holders of
> the service provider's system or network who are repeat
> infringers." [footnotes and citations omitted]

From an economics approach, the idea to "strike a balance" recognizes that the
purpose of copyright enforcement under the DMCA is to discourage
infringement while reducing the costs associated with litigation.

At the time of the downloading activity alleged by Plaintiff, Defendant's Internet
service provider, Comcast, indicates it had policies to comply with the DMCA:[5]

> Owners of copyrighted works who believe that their rights under
> U.S. copyright law have been infringed may take advantage of
> certain provisions of the Digital Millennium Copyright Act of 1998
> (the "DMCA") to report alleged infringements to us. In accordance
> with the DMCA and other applicable laws, Comcast also maintains
> a policy to terminate the Service, in appropriate circumstances,
> provided to any customer or user who is a repeat infringer of third
> party copyright rights.

I understand that Plaintiff has not provided any information demonstrating that
Strike 3 notified Comcast of Defendant's alleged activity outside of the present
litigation.

Monitoring companies like Rightscorp, Inc. send DMCA notices on behalf of
other media companies to the IP address of alleged infringers. In these notices,
requests are made to pay for the works allegedly infringed. In some cases, the
infringers have paid for the works allegedly infringed. In other cases, the notices
have been associated with a cessation of the alleged infringing activity. In either

---

[5] Comcast Corporation. Acceptable use policy for XFINITY® Internet. October 11, 2017.
https://web.archive.org/web/20171011050118/www.xfinity.com/Corporate/Customers/Policies/Hi
ghSpeedInternetAUP.html, retrieved February 22, 2019.

case, if the objective of Strike 3 is to reduce alleged infringement, this approach would be more beneficial to Strike 3 than filing lawsuits. The notice requesting payment would provide an infringer the incentive to convert to a subscriber. A notice to subscriber who is not the infringer could result in proactive actions to prevent infringement, such as changing a wi-fi password. Since the cost of sending a DMCA notice is de minimis, and since a DMCA notice can be sent in a more timely manner than filing a lawsuit, this approach is less costly and more effective than pursuing lawsuits against, what Plaintiff describes as "the worst" infringers.

I understand a 30(b)(6) deposition was taken of Strike 3. I have not had an opportunity to review the deposition transcript. Upon discussion with Defendant's counsel, I understand no objective reasons were presented indicating why DMCA notice cannot be sent to the IP address associated with a subscriber. Upon review of the transcripts, I intend to supplement my report.

# 5   Actual and statutory damages

17 USC 504 identifies two remedies for copyright infringement.

1. **Actual damages and profits**: a quantifiable monetary loss the plaintiff has suffered, or the profit the infringer has gained, from infringing the copyrights. I understand Plaintiff has not made a claim that Defendant gained a profit from the alleged copyright infringement. A quantifiable monetary loss to Plaintiff can be calculated by identifying what Plaintiff would have received had it sold or licensed the works.

2. **Statutory damages**: an amount in the range of $750 to $30,000 per infringed work. In some circumstances, including those in which the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court may reduce the award of statutory damages to $200.

I understand that Plaintiff sought statutory damages and did not specify the range of statutory damages sought (Complaint, Docket 1).

When this complaint was filed, statutory damages for 80 works was sought. Then, I understand Plaintiff amended its complaint and sought statutory

damages for 87 works. Likewise, Plaintiff did not specify the range of statutory damages sought.

In my experience defendants have been more concerned with the maximum exposure to damages than the likely exposure to damages. This is likely more significant in a case such as this, in which the Plaintiff is represented by a large national law firm having hundreds of attorneys.

For the range of statutory damages specified by 17 USC 504, and assuming Defendant is liable for infringing on all 87 works, damages would be in the range of $62,250 and $2,610,000.

In a similar BitTorrent case, the court concludes statutory damages are not intended to serve as a windfall to plaintiffs:[6]

> Plaintiff argues that a significantly higher award is necessary to force people like Defendants to appear and participate in these BitTorrent cases. Plaintiff apparently wants the Court to raise the statutory damage award to an amount that is at or above the anticipated costs of defending this action. A defendant may, however, decide that conceding liability through default is the best course of action given the nature of the claims and the available defenses. The "punishment" for that choice is the entry of default judgment and an award of damages under the governing standards. As discussed above, those standards lead to the conclusion that the minimum statutory penalty should apply in this case. Plaintiff offers no support for the proposition that participation in federal litigation should be compelled by imposing draconian penalties that are out of proportion to the harm caused by Defendants' actions or any benefits derived therefrom. Statutory damages are not intended to serve as a windfall to plaintiffs and will not be used to provide such a windfall here.

I reserve the right to supplement or modify my report if Plaintiff or its experts provide a quantifiable claim for damages.

---

[6] *CELL Film Holdings, LLC v. Roger Hawkins,* Order Granting in Part Cell Film Holdings' Motions for Default Judgment, Case 2:16-cv-01091-RSL (W.D. Wash, March 14, 2019).

# 6  Nuisance lawsuits and sue-then-settle strategies

Plaintiff's actions in this suit, and others, is consistent with a theory that plaintiff is pursuing nuisance-value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-of-prevailing claims.

One of the earliest models of a sue-then-settle strategy finds that with low costs of filing a suit, plaintiffs can gather valuable information about the strength of their claim from a defendant's response:[7]

> A strategy such as [file suit, then go to trial if the defendant offers to settle, otherwise drop the action] may not at first seem to make much sense. Why does the plaintiff not grab the settlement when it is offered? Further reflection reveals that such a strategy may be quite appropriate where the defendant has information not available to the plaintiff. For instance, it might be that the defendant has chosen [to offer to settle if violator, otherwise do not offer to settle]. For the plaintiff then, the defendant's offer to settle is an indication that the defendant did in fact violate the law, so that the plaintiff may prefer to increase his winnings by going to trial. On the other hand, the defendant's refusal to offer to settle may be an indication that he did not violate the law, in which case the plaintiff would want to cut his losses. …

> Put differently, the plaintiff's first strategy, (do not sue), is dominated by his fifth strategy, [file suit, then go to trial if the defendant offers to settle, otherwise drop the action]. We conclude that the plaintiff will always bring an action.

> This surprising result is implied by the assumption that the plaintiff incurs no legal costs by filing an action and then dropping it. Given the assumption, the conclusion is quite intuitive: the plaintiff loses nothing from filing suit.

---

[7] P'ng, I. P. L. (1983). Behavior in suit, settlement, and trial. *Bell Journal of Economics*, 14(2): 539–550.

Another early model of "nuisance suits" concludes that although a defendant knows that the plaintiff will drop the case if the defendant responds, the defendant will still be willing to pay a settlement amount of up to the cost of responding solely in order to avoid having to make such a response.[8]

P'ng (1983) applies his sue-then-settle model to what he calls "frivolous suits:"

> To some extent, this result accords with the folklore: a plaintiff brings a frivolous action in the hope of extorting a settlement that is less than the value of the defendant's legal costs. The analysis also points to another possibility: the defendant may be able to deter plaintiffs who have filed actions from bringing these to trial by adopting a strategy of refusing to settle, whatever his true type.

The economic rationale for damages is to make the Plaintiff "whole" and/or to deny the liable party of the profits of from the wrongful act. Concepts of the efficient allocation of resources conclude that laws, institutions, or arrangements that provide a windfall profit to plaintiffs would result in a misallocation of resources. Legal scholars have implicitly incorporated the economic approach in their attempts to define a copyright "troll:"[9]

> A copyright troll is a plaintiff who seeks damages for infringement upon a copyright it owns, not to be made whole, but rather as a primary or supplemental revenue stream.

The following attempt to define "trolling" recognizes the process of searching or prowling for potential revenues from litigation:[10]

> The essence of trolling is that the plaintiff is more focused on the business of litigation than on selling a product or service or licensing their IP to third parties to sell a product or a service. The paradigmatic troll plays a numbers game in which it targets hundreds or thousands of defendants, seeking quick settlements

---

[8] Rosenberg, D. and S. Shavell (1985). A model in which suits are brought for their nuisance value. *International Review of Law and Economics*. 5(1): 3–13.

[9] DeBriyn, J. (2012). Shedding light on copyright trolls: An analysis of mass copyright litigation in the age of statutory damages. *UCLA Entertainment Law Review*, 19(1): 79–112.

[10] Sag, M. (2015). Copyright trolling: An empirical study. *Iowa Law Review*, 100(3): 1105–1147.

priced just low enough that it is less expensive for the defendant to pay the troll rather than defend the claim.

Greenberg (2015) identifies the role statutory damages may play in the misallocation of resources for a copyright owner who "uses the prospect of statutory damages and litigation expenses to extract quick settlements of often weak claims."[11]

Commenting on the doctrine of copyright misuse, Judge Posner noted the following: "hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process."[12]

Consistent with Posner's observation regarding opponents with a "lack of resources," AIPLA (2011) reports the median cost of litigating copyright infringement through the end of discovery in the West is $150,000.[13]

Sudarshan (2008) proposes a three-part test to identify nuisance value patent litigation, which could be applied to copyright suits (citations omitted):[14]

> This Article relies on nuisance-value patent litigation having three specific and necessary definitional conditions.
>
> 1. First, the patent holder offers a settlement (or license) figure which is significantly less than the cost of defending the suit through the discovery phase of a trial.
>
> 2. Second, this settlement amount does not correspond to traditional measures of patent damages, i.e., reasonable royalty or lost profits.

---

[11] Greenberg, B. A. (2015). Copyright trolls and common law. *Iowa Law Review Bulletin*, vol. 100:77–86.

[12] *Assessment Techs. of WI, LLC v. Wire Data, Inc.*, 350 F.3d 640 (2003).

[13] American Intellectual Property Law Association (2011). *Report of the Economic Survey*.

[14] Sudarshan, R. (2008). Nuisance-value patent suits: An economic model and proposal, *Santa Clara High Technology Law Journal*, 25(1):159-189.

3. Third, the plaintiff seeks to avoid litigation because of a sufficiently high probability that the asserted claims are a) invalid, or b) not infringed by the defendant's products.

This definition recognizes that a suit is not necessarily a nuisance suit just because the offered settlement amount is less than the cost of defense. For example, the second prong of the definition excludes situations where a defendant's infringement may have been so minor that a license would have been worth less than the cost of asserting the patent in litigation. Similarly, the third prong of the definition leaves out scenarios where a plaintiff's validity and infringement contentions are meritorious, but a steep discount may have been given to the defendant for any number of reasons.

Based on information available at the time of this report, Strike 3's strategy in BitTorrent litigation appears to satisfy Sudarshan's (2008) three-part test for nuisance value litigation.

Sag (2015) suggests that sue-then-settle actions are consistent with a theory that plaintiffs are pursuing nuisance value settlements:[15]

After obtaining the names and addresses of account holders suspected of participating in a BitTorrent swarm, the plaintiff can get to work negotiating settlements. An account holder accused of infringement is almost invariably threatened with statutory damages and the prospect of paying the plaintiff's attorney's fees if he is unable to establish his innocence. Reports indicate that settlements are usually in the range of $2000 to $4000. That is a lot to pay for a movie, but only a fraction of the potential statutory damages for willful copyright infringement, which can be as high as $150,000 per work infringed. The $4000 figure is also evidently "a sum calculated to be just below the cost of a bare-bones defense." This does not prove that the plaintiffs are simply pursuing nuisance-value settlements, but it is consistent with that theory.

---

[15] Sag, M. (2015). Copyright trolling: An empirical study. *Iowa Law Review*, 100(3): 1105–1147.

EXPERT REPORT OF ERIC FRUITS, PH.D.                                        **15**

Consistent with Sag's (2015) observations, I understand Strike 3 has accepted offers of judgment of $3,250, inclusive of damages, costs, and attorney fees.

1. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 76.172.87.57* (S.D.Cal.) 3:17-cv-02317-JAH-BLM.

2. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 76.247.176.87* (N.D.Cal.) 5:17-cv-07058-EJD.

In a similar Strike 3 matter, the court concluded, "Strike 3 is a copyright troll," and invoked much of the economic logic discussed above:[16]

> Little wonder so many defendants settle. Indeed, the copyright troll's success rate comes not from the Copyright Act, but from the law of large numbers. According to PACER, over the past thirteen months, Strike 3 has filed 1849 cases just like this one in courts across the country—forty in this district alone—closely following the copyright trolls who together consumed 58% of the federal copyright docket in 2015. These serial litigants drop cases at the first sign of resistance, preying on low-hanging fruit and staying one step ahead of any coordinated defense. They don't seem to care about whether defendant actually did the infringing, or about developing the law. If a Billy Goat Gruff moves to confront a copyright troll in court, the troll cuts and runs back under its bridge. Perhaps the trolls fear a court disrupting their rinse-wash-and-repeat approach: file a deluge of complaints; ask the court to compel disclosure of the account holders; settle as many claims as possible; abandon the rest. [citations omitted]

Consistent with Judge Lamberth's "Billy Goat Gruff" observation, I understand Strike 3 has dismissed all cases being heard by Judge Zilly. I also understand that in the face of risking $250 in sanctions for missing deadlines in the Eastern District of California, Strike 3 has terminated 24 cases. This seems to support Judge Lamberth's "cut and run" observation.

---

[16] *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.180.154.14.* Memorandum Opinion. Civil Action #1:18-cv-01425-RCL (D.D.C). November 16, 2018.

EXPERT REPORT OF ERIC FRUITS, PH.D.                                    **16**

1. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.2.97.225*, 1:18-cv-01075-MCE-CKD

2. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 24.7.149.73*, 1:18-cv-01076-MCE-CKD

3. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.151.0.97*, 1:18-cv-01080-MCE-CKD

4. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.220.162.116*, 1:18-cv-01089-MCE-CKD

5. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.151.0.180*, 1:18-cv-01304-MCE-CKD

6. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 67.160.250.96*, 2:18-cv-02640-MCE-CKD

7. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.70.116.109*, 2:18-cv-02641-MCE-CKD

8. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.71.165.41*, 2:18-cv-02642-MCE-CKD

9. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 98.208.93.240*, 2:18-cv-02643-MCE-CKD

10. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 108.245.210.201*, 2:18-cv-02584-MCE-CKD

11. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 162.237.197.54*, 2:18-cv-02585-MCE-CKD

12. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 98.238.245.116*, 2:18-cv-02636-MCE-CKD

13. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 24.10.96.207*, 2:18-cv-02638-MCE-CKD

14. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 71.193.15.139*, 2:18-cv-02639-MCE-CKD

15. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.41.142.236*, 2:18-cv-02206-MCE-CKD

16. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.41.243.20,* 2:18-cv-02207-MCE-CKD

17. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.41.91.169,* 2:18-cv-02208-MCE-CKD

18. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.90.99.129,* 2:18-cv-02209-MCE-CKD

19. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 108.197.138.209,* 2:18-cv-02582-MCE-CKD

20. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 24.7.176.79,* 2:18-cv-02201-MCE-CKD

21. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 67.164.218.16,* 2:18-cv-02202-MCE-CKD

22. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 67.169.98.18,* 2:18-cv-02203-MCE-CKD

23. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.151.99.229,* 2:18-cv-02204-MCE-CKD

24. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.192.163.54,* 2:18-cv-02205-MCE-CKD

# 7   Plaintiff's revenues from settling litigation

Plaintiff has not provided financial information for Strike 3 in this matter. Upon provision of such information, I reserve the right to supplement or modify my report to evaluate revenues and/or income Plaintiff receives from pursuing its litigation strategy in BitTorrent matters. The following information would be useful to more comprehensively evaluate Plaintiff's income from pursuing and settling litigation:

1. Information similar to that submitted to the court in *Malibu Media, LLC v. John Doe subscriber assigned IP address 24.148.79.226,* Plaintiff's Status and Informational Report for Its Cases in the Northern District of Illinois, Civil Action No. 1:14-cv-00693 (N.D. Ill. Apr. 6, 2014). The submission provides

information regarding 268 cases filed by Malibu Media and included the following information:

    a.  Number of cases filed,

    b.  Number of cases with joined defendants and number of cases against a single defendant;

    c.  Investigation costs associated with each case including, but not limited to the purchase and investigation of PCAP files;

    d.  Status of each of the cases, such as:

        i.  Dismissed—Hardship

        ii.  Dismissed—Insufficient Evidence

        iii.  Dismissed—No Discovery

        iv.  Dismissed—Settled (including settlement amount)

        v.  Judgment Entered (including judgment amount)

        vi.  Litigation

        vii.  Negotiating

        viii.  Pre-Discovery

        ix.  Pre-Litigation

2.  Number of monthly and/or annual subscriptions to Strike 3's Blacked, Tushy, and Vixen adult websites; monthly and/or annual subscription revenue; processing charges associated with subscriptions.

3.  Number of monthly and/or annual unit sales of and revenues from DVDs sold by Strike 3.

4.  Monthly and/or annual expenditures associated with serving DMCA notices.

I understand depositions were taken—and continue to be taken—in this matter. I have not had an opportunity to review the deposition transcripts. Lacking any financial details from Strike 3, and based on Defendant's counsel's observations

from deposition testimony, I estimate the following allocation of revenues, costs, and profits from Plaintiff's litigation strategy to date.



*Revenues from settlements*, *IPP services*, and *net revenues from settlements* are from Defendant's counsel's observations of deposition testimony. Number of complaints are from Lex Machina. *Additional court fees* and *inside counsel* costs are my estimates.



# 8   Damages

My understanding is that Defendant has filed two counterclaims, one for declaratory relief of non-infringement and another for abuse of process. Further, my understanding is that Washington state law entitles a party claiming abuse of process to claim damages.[17]

I understand a part of the damage element is the harm incurred by the individual, including attorney's fees and costs. It is also my understanding that attorney's fees in the Ninth Circuit is determined by "Lodestar."

---

[17] *Hough v. Stockbridge*. 152 Wash. App. 328 (2009)

At this time, I understand that damages will be incurred as the case proceeds. These damage are likely to take the form of attorney's fees, expert fees, and actual harm to the Defendant separate from attorney's fees and costs.

The harm suffered by Defendant would be legal fees, which are ongoing until termination of this matter. At that time, I am prepared to give an opinion regarding the reasonableness of these fees. AIPLA (2011) reports the median cost of litigating copyright infringement through the end of discovery in the West is $150,000, with 50 percent of cases in the range of $100,000 to $250,000.[18]

The U.S. Supreme Court concluded, "a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright."[19] Economically speaking, an award of attorney's fees that encourages the defense of potential nuisance suits may further the policies of the Copyright Act by discouraging the filing of a suits that plaintiffs and plaintiffs' attorneys know to be nuisance suits.

# 9   Conclusion

Litigation is not the only way for Plaintiff to stop infringement. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

DMCA notices are one well known and widely used method to discourage infringement. At the time of the downloading activity alleged by Plaintiff, Defendant's Internet service provider, Comcast, indicates it had policies to comply with the DMCA, including, "a policy to terminate the Service, in appropriate circumstances, provided to any customer or user who is a repeat infringer of third party copyright rights."

Plaintiff's actions in this suit, and others, are consistent with a theory that plaintiff is pursuing nuisance value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-

---

[18] American Intellectual Property Law Association (2011). *Report of the Economic Survey*.
[19] *Fogerty v. Fantasy*, 510 U.S. 517 (1994).

of-prevailing claims. Strike 3's strategy in BitTorrent litigation appears to satisfy a three-part test for nuisance value litigation. ■

Respectfully submitted by

Dated: April 15, 2019

Eric Fruits, Ph.D.

# Eric Fruits, Ph.D.

Tel: 503-928-6635
www.econinternational.com
fruits@econinternational.com

**Dr. Eric Fruits** is an economics expert, finance expert, and statistics expert. He has produced numerous research studies involving economic analysis, financial modeling, and statistical analysis.  As an expert witness, he has provided expert testimony in state courts, federal courts, and an international court.



 As an economic damages expert, Dr. Fruits has provided expert testimony regarding business valuation, lost profits, and foregone income.  He has been a testifying expert in cases involving real estate valuation, health care services, and transportation and shipping services.  His research on the formation of cartels was published in the top-tier *Journal of Law & Economics*.  His study of the impact of natural gas pipeline on residential property values has been published in the *Journal of Real Estate Research*, one of the premier academic journals in the field. He has provided expert testimony to state courts and federal courts.

 As a finance expert, Dr. Fruits has been a testifying expert and provided expert consulting services in cases alleging insider trading and market manipulation.  He is a securities expert who has conducted numerous research studies on financial issues, including initial public offerings and municipal bonds.

 As a statistical expert, Dr. Fruits has provided expert testimony regarding real estate transactions, profit projections, agricultural commodities, and war crimes allegations.  His expert testimony has been submitted to state courts, federal courts, and an international court.

 He has written peer-reviewed articles on real estate markets, initial public offerings (IPOs), the municipal bond market, and the formation and operation of cartels.

 Dr. Fruits has been affiliated with Portland State University, Pacific Northwest College of Art, University of Southern California, Indiana University, and the Claremont Colleges.  He has been an economic consultant with Nathan Associates, LECG, ECONorthwest, and Econ One Research.

## Present Positions & Affiliations

Economics International Corp.              2006–present
  President and Chief Economist

Cascade Policy Institute                2019–present
  Vice President of Research

International Center for Law & Economics        2017–present
  Chief Economist

Portland State University               2002–present
  Adjunct Professor in Economics, Business Administration, and Urban Studies & Planning

## Previous Professional Experience

Portland State University                                                                      2010–2019
    Oregon Association of Realtors Faculty Fellow
    *Center for Real Estate Quarterly Report*, Editor

Nathan Associates Inc.                                                                         2012–2018
    Principal Consultant

Info Tech, Inc.                                                                                2015–2018
    Expert Consultant

Pacific Northwest College of Art                                                               2009–2010
    Adjunct Professor

ECONorthwest                                                                                   2002–2008
    Senior Economist

LECG, LLC                                                                                      1999–2002
    Senior Economist

Claremont Graduate University                                                                  1996–2002
    Adjunct Professor of Economics and Visiting Scholar

Econ One Research, Inc.                                                                        1998–1999
    Economist

University of Southern California, Marshall School of Business                                 1997–1998
    Visiting Assistant Professor of Finance & Business Economics

Indiana University, Kelley School of Business                                                  1997
    Visiting Assistant Professor of Business Economics & Public Policy

Scripps College                                                                                1996
    Adjunct Professor of Economics

Pomona College                                                                                 1994
    Lecturer in Economics

Andersen Consulting                                                                            1990–1991
    Staff Consultant

## Education

Ph.D., Economics, Claremont Graduate University                                                1997

M.A., Economics, Claremont Graduate University                                                 1993

B.S. with Distinction, Business Economics & Public Policy, Indiana University                  1990

# Publications, Reports, and Other Papers

## Academic Publications

Perceived environmental risk, media, and residential sales prices. *Journal of Real Estate Research*, with J. Freybote. 37(2):217–243. 2015.

Compact development and greenhouse gas emissions: A review of recent research. *Center for Real Estate Quarterly Journal*, 5(1):2–7. Winter 2011.

Test bank for W. B. Brueggeman and J. D. Fisher. *Real Estate Finance and Investments*, 14th ed. McGraw-Hill/Irwin. 2010.

A comprehensive evaluation of the comparative cost of negotiated and competitive methods of municipal bond issuance. *Municipal Finance Journal*, with R. J. Pozdena, J. Booth, and R. Smith. 28(4):15–41. Winter 2008.

Market power and cartel formation: Theory and an empirical test. *Journal of Law and Economics*, with D. Filson, E. Keen, and T. Borcherding. 44:465–480. 2001.

*The Determinants of Managerial Ownership: Theory and Evidence From Initial Public Offerings*. Claremont Graduate University. 1997.

Managerial ownership, compensation, and initial public offerings. In Marr, M. and Hirschey, M., editors, *Advances in Financial Economics*, volume 2. JAI Press. 1996.

## Research Reports

*Impact of Federal Transfers on State and Local Own-Source Spending*. Interstate Policy Alliance. 2015.

*Impact of Right-to-Work on the State of Washington*. Washington Policy Center. 2015.

*Proposal for Management of the Elliott State Forest to Provide Adequate Returns for Oregon Schools*. Cascade Policy Institute. 2014.

*Tax Myths Debunked*. American Legislative Exchange Council, with R. J. Pozdena. 2013.

Forecast of Oregon's economy in 2013: Disappointing but not disastrous. *Center for Real Estate Quarterly Journal*, 6(4):4–10. Fall 2012.

*Right-to-Work and Economic Growth: A Comprehensive Analysis of the Economic Benefits to New Mexico of Enacting a Right-to-Work Law*. Rio Grande Foundation. 2012.

*Right-to-Work is Right for Oregon: A Comprehensive Analysis of the Economics Benefits From Enacting a Right-to-Work Law*. Cascade Policy Institute, with R. J. Pozdena. 2012.

*Tax Policy and the Colorado Economy: The Effects on Employment and Migration*. Common Sense Policy Roundtable, with R. J. Pozdena. 2011.

*Fiscal Impacts of an Oregon Tax Credit Scholarship Program*. Cascade Policy Institute. 2011.

*The Oregon Health Plan: A "Bold Experiment" that Failed*. Cascade Policy Institute. 2010.

*Tax Policy and the Oregon Economy: The Effects of Measures 66 and 67*. Cascade Policy Institute, with R. J. Pozdena. 2009.

*Future Management of the Elliott State Forest: Providing Adequate Returns for Oregons Schools*. Cascade Policy Institute. 2009.

*Fiscal Impacts of Proposed Educational Tax Credits*. Cascade Policy Institute. 2009.

*Impact of Minimum Wage Indexing on Employment and Wages: Evidence from Oregon and Washington*. Employment Policies Institute. 2009.

*The Relationship Between Residential Development and Greenhouse Gas Emissions.* National Association of Homebuilders. 2008.

*Oregon Greenhouse Gas Reduction Policies: The Economic and Fiscal Impact Challenges*. Cascade Policy Institute, with R. J. Pozdena. 2008.

*The Ranking of Oregon State and Local Spending*. Cascade Policy Institute, with R. J. Pozdena. 2008.

Damages: Experts, liability, and calculations. In *The Employment Case: From Discovery to Decision*. Oregon State Bar CLE Seminars. 2004.

*How Does Oregon Spending Rank?  Ideas for Budget Stability*. Cascade Policy Institute, with R. J. Pozdena. 2004.

## Letters, Op-Eds, and Columns

Supplement bus lines with ridesharing. *Portland Tribune*. January 24, 2019.

What ever happened to Pendleton Grain Growers?  Pay attention to your co-op. *Oregon Family Farmer*. Fall 2018.

80% of Oregon marijuana exported? *Oregon Family Farmer*.  Fall 2018.

Taxing e-cigarettes may do more harm than good. *Oregonian*.  November 29, 2018.

Policy reforms would improve state for all. *Portland Tribune*.  December 14, 2017.  Also published in *Gresham Outlook*.

Health care tax would hurt middle class. *Portland Tribune*.  September 21, 2017.

State can balance budget without taxes. *Portland Tribune*.  February 23, 2017.

Oregon leaders must reject Medicaid expansion. *Oregonian*.  January 27, 2017.

Oregon: State of wonder, or state of failure? *Oregon Business*.  May 2016.

How "free" federal money costs North Carolina. *News & Observer*, with B. Balfour.  December 15, 2015.

The real cost to states of "free" federal grants. *Orange County Register*.  December 10, 2015.

Demand, not fiat, creates jobs. *Wall Street Journal*.  June 27, 2015.

Right to work is right for Washington. *Puget Sound Business Journal*, with Erin Shannon. June 26, 2015.

Oregon chemical bill is bad news for businesses. *Oregonian*. April 11, 2015.

Right to work is right for West Virginia. *Charleston Daily Mail*. February 19, 2015.

City's noble goal meets an outlawed tax. *Portland Tribune*. August 8, 2012.

Right to work law can spur economy. *Deming Headlight*. July 10, 2012. Also published in *Tri-City Tribune*.

Rethinking public schools: It's time Portland elects a real education mayor. *Oregonian*. August 9, 2011.

PPS bonds: Save the schools but lose the house? *Oregonian*. January 12, 2011.

Water and sewer charges: Basic services before pet projects. *Oregonian*. May 21, 2010.

PERS disaster will cost taxpayers. *Statesman Journal*. November 8, 2009.

Health care: Congress can learn from the costly mistakes of the states. *Oregonian*. September 1, 2009.

Behind Oregon's jobless rate. *Oregon Business*. February 2009.

The high costs of climate change policies. *Oregonian*. January 24, 2009.

Facing the challenge of a revenue shortfall. *Oregonian*. November 19, 2008.

The youngest boomers trail behind. *Oregon Business*. September 2008.

Slow the growth to cut the carbon. *Oregon Business*. April 2008.

Do we really have a health-care crisis? *Oregon Business*. January 2008.

Economic forecast: Will 2008 bring economic salvation? *Oregon Business Powerbook 2008*. 2007.

The pixie dust of streetcars. *Oregon Business*. October 2007.

Pay me what I'm worth, or else. *Oregon Business*. July 2007.

Easy money. *The Economist*, p. 6. 1994.

## Committee and Other Service

Peer reviewer and academic adviser for textbooks and academic journals:

A. O'Sullivan. *Urban Economics*, 9th ed. McGraw-Hill/Irwin. In print.

*Taking Sides: Clashing Views in Urban Studies*. M. A. Levine, editor. McGraw Hill. 2012.

W. B. Brueggeman and J. D. Fisher. *Real Estate Finance and Investments*, 14th ed. McGraw-Hill/Irwin. 2011.

*Municipal Finance Journal*

*Land Economics*

Taxpayer Association of Oregon. Board Member, 2014–present.

City Club of Portland. Research Board Member, 2015–2017.

State of Oregon. Explanatory Statement Committee member. Ballot Title 86: Amends Constitution: Requires creation of fund for Oregonians pursuing post-secondary education, authorizes state indebtedness to finance fund. 2014.

Laurelhurst Neighborhood Association. City of Portland, Oregon. Past President and Board Member, 2014–2015. President, 2009–2014.

City of Portland. Mayor's Economic Cabinet. 2008–2012.

State of Oregon Department of Environmental Quality. Fiscal Advisory Committee for the Proposed Adoption of Air Quality Improvements at the PGE Boardman Power Plant. 2008.

State of Oregon Department of Environmental Quality. Fiscal Advisory Committee for the Proposed Adoption of the Utility Mercury Rule and Other Federal Air Quality Regulations. 2006.

City of Portland. Mayor's Ad Hoc Work Group on Regulatory Reform. 2002.

## Testimony in Legal Proceedings

*Julie Veysey v. Israel Cervante Meraz and Henry Nicholas Veysey.* Circuit Court for the State of Oregon for the County of Marion. Case No. 17CV52030. Trial testimony October 3, 2018.

*Katrina L. Pinkerton v. Wells Fargo Bank, N.A.* United States Bankruptcy Court for the District of Oregon. Case No. 17-33794-tmb13. Adv. Proc. No. 18-03016-tmb. Prove-up hearing testimony June 20, 2018.

*Estate of Jamey Charlotte Haines v. State of Oregon Department of Transportation.* Circuit Court for the State of Oregon for the County of Washington. Case No. 17CV17952. Trial testimony February 6, 2018.

*Rosebank Road Medical Services Ltd. dba Rosebank Road Medical Centre, and Geeta Murali Ganesh v. Ramji Govindarajan and John Does 2–20.* Superior Court of California, County of San Francisco, Unlimited Civil. Case No. CGC-16-549755. Deposition testimony September 27, 2017. Trial testimony December 13–14, 2017.

*United States of America ex rel. Duke Tran v. Wells Fargo Bank, N.A.* United States District Court for the District of Oregon, Portland Division. Case No. 3:15-cv-979. Deposition testimony October 3, 2017.

*Nubia Rodriguez v. The State of Oregon, Department of Human Services and Antoinette Hughes.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 16CV09393. Trial testimony September 13, 2017.

*Madison-Rae Jordan v. United States of America.* United States District Court for the Southern District of California. Case No. 3:15-cv-01199-BEN-NLS. Deposition testimony January 25, 2017.

*Marie M. Pearson v. Waste Management of Oregon, Inc. and James Walker.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 15CV18258. Trial testimony August 23, 2016.

*Investors Asset Acquisition, et al. v. Angelo S. Scardina, et al.* Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. Case No. 502014CA004618XXXXMB AD. Deposition testimony August 5, 2016.

*James Busey vs. Richland School District, Richard Jansons, Heather Cleary, Mary Guay, Rick Donahoe, and Phyllis Strickler.* United States District Court for the Eastern District of Washington. Case No. CV-12-5022-EFS. Deposition testimony February 25, 2016.

*Kivin Varghese v. Amazon.com, Inc. and Amazon Technologies, Inc.* Superior Court for the State of Washington in and for the County of King. No. 12-2-39303-6 SEA. Deposition testimony September 22, 2014.

*LMG Concerts, LLC v. Salem Communications Corporation, Salem Media of Oregon, Inc., Caron Broadcasting, Inc., Does 1 through 5.* U.S. District Court for the District of Oregon. Case No. 3:12-CV-1117. Deposition testimony September 18, 2013.

*Claude Hadley v. Extreme Technologies, Inc.* Circuit Court for the State of Oregon for Lane County. Case No. 16-11-03225. Trial testimony March 14, 2012.

*David Hill Development, LLC, v. City of Forest Grove, Steve A. Wood, and Robert A. Foster.* U.S. District Court for the District of Oregon. Civ. No. 08-266-AC. Deposition testimony December 10, 2010. Trial testimony September 20, 2011.

*Gordon Ogawa v. Malheur Home Telephone Company dba Malheur Bell and Qwest Corporation.* U.S. District Court for the District of Oregon. No. CV 08-694-MO. Trial testimony September 9, 2010.

*Dave Molony and Gold Leaf Investments, Inc. v. Crook County.* U.S. District Court for the District of Oregon. No. 3:05-CV-1467-MO. Trial testimony May 27, 2009.

*Starr-Wood Cardiac Group of Portland, P.C., Dr. H. Storm Floten, and Dr. Anthony Furnary v. Dr. Jeffrey S. Swanson, Dr. Hugh L. Gately, and Cardiothoracic Surgeons LLC.* Circuit Court for the State of Oregon for the County of Multnomah, No. 0706-06308. Trial testimony September 5, 2008.

*Milutinovic et al.* International Criminal Tribunal for the former Yugoslavia, No. IT-05-87 PT. Trial testimony April 23–24, 2008.

*In re: The Marriage of Virginia Salvadori and Gabriel Salvadori.* State of Washington Clark County Superior Court, No. 06-3-00692-2. Trial testimony April 14, 2008.

*Pamela L. Bond, Individually and as Personal Representative of the Estate of Craig R. Bond, Deceased v. United State of America.* U.S. District Court for the District of Oregon. No. 06-1652-JO. Trial testimony February 6, 2008.

*Erik E. Tolleshaug v. Shaver Transportation Co.* Circuit Court for the State of Oregon for the County of Multnomah, No. 060809122. Trial testimony December 14, 2007.

*In re: The Marriage of Denise M. Kunze and Gust F. Kunze.* State of Washington Clark County Superior Court, No. 05-3-00801-3. Trial testimony October 29, 2007.

*Securities and Exchange Commission v. Philip Evans and Paul Evans.*  U.S. District Court for the District of Oregon.  No. CV 05-1162-PK. Deposition testimony February 27, 2007.  Trial testimony March 8, 2007.

*Randall D. Lam v. Kaiser Foundation Hospitals; Northwest Permanente, P.C.; Kaiser Foundation Health Plan of the Northwest; Robert James Shneidman, M.D.; and David Lee Brown, Jr., P.A.* Circuit Court for the State of Oregon for the County of Multnomah. No. 020706633.  Trial testimony November 9, 2006.

*Vitascan Partners I and Vitascan Partners II v. G.E. Healthcare Financial Services and GE/Imatron.* Superior Court for the State of California.  No. 01129909.  Trial testimony July 24, 2006.

*Squaxin Island Tribe, Island Enterprises, Inc., Swinomish Indian Tribal Community, and Swinomish Development Authority v. Fred Stephens, Director, Washington State Department of Licensing.* U.S. District Court for Western District of Washington.  No. C033951Z. Deposition testimony June 15, 2005.

*Androutsakos v. M/V PSARA, PSARA Shipping Corporation, and Chevron U.S.A., Inc.* United States District Court for the District of Oregon.  No. 02CV1173KI. Trial testimony May 21, 2004.

*In re: Consolidated PERS Litigation.* Supreme Court for the State of Oregon.  Nos. S50593, S50532, S50656, S50657, S50645, S50685, S50687, and S50686.  Trial testimony February 27, 2004.

*CollegeNET, Inc., v. ApplyYourself, Inc.* United States District Court for the District of Oregon.  Nos. 02CV484HU and 02CV1359HU. Daubert hearing May 9, 2003.

## Grants and Awards

| | |
|---|---:|
| City of Portland Spirit of Portland Award, nominee | 2010 |
| City of Portland Livability Volunteer Award | 2010 |
| Institute for Humane Studies Research Grant | 1996 |
| John Randolph Haynes and Dora Haynes Foundation Grant | 1995 |
| Lynde and Harry Bradley Foundation Grant | 1992–1995 |
| Lionel Edie Award | 1990 |

## Courses Taught

Microeconomics

Industrial Organization

Economics of Regulation and Antitrust

Urban Economics

Managerial Economics

Econometrics

Eric Fruits, Ph.D.                                                                                    9

Real Estate Finance and Investment

State and Local Public Finance

Economics and the Creative Industries

War Crimes

March 14, 2019