# **<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


STRIKE 3 HOLDINGS, LLC, a Delaware )
corporation,                       )
                                   )
            Plaintiff,             )
                                   ) Case No.
      vs.                          ) 2:17-cv-01731-TSZ
                                   )
JOHN DOE, subscriber assigned IP   )
address 73.225.38.130,             )
                                   )
            Defendant.             )


VIDEOTAPED DEPOSITION OF ███████████

April 9, 2019

10:01 a.m.

Seattle, Washington


Reported by:
Mark Hovila, CCR, CM
CCR No. 2599
Job No. 790669

Page 30

```
1        Q.   Who?
2        A.   I do not know his name, but an attorney in
3   Spokane.
4        Q.   Okay.  And was that one of the attorneys
5   you'd reached out to --
6        A.   Yes.
7        Q.   -- see about working on this?
8        A.   Yes.
9        Q.   Okay.  And who referred you to the Terrell
10  Marshall firm?
11       A.   The Terrell --
12       Q.   This is her firm.
13            MS. McENTEE:  I'm going to object and
14  instruct the witness not to answer, because it's
15  invading the attorney-client privilege.
16  BY MR. BANDLOW:
17       Q.   Did you pay Mr. Edmondson up front to
18  represent you in this case?
19       A.   No.
20            MS. McENTEE:  Objection.  Instruct the
21  client not to answer.  You don't get to ask these
22  questions about --
23            MR. BANDLOW:  Are you sure?  Compensation to
24  an attorney you don't get to ask?  Do you want to give
25  me a case on that?
```

Page 31

```
1            MS. McENTEE:  You want to give me a case on
2   the other side?
3            MR. BANDLOW:  Absolutely you get to ask
4   about financial arrangements between the attorney.
5   I've asked it about 100 times in cases.  You're going
6   to instruct him not to answer that?
7            MS. McENTEE:  Why don't you let us take a
8   break.
9            THE VIDEOGRAPHER:  We're going off the
10  record.
11           (Recess)
12           THE VIDEOGRAPHER:  We are back on the
13  record.
14           MR. BANDLOW:  Did you want to say something
15  about the last objection?
16           MS. McENTEE:  No.  I thought that you were
17  intending to just go forward with the questioning and
18  allow any objections to be on the record.
19  BY MR. BANDLOW:
20       Q.   Okay.  How much did you pay Mr. Edmondson to
21  retain him to take this case?
22            MS. McENTEE:  Objection and instruction not
23  to answer.
24  BY MR. BANDLOW:
25       Q.   Are you going to follow your lawyer's advice
```

Page 32

```
1   and not answer that question?
2        A.   Yes.
3        Q.   Okay.  How much did have you paid to date in
4   legal fees to defend this case?
5            MS. McENTEE:  Same objection.  And I just
6   want to add to that that we are not interested in
7   having a waiver of the attorney-client privilege here.
8   I think this is an issue that we need to take up with
9   the court, because obviously you're entitled to
10  explore damages in this case for abuse of process.
11  But I think we need to figure out a mechanism for that
12  to happen that doesn't involve my client waiving his
13  attorney-client privilege, which is why I suggested
14  that we try to talk about this off the record before
15  we resume questioning.
16           MR. BANDLOW:  Well, okay, we can go off the
17  record if you want to in a minute.  I don't ever have
18  any intention of asking him anything he's discussed
19  with his attorneys, conversations about how to handle
20  the case, anything of that nature.  I'm interested in
21  simply how much he's paid and who's paying the legal
22  fees in this case.  Period.  It will end at that.  I'm
23  not going to go into anything else attorney-client
24  privilege.  If you think by his answering that
25  question that somehow waives privilege, I don't agree
```

Page 33

```
1   that it does, because I don't think it's privileged
2   information, but it's certainly clear for the record I
3   don't ever care about any conversations or
4   interactions he's had with his counsel.  I'm asking
5   solely about financial aspects of this case.
6            MS. McENTEE:  Certainly if the question is
7   have you paid anything, how much have you paid, are
8   you obligated to pay, and are you obligated for costs,
9   I think those are appropriate questions.
10           MR. BANDLOW:  Okay.  I'd love the answer to
11  all of those.  They were great.  I might even have the
12  reporter read them back they, were so good.
13  BY MR. BANDLOW:
14       Q.   Are you obligated to pay costs in this
15  lawsuit?
16       A.   Yes, I am.
17       Q.   Okay.  And have you to date paid costs?
18       A.   No.
19       Q.   Have you paid anything in attorney's fees to
20  date on this matter?
21       A.   No.
22       Q.   Do you know who has -- do you know if anyone
23  has paid your attorneys for their services for this
24  case?
25       A.   No.  No.
```



Page 218

1

---

Page 219

1    Q.   Okay.  And you filed a declaration early in
2  this case essentially saying you'd never heard of us,
3  you'd never downloaded anything, et cetera, right?
4    A.   Yes.
5    Q.   Were you made aware at the beginning of this
6  lawsuit that if Strike 3 could verify the contents of
7  that declaration it would dismiss the lawsuit?
8    A.   I'm assuming that the letter may have -- I
9  don't know how, you know -- that they may have what?
10   Q.   Dismissed the lawsuit if they could just
11 confirm the contents of your declaration.
12   A.   I don't know how -- I'd have to read the
13 letter to put it, you know.
14   Q.   And as of the date when you filed the
15 declaration, it was signed John Doe --
16   A.   Yes.
17   Q.   -- and we had no idea who you were, correct?
18   A.   Yes.
19   Q.   And do you have any idea how long it took
20 for Strike 3 to be actually made aware of your name
21 and address after filing the lawsuit?
22        MS. McENTEE:  I've allowed some leeway here,
23 but I'm objecting because you're getting into an
24 attorney-client privileged area and it's improper.  So
25 I think you should move on.

---

Page 220

1  BY MR. BANDLOW:
2    Q.   You knew the judge had ordered that Comcast
3  had to provide that information to the judge and not
4  to us, right?
5        MS. McENTEE:  Objection, foundation.
6  BY MR. BANDLOW:
7    Q.   You can answer.  She's making objections for
8  the record.
9    A.   Oh.  Can you ask it again?
10   Q.   You had been made aware early on that if the
11 judge had entered an order that Comcast was not to
12 give your name and address to Strike 3 but was simply
13 to give it to the court?
14        MS. McENTEE:  Don't answer that question.
15 Another objection.  You're infringing on the
16 attorney-client privilege.  Now, if you have some
17 other sort of evidence you want to provide to this
18 witness that does not infringe on that privilege, by
19 all means.
20 BY MR. BANDLOW:
21   Q.   Exhibit 2.  Your letter to Comcast.  You
22 wrote: "In part, the 'MINUTE ORDER' provides that:
23 As of 1/25/2018, if the ISP has not already provided
24 responsive material to the plaintiff or its counsel,
25 the ISP shall not disclose any such responsive

---

Page 221

1  material to plaintiff or its counsel, but instead
2  shall send the responsive material, in an envelope
3  promptly marked 'CONFIDENTIAL SUBSCRIBER INFORMATION,
4  TO BE FILED UNDER SEAL,' addressed to the Clerk."  You
5  knew --
6    A.   Yes.
7    Q.   -- as of February 2nd, 2018, that the
8  information was not going to come to Strike 3, it was
9  going to go to the court alone, correct?
10   A.   Yes.  That --
11   Q.   And when did you find out your ultimate
12 information as to who you were and what your address
13 had been provided to Strike 3?
14   A.   When did I find out?
15   Q.   Yeah.
16        MS. McENTEE:  Again, objection and
17 instruction not to answer.  You are infringing on the
18 attorney-client privilege.
19 BY MR. BANDLOW:
20   Q.   Are you going to follow that instruction?
21   A.   Yeah.
22   Q.   Okay.  You were in law enforcement for a
23 number of years, correct?
24   A.   Yes.
25   Q.   Multiple people in your course of dealing in

Page 262

```
1   point of DMCA.
2       A.  Okay.
3           MS. McENTEE:  Counsel, are you going to ask
4   questions?
5   BY MR. BANDLOW:
6       Q.  Did you know that?
7       A.  No.
8           MS. McENTEE:  You keep asking this witness,
9   a lay witness, questions that are more appropriately
10  directed to experts.  If you want to keep --
11          MR. BANDLOW:  No --
12          MS. McENTEE:  -- going down that path we
13  can, but --
14          MR. BANDLOW:  No.  No.  I'm asking about his
15  allegations.
16          MS. McENTEE:  Okay.  Go ahead.
17          MR. BANDLOW:  Period.  Period.  I'm reading
18  specifically from his allegations.
19  BY MR. BANDLOW:
20      Q.  What was your good faith basis for your
21  assertion that Strike 3 has no intention of litigating
22  its cases?
23      A.  Again, it's just based on what I have, you
24  know, read that they're more interested in or
25  interested in settling without going to court.  I
```

Page 263

```
1   don't -- you know.  I've read that numerous times
2   and --
3       Q.  Did you do any research of the lawsuits
4   filed by Strike 3 around the country to see if they'd
5   actually litigated any of them?
6       A.  Well, the only ones that I'd done, you know,
7   I can't say the only ones.  Ones that I had researched
8   or printed out in many cases involved numerous filings
9   on one filing for numerous IP addresses, and that in
10  the end, the only one that was -- that the filing was
11  -- everything was thrown out except for the primary.
12      Q.  Are you talking about cases where there were
13  multiple defendants joined in one lawsuit?
14      A.  Yes.
15      Q.  Did you read those?  You know that's not
16  this case, right?  This is a --
17      A.  Yes, I do know that.  I'm basing -- I'm
18  basing what you're asking me about on what I had read
19  and what I had, you know, the things that I had read.
20      Q.  Does that include cases where that other
21  plaintiffs besides Strike 3 have done in these kind of
22  cases?  Did that information go into your good faith
23  basis for making these allegations?  Do you know who
24  Prenda is?
25      A.  No, I don't know who Prenda is.
```

Page 264

```
1       Q.  Do you know who Malibu Media is?
2       A.  I've heard of that, yes, in that research.
3       Q.  Okay.  So you saw some of the information of
4   other plaintiffs.  Did you put that into the mix of
5   what you made as the basis for your allegations
6   against Strike 3?
7       A.  I would -- yeah.
8       Q.  What other people have done?
9       A.  What other people and what I observed from
10  Strike 3.
11      Q.  Okay.  What did you observe from Strike 3 by
12  the time you filed the counterclaim?
13      A.  Well, on the cases, I'm saying.
14      Q.  Did you do a PACER search?
15      A.  I don't have PACER, no.
16      Q.  You know what PACER is though, right?
17      A.  Yeah.  I thought about, you know --
18      Q.  You could track federal pleadings, couldn't
19  you, with PACER, right?
20      A.  With?
21      Q.  With PACER you could track federal
22  pleadings.
23      A.  Well, I don't know that much about it.  I
24  just know they have access to -- you can get access to
25  court decisions and things.
```

```
1       Q.  What do you want out of the counterclaim?
2   What do you want?
3       A.  What do I want?
4       Q.  Yeah.  You've got a counterclaim.  What do
5   you want?
6       A.  I want attorney fees covered.
7       Q.  In case they go after you for attorney's
8   fees, because you haven't paid them yet, right?
9       A.  Huh?
10      Q.  You haven't had to pay them yet?
11      A.  I don't want to have to pay anybody for
12  attorney fees that I'm wrongly accused of.
13      Q.  Do you have a deal with your attorneys that
14  allowed them to go seek attorney's fees from Strike 3
15  so that you don't ever have to pay them?
16          MS. McENTEE:  Objection and instruction not
17  to answer.  You do not get to ask that question.
18          MR. BANDLOW:  Oh.  Questions about retainer
19  agreements and how they work aren't proper?
20          MS. McENTEE:  I asked you earlier,
21  counsel --
22          MR. BANDLOW:  I'll just make a note for the
23  end of this week.
24          MS. McENTEE:  No, no, no.  I asked you
25  earlier to provide me some case law on that issue and
```

1  you did not.
2       MR. BANDLOW:  Because you withdrew your
3  objection.  Now you're making it again.
4       MS. McENTEE:  No.  I went through objection
5  as to --
6       MR. BANDLOW:  You let him answer all of
7  them.
8       MS. McENTEE:  Counsel, please don't
9  interrupt.
10      MR. BANDLOW:  You let him answer all of
11 them.  That's why I didn't --
12      MS. McENTEE:  I gave leeway to ask questions
13 that are proper.  But you don't get to get into the
14 details of a retainer agreement.  And if you have
15 authority, right, which suggests otherwise, please
16 share it with me and I am happy to consider it.  But
17 without that I'm not going to waive my client's
18 attorney-client privilege.
19 BY MR. BANDLOW:
20      Q.   So you want the attorney's fees.  Right?
21      A.   Absolutely.
22      Q.   Okay.
23      A.   I don't believe I am responsible -- there
24 would not have been any attorney fees had the lawsuit
25 been brought on me.  Wrongly brought on me.

1       Q.   If you -- it's your understanding that
2  ultimately your attorneys are going to seek to have
3  you pay their attorney's fees?
4       A.   That would be -- yes.
5       Q.   Okay.  Anything else you want?
6       A.   That's -- that's the main thing.  I would
7  really like to see some practices changed.
8       Q.   What would you like to see changed?
9       A.   Notices, you know, letting people know that
10 they're doing, you know, doing something wrong and --
11      Q.   A DMCA notice tells an ISP that one of their
12 subscribers is infringing copyrighted works.  Do you
13 understand that?
14      A.   Yeah.
15      Q.   Okay.  So in other words, even a DMCA notice
16 that goes out to an ISP, it's informing that ISP of
17 infringements that have already happened.
18      A.   Okay.
19      Q.   Do you want those infringements that have
20 already happened to never be -- a person will never be
21 held responsible for them?
22      A.   In some cases, yeah.  If the person is not
23 knowingly downloading something that is infringement.
24 Not everything that people download are, you know, say
25 this is infringing on somebody's right.  If they do it

1  without knowing about it and are not notified, how are
2  to know that it's not -- you're not -- it's not
3  copyrighted material?
4       Q.   If you assume someone knowingly --
5       A.   If I assume --
6       Q.   Hold on.  If you assume someone knowingly
7  went onto BitTorrent to acquire movies that they had
8  not paid for so they could watch them, and a DMCA
9  notice goes out, would you at least agree that those
10 prior infringements of those works should be
11 compensated?
12      A.   Not necessarily.  You know, like I say, if
13 you're doing something not knowing that you're doing
14 something wrong, you know.  When you are informed that
15 you're doing something wrong and you continue to do
16 it, yes, I can see that compensation should be made in
17 that case, you know.  If somebody is doing something
18 that, you know, downloading something that they
19 shouldn't and are not aware of it, then, you know,
20 it's -- they have to knowingly, at least in criminal,
21 I don't know about this kind of law, but I know in a
22 criminal prosecution you have to knowingly know that
23 you're doing something wrong before --
24      Q.   Well, do you know that copyright law has no
25 state of mind requirement?  If you do it you're in

1  trouble, that's it?
2       A.   No, I don't know that.
3       Q.   Okay.  And if you were a police officer if
4  you had suspicion that someone had done something --
5       A.   Yeah.
6       Q.   -- but you're not actually convinced, you'd
7  want to gather more evidence, right?
8       MS. McENTEE:  Counsel, again, objection.
9  This calls for speculation, has nothing to do with the
10 claims or defenses in this case, and we're going down
11 a path now that is highly argumentative and improper.
12 BY MR. BANDLOW:
13      Q.   If Strike 3 had information that led it to
14 believe that the ISP address that your ISP has
15 identified was downloading its content, would you
16 think there was anything improper with Strike 3 trying
17 to find out more information to confirm that?
18      MS. McENTEE:  Objection, calls for a legal
19 conclusion.
20 BY MR. BANDLOW:
21      Q.   You can answer.
22      A.   I'm going to --
23      Q.   She didn't instruct you not to answer.  She
24 made an objection for the record.
25      A.   Oh, okay.