# EXHIBIT 10

███████████

April 09, 2019

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

STRIKE 3 HOLDINGS, LLC, a Delaware )
corporation,                       )
                                   )
            Plaintiff,             )
                                   ) Case No.
       vs.                         ) 2:17-cv-01731-TSZ
                                   )
JOHN DOE, subscriber assigned IP   )
address 73.225.38.130,             )
                                   )
            Defendant.             )

VIDEOTAPED DEPOSITION OF ████████████

April 9, 2019

10:01 a.m.

Seattle, Washington

Reported by:
Mark Hovila, CCR, CM
CCR No. 2599
Job No. 790669

April 09, 2019

```
 1        A.   My wife and I, my son off and on.

 2        Q.   No one else?

 3        A.   Yes.  My brother-in-law.

 4        Q.   Anybody else?

 5        A.   Not -- not lived, no.

 6        Q.   Okay.  Obviously you've had visitors at your

 7   house.

 8        A.   Lots of visitors, yes.

 9        Q.   And just for reference, what is your wife's

10   first name?

11        A.   ████████

12        Q.   ████.  Okay.  And your daughter's first

13   name?

14        A.   ████████

15        Q.   ████████  And the brother-in-law's first

16   name?

17        A.   ████

18        Q.   ████  Okay.  Do you currently have an email

19   address?

20        A.   Yes, I do.

21        Q.   What is that email address?

22        A.   ███████████████

23        Q.   Is that the only email address you currently

24   have?

25        A.   No.
```

1        A.   1998 or '99, in that frame.

2        Q.   Was there a reason for you --

3        A.   Just to fix them up and resell them.

4        Q.   And that's something you to this day

5    continue to do?

6        A.   I'm -- well, within the last year or so I

7    just started working on a couple of computers for my

8    niece, to repair them.

9        Q.   This is your niece -- your niece is -- how

10   is your niece related to you?  Is that your sons's --

11   wait, I'm terrible with --

12       A.   My brother's daughter.

13       Q.   Your brother's daughter, okay.  How old is

14   she?

15       A.   Probably 46, 47.

16       Q.   Oh.  Are there any young children in your

17   house in the last few years?

18       A.   By young --

19       Q.   You know, 10 or below, or any children of

20   that age?

21       A.   No.

22       Q.   Any early teen kids in the house in the last

23   few years?

24       A.   Well, they've visited, yes.  The younger and

25   the teens have visited.  My grandson has stayed at the

April 09, 2019

1    home on several days.

2          Q.   Okay.  So let me back up.  So you have a

3    daughter and a son?

4          A.   Yes.

5          Q.   Okay.  Your son ███, does he have any

6    children?

7          A.   No.

8          Q.   Okay.  And your daughter, you were kind of

9    enough to give her name, so let me see.  ██████ has

10   children?

11         A.   Yes.

12         Q.   How old are her children?

13         A.   18 and 20.

14         Q.   Okay, 18 and 20.  All right.  And one of

15   those is the grandson you just mentioned?

16         A.   Yes.

17         Q.   Okay.  So is the grandson the 18-year-old?

18         A.   Yes.

19         Q.   Okay.  And the 20-year-old, is that a

20   granddaughter?

21         A.   Yes.

22         Q.   Okay.  And in the last couple years they've

23   occasionally stayed over at the home?

24         A.   Yes.

25         Q.   All right.  Do you know if they've watched

```
1          Q.   Evening?  What hours in the evening do you
2     typically work on computers?
3          A.   Sometimes it will start at 8 and it can run
4     until 2 or 3 o'clock in the morning.
5          Q.   Do you work on weekends on computers?
6          A.   Sometimes.
7          Q.   Do you have a sort of normal Monday through
8     Friday schedule?
9          A.   No.
10         Q.   Okay.  What are you generally doing during
11    the days?
12         A.   Working in the yard, working around the
13    house.  Shopping.  Going to the garbage, you know.
14         Q.   Is your son currently living at your house?
15         A.   He's in and out.
16         Q.   And on evenings in which he does not stay at
17    your house do you know where he's staying?
18         A.   No.
19         Q.   Does your son have a job?
20         A.   No.
21         Q.   When is the last time your son was employed?
22         A.   I would say a minimum of 15, maybe as long
23    as 20 years ago.
24         Q.   When he was employed what was he employed
25    as?
```

April 09, 2019

```
1    yeah.
2         Q.  Do you know if you -- do you have a
3    recollection of what you did on the 4th of July in
4    2017?
5         A.  Nope.
6         Q.  Do you know if your son was home for the 4th
7    of July in 2017?
8         A.  No, I don't.
9         Q.  Okay.  Do you have any recollection of what
10   you did for the first 10 days in October in 2017?
11        A.  No, I don't recall.
12        Q.  Do you know if you were away from home in
13   October of 2017 for any extended periods?
14        A.  No, I don't.
15        Q.  Do you know if you were away from home
16   during the last week of October in 2017?
17        A.  I can't remember, no.
18        Q.  Okay.  In 2017 were you home for
19   Thanksgiving?
20        A.  Yes.
21        Q.  Okay.  Was your son with you?
22        A.  I believe he was, yes.
23        Q.  Was there anybody else staying in the house
24   around Thanksgiving?
25        A.  The only one that I can think of is the
```

April 09, 2019

1    brother-in-law, ███, that was mentioned.

2         Q.   What is ███ last name?

3         A.   ███.

4         Q.   Where does he live?

5         A.   In Federal Way, I believe.  I'm not --

6         Q.   Is that here?  Is that a street?  I'm sorry,

7    I'm --

8         A.   No, the city of Federal Way, I believe.

9         Q.   Federal Way is a city?

10        A.   He lives in the area.  He's in an apartment,

11   that's all I know.

12        Q.   Do you know if you went on any trips or left

13   your home in December of 2017?

14        A.   I don't -- I don't recollect, but I don't

15   believe so.

16        Q.   Okay.  Your Internet service provider from

17   2016 to the present has been Comcast Cable, correct?

18        A.   Yes.

19        Q.   Okay.  Do you know how long you've had

20   service with Comcast?

21        A.   Since they bought out AT&T, whenever that

22   was.

23        Q.   And the Comcast service is in your name?

24        A.   Yes.

25        Q.   Okay.  Do you know the exact name it says on

April 09, 2019

```
1    the bills?  Does it say ████?  What does it say?
2         A.   I don't know.
3         Q.   But it's in your name.  Are you the one who
4    pays for the Comcast bill?
5         A.   Yes.
6         Q.   Okay.  Do you separately pay for cable
7    television?
8         A.   No.  It's a single package.
9         Q.   Okay.  So Comcast provides your cable and
10   your Internet?
11        A.   And phone.
12        Q.   And are you still with Comcast?
13        A.   Yes.
14        Q.   Okay.  So between August of 2016 and
15   December of 2017, during periods of that time your son
16   lived at the house, correct?
17        A.   Yes.
18        Q.   Did anybody else in that period of time live
19   at the house?  Obviously besides you and your wife.
20        A.   Yes.  I'm trying to -- I can't remember when
21   he moved in, but my brother-in-law ██, he lived with
22   us for about three and a half years.
23        Q.   You have a sister --
24        A.   Wife's --
25        Q.   Oh, your wife's --
```

April 09, 2019

1        A.    Brother.

2        Q.    Brother.  Okay.  So give me the time frame

3    of when he lived in the house.

4        A.    They moved -- from, I believe it was maybe

5    November of last year for about three and a half years

6    before that.

7        Q.    Oh, okay.  So 2014 or '15 he may have moved

8    in and lived all the way through November of 2018?

9        A.    Yeah, maybe.

10        Q.    Okay.

11        A.    Latter part of maybe '14, I guess.  Or '15.

12        Q.    When he moved in where did he live?  What

13    room did he live in?

14        A.    The guest bedroom.

15        Q.    So bedroom number 1 on your chart?

16        A.    Yes.

17        Q.    And then during that time bedroom number 2

18    your son was in?

19        A.    Yes, when he was here.

20        Q.    Okay.  And his name, you said, was ███

21    ███?

22        A.    Yes.

23        Q.    Do you know where he works?

24        A.    No, he -- he's a commercial plumber.

25    Seattle, I think.

April 09, 2019

1      Q.   Do you know what company he works for?

2      A.   Whoever they -- the union assigns him to

3   work with.  I have no idea who that might be.

4      Q.   How old is Mr. ████?

5      A.   Sixty -- I'd say 63 or '4.

6      Q.   Have you ever talked to him about this

7   lawsuit?

8      A.   No.

9      Q.   And other than Federal Way, do you have any

10   other address information for him?

11      A.   No.  I don't know it.

12      Q.   Does he have a middle name?

13      A.   I don't know.  I'm sure -- I don't know.

14      Q.   Did he have -- during the time he lived in

15   the house did he have a computer in his room?

16      A.   No.

17      Q.   Did he have a laptop or any kind of

18   computer?

19      A.   Let me expand -- he had a netbook that his

20   son gave him for about the last six months that he

21   lived in there.  And that computer, or that laptop, or

22   netbook, was never -- was not operable.

23      Q.   How do you know it was not operable?

24      A.   I looked at it I wound up fixing it up when

25   he left.

April 09, 2019

1      Q.    Did Mr. ▆▆▆▆ have access to other

2   computers that were in the home?

3      A.    Yes.

4      Q.    Okay.  What computers did he have access to?

5      A.    My desktop.

6      Q.    Where was your desktop located?

7      A.    In the front room.

8      Q.    Okay.  So was there a desk and sort of a

9   computer setup in the front room?

10      A.    Yes.

11      Q.    And that desktop computer could search the

12   Internet, could get access to the Internet?

13      A.    Yes.

14      Q.    Okay.  What is the -- is there an

15   identifying number for that computer?

16      A.    Not that I'm aware of.

17      Q.    Do you know if that computer's been produced

18   in connection with this case?  Was that given to your

19   attorneys for production in this case?

20      A.    Yes.

21      Q.    It was.  Were there any other computers that

22   Mr. ▆▆▆▆ had access to while he was staying there?

23      A.    No.

24      Q.    Your son, does he have a computer in his

25   room?

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 252
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1          A.   Yes.

2          Q.   What kind of computer is that?

3          A.   A generic.

4          Q.   Is it a PC?

5          A.   Yeah, it's a PC.

6          Q.   Does it have access to the Internet?

7          A.   Yes.

8          Q.   Does he still have that in his room?

9          A.   No.

10         Q.   When --

11         A.   We'll, he has a different computer,

12    basically.

13         Q.   Okay.  So let me back up.

14         A.   Okay.

15         Q.   From the period of August 2016 through

16    December 2017, did your son have a computer in his

17    room?

18         A.   There was a computer in his room, yes.

19         Q.   And was that a desktop?

20         A.   Yes.

21         Q.   And it was a PC?

22         A.   A PC.

23         Q.   And it had access to the Internet?

24         A.   Yes.

25         Q.   Okay.  And does that computer still exist?

April 09, 2019

1          A.   I'm sure it does.

2          Q.   Do you know where it is?

3          A.   No.

4          Q.   Well, why do you say you're sure it does?

5          A.   It was a gaming computer, and I'm just --

6    you know, you're not going to throw that away.

7          Q.   Okay.  So do you know as you sit here today

8    that still exists somewhere in the house?

9          A.   No.

10         Q.   It doesn't?

11         A.   No.

12         Q.   Okay.  At some point it left the house?

13         A.   Yes.

14         Q.   How?

15         A.   It was sold.  And the computer he has now is

16   a computer that we saved over the years for his

17   Christmas and his birthday.  I would buy components so

18   eventually he would be able -- I would able to put

19   together a gaming computer for him.  And that's the

20   computer that he has.

21         Q.   Your son is a video gamer, plays video

22   games?

23         A.   Yes.

24         Q.   Okay.  I want to go back to the computer

25   that he had for some time.  And at some point it left

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 254
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1    the house.  How?  Was it sold, was it taken --

2         A.   Yes.

3         Q.   Okay, it was sold.  Do you know who it was

4    sold to?

5         A.   No.

6         Q.   Do you know how it was sold?

7         A.   I don't.

8         Q.   How do you have knowledge that it was sold?

9    How do you know that?

10        A.   Well, I guess I don't for sure.  He said,

11    you know --

12        Q.   That's what I'm saying.  Your knowledge that

13    it was sold is because your son told you he sold it.

14    Correct?

15        A.   Yeah.  Well, yeah.

16        Q.   Okay.

17        A.   I guess.

18        Q.   Do you remember when your son told you he

19    sold that computer?

20        A.   No, it's probably been -- I'm guessing it

21    would be March or April of last year.

22        Q.   Of 2018?

23        A.   2018.

24        Q.   Okay.  Okay.

25        A.   Can I expound on that a little bit?

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 255
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1    Q.   Yes, please.

2    A.   The reason I say that is that over the years

3    that we were buying these components for a computer,

4    they were only bought for -- as a Christmas gift or on

5    his birthdays.  And his birthday is in February.  And

6    that was the time that I bought the final parts for

7    the computer to be put together.

8    Q.   February of 2018 for his birthday you had

9    assembled everything you needed to give him a new

10   computer?

11   A.   Yes.  Over a period of about six or seven

12   years.  Six years or so.  And I had assumed -- we were

13   going to put -- I had assumed that he was going to put

14   some of the components into the computer that he

15   already had, but he chose to just save them until we

16   had all the components.

17   Q.   Okay.  And so on his birthday in February

18   2018 did you present him with this new computer?

19   A.   No.  The last components.

20   Q.   Okay.  And maybe I'm missing -- so you were

21   assuming you'd gathered all these components and he'd

22   put it into his existing computer, but he ended up not

23   doing that?

24   A.   Right.  I bought a new case and -- as part

25   of these parts that I was buying was a case, mother

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 256
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1    case, motherboard, the video cards, the RAM, all those

2    things were --

3        Q.   So he ultimately took those components and

4    put them into a different computer?

5        A.   I put them into the computer.

6        Q.   You did.  Because he acquired a new

7    computer?

8        A.   No.  I put them into --

9        Q.   Oh, I see.

10       A.   I built -- put the computer together for

11   him.

12       Q.   Okay.

13       A.   And he sold the old one.

14       Q.   So now you've taken all these components

15   you've gathered, you made this new computer.  When is

16   he presented with this new computer for him to use?

17       A.   That's why I say it was in -- about the

18   April --

19       Q.   March or April?

20       A.   Yeah.

21       Q.   Okay.

22       A.   It was after he had been presented with the

23   last components.

24       Q.   And when you presented him with this new

25   computer, did he still have the old computer?

April 09, 2019

1          A.   At that time, yes.

2          Q.   And so was it -- is it your understanding

3    that based on your presenting him with this new

4    computer, he decided, well, I don't need this old one,

5    I'll sell it?

6          A.   Yes.

7          Q.   Is that how it worked?   Okay.   And this was

8    in the 2018 period, correct?

9          A.   Yes, I'm pretty -- yes.

10         Q.   And this was after the lawsuit had been

11   filed, correct?

12         A.   Yes, I believe so.

13         Q.   And so he was allowed to sell that computer

14   and that computer was allowed to leave the house after

15   the lawsuit was filed, correct?

16              MS. McENTEE:   Objection to the

17   characterization of anyone being allowed to sell

18   anything.

19   BY MR. BANDLOW:

20         Q.   Did you have any discussion with your son

21   about whether you should keep that computer?

22         A.   No.

23         Q.   You had no discussion about whether it

24   should be held onto because there was a lawsuit

25   pending?

April 09, 2019

1          A.   No.

2          Q.   Okay.  Do you know who he sold that computer

3     to?

4          A.   No.

5          Q.   I may have asked this.  Do you know how he

6     sold it?  eBay?  What did he do?

7          A.   I wasn't involved in it.

8          Q.   Okay.  He just told you he was going to sell

9     it and then one day it was gone?

10          A.   He -- you know, he needed -- he doesn't

11     work.  He doesn't have any money.  That's what, you

12     know, he --

13          Q.   Did he tell you he was selling it because he

14     needed money?

15          A.   No, not that I can remember.

16          Q.   Did he tell you anything else about why he

17     was selling it?

18          A.   No.

19          Q.   Did you preserve any of the data that was on

20     it before it was sold?

21          A.   No.  I'm assuming -- well, just no.

22          Q.   Do you know if he preserved any of the data

23     that was on it before he sold it?

24          A.   No.  Well, I know that he transferred World

25     of Warcraft files from there.

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 259
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1        Q.    So he plays World of Warcraft, right?

2        A.    Yes.

3        Q.    Are there any other games that you know that

4    he plays?

5        A.    I don't know the names of them.  But he

6    plays other ones, and I don't know the names of them.

7    There are -- well, I don't know if it will name them,

8    but he will have -- I mean, there will be records of

9    when they purchased.  Go online to Steam or something

10   like that and every once in a while they'll have a

11   special on different games and --

12       Q.    How do you know about Steam?

13       A.    He has -- I have -- he only has basically

14   two friends in the world.  One of them lives here in

15   West Seattle and the other one lives in Minnesota,

16   moved to Minnesota.  The main time that he is able to

17   play games with them is in the late evening through

18   the morning hours.  And when they play games, you

19   know, if -- ▮ is the gentleman from Minnesota.

20   They talk and they'll say, hey, there's a cool game or

21   something that's cheap, and he'll want to buy that

22   game so they can play.

23       Q.    So you've helped him buy games on Steam

24   sometimes?

25       A.    Well, I -- yes, I have --

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 260
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1        Q.    Do you know ███ last name, the friend in

2   Minnesota, by any chance?

3        A.    I know it.  And I can see it, but I can't

4   say it.

5        Q.    What about -- you said he had another friend

6   in West Seattle.  Do you know that person's name?

7        A.    ████████

8        Q.    ████████

9        A.    Yes.

10        Q.    Do you have any other contact information

11   for ██████?

12        A.    No.

13        Q.    How do you know he's in West Seattle?

14        A.    That's where he bought a home.

15        Q.    How do you know he bought a home there?

16        A.    I took my son to the home for visits

17   every -- occasionally.

18        Q.    Do you know the address?

19        A.    No.  I don't know.  The farther away from

20   Seattle I am, the better.

21        Q.    Okay.

22        A.    My son hears from ██████ maybe once

23   every month and a half or two.

24        Q.    Does your son watch movies on his computer?

25   Ever see him watching movies?

April 09, 2019

1        A.    I haven't seen him watch movies, no.

2        Q.    Does your son -- do you know your son's

3    musical tastes?

4        A.    Everything and anything.

5        Q.    Do you know your son's favorite television

6    shows?

7        A.    I know he watches both MSNBC and Fox News.

8    He likes to watch both sides to know what each side is

9    thinking.  And he watches The Five, whatever that is.

10   And --

11       Q.    Sitcoms, anything like that you can think of

12   that he likes?

13       A.    I don't -- usually -- I mean, the only ones

14   that I knew about were like the animated -- Simpsons,

15   he used to watch them.  I don't think he does it

16   anymore.  I don't think he watches those kind of

17   things anymore.

18       Q.    Do you know what anime is?  Japanese cartoon

19   art?

20       A.    I've -- I don't --

21       Q.    Do you know if your son --

22             MS. McENTEE:  And this is natural to talk

23   over one another, but you've got let the witness

24   actually answer the question.

25   BY MR. BANDLOW:

April 09, 2019

1      Q.   Okay.  I'm sorry to interrupt you.  Do you

2    know if your son is interested in anime?

3      A.   I don't.

4      Q.   You don't know, okay.

5      A.   No.

6      Q.   All right.  So I want to go back to this

7    computer.  So the computer that was ultimately sold in

8    March or April of 2018, that had existed in your son's

9    bedroom for how many years prior to that being sold?

10          MS. McENTEE:   Objection, foundation.

11   BY MR. BANDLOW:

12     Q.   Well, I'm not trying to actually go life

13   history here.  From August 2016 through December 2017,

14   was that computer in the house?  In your son's room?

15     A.   Yes.

16     Q.   Okay.  That's all I'm trying to establish.

17   So now there's a new computer in his room, correct?

18     A.   Yes.

19     Q.   And that computer still exists, correct?

20     A.   I -- yes.

21     Q.   Was that provided to your counsel to be

22   produced in this case?

23     A.   No, it was not.

24     Q.   It's still sitting in the house?

25     A.   It's still sitting in the house.

April 09, 2019

1          Q.   Has it been searched for any of --

2               MS. McENTEE:   Objection, foundation.

3     BY MR. BANDLOW:

4          Q.   Have you ever searched through that

5     computer?

6          A.   I don't look at his computer.

7          Q.   You never go look at his computer?

8          A.   No.

9          Q.   Have you ever asked him to search through

10    that computer?

11         A.   No.  He's an adult.  I don't.

12         Q.   Okay.

13         A.   I wouldn't snoop on his phone or --

14         Q.   And that --

15              MS. McENTEE:   Let him finish answering the

16    question.

17    BY MR. BANDLOW:

18         Q.   Go ahead.  You want to finish?

19         A.   I wouldn't -- he doesn't have a cell phone,

20    but I wouldn't ask, snoop on anybody's cell phone.

21    That's their private business.  I don't -- he's an

22    adult and, you know, I don't do that with my grand --

23    my daughter, my granddaughter, my grandson.

24         Q.   You've never asked him to search his

25    computer for any of the works that are at issue in

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 264
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1    this lawsuit, correct?

2              MS. McENTEE:  Objection, asked and answered.

3              MR. BANDLOW:  I never asked about the works

4    in this lawsuit.

5              MS. McENTEE:  You asked about a search

6    generally.  And he said no.

7              MR. BANDLOW:  I've asked him if he asked his

8    son to do this.  This is a different question.  So let

9    me --

10             MS. McENTEE:  Go right ahead, counsel.

11   BY MR. BANDLOW:

12        Q.   Have you ever asked your son to search his

13   computer for any Strike 3 works of any kind?

14        A.   No.

15        Q.   Okay.  That's the question wanted to ask.

16   Now, and that computer -- okay, we established it

17   still exists in the house.  That computer uses the

18   wi-fi that's available in the home, correct?

19        A.   No.

20        Q.   How does it connect to the Internet?

21        A.   I can only assume it doesn't.  We have --

22   the computers in the home generally have been hard

23   connected.  Hard wired.  It has the capability of

24   using the wi-fi.

25        Q.   And the prior computer that was sold, that

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 265
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1   had the capability of using the wi-fi, correct?

2           MS. McENTEE:  Objection, foundation.

3   BY MR. BANDLOW:

4       Q.   Well, did it?

5           MS. McENTEE:  Objection, foundation.

6           MR. BANDLOW:  I'm asking him to lay that

7   foundation.

8   BY MR. BANDLOW:

9       Q.   Do you know if the prior computer --

10          MS. McENTEE:  That's the foundation.

11      Q.   -- could access the Internet?

12          MS. McENTEE:  You can go ahead and answer.

13      A.   No, I don't know.

14  BY MR. BANDLOW:

15      Q.   You don't know one way or the other?

16      A.   No.

17      Q.   Do you know if the prior computer was hard

18  wired in?

19      A.   Yes.

20      Q.   And was it?

21      A.   Yes.

22      Q.   It was hard wired in?

23      A.   Yes.

24      Q.   So it was using -- through the hard wiring

25  it was using your Internet service, correct?

DECLARATION OF ADRIENNE D. MCENTEE IN
SUPPORT OF DEFENDANT'S SUPPLEMENTAL
RESPONSE TO MOTION FOR SUMMARY
JUDGMENT - 266
CASE NO. 2:17-CV-01731-TSZ

April 09, 2019

1            A.   Yes.

2            Q.   Okay.  And the current computer, just to

3     make sure I'm clear, do you know if that one is hard

4     wired in?

5            A.   Yes.

6            Q.   It is hard wired in?

7            A.   Yes.

8            Q.   And it is using the home's Internet?

9            A.   Yes.

10           Q.   Okay.  Did your son, for either of the two

11    computers we've been talking about did your son ever

12    request that those computers be hard wired in of you?

13           A.   No.

14           Q.   Did you ever have any conversations with him

15    at all about whether he -- whether it be Internet or

16    hard wired?

17           A.   No.

18           Q.   But you know it has the capability of being

19    hard wired in that bedroom?

20           A.   Yes.

21           Q.   Okay.  So then let me -- okay, let me back

22    up here a little bit.  During the period of 2016,

23    August 2016 through December 2017, I know you have a

24    lot of computers that you're fixing up, so I don't

25    want to talk about one sitting over in a corner.  I

April 09, 2019

1   want to talk about computers that are in the house

2   that are hooked up to the Internet and are functional

3   with the Internet.

4        A.   Okay.

5        Q.   How many computers were there of those?

6        A.   Two.  Two permanently and on and off the

7   Internet, many.  I mean, when I'd work on them.

8        Q.   So when you were working on a computer you

9   could temporarily hook it up to the Internet if you

10   wanted to?

11        A.   If I needed to download files.

12        Q.   At any point when you ever hooked up a

13   computer temporarily to download files, did you ever

14   go to BitTorrent?

15        A.   I don't know if -- I can't remember if any

16   of those were.

17        Q.   I'll get back to that.

18        A.   Okay.

19        Q.   So I want to -- for purposes of this

20   question right now, I don't want to talk about the

21   ones that you might temporarily hook up to the

22   Internet to do some stuff you need to do.

23        A.   Okay.

24        Q.   So during that period of August 2016 through

25   December 2017 there was one computer in your son's

April 09, 2019

1    room that was hard wired in, correct?

2          A.   Yes.

3          Q.   Okay.  There was a computer in the family --

4          A.   Front.

5          Q.   Front room that was hard wired in?

6          A.   Yes.

7          Q.   Okay.  And anybody had access to that if

8    they wanted to?

9          A.   If they requested it, yes.  They just didn't

10   go jump on it.

11         Q.   And those are the two you said were

12   permanently in?  Is that what you're referring to?

13         A.   Yeah.

14         Q.   Any other -- so no other computers were hard

15   wired in in that time frame, right?

16         A.   Other than the ones I'd be working on, no.

17         Q.   Okay.  No computers in your bedroom?

18         A.   No.

19         Q.   The second bedroom where the brother-in-law

20   was staying, was there a computer hooked up in there?

21         A.   Not during that time period.

22         Q.   Not during that time period.  Okay.  Is

23   there an outlet for an Ethernet line in that other

24   bedroom if someone wanted to hook one up?

25         A.   Yes.  But there was not one during that time

April 09, 2019

1    frame.

2        Q.  There was not, okay.  I'm sorry, I may have

3    forgotten.  Did your brother-in-law have a laptop?

4        A.  He had a netbook that was not functional.

5        Q.  It didn't work.  And are you aware that it

6    ever had the capability of working during the time he

7    was living there?

8        A.  No, he couldn't start it up.

9        Q.  Okay.

10        A.  Had bad RAM.

11        Q.  Okay.  And during -- just to close the

12    circle here, during the period of August 2016 to

13    December 2017 did your son have a laptop, too?

14        A.  No.

15        Q.  So if he was on the computer he was on the

16    desktop hard wired in in his room?

17        A.  Yes.

18        Q.  All right.  Okay.

19        MR. BANDLOW:  Do you guys have a sense of

20    when you want to do a lunch break?

21        MS. McENTEE:  I was getting ready to ask

22    him.  How are you feeling?  Do you want to take break

23    now or do you want to go a little longer?

24        THE WITNESS:  It's up to you.

25        MR. BANDLOW:  I'm going to start marching

April 09, 2019

```
1    UNITED STATES DISTRICT COURT              )
                                               )
2    FOR THE WESTERN DISTRICT OF WASHINGTON    )

3              I, Mark Hovila, CCR No. 2599, Certified

4    Court Reporter, certify:

5              That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witness was put under oath by me;

8              That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13             That a review of the transcript by the

14   deponent was requested;

15             That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17             I further certify that I am not a relative

18   or employee of any attorney of the parties, nor

19   financially interested in the action.

20             I declare under penalty of perjury under the

21   laws of Washington that the foregoing is true and

22   correct.

23             Dated this 19th day of April 2019.

24             _____

25             Mark Hovila, CCR No. 2599, CM
```