# EXHIBIT 2

```
               U.S. DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON

STRIKE 3 HOLDINGS, LLC, a        )
Delaware corporation,            )
                                 )
       Plaintiff,                )
                                 ) No.
     -vs-                        ) 2:17-cv-01731-TSZ
                                 )
JOHN DOE, subscriber assigned    )
IP address 73.225.38.130,        )
                                 )
       Defendant.                )
_____  )
                                 )
JOHN DOE subscriber assigned     )
IP address 73.225.38.130,        )
                                 )
       Counterclaimaint,         )
                                 )
     -vs-                        )
                                 )
STRIKE 3 HOLDINGS, LLC,          )
                                 )
       Counterdefendant.         )
```

        The deposition of
SUSAN BLACKWOOD STALZER, called for examination
pursuant to notice and the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Allison D. Weber, CSR, a notary public
within and for the County of Cook and State of
Illinois, at 8745 West Higgins Road, Suite 110,
Chicago, Illinois, on April 16, 2019, at the
hour of 10:08 o'clock a.m.


Reported by:   Allison D. Weber, CSR
License No.:   084-002238

2

1     A.    Yes.
2     Q.    So in your business as a real estate
3  agent probably a speculation would be if you
4  have never seen the house before, you would say,
5  well, I think it might be 3,000 square feet,
6  that would be a speculation, but if you actually
7  look at it, you can estimate what the square
8  footage of the house is; is that fair?
9     A.    I understand the difference between
10 the two, if that's what you're asking.
11    Q.    Excellent.  Okay.  Now, you testified
12 that -- is it Mr. Othon?
13    A.    Othon.
14    Q.    How do you spell that?
15    A.    O-t-h-o-n.
16    Q.    You had friends in common.  And are
17 these friends in common associated with the
18 pornographic industry?
19    A.    No.
20    Q.    Just friends in common.  What friend
21 did he know that introduced you to
22 Strike 3 Holdings?
23    A.    None.
24    Q.    So he knew of Strike 3 Holdings?
25    A.    He did.

11

1    Q.   Okay.  And who did he -- did he tell
2  you who he knew at Strike 3 Holdings?
3    A.   No.
4    Q.   So what did he do?  Did he say call up
5  a person at Strike 3 Holdings about extra work?
6    A.   He said if I was interested that he
7  would put me in touch with the company.
8    Q.   In touch.  And who did he put you in
9  touch with?
10   A.   Emily Kennedy.
11   Q.   And when did you first speak with
12 Miss Kennedy?
13   A.   I cannot tell you exactly.  I believe
14 it's around 2014, sometime during 2014.
15   Q.   And what did Miss Kennedy tell you in
16 2014?
17   A.   That was not in relation to Strike 3
18 at that point.
19   Q.   What was it in relation to?
20   A.   They were working for Malibu Media at
21 the time.
22   Q.   And did you verify any of the works
23 for Malibu Media?
24   A.   I did not.
25   Q.   Why didn't you?

12

1       A.    That was not something that -- a
2  position that was offered to me.
3       Q.    What position was offered to you in
4  2014?
5       A.    I worked as an assistant in
6  proofreading e-mails.
7       Q.    Okay.  Proofreading e-mail?
8       A.    Uh-hum.
9       Q.    You proofread one e-mail or more?
10      A.    Multiple.
11      Q.    Multiple e-mails.
12            And what was the content of these
13 e-mails?
14      A.    They were e-mails regarding
15 settlements.
16      Q.    Okay.  How many settlement e-mails did
17 you review?
18      A.    I could not begin to give you a
19 number.
20      Q.    Can you estimate?
21            MR. BANDLOW:  If you can.  Don't
22 guess, but if you can estimate.
23            THE WITNESS:  A very vague estimation
24 would be several hundred.
25

13

```
 1   BY MR. EDMONDSON:
 2         Q.    Okay.  Over what period of time?
 3         A.    Probably a year.
 4         Q.    So were you reviewing 10 settlement
 5   e-mails a week?
 6         A.    I don't feel comfortable giving a
 7   number --
 8         Q.    Okay.
 9         A.    -- simply because I don't feel like I
10   can be accurate.
11         Q.    Well, but you can estimate.
12         A.    It varied.
13         Q.    Okay.  You stated several hundred
14   settlement e-mails.  Would you say it was less
15   than 500?
16         A.    Probably.
17               MR. BANDLOW:  If you can estimate.
18         Only if you can estimate.
19               THE WITNESS:  Probably more.
20   BY MR. EDMONDSON:
21         Q.    Would you say it's less than a
22   thousand?
23         A.    Yes.
24         Q.    So somewhere between 500 and 1,000
25   e-mails over a period of one year?
```

14

```
 1   understand your testimony correctly, there is a
 2   link on your desktop.  What's the title of that
 3   link?
 4        A.   Verification tool.
 5        Q.   Verification tool.  Who provided you
 6   with that link?
 7        A.   Strike 3.
 8        Q.   Okay.  And who at Strike 3 provided
 9   you with that link?
10        A.   Sud.  Please do not ask me his last
11   name because I cannot spell it, nor pronounce
12   it.
13        Q.   Well, can you say it?
14        A.   No, sir, I cannot pronounce it, and I
15   wouldn't guess at the spelling.
16        Q.   Do you get e-mails directly from Sud?
17        A.   I do.
18        Q.   Well, how many e-mails have you gotten
19   from Sud since your engagement with Strike 3
20   started?
21        A.   I don't know.
22        Q.   Can you estimate?
23        A.   Less than 100.
24        Q.   And what's the topic of these e-mails?
25        A.   The only e-mails I get from Sud are to
```

37

1    let me know when things have been loaded into
2    the verification tool and the verification needs
3    to be done.
4         Q.   And how often do you get an e-mail
5    from Sud?
6         A.   It varies.
7         Q.   Do you get one a week?
8         A.   I would say on average yes.
9         Q.   Do you know how many cases have been
10   filed by Strike 3 Holdings?
11        A.   No.
12        Q.   Do you know the purpose of -- strike
13   that.
14             Do you know what your verification
15   task is going to be used for by Strike 3
16   Holdings?
17        A.   Yes.
18        Q.   And what's your understanding of that?
19        A.   My understanding is that it's been
20   discovered that some of Strike 3 properties has
21   potentially been downloaded illegally, thus
22   stolen and that they're trying to protect their
23   copyright rights and their property.
24        Q.   Who told you that Strike 3 Holdings is
25   trying to protect their copyrights?

38

```
 1       A.   I don't believe so, no.
 2       Q.   Have you ever worked with a computer
 3  system that's 100 percent accurate?
 4            MR. BANDLOW:  Objection.  Vague and
 5       ambiguous.
 6                 You can answer.
 7            THE WITNESS:  I would say no.
 8  BY MR. EDMONDSON:
 9       Q.   And did you ever inquire as to whether
10  the information given to you was processed
11  accurately or not?
12       A.   It was made clear to me that the
13  information I was being given was the most
14  accurate and best possible information that
15  could be provided.
16       Q.   Okay.  And who made that
17  representation to you?
18       A.   I'm just trying to think if I can
19  identify who specifically it came from.  It was
20  probably during the course of e-mail exchanges
21  with Sud, Emily and perhaps Tobias.
22       Q.   So these representations on accuracy
23  is -- are in e-mails somewhere?
24       A.   Potentially.
25       Q.   Would they be in the Slack
```

128

```
 1        of recently other than putting Windows on a
 2        computer or something to that effect, I
 3        believe I have done that.  It's certainly
 4        been a while.
 5   BY MR. EDMONDSON:
 6        Q.   Have you installed Excel on your
 7   computer?
 8        A.   I bought it with it on it --
 9        Q.   Okay.
10        A.   -- so I don't have to do it.
11             MR. BANDLOW:  That's why you buy it
12        that way.
13   BY MR. EDMONDSON:
14        Q.   I may have asked this question.  Are
15   you aware of any other Strike 3 or General Media
16   System employees or independent contractors in
17   the Chicago area?
18        A.   I'm not aware of pretty much anybody's
19   location.
20        Q.   Well, are you aware of where
21   Emily Kennedy is located?
22        A.   It's my understanding she's in
23   California, but...
24        Q.   And how about Sud, do you know where
25   he's located?
```

149

1    A.    Overseas is my understanding.
2    Q.    And how would you understand that he's
3    overseas?
4          MR. BANDLOW:  How do you have that
5    understanding so it's not speculative?
6          THE WITNESS:  I have that
7    understanding because I think at some point
8    I had sent an e-mail and I didn't get a
9    response, and Emily explained to me he was
10   in a different time zone, a significantly
11   different time zone.  If she told me which
12   or where, I do not recall that.
13   BY MR. EDMONDSON:
14   Q.    Have you reviewed any expert reports
15   in this case?
16   A.    That pertains to the legal case?
17   Q.    Have you -- do you know what an expert
18   report is?
19   A.    Only by maybe hearing it on TV, but,
20   no, I have not reviewed anything -- certainly
21   nothing has been presented to me as that.
22   Q.    Have you ever heard of a Patrick Page?
23   A.    I'm not familiar with that name.
24   Q.    And did you hear of -- okay.  Have you
25   heard of a Mr. Bunting?

150