# EXHIBIT 14

AMENDED EXPERT REPORT OF ERIC FRUITS, PH.D.
IN THE MATTER OF

# STRIKE 3 HOLDINGS, LLC

V.

# JOHN DOE, SUBSCRIBER
# ASSIGNED IP ADDRESS 73.225.38.130

CASE NO. 2:17-CV-01731-TSZ
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

**Economics International Corp.**

503-928-6635
www.econinternational.com
info@econinternational.com

April 15, 2019

# Contents

Summary of conclusions.................................................................................2

1   Qualifications......................................................................................3

2   Assignment and background ...............................................................4

3   Litigation is not the only effective way to stop infringement............5

4   DMCA notices as a method to discourage infringement....................7

5   Actual and statutory damages ............................................................9

6   Nuisance lawsuits and sue-then-settle strategies .............................11

7   Plaintiff's revenues from settling litigation.....................................17

8   Damages..............................................................................................19

9   Conclusion ..........................................................................................20

**Exhibits**

1   Curriculum vitae

# Summary of conclusions

I have been retained by counsel for Defendant in this matter to provide an economic opinion regarding damages in this matter.

Plaintiff's amended complaint alleges that, using BitTorrent, Defendant copied and distributed 87 works in which Plaintiff is the owner of the copyrights-in-suit and thereby willfully infringed on Plaintiff's copyrights. Plaintiff is seeking, inter alia, statutory damages. The following are my conclusions.

- Litigation is not the only way for Plaintiff to stop infringement. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

- DMCA notices are one method to discourage infringement. At the time of the downloading activity alleged by Plaintiff, Defendant's Internet service provider, Comcast, indicates it had policies to comply with the DMCA, including, "a policy to terminate the Service, in appropriate circumstances, provided to any customer or user who is a repeat infringer of third party copyright rights."

- Plaintiff's actions in this suit, and others, are consistent with a theory that plaintiff is pursuing nuisance value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-of-prevailing claims. Strike 3's strategy in BitTorrent litigation appears to satisfy a three-part test for nuisance value litigation.

- Additional information from Plaintiff would be useful to more comprehensively evaluate Plaintiff's income from pursuing and settling litigation.

The remainder of the report provides the bases for the conclusions summarized above. ∎

# STRIKE 3 HOLDINGS, LLC v.
# JOHN DOE, SUBSCRIBER
# ASSIGNED IP ADDRESS 73.225.38.130

ERIC FRUITS, PH.D.

## 1  Qualifications

I am president and chief economist at Economics International Corp., a consulting firm that specializes in providing economics services to private and public sector clients. I am also an adjunct professor at Portland State University, where I teach courses in economics and real estate. I have a masters' and a doctorate degree in economics and a bachelors' degree in business economics and public policy. Exhibit 1 is a current curriculum vitae including testimony and publications.

My graduate-level training included the study of statistics and econometrics (the application of statistical methods to economics issues). I have taught graduate-level courses in economics, econometrics, finance, and the economics of regulation and antitrust. I have published several peer-reviewed papers, each of which have included statistical and econometric analysis.

I have been engaged in many projects involving financial analysis and business valuation. I have testified in federal and state courts on business and technology valuation and financial markets. As an economic damages expert, I have provided expert testimony regarding business valuation, lost profits, and foregone income. I have consulted and testified in several matters involving the

valuation of intellectual property, including the valuation of technology, trade marks, and trade dress. I have provided expert opinions involving statistics, economics, and finance to United States of America federal and state courts and to an international criminal tribunal.

I am familiar with BitTorrent litigation. I served as an economics expert in the case of *Malibu Media, LLC v. Doe subscriber assigned IP address 76.126.99.126* in the Northern District of California. I served as an economics expert in the case of *Clear Skies v. Hancock* in the Northern District of Illinois. I served as an economics expert in the case of *QOTD v. Wilson* in the Western District of Washington.

Economics International Corp. is compensated at an hourly rate of $350 for my work on this matter. No part of the compensation is dependent on the outcome of the matter.

# 2   Assignment and background

I have been retained by counsel for Defendant in this matter to provide an economic opinion regarding damages in this matter.

Plaintiff's amended complaint alleges that, using BitTorrent, Defendant copied and distributed 87 works in which Plaintiff is the owner of the copyrights-in-suit and thereby willfully infringed on Plaintiff's copyrights. Plaintiff is seeking, inter alia, statutory damages.

Greg Lansky made a declaration under a penalty of perjury at Docket 4-3. Greg Lansky states he has "…personal knowledge of all matters contained in this declaration…". I note that at Docket 70, made a different declaration about his knowledge. For this purposes of this motion, I will assume Docket 4-2 is accurate and not contradicted by Docket 70.

Relevant parts of the Lansky Declaration (4-2) state:

1. "Unfortunately, piracy is a major threat to our company. We can compete in the industry, but we cannot compete when our content is stolen." (¶22)

2. "We have discovered that when we put videos online for paid members to view, it takes as little as four minutes to be downloaded on to torrent

> websites. We have attempted to identify the initial seeder but have
> found it impossible with the large volume of our subscriber base." (¶23)

3. "We send on average 50,000 DMCA notices a month but it does
   virtually nothing to stop the rampant copyright infringement." (¶26)

4. "The only effective way to stop piracy of our movies on BitTorrent is to
   file lawsuits like this one." (¶27).

I am not offering any analysis, conclusions, or expert opinions regarding the law.
To the extent this report refers to laws, court decisions, and/or legal opinions, my
analysis is based on an economic evaluation of the information presented.

I have no opinions regarding liability in this matter.

In preparing this report, I have relied on my general expertise and knowledge
regarding economics, finance, and statistics as well as publicly available
information and information provided by Defendant and/or Defendant's
counsel. The materials relied upon are cited in the text and footnotes to this
report. Any of the information referred to in this report and its exhibits, as well
as summaries or exhibits based on this information, may be used at trial.

I understand that discovery is not complete. I reserve the right to supplement or
modify my report and opinions as new or additional information is presented,
obtained, or reviewed or new or additional analyses are completed, including
analyses provided by Plaintiff or its experts.

This amended report incorporates by reference my declaration in this matter
dated February 25, 2019 (Dckt. 81).

# 3   Litigation is not the only effective way to stop infringement

The Lansky Declaration claims filing lawsuits against individual alleged
downloaders is "the only effective way to stop" infringing downloading of its
copyrighted material.

Strike 3 has filed more than 2,700 complaints in federal court alleging copyright
infringement. Filing fees alone amount to more than $1.1 million.

Since the date of the Lansky Declaration, Strike 3 has filed more than 2,600 complaints alleging copyright infringement. In the first two months of 2019, Strike 3 had filed more than 360 complaints. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

The Lansky Declaration claims Strike 3 was formed in 2015. Prior to the formation of Strike 3, Malibu Media, LLC filed nearly 3,300 complaints alleging copyright infringement similar to the claims Strike 3 is making in this case. Mr. Lansky claims he was involved in the industry for approximately nine years before forming Strike 3. His declaration indicates that he was sufficiently familiar with the industry to conclude, "the industry and I were not offering the best quality and experience possible." As someone with nearly a decade of experience in the industry, it would be reasonable to conclude that Mr. Lanksy was aware of the highly publicized Malibu Media cases and had an understanding of the pervasiveness of alleged copyright infringement of pornographic works. It defies economic reasoning and common sense that Mr. Lansky would form his business and—as he says in his declaration—"risk everything" without a strategy to mitigate the costs of anticipated efforts to infringe on Strike 3's works.

Forensic watermarking of content is a well-known and widely used technique to identify individuals distributing infringing content and has been available prior to the formation of Strike 3.[1] Trade publication Streaming Media notes: "Forensic watermarking allows content owners and rights holders to identify pirated content online, then alert internet service providers, who can then issue a warning to the infringing user or even shut off the user's subscription."[2] Using such a service, Strike 3 can identify which of its subscribers is uploading infringing content and take immediate action, such as cancelling the uploaders' subscriptions to Strike 3's services.

---

[1] See, for example: Trabelsi, W. and M. H. Selmi. Multi-signature robust video watermarking. *2014 1st International Conference on Advanced Technologies for Signal and Image Processing (ATSIP)*, pp. 158-163. 2014.

[2] Krefetz, N. Protecting your assets: How studios secure their premium video. *Streaming Media Magazine*. September 28, 2018. https://www.streamingmedia.com/Articles/Editorial/Featured-Articles/Protecting-Your-Assets-How-Studios-Secure-Their-Premium-Video--127701.aspx, retrieved February 22, 2019.

Custos Media Technologies (RF) (Pty) Ltd. provides a service named "Screener Copy." The service adds a unique watermark and embeds a Bitcoin bounty to each video file distributed to users. The watermark and bounty make each copy identifiable and traceable. "Bounty hunters" on the Internet scan video files for the hidden Bitcoin bounties and, once found, claim it as a reward. Once the bounty is claimed, the copyright owner is notified of the leaked copy. Because the bounty is unique to each copy, the copyright owner can identify the source of the leak.[3] Custos indicates it was designed to serve "smaller movie producers" and claims of 130,000 copies of material it has distributed, the service has "not had a single leak."[4] Based on information available at the time of this report, it is likely that Custos' service or similar services would more effective and less costly than Strike 3's litigation strategy.

# 4   DMCA notices as a method to discourage infringement

The Lansky Declaration states Strike 3 sends an average of 50,000 DMCA notices a month, but that the notices do "virtually nothing" to stop infringement of its copyrights.

Citing *In re Charter Commc'ns, Subpoena Enforcement Matter*, 393 F.3d at 773 (8th Cir. 2005), the court in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.* (E.D. Va., 2016) notes:

> Congress enacted the Digital Millennium Copyright Act ("DMCA"), which sought to strike a balance "between the interests of ISPs in avoiding liability for infringing use of their services and the interest of copyright owners in protecting their intellectual property and minimizing online piracy." In return for a certain

---

[3] Custos Media Technologies (RF) (Pty) Ltd. Custos Video: A simple one-click solution for filmmakers and videographers. 2017. https://custostech.com/custos-video/, retrieved February 22, 2019.

[4] Lourie, G. This SA startup is fighting global problem of online piracy using Bitcoin blockchain. *TechFinancials*. June 21, 2018. https://techfinancials.co.za/2018/06/21/this-sa-startup-is-fighting-global-problem-of-online-piracy-using-bitcoin-blockchain/, retrieved February 22, 2019.

> amount of cooperation, ISPs would enjoy the protection of four liability-limiting safe harbors. To be eligible, an ISP must, for example, "adopt[] and reasonably implement[], and inform[] subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." [footnotes and citations omitted]

From an economics approach, the idea to "strike a balance" recognizes that the purpose of copyright enforcement under the DMCA is to discourage infringement while reducing the costs associated with litigation.

At the time of the downloading activity alleged by Plaintiff, Defendant's Internet service provider, Comcast, indicates it had policies to comply with the DMCA:[5]

> Owners of copyrighted works who believe that their rights under U.S. copyright law have been infringed may take advantage of certain provisions of the Digital Millennium Copyright Act of 1998 (the "DMCA") to report alleged infringements to us. In accordance with the DMCA and other applicable laws, Comcast also maintains a policy to terminate the Service, in appropriate circumstances, provided to any customer or user who is a repeat infringer of third party copyright rights.

I understand that Plaintiff has not provided any information demonstrating that Strike 3 notified Comcast of Defendant's alleged activity outside of the present litigation.

Monitoring companies like Rightscorp, Inc. send DMCA notices on behalf of other media companies to the IP address of alleged infringers. In these notices, requests are made to pay for the works allegedly infringed. In some cases, the infringers have paid for the works allegedly infringed. In other cases, the notices have been associated with a cessation of the alleged infringing activity. In either

---

[5] Comcast Corporation. Acceptable use policy for XFINITY® Internet. October 11, 2017. https://web.archive.org/web/20171011050118/www.xfinity.com/Corporate/Customers/Policies/HighSpeedInternetAUP.html, retrieved February 22, 2019.

case, if the objective of Strike 3 is to reduce alleged infringement, this approach would be more beneficial to Strike 3 than filing lawsuits. The notice requesting payment would provide an infringer the incentive to convert to a subscriber. A notice to subscriber who is not the infringer could result in proactive actions to prevent infringement, such as changing a wi-fi password. Since the cost of sending a DMCA notice is de minimis, and since a DMCA notice can be sent in a more timely manner than filing a lawsuit, this approach is less costly and more effective than pursuing lawsuits against, what Plaintiff describes as "the worst" infringers.

I understand a 30(b)(6) deposition was taken of Strike 3. I have not had an opportunity to review the deposition transcript. Upon discussion with Defendant's counsel, I understand no objective reasons were presented indicating why DMCA notice cannot be sent to the IP address associated with a subscriber. Upon review of the transcripts, I intend to supplement my report.

# 5   Actual and statutory damages

17 USC 504 identifies two remedies for copyright infringement.

1. **Actual damages and profits**: a quantifiable monetary loss the plaintiff has suffered, or the profit the infringer has gained, from infringing the copyrights. I understand Plaintiff has not made a claim that Defendant gained a profit from the alleged copyright infringement. A quantifiable monetary loss to Plaintiff can be calculated by identifying what Plaintiff would have received had it sold or licensed the works.

2. **Statutory damages**: an amount in the range of $750 to $30,000 per infringed work. In some circumstances, including those in which the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court may reduce the award of statutory damages to $200.

I understand that Plaintiff sought statutory damages and did not specify the range of statutory damages sought (Complaint, Docket 1).

When this complaint was filed, statutory damages for 80 works was sought. Then, I understand Plaintiff amended its complaint and sought statutory

damages for 87 works. Likewise, Plaintiff did not specify the range of statutory damages sought.

In my experience defendants have been more concerned with the maximum exposure to damages than the likely exposure to damages. This is likely more significant in a case such as this, in which the Plaintiff is represented by a large national law firm having hundreds of attorneys.

For the range of statutory damages specified by 17 USC 504, and assuming Defendant is liable for infringing on all 87 works, damages would be in the range of $62,250 and $2,610,000.

In a similar BitTorrent case, the court concludes statutory damages are not intended to serve as a windfall to plaintiffs:[6]

> Plaintiff argues that a significantly higher award is necessary to force people like Defendants to appear and participate in these BitTorrent cases. Plaintiff apparently wants the Court to raise the statutory damage award to an amount that is at or above the anticipated costs of defending this action. A defendant may, however, decide that conceding liability through default is the best course of action given the nature of the claims and the available defenses. The "punishment" for that choice is the entry of default judgment and an award of damages under the governing standards. As discussed above, those standards lead to the conclusion that the minimum statutory penalty should apply in this case. Plaintiff offers no support for the proposition that participation in federal litigation should be compelled by imposing draconian penalties that are out of proportion to the harm caused by Defendants' actions or any benefits derived therefrom. Statutory damages are not intended to serve as a windfall to plaintiffs and will not be used to provide such a windfall here.

I reserve the right to supplement or modify my report if Plaintiff or its experts provide a quantifiable claim for damages.

---

[6] *CELL Film Holdings, LLC v. Roger Hawkins,* Order Granting in Part Cell Film Holdings' Motions for Default Judgment, Case 2:16-cv-01091-RSL (W.D. Wash, March 14, 2019).

# 6   Nuisance lawsuits and sue-then-settle strategies

Plaintiff's actions in this suit, and others, is consistent with a theory that plaintiff is pursuing nuisance-value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-of-prevailing claims.

One of the earliest models of a sue-then-settle strategy finds that with low costs of filing a suit, plaintiffs can gather valuable information about the strength of their claim from a defendant's response:[7]

> A strategy such as [file suit, then go to trial if the defendant offers to settle, otherwise drop the action] may not at first seem to make much sense. Why does the plaintiff not grab the settlement when it is offered? Further reflection reveals that such a strategy may be quite appropriate where the defendant has information not available to the plaintiff. For instance, it might be that the defendant has chosen [to offer to settle if violator, otherwise do not offer to settle]. For the plaintiff then, the defendant's offer to settle is an indication that the defendant did in fact violate the law, so that the plaintiff may prefer to increase his winnings by going to trial. On the other hand, the defendant's refusal to offer to settle may be an indication that he did not violate the law, in which case the plaintiff would want to cut his losses. …

> Put differently, the plaintiff's first strategy, (do not sue), is dominated by his fifth strategy, [file suit, then go to trial if the defendant offers to settle, otherwise drop the action]. We conclude that the plaintiff will always bring an action.

> This surprising result is implied by the assumption that the plaintiff incurs no legal costs by filing an action and then dropping it. Given the assumption, the conclusion is quite intuitive: the plaintiff loses nothing from filing suit.

---

[7] P'ng, I. P. L. (1983). Behavior in suit, settlement, and trial. *Bell Journal of Economics*, 14(2): 539–550.

Another early model of "nuisance suits" concludes that although a defendant knows that the plaintiff will drop the case if the defendant responds, the defendant will still be willing to pay a settlement amount of up to the cost of responding solely in order to avoid having to make such a response.[8]

P'ng (1983) applies his sue-then-settle model to what he calls "frivolous suits:"

> To some extent, this result accords with the folklore: a plaintiff brings a frivolous action in the hope of extorting a settlement that is less than the value of the defendant's legal costs. The analysis also points to another possibility: the defendant may be able to deter plaintiffs who have filed actions from bringing these to trial by adopting a strategy of refusing to settle, whatever his true type.

The economic rationale for damages is to make the Plaintiff "whole" and/or to deny the liable party of the profits of from the wrongful act. Concepts of the efficient allocation of resources conclude that laws, institutions, or arrangements that provide a windfall profit to plaintiffs would result in a misallocation of resources. Legal scholars have implicitly incorporated the economic approach in their attempts to define a copyright "troll:"[9]

> A copyright troll is a plaintiff who seeks damages for infringement upon a copyright it owns, not to be made whole, but rather as a primary or supplemental revenue stream.

The following attempt to define "trolling" recognizes the process of searching or prowling for potential revenues from litigation:[10]

> The essence of trolling is that the plaintiff is more focused on the business of litigation than on selling a product or service or licensing their IP to third parties to sell a product or a service. The paradigmatic troll plays a numbers game in which it targets hundreds or thousands of defendants, seeking quick settlements

---

[8] Rosenberg, D. and S. Shavell (1985). A model in which suits are brought for their nuisance value. *International Review of Law and Economics*. 5(1): 3–13.

[9] DeBriyn, J. (2012). Shedding light on copyright trolls: An analysis of mass copyright litigation in the age of statutory damages. *UCLA Entertainment Law Review*, 19(1): 79–112.

[10] Sag, M. (2015). Copyright trolling: An empirical study. *Iowa Law Review*, 100(3): 1105–1147.

> priced just low enough that it is less expensive for the defendant to pay the troll rather than defend the claim.

Greenberg (2015) identifies the role statutory damages may play in the misallocation of resources for a copyright owner who "uses the prospect of statutory damages and litigation expenses to extract quick settlements of often weak claims."[11]

Commenting on the doctrine of copyright misuse, Judge Posner noted the following: "hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process."[12]

Consistent with Posner's observation regarding opponents with a "lack of resources," AIPLA (2011) reports the median cost of litigating copyright infringement through the end of discovery in the West is $150,000.[13]

Sudarshan (2008) proposes a three-part test to identify nuisance value patent litigation, which could be applied to copyright suits (citations omitted):[14]

> This Article relies on nuisance-value patent litigation having three specific and necessary definitional conditions.
>
> 1. First, the patent holder offers a settlement (or license) figure which is significantly less than the cost of defending the suit through the discovery phase of a trial.
>
> 2. Second, this settlement amount does not correspond to traditional measures of patent damages, i.e., reasonable royalty or lost profits.

---

[11] Greenberg, B. A. (2015). Copyright trolls and common law. *Iowa Law Review Bulletin*, vol. 100:77–86.

[12] *Assessment Techs. of WI, LLC v. Wire Data, Inc.*, 350 F.3d 640 (2003).

[13] American Intellectual Property Law Association (2011). *Report of the Economic Survey*.

[14] Sudarshan, R. (2008). Nuisance-value patent suits: An economic model and proposal, *Santa Clara High Technology Law Journal*, 25(1):159-189.

3. Third, the plaintiff seeks to avoid litigation because of a sufficiently high probability that the asserted claims are a) invalid, or b) not infringed by the defendant's products.

This definition recognizes that a suit is not necessarily a nuisance suit just because the offered settlement amount is less than the cost of defense. For example, the second prong of the definition excludes situations where a defendant's infringement may have been so minor that a license would have been worth less than the cost of asserting the patent in litigation. Similarly, the third prong of the definition leaves out scenarios where a plaintiff's validity and infringement contentions are meritorious, but a steep discount may have been given to the defendant for any number of reasons.

Based on information available at the time of this report, Strike 3's strategy in BitTorrent litigation appears to satisfy Sudarshan's (2008) three-part test for nuisance value litigation.

Sag (2015) suggests that sue-then-settle actions are consistent with a theory that plaintiffs are pursuing nuisance value settlements:[15]

After obtaining the names and addresses of account holders suspected of participating in a BitTorrent swarm, the plaintiff can get to work negotiating settlements. An account holder accused of infringement is almost invariably threatened with statutory damages and the prospect of paying the plaintiff's attorney's fees if he is unable to establish his innocence. Reports indicate that settlements are usually in the range of $2000 to $4000. That is a lot to pay for a movie, but only a fraction of the potential statutory damages for willful copyright infringement, which can be as high as $150,000 per work infringed. The $4000 figure is also evidently "a sum calculated to be just below the cost of a bare-bones defense." This does not prove that the plaintiffs are simply pursuing nuisance-value settlements, but it is consistent with that theory.

---

[15] Sag, M. (2015). Copyright trolling: An empirical study. *Iowa Law Review*, 100(3): 1105–1147.

Consistent with Sag's (2015) observations, I understand Strike 3 has accepted offers of judgment of $3,250, inclusive of damages, costs, and attorney fees.

1. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 76.172.87.57* (S.D.Cal.) 3:17-cv-02317-JAH-BLM.

2. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 76.247.176.87* (N.D.Cal.) 5:17-cv-07058-EJD.

In a similar Strike 3 matter, the court concluded, "Strike 3 is a copyright troll," and invoked much of the economic logic discussed above:[16]

> Little wonder so many defendants settle. Indeed, the copyright troll's success rate comes not from the Copyright Act, but from the law of large numbers. According to PACER, over the past thirteen months, Strike 3 has filed 1849 cases just like this one in courts across the country—forty in this district alone—closely following the copyright trolls who together consumed 58% of the federal copyright docket in 2015. These serial litigants drop cases at the first sign of resistance, preying on low-hanging fruit and staying one step ahead of any coordinated defense. They don't seem to care about whether defendant actually did the infringing, or about developing the law. If a Billy Goat Gruff moves to confront a copyright troll in court, the troll cuts and runs back under its bridge. Perhaps the trolls fear a court disrupting their rinse-wash-and-repeat approach: file a deluge of complaints; ask the court to compel disclosure of the account holders; settle as many claims as possible; abandon the rest. [citations omitted]

Consistent with Judge Lamberth's "Billy Goat Gruff" observation, I understand Strike 3 has dismissed all cases being heard by Judge Zilly. I also understand that in the face of risking $250 in sanctions for missing deadlines in the Eastern District of California, Strike 3 has terminated 24 cases. This seems to support Judge Lamberth's "cut and run" observation.

---

[16] *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.180.154.14.* Memorandum Opinion. Civil Action #1:18-cv-01425-RCL (D.D.C). November 16, 2018.

EXPERT REPORT OF ERIC FRUITS, PH.D.                                    **16**

1. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.2.97.225*, 1:18-cv-01075-MCE-CKD

2. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 24.7.149.73*, 1:18-cv-01076-MCE-CKD

3. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.151.0.97*, 1:18-cv-01080-MCE-CKD

4. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.220.162.116*, 1:18-cv-01089-MCE-CKD

5. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.151.0.180*, 1:18-cv-01304-MCE-CKD

6. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 67.160.250.96*, 2:18-cv-02640-MCE-CKD

7. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.70.116.109*, 2:18-cv-02641-MCE-CKD

8. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.71.165.41*, 2:18-cv-02642-MCE-CKD

9. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 98.208.93.240*, 2:18-cv-02643-MCE-CKD

10. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 108.245.210.201*, 2:18-cv-02584-MCE-CKD

11. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 162.237.197.54*, 2:18-cv-02585-MCE-CKD

12. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 98.238.245.116*, 2:18-cv-02636-MCE-CKD

13. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 24.10.96.207*, 2:18-cv-02638-MCE-CKD

14. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 71.193.15.139*, 2:18-cv-02639-MCE-CKD

15. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.41.142.236*, 2:18-cv-02206-MCE-CKD

16. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.41.243.20,* 2:18-cv-02207-MCE-CKD

17. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.41.91.169,* 2:18-cv-02208-MCE-CKD

18. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.90.99.129,* 2:18-cv-02209-MCE-CKD

19. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 108.197.138.209,* 2:18-cv-02582-MCE-CKD

20. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 24.7.176.79,* 2:18-cv-02201-MCE-CKD

21. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 67.164.218.16,* 2:18-cv-02202-MCE-CKD

22. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 67.169.98.18,* 2:18-cv-02203-MCE-CKD

23. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.151.99.229,* 2:18-cv-02204-MCE-CKD

24. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.192.163.54,* 2:18-cv-02205-MCE-CKD

# 7  Plaintiff's revenues from settling litigation





EXPERT REPORT OF ERIC FRUITS, PH.D.                                    **19**



## 8   Damages

My understanding is that Defendant has filed two counterclaims, one for declaratory relief of non-infringement and another for abuse of process. Further, my understanding is that Washington state law entitles a party claiming abuse of process to claim damages.[17]

I understand a part of the damage element is the harm incurred by the individual, including attorney's fees and costs. It is also my understanding that attorney's fees in the Ninth Circuit is determined by "Lodestar."

---

[17] *Hough v. Stockbridge.* 152 Wash. App. 328 (2009)

At this time, I understand that damages will be incurred as the case proceeds. These damage are likely to take the form of attorney's fees, expert fees, and actual harm to the Defendant separate from attorney's fees and costs.

The harm suffered by Defendant would be legal fees, which are ongoing until termination of this matter. At that time, I am prepared to give an opinion regarding the reasonableness of these fees. AIPLA (2011) reports the median cost of litigating copyright infringement through the end of discovery in the West is $150,000, with 50 percent of cases in the range of $100,000 to $250,000.[18]

The U.S. Supreme Court concluded, "a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright."[19] Economically speaking, an award of attorney's fees that encourages the defense of potential nuisance suits may further the policies of the Copyright Act by discouraging the filing of a suits that plaintiffs and plaintiffs' attorneys know to be nuisance suits.

# 9   Conclusion

Litigation is not the only way for Plaintiff to stop infringement. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

DMCA notices are one well known and widely used method to discourage infringement. At the time of the downloading activity alleged by Plaintiff, Defendant's Internet service provider, Comcast, indicates it had policies to comply with the DMCA, including, "a policy to terminate the Service, in appropriate circumstances, provided to any customer or user who is a repeat infringer of third party copyright rights."

Plaintiff's actions in this suit, and others, are consistent with a theory that plaintiff is pursuing nuisance value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-

---

[18] American Intellectual Property Law Association (2011). *Report of the Economic Survey*.
[19] *Fogerty v. Fantasy*, 510 U.S. 517 (1994).

EXPERT REPORT OF ERIC FRUITS, PH.D.                                      **21**

of-prevailing claims. Strike 3's strategy in BitTorrent litigation appears to satisfy a three-part test for nuisance value litigation. ∎

Respectfully submitted by

Dated: April 15, 2019

Eric Fruits, Ph.D.

# Eric Fruits, Ph.D.

Tel: 503-928-6635
www.econinternational.com
fruits@econinternational.com

**Dr. Eric Fruits** is an economics expert, finance expert, and statistics expert. He has produced numerous research studies involving economic analysis, financial modeling, and statistical analysis.  As an expert witness, he has provided expert testimony in state courts, federal courts, and an international court.



As an economic damages expert, Dr. Fruits has provided expert testimony regarding business valuation, lost profits, and foregone income.  He has been a testifying expert in cases involving real estate valuation, health care services, and transportation and shipping services.  His research on the formation of cartels was published in the top-tier *Journal of Law & Economics*.  His study of the impact of natural gas pipeline on residential property values has been published in the *Journal of Real Estate Research*, one of the premier academic journals in the field. He has provided expert testimony to state courts and federal courts.

As a finance expert, Dr. Fruits has been a testifying expert and provided expert consulting services in cases alleging insider trading and market manipulation.  He is a securities expert who has conducted numerous research studies on financial issues, including initial public offerings and municipal bonds.

As a statistical expert, Dr. Fruits has provided expert testimony regarding real estate transactions, profit projections, agricultural commodities, and war crimes allegations.  His expert testimony has been submitted to state courts, federal courts, and an international court.

He has written peer-reviewed articles on real estate markets, initial public offerings (IPOs), the municipal bond market, and the formation and operation of cartels.

Dr. Fruits has been affiliated with Portland State University, Pacific Northwest College of Art, University of Southern California, Indiana University, and the Claremont Colleges.  He has been an economic consultant with Nathan Associates, LECG, ECONorthwest, and Econ One Research.

## Present Positions & Affiliations

Economics International Corp.      2006–present
    President and Chief Economist

Cascade Policy Institute      2019–present
    Vice President of Research

International Center for Law & Economics      2017–present
    Chief Economist

Portland State University      2002–present
    Adjunct Professor in Economics, Business Administration, and Urban Studies & Planning

## Previous Professional Experience

Portland State University                                                          2010–2019
    Oregon Association of Realtors Faculty Fellow
    *Center for Real Estate Quarterly Report*, Editor

Nathan Associates Inc.                                                            2012–2018
    Principal Consultant

Info Tech, Inc.                                                                      2015–2018
    Expert Consultant

Pacific Northwest College of Art                                              2009–2010
    Adjunct Professor

ECONorthwest                                                                      2002–2008
    Senior Economist

LECG, LLC                                                                          1999–2002
    Senior Economist

Claremont Graduate University                                                1996–2002
    Adjunct Professor of Economics and Visiting Scholar

Econ One Research, Inc.                                                        1998–1999
    Economist

University of Southern California, Marshall School of Business       1997–1998
    Visiting Assistant Professor of Finance & Business Economics

Indiana University, Kelley School of Business                             1997
    Visiting Assistant Professor of Business Economics & Public Policy

Scripps College                                                                    1996
    Adjunct Professor of Economics

Pomona College                                                                   1994
    Lecturer in Economics

Andersen Consulting                                                            1990–1991
    Staff Consultant

## Education

Ph.D., Economics, Claremont Graduate University                      1997

M.A., Economics, Claremont Graduate University                       1993

B.S. with Distinction, Business Economics & Public Policy, Indiana University       1990

## Publications, Reports, and Other Papers

### Academic Publications

Perceived environmental risk, media, and residential sales prices. *Journal of Real Estate Research*, with J. Freybote. 37(2):217–243. 2015.

Compact development and greenhouse gas emissions: A review of recent research. *Center for Real Estate Quarterly Journal*, 5(1):2–7. Winter 2011.

Test bank for W. B. Brueggeman and J. D. Fisher. *Real Estate Finance and Investments*, 14th ed. McGraw-Hill/Irwin. 2010.

A comprehensive evaluation of the comparative cost of negotiated and competitive methods of municipal bond issuance. *Municipal Finance Journal*, with R. J. Pozdena, J. Booth, and R. Smith. 28(4):15–41. Winter 2008.

Market power and cartel formation: Theory and an empirical test. *Journal of Law and Economics*, with D. Filson, E. Keen, and T. Borcherding. 44:465–480. 2001.

*The Determinants of Managerial Ownership: Theory and Evidence From Initial Public Offerings*. Claremont Graduate University. 1997.

Managerial ownership, compensation, and initial public offerings. In Marr, M. and Hirschey, M., editors, *Advances in Financial Economics*, volume 2. JAI Press. 1996.

### Research Reports

*Impact of Federal Transfers on State and Local Own-Source Spending*. Interstate Policy Alliance. 2015.

*Impact of Right-to-Work on the State of Washington*. Washington Policy Center. 2015.

*Proposal for Management of the Elliott State Forest to Provide Adequate Returns for Oregon Schools*. Cascade Policy Institute. 2014.

*Tax Myths Debunked*. American Legislative Exchange Council, with R. J. Pozdena. 2013.

Forecast of Oregon's economy in 2013: Disappointing but not disastrous. *Center for Real Estate Quarterly Journal*, 6(4):4–10. Fall 2012.

*Right-to-Work and Economic Growth: A Comprehensive Analysis of the Economic Benefits to New Mexico of Enacting a Right-to-Work Law*. Rio Grande Foundation. 2012.

*Right-to-Work is Right for Oregon: A Comprehensive Analysis of the Economics Benefits From Enacting a Right-to-Work Law*. Cascade Policy Institute, with R. J. Pozdena. 2012.

*Tax Policy and the Colorado Economy: The Effects on Employment and Migration*. Common Sense Policy Roundtable, with R. J. Pozdena. 2011.

*Fiscal Impacts of an Oregon Tax Credit Scholarship Program*. Cascade Policy Institute. 2011.

*The Oregon Health Plan: A "Bold Experiment" that Failed*. Cascade Policy Institute. 2010.

*Tax Policy and the Oregon Economy: The Effects of Measures 66 and 67.* Cascade Policy Institute, with R. J. Pozdena. 2009.

*Future Management of the Elliott State Forest: Providing Adequate Returns for Oregons Schools.* Cascade Policy Institute. 2009.

*Fiscal Impacts of Proposed Educational Tax Credits.* Cascade Policy Institute. 2009.

*Impact of Minimum Wage Indexing on Employment and Wages: Evidence from Oregon and Washington.* Employment Policies Institute. 2009.

*The Relationship Between Residential Development and Greenhouse Gas Emissions.* National Association of Homebuilders. 2008.

*Oregon Greenhouse Gas Reduction Policies: The Economic and Fiscal Impact Challenges.* Cascade Policy Institute, with R. J. Pozdena. 2008.

*The Ranking of Oregon State and Local Spending.* Cascade Policy Institute, with R. J. Pozdena. 2008.

Damages: Experts, liability, and calculations. In *The Employment Case: From Discovery to Decision.* Oregon State Bar CLE Seminars. 2004.

*How Does Oregon Spending Rank? Ideas for Budget Stability.* Cascade Policy Institute, with R. J. Pozdena. 2004.

## Letters, Op-Eds, and Columns

Supplement bus lines with ridesharing. *Portland Tribune.* January 24, 2019.

What ever happened to Pendleton Grain Growers? Pay attention to your co-op. *Oregon Family Farmer.* Fall 2018.

80% of Oregon marijuana exported? *Oregon Family Farmer.* Fall 2018.

Taxing e-cigarettes may do more harm than good. *Oregonian.* November 29, 2018.

Policy reforms would improve state for all. *Portland Tribune.* December 14, 2017. Also published in *Gresham Outlook.*

Health care tax would hurt middle class. *Portland Tribune.* September 21, 2017.

State can balance budget without taxes. *Portland Tribune.* February 23, 2017.

Oregon leaders must reject Medicaid expansion. *Oregonian.* January 27, 2017.

Oregon: State of wonder, or state of failure? *Oregon Business.* May 2016.

How "free" federal money costs North Carolina. *News & Observer*, with B. Balfour. December 15, 2015.

The real cost to states of "free" federal grants. *Orange County Register.* December 10, 2015.

Demand, not fiat, creates jobs. *Wall Street Journal.* June 27, 2015.

Right to work is right for Washington. *Puget Sound Business Journal*, with Erin Shannon. June 26, 2015.

Oregon chemical bill is bad news for businesses. *Oregonian*. April 11, 2015.

Right to work is right for West Virginia. *Charleston Daily Mail*. February 19, 2015.

City's noble goal meets an outlawed tax. *Portland Tribune*. August 8, 2012.

Right to work law can spur economy. *Deming Headlight*. July 10, 2012. Also published in *Tri-City Tribune*.

Rethinking public schools: It's time Portland elects a real education mayor. *Oregonian*. August 9, 2011.

PPS bonds: Save the schools but lose the house? *Oregonian*. January 12, 2011.

Water and sewer charges: Basic services before pet projects. *Oregonian*. May 21, 2010.

PERS disaster will cost taxpayers. *Statesman Journal*. November 8, 2009.

Health care: Congress can learn from the costly mistakes of the states. *Oregonian*. September 1, 2009.

Behind Oregon's jobless rate. *Oregon Business*. February 2009.

The high costs of climate change policies. *Oregonian*. January 24, 2009.

Facing the challenge of a revenue shortfall. *Oregonian*. November 19, 2008.

The youngest boomers trail behind. *Oregon Business*. September 2008.

Slow the growth to cut the carbon. *Oregon Business*. April 2008.

Do we really have a health-care crisis? *Oregon Business*. January 2008.

Economic forecast: Will 2008 bring economic salvation? *Oregon Business Powerbook 2008*. 2007.

The pixie dust of streetcars. *Oregon Business*. October 2007.

Pay me what I'm worth, or else. *Oregon Business*. July 2007.

Easy money. *The Economist*, p. 6. 1994.

## Committee and Other Service

Peer reviewer and academic adviser for textbooks and academic journals:

A. O'Sullivan. *Urban Economics*, 9th ed. McGraw-Hill/Irwin. In print.

*Taking Sides: Clashing Views in Urban Studies*. M. A. Levine, editor. McGraw Hill. 2012.

W. B. Brueggeman and J. D. Fisher. *Real Estate Finance and Investments*, 14th ed. McGraw-Hill/Irwin. 2011.

*Municipal Finance Journal*

*Land Economics*

Taxpayer Association of Oregon. Board Member, 2014–present.

City Club of Portland. Research Board Member, 2015–2017.

State of Oregon. Explanatory Statement Committee member. Ballot Title 86: Amends Constitution: Requires creation of fund for Oregonians pursuing post-secondary education, authorizes state indebtedness to finance fund. 2014.

Laurelhurst Neighborhood Association. City of Portland, Oregon. Past President and Board Member, 2014–2015. President, 2009–2014.

City of Portland. Mayor's Economic Cabinet. 2008–2012.

State of Oregon Department of Environmental Quality. Fiscal Advisory Committee for the Proposed Adoption of Air Quality Improvements at the PGE Boardman Power Plant. 2008.

State of Oregon Department of Environmental Quality. Fiscal Advisory Committee for the Proposed Adoption of the Utility Mercury Rule and Other Federal Air Quality Regulations. 2006.

City of Portland. Mayor's Ad Hoc Work Group on Regulatory Reform. 2002.

## Testimony in Legal Proceedings

*Julie Veysey v. Israel Cervante Meraz and Henry Nicholas Veysey.* Circuit Court for the State of Oregon for the County of Marion. Case No. 17CV52030. Trial testimony October 3, 2018.

*Katrina L. Pinkerton v. Wells Fargo Bank, N.A.* United States Bankruptcy Court for the District of Oregon. Case No. 17-33794-tmb13. Adv. Proc. No. 18-03016-tmb. Prove-up hearing testimony June 20, 2018.

*Estate of Jamey Charlotte Haines v. State of Oregon Department of Transportation.* Circuit Court for the State of Oregon for the County of Washington. Case No. 17CV17952. Trial testimony February 6, 2018.

*Rosebank Road Medical Services Ltd. dba Rosebank Road Medical Centre, and Geeta Murali Ganesh v. Ramji Govindarajan and John Does 2–20.* Superior Court of California, County of San Francisco, Unlimited Civil. Case No. CGC-16-549755. Deposition testimony September 27, 2017. Trial testimony December 13–14, 2017.

*United States of America ex rel. Duke Tran v. Wells Fargo Bank, N.A.* United States District Court for the District of Oregon, Portland Division. Case No. 3:15-cv-979. Deposition testimony October 3, 2017.

*Nubia Rodriguez v. The State of Oregon, Department of Human Services and Antoinette Hughes.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 16CV09393. Trial testimony September 13, 2017.

*Madison-Rae Jordan v. United States of America.* United States District Court for the Southern District of California. Case No. 3:15-cv-01199-BEN-NLS. Deposition testimony January 25, 2017.

*Marie M. Pearson v. Waste Management of Oregon, Inc. and James Walker.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 15CV18258. Trial testimony August 23, 2016.

*Investors Asset Acquisition, et al. v. Angelo S. Scardina, et al.* Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. Case No. 502014CA004618XXXXMB AD. Deposition testimony August 5, 2016.

*James Busey vs. Richland School District, Richard Jansons, Heather Cleary, Mary Guay, Rick Donahoe, and Phyllis Strickler.* United States District Court for the Eastern District of Washington. Case No. CV-12-5022-EFS. Deposition testimony February 25, 2016.

*Kivin Varghese v. Amazon.com, Inc. and Amazon Technologies, Inc.* Superior Court for the State of Washington in and for the County of King. No. 12-2-39303-6 SEA. Deposition testimony September 22, 2014.

*LMG Concerts, LLC v. Salem Communications Corporation, Salem Media of Oregon, Inc., Caron Broadcasting, Inc., Does 1 through 5.* U.S. District Court for the District of Oregon. Case No. 3:12-CV-1117. Deposition testimony September 18, 2013.

*Claude Hadley v. Extreme Technologies, Inc.* Circuit Court for the State of Oregon for Lane County. Case No. 16-11-03225. Trial testimony March 14, 2012.

*David Hill Development, LLC, v. City of Forest Grove, Steve A. Wood, and Robert A. Foster.* U.S. District Court for the District of Oregon. Civ. No. 08-266-AC. Deposition testimony December 10, 2010. Trial testimony September 20, 2011.

*Gordon Ogawa v. Malheur Home Telephone Company dba Malheur Bell and Qwest Corporation.* U.S. District Court for the District of Oregon. No. CV 08-694-MO. Trial testimony September 9, 2010.

*Dave Molony and Gold Leaf Investments, Inc. v. Crook County.* U.S. District Court for the District of Oregon. No. 3:05-CV-1467-MO. Trial testimony May 27, 2009.

*Starr-Wood Cardiac Group of Portland, P.C., Dr. H. Storm Floten, and Dr. Anthony Furnary v. Dr. Jeffrey S. Swanson, Dr. Hugh L. Gately, and Cardiothoracic Surgeons LLC.* Circuit Court for the State of Oregon for the County of Multnomah, No. 0706-06308. Trial testimony September 5, 2008.

*Milutinovic et al.* International Criminal Tribunal for the former Yugoslavia, No. IT-05-87 PT. Trial testimony April 23–24, 2008.

*In re: The Marriage of Virginia Salvadori and Gabriel Salvadori.* State of Washington Clark County Superior Court, No. 06-3-00692-2. Trial testimony April 14, 2008.

*Pamela L. Bond, Individually and as Personal Representative of the Estate of Craig R. Bond, Deceased v. United State of America.* U.S. District Court for the District of Oregon. No. 06-1652-JO. Trial testimony February 6, 2008.

*Erik E. Tolleshaug v. Shaver Transportation Co.* Circuit Court for the State of Oregon for the County of Multnomah, No. 060809122. Trial testimony December 14, 2007.

*In re: The Marriage of Denise M. Kunze and Gust F. Kunze.* State of Washington Clark County Superior Court, No. 05-3-00801-3. Trial testimony October 29, 2007.

*Securities and Exchange Commission v. Philip Evans and Paul Evans.* U.S. District Court for the District of Oregon. No. CV 05-1162-PK. Deposition testimony February 27, 2007. Trial testimony March 8, 2007.

*Randall D. Lam v. Kaiser Foundation Hospitals; Northwest Permanente, P.C.; Kaiser Foundation Health Plan of the Northwest; Robert James Shneidman, M.D.; and David Lee Brown, Jr., P.A.* Circuit Court for the State of Oregon for the County of Multnomah. No. 020706633. Trial testimony November 9, 2006.

*Vitascan Partners I and Vitascan Partners II v. G.E. Healthcare Financial Services and GE/Imatron.* Superior Court for the State of California. No. 01129909. Trial testimony July 24, 2006.

*Squaxin Island Tribe, Island Enterprises, Inc., Swinomish Indian Tribal Community, and Swinomish Development Authority v. Fred Stephens, Director, Washington State Department of Licensing.* U.S. District Court for Western District of Washington. No. C033951Z. Deposition testimony June 15, 2005.

*Androutsakos v. M/V PSARA, PSARA Shipping Corporation, and Chevron U.S.A., Inc.* United States District Court for the District of Oregon. No. 02CV1173KI. Trial testimony May 21, 2004.

*In re: Consolidated PERS Litigation.* Supreme Court for the State of Oregon. Nos. S50593, S50532, S50656, S50657, S50645, S50685, S50687, and S50686. Trial testimony February 27, 2004.

*CollegeNET, Inc., v. ApplyYourself, Inc.* United States District Court for the District of Oregon. Nos. 02CV484HU and 02CV1359HU. Daubert hearing May 9, 2003.

## Grants and Awards

City of Portland Spirit of Portland Award, nominee                               2010

City of Portland Livability Volunteer Award                                      2010

Institute for Humane Studies Research Grant                                      1996

John Randolph Haynes and Dora Haynes Foundation Grant                           1995

Lynde and Harry Bradley Foundation Grant                                      1992–1995

Lionel Edie Award                                                                1990

## Courses Taught

Microeconomics

Industrial Organization

Economics of Regulation and Antitrust

Urban Economics

Managerial Economics

Econometrics

Eric Fruits, Ph.D.                                                                                        9

Real Estate Finance and Investment

State and Local Public Finance

Economics and the Creative Industries

War Crimes

March 14, 2019