# EXHIBIT 16

Page 1

1           PATRICK PAIGE - June 27, 2019

2            UNITED STATES DISTRICT COURT

3            WESTERN DISTRICT OF WASHINGTON

4  STRIKE 3 HOLDINGS, LLC, a )
   Delaware corporation,    )
5                           )
           Plaintiff,       )
6                           )
      vs.                   )  Case No. 2:17-cv-01731-TSZ
7                           )
   JOHN DOE, subscriber     )
8  assigned IP address      )
   73.225.38.130            )
9                           )
           Defendant.       )
10 _____)
   JOHN DOE, subscriber     )
11 assigned IP address      )
   73.225.38.130,           )
12                          )
         Counterclaimant,   )
13                          )
      vs.                   )
14                          )
   STRIKE 3 HOLDINGS, LLC,  )
15                          )
         Counterdefendant.  )
16

17

18           DEPOSITION OF PATRICK PAIGE

19               (Appearing via Skype)

20          Taken in behalf of the Defendant

21                  June 27, 2019

22

23  Reported by:

24  Tamara Pearce, RPR, WA CCR No. 2141, OR CSR No. 90-0199

25  Job No. 163392

Page 5

1        PATRICK PAIGE - June 27, 2019
2   anything.
3        Q.   Were you ever told to file any expert reports
4   in this case?
5        A.   No.
6        Q.   Did you prepare any expert reports in this
7   case?
8        A.   Just in front of you.
9        Q.   Excuse me?
10       A.   Yeah, I prepared a report that's attached to
11  the subpoena, or maybe it's not attached to the
12  subpoena.  It was at one time.
13       Q.   Okay.  Well, why don't I back up a bit.
14            Prior to March 15th, 2019, were you ever
15  asked to prepare an expert report in this case?
16       A.   Yes.
17       Q.   Who asked you to prepare the expert report?
18       A.   Are you talking about the -- the test of
19  the -- no, I haven't done an expert report, if you're
20  referring to the test, or are you referring to an
21  expert report in this specific case?
22       Q.   I'm talking about an expert report for this
23  specific case.  Were you ever asked to prepare an
24  expert report specifically for this case?
25       A.   No.

```
 1                PATRICK PAIGE - June 27, 2019
 2   rate you've had for Strike 3 in all their cases?
 3        A.    Yes.
 4        Q.    Okay.  And how many expert reports have you
 5   prepared for Strike 3 besides this case?
 6        A.    I do not know offhand.
 7        Q.    Can you -- can you estimate?
 8        A.    No.
 9        Q.    How many cases have you worked on for Strike
10   3?
11        A.    I haven't -- I have not examined anybody's
12   computer in any cases involving Strike 3.
13        Q.    Okay.  So is it fair to say that you have not
14   been retained on any other cases besides this case?
15              MR. BANDLOW:  Objection, misstates his
16   testimony.  Go ahead and answer.
17        A.    Can you repeat the question?
18   BY MR. EDMONDSON:
19        Q.    Well, is it fair to say that you have not
20   been retained to work on any other cases besides this
21   case?
22        A.    I'm retained in general to work on all their
23   cases.
24        Q.    Okay. And do you have a fee agreement that's
25   specific to Strike 3?
```

Page 47

1                PATRICK PAIGE - June 27, 2019

2       Q.    Well, the two documents I'm looking at is
3    what was served on us as your expert report.  Is there
4    some other document that you drafted specific to this
5    case?
6       A.    No.
7       Q.    Okay.  So for this case, just so that we're
8    clear, you did not sit down and write an expert report
9    specific to this case.  Is that correct?
10      A.    Correct.
11      Q.    Okay.  It's -- I just want to understand.
12            Now, then that leads to the earlier question:
13   Why didn't you sit down and write an expert report
14   specific to this case?
15      A.    I don't know.  I don't have an answer for
16   you.
17      Q.    Okay.  Nobody told you to write an expert
18   report specific for this case?
19      A.    Not that I'm aware of.
20      Q.    Okay.  Were you ever told by anyone not to
21   write an expert report specific to this case?
22      A.    No.
23      Q.    Okay.  Did you review Mr. Bunting's expert
24   report in this case?
25      A.    No.

Page 48

```
 1                PATRICK PAIGE - June 27, 2019
 2     Q.    Do you know who Mr. Bunting is?
 3     A.    Yes.
 4     Q.    Okay.  And have you ever had conversations
 5  with Mr. Bunting?
 6     A.    I've known him for a long time.  Yes.
 7     Q.    Okay.  And have you talked to Mr. Bunting
 8  about the Strike 3 cases?
 9     A.    No.
10     Q.    Have you talked to Mr. Bunting about the
11  Malibu cases?
12     A.    Not specific to a case.  Back when I had
13  worked some Malibu cases, in examining hard drives I
14  may have consulted him on theories of spoliation and
15  whatnot.
16     Q.    And why did you -- when did you talk to him
17  the spoliation?
18     A.    Throughout the years.
19     Q.    Well, the last five years?
20     A.    Yes.
21     Q.    Okay.  And some of these spoliation arguments
22  made their way into court filings?
23           Well, let me back up on that.
24           Did you ever give expert reports on
25  spoliation?
```

1                PATRICK PAIGE - June 27, 2019
2        A.    Yes.
3        Q.    Okay.  And did you ever mention in those
4   expert reports that you had consulted with Mr. Bunting?
5        A.    No.
6        Q.    Why not?
7        A.    There was no need to.
8        Q.    What opinions do you intend to give as an
9   expert in this case?
10       A.    It's referenced in the test that I did that
11  you're -- that's Exhibit 3.
12       Q.    Did you ever repeat the test in Exhibit 3 --
13  I'll call it the 2016 test.  Did you ever repeat it in
14  2017?
15       A.    No.
16       Q.    Okay.  And did you ever repeat it in 2018?
17       A.    No.
18       Q.    Okay.  Do you need to take a break?  You look
19  like you're sleepy or --
20       A.    No, I'm fine.
21       Q.    Okay, I just wanted to make sure.
22             MR. BANDLOW:  I'll object as
23  mischaracterizing what he looks like, so.
24             MR. EDMONDSON:  No, no, I'm just -- I
25  don't want to -- if someone's groggy or something, it's

1  PATRICK PAIGE - June 27, 2019
2  what the process -- or the status of the case is.
3      Q.   Okay.  Now, since 20 -- since 2017, Malibu
4  Media has filed a thousand -- approximately a thousand
5  cases, and is it -- it's my understanding that in all
6  those cases they have filed a declaration similar to
7  the one that you were shown as Exhibit 3.  Is that your
8  understanding also?
9      A.   I'm not sure.
10     Q.   Okay.  How much has Malibu Media paid you to
11 allow those declarations to be filed since 2017?
12          MR. BANDLOW:  Objection, lacks
13 foundation, that that's what he's paid for, but you can
14 answer.
15     A.   Nothing.
16 BY MR. EDMONDSON:
17     Q.   Now, since 2017, how much has Strike 3 paid
18 you for -- in connection with the case -- in connection
19 with any of the cases?
20     A.   Like I said, I had a $2500 retainer, and the
21 other one's not completed yet.
22     Q.   Okay.  And how much have you billed on the
23 other case?
24     A.   I believe it was around -- could have been
25 around four or five thousand dollars, just guessing off

```
 1                PATRICK PAIGE - June 27, 2019
 2   software testing you didn't consider to be relevant?
 3              MR. BANDLOW:  Objection, asked and
 4   answered, harassing.
 5              Go ahead and answer it again.
 6       A.    Same answer.
 7   BY MR. EDMONDSON:
 8       Q.    Okay.  And then looking at paragraph 10,
 9   you -- in paragraph 7, you talk about the awards you
10   got as a police officer, correct?
11       A.    Correct.
12       Q.    Okay.  And under what conditions did you
13   leave your -- leave your employment as a police
14   officer?
15       A.    Well, like we discussed prior to -- in a
16   previous deposition, I've asked -- I've answered these
17   questions in a previous -- you've asked me and I've
18   answered these questions in a previous deposition with
19   you.  I left the sheriff's office for -- in reference
20   to PTSD, child pornography related; a workers' comp
21   complaint was involve in it also.
22       Q.    Okay.  And as in the prior deposition, you --
23   you left because contraband was being used in a PO box
24   or something to that effect, correct?
25              MR. BANDLOW:  He's already testified to
```

Page 78

```
 1                PATRICK PAIGE - June 27, 2019
 2   software?
 3        A.   Again, we're -- you're talking about two
 4   different things.  You're talking about a car and
 5   software.  I don't really get what you're talking
 6   about.
 7        Q.   Well, I'm not the one who created the
 8   analogy, but my understanding was you agreed with
 9   Mr. Bandlow's analogy that the two can be compared, but
10   by that same function, every mechanical system and
11   every electrical system has a level of reliability; is
12   that correct?
13        A.   Yes.
14        Q.   Okay.  And what test did you do to determine
15   the reliability of the IPP system?
16        A.   It's laid out in my declaration.
17        Q.   That was a test on one day for one instance,
18   but what test did you construct to determine the
19   reliability over a period of time?
20        A.   I've asked -- you've asked this question
21   probably three or four times already and I'd probably
22   answer the same:  None.
23        Q.   Okay.
24        A.   I've answered that question several times
25   with you.  I mean we can beat a dead horse here, but
```

1    PATRICK PAIGE - June 27, 2019
2    I've answered it.
3        Q.    So you don't know the reliability of the IPP
4    system?
5        A.    Again, I tested it twice.  You have the --
6    the declarations, and again I'll answer the same
7    question.  I tested on those specific dates that you
8    have and that we discussed.
9        Q.    Okay.
10       A.    I don't know how more plainly I can be.
11             MR. EDMONDSON:  No more questions.
12
13                  FURTHER EXAMINATION
14   BY MR. BANDLOW:
15       Q.    Mr. Paige, you weren't asked to test -- you
16   weren't asked to determine if the particular
17   infringement of the findings in this case --
18             THE REPORTER:  Can you say the last part
19   again, please, Lincoln?
20             MR. EDMONDSON:  I would start over.
21   BY MR. BANDLOW:
22       Q.    You weren't asked to test whether the
23   particular findings of infringement in this case had
24   been accurately found by IPP, correct?
25       A.    Correct.

...

Page 84

```
 1              PATRICK PAIGE - June 27, 2019

 2                     C E R T I F I C A T E

 3

 4           I, Tamara Aufdermauer Pearce, Oregon CSR No.

 5   90-0199, Washington CCR No. 2141, do hereby certify that

 6   PATRICK PAIGE, via Skype, appeared before me at the time

 7   and place mentioned in the caption herein; that the

 8   witness was by me first duly sworn on oath and examined

 9   upon oral interrogatories propounded by counsel; that

10   said examination, together with the testimony of said

11   witness, was taken down by me in stenotype and

12   thereafter reduced to typewriting; and that the

13   foregoing transcript, pages 1 to 83, both inclusive,

14   constitutes a full, true and accurate record of said

15   examination of and testimony given by said witness, and

16   of all other proceedings had during the taking of said

17   deposition and of the whole thereof, to the best of my

18   ability.

19           Witness my hand at Portland, Oregon, this 11th

20   day of July, 2019.

21

22              _____

23                  TAMARA AUFDERMAUER PEARCE

24                  OCSR No. 90-0199   Expires:  12/31/2020

25                  WCCR No. 2141      Expires:12/01/2019
```